**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III (State Bar No. 320783)
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: fklorczyk@bursor.com

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com
          jvenditti@bursor.com

*Class Counsel*

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH JORDAN, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>WP COMPANY LLC, d/b/a THE WASHINGTON POST,<br><br>        Defendant. | Case No. 3:20-cv-05218-WHO<br><br>**DECLARATION OF FREDERICK J. KLORCZYK III IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, COSTS, EXPENSES, AND AN INCENTIVE AWARD**<br><br>Date:   November 17, 2021<br>Time:   2:00 p.m.<br>Courtroom: 2, 17th Floor<br>Judge:  Hon. William H. Orrick |

DECLARATION OF FREDERICK J. KLORCZYK III
CASE NO. 3:20-cv-05218-WHO

1

I, Frederick J. Klorczyk III, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Deborah Jordan ("Plaintiff") in this action.  I am an attorney-at-law licensed to practice in the State of California, and I am a member of the bar of this Court.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2.      I make this Declaration in support of Plaintiff's Motion for Attorneys' Fees, Costs, Expenses, And An Incentive Award, filed contemporaneously herewith.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the Parties' Class Action Settlement Agreement, and the exhibits attached thereto.

4.      Beginning in or around August 2019, my firm commenced a pre-suit investigation into potential violations of California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq.*, by certain newspaper and magazine publishing companies, such as The New York Times Company, and, later, Defendant WP Company LLC ("WaPo" or "Defendant") (together with Plaintiff, the "Parties").  At that time, the theory of liability was relatively novel. Although a handful of other cases had been filed asserting ARL claims under California law, at the start of our investigation only one ARL case had progressed through summary judgment.  *See Ingalls v. Spotify USA, Inc.*, 2017 WL 3021037 (N.D. Cal. Jul. 17, 2017).[1]  Further, at that time, one court had ever ruled on a contested motion for class certification in the context of an alleged ARL violation, and that motion was denied.  *See Roz v. Nestle Waters N Am., Inc.*, 2017 WL 6942657, at *3-6 (C.D. Cal. Sept. 13, 2017) (denying motion for class certification under the ARL where plaintiff could not establish that class members all heard the same oral disclosures.  Thus, our pre-suit investigation of ARL liability was extensive, spanning several months and involving in-depth research into the legislative history of the statute, textual analyses of the ARL, and the assertion of predicate claims for ARL violations under California's consumer protection statutes (particularly under the "unlawful prong" of California's Unfair Competition Law ("UCL"), Cal.

---

[1] Note that the *Ingalls* decision, issued July 17, 2017, precedes the 2018 enactment of California's Senate Bill 313, which amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online.

DECLARATION OF FREDERICK J. KLORCZYK III                                              2
CASE NO. 3:20-cv-05218-WHO

Bus. & Prof. Code §§ 17200, *et seq*.), and industry-wide practices regarding automatic renewal offers, including billing practices and cancellation policies common to publishing companies that offer automatic renewal plans for subscriptions to their digital publications.

5.      Subsequently, while our initial investigation of ARL liability was still ongoing, the U.S. District Court for the Southern District of California issued an opinion denying a motion for class certification in a case predicated on alleged ARL violations.  *See Robinson v. OnStar, LLC*, 2020 WL 364221 (S.D. Cal. Jan. 22, 2020).  There, the court rejected the plaintiff's proposed model of "full refund" damages based, in part, on its finding that the "gift provision" under Section 17603 of the ARL was inapplicable "because that provision applies to 'goods' and not 'services.'" *Id.*, at *22-24 (citing Cal. Bus. & Prof. Code § 17603).  Thus, my firm knew that we faced a potential risk in establishing that damages are capable of measurement on a class-wide basis under a "full refund" theory, which would depend largely on the applicability of the "gift provision" under Section 17603 of the ARL.  Therefore, my firm's pre-suit investigation also included extensive legal research regarding the application of Section 17603 to Plaintiff's claims, and a detailed review of the briefing before the Southern District of California, in the *Robinson* matter. The *Robinson* court also denied the plaintiff's motion for class certification on the basis that the oral disclosures provided to plaintiff on "calls with [Defendant's] 'live' operators necessarily vary, requiring individual inquiries into what was actually said." *Id.* at *18.  Accordingly, my firm also conducted a thorough analysis of Ninth Circuit decisions on motions for class certification in the context of failures to disclose statutorily mandated information or fraudulent omissions.

6.      Also during our pre-suit investigation, the U.S. District Court for the Central District of California issued an opinion in connection with a motion to dismiss ARL claims in *Hall v. Time, Inc.*, which the U.S. Court of Appeals for the Ninth Circuit later affirmed on appeal.  *See generally*, *id*., 2020 WL 2303088 (C.D. Cal. Mar. 13, 2020), *aff'd*, No. 20-55354, 2021 WL 2071991 (9th Cir. May 24, 2021) (rejecting plaintiff's arguments that defendant failed to obtain "affirmative consent" and that defendant's disclosures lacked "visual proximity" within the meaning of Cal. Bus. & Prof. Code § 17602(a), and dismissing case for failure to state ARL violation).  Therefore, my firm's pre-suit investigation also included extensive analysis of the

issues presented in *Hall*, such as the ARL's requirements of "visual proximity" and "affirmative consent" under Section 17602(a) of the ARL, neither of which are defined by statute.

7.     Moreover, my firm was aware that defendants, like WaPo, would probably challenge liability by arguing that they achieved a level of compliance sufficient to qualify for a purported good faith "safe harbor" under Section 17604(b) of the ARL.  Thus, my firm also performed extensive legal research and analysis regarding the application of the purported safe harbor provision under the ARL and other similar statutes in California and across the country. Additionally, my firm anticipated that defendants, like WaPo, would likely raise a challenge to Plaintiff's ability to show causation and reliance on the asserted misrepresentations and omissions as required under California's consumer protection statutes.  Therefore, my firm performed extensive legal research regarding the requirements of statutory standing under California law.

8.     In June of 2020, my firm was retained by Plaintiff to pursue class action claims against Defendant for alleged ARL violations committed in connection with Plaintiff's digital subscription to *The Washington Post*.  Despite knowing we were wading into substantially uncharted waters, on July 2, 2020, Plaintiff, by and through counsel, sent a letter to Defendant via certified mail, return receipt requested, alleging that Defendant violated California's consumer protection statutes, including the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*., by intentionally making and disseminating statements concerning its digital automatic renewal offerings (the "WaPo Subscriptions") to consumers in California and the general public, which are untrue and misleading on their face and by omission.  The written notice was sent in compliance with the provisions of California Civil Code § 1782, demanded that Defendant cease and desist from such violations and make full restitution by refunding the monies received therefrom, and informed Defendant of Plaintiff's intention to amend her complaint to include a request for damages under California Civil Code § 1750 if Defendant failed to take corrective action within 30 days of receipt of the demand letter.  The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated."

9.     On July 29, 2020, Plaintiff filed her Class Action Complaint in the United States District Court for the Northern District of California, alleging that Defendant violated California

law by automatically renewing her monthly digital WaPo Subscription and charging renewal fees to her payment method without first providing her with the disclosures and authorizations required to be made to California consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*.  Plaintiff further alleged that, because every violation of the ARL constitutes an "unlawful" practice under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*., Defendant's conduct violated the UCL as well.  In addition, Plaintiff alleged that, because Defendant's ARL violations involve misrepresentations and/or omissions of material fact, Defendant also violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*. and California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*., and therefore asserted an FAL claim seeking injunctive and restitutionary relief and a CLRA claim seeking injunctive relief only.  On the same basis, Plaintiff also brought common law claims against Defendant for conversion, unjust enrichment/restitution, negligent misrepresentation, and fraud.  *See* ECF No. 1.

10.     After Plaintiff filed her Complaint, the Parties engaged in a Rule 26(f) planning conference and a Rule 16 scheduling conference.  *See* ECF No. 16.

11.     In response to the complaint, on September 21, 2020, Defendant filed a motion to dismiss under Rule 12(b)(6) and Rule 9(b), arguing, inter alia, that Plaintiff failed to state a claim upon which relief could be granted and that she failed to plead her claims with sufficient particularity.  *See* ECF No. 21.

12.     On October 5, 2020, Plaintiff filed her First Amended Class Action Complaint ("FAC") as of right.  *See* ECF No. 22.  In addition to the claims for relief brought by Plaintiff's original Complaint, the FAC contains a request for damages under the CLRA at Count IV.  *See id*. ¶ 104.

13.     On October 19, 2020, Defendant filed a motion to dismiss Plaintiff's FAC for failure to state a claim upon which relief could be granted under Rule 12(b)(6) and for failure to plead claims with sufficient particularity under Rule 9(b).  *See* ECF No. 23.

14.     On November 19, 2020, before Plaintiff's opposition brief was due to be filed, the Parties filed a Joint Stipulation and Proposed Order with the Court, indicating that the Parties had

agreed to explore early resolution of the case through private mediation and requesting that the Court enter an order staying all upcoming deadlines pending settlement discussions, including Plaintiff's deadline to file an opposition to Defendant's motion to dismiss.  *See* ECF No. 28.  On November 20, 2020, the Court entered an order granting the Parties' requests.  *See* ECF No. 29.  On March 22, 2021 and March 30, 2021, the Court entered orders extending the stay of the action. *See* ECF Nos. 35, 37.

15.     From the outset of the case, including during the pendency of Defendant's motion to dismiss, the Parties engaged in direct communications, and as part of their obligations under Fed. R. Civ. P. 26, discussed the prospect of an early resolution.  Those discussions eventually led to an agreement between the Parties to engage in early mediation, which the Parties agreed would take place before Jill R. Sperber, Esq., who is an experienced neutral affiliated with Judicate West.

16.     In advance of the mediation, and in order to competently assess their relative negotiating positions, the Parties exchanged and thoroughly analyzed discovery related to issues of class certification and summary judgment, including on issues such as the size and scope of the putative class; representative web and mobile pay flow and check out pages and digital acknowledgment emails showing the content and presentation of the ARL disclosures over time; and Defendant's current and historical Terms of Sale and Terms of Service, which recap the ARL terms and other relevant provisions related to subscriptions.  This information would have been core evidence had the case progressed through discovery and was sufficient for the Parties to assess the strengths and weakness of their respective claims and defenses.

17.     In preparing to make a settlement demand at mediation, my firm devoted substantial time to researching the viability of different class-wide settlement structures under the relevant Ninth Circuit case law.

18.     In advance of the mediation, my firm also prepared a detailed mediation statement outlining the strength of the Plaintiff's case in response to the arguments raised in Defendant's motion to dismiss.  In addition to a draft class settlement term sheet, to assist the Parties and the mediator evaluate any potential settlement.  Defendant also submitted a detailed mediation statement, and my firm reviewed Defendant's mediation statement closely to evaluate the veracity

1   of its arguments.

2     19. The Parties participated in two mediation sessions with Jill R. Sperber, Esq., which

3   were both conducted by Zoom.  The first session took place on March 16, 2021, and lasted

4   approximately nine hours.  The Parties promptly arranged for a second mediation session which

5   took place on March 25, 2021, and lasted nearly six hours.  The Parties engaged in good faith

6   negotiations, which were at all times arms'-length.  At the end of the second mediation session, the

7   Parties reached an agreement as to all material terms of a settlement in this case.

8     20. Through their negotiations, the Parties focused their discussions on the monetary

9   relief made available to the Class – with the provision that Plaintiff may apply for up to $2,000,000

10  in attorneys' fees and as reimbursement of expenses, which constitutes approximately 29 percent of

11  the total value of the common fund.  As such, the provisions of the Settlement Agreement

12  concerning attorneys' fees and expenses were negotiated in such a manner as to avoid any potential

13  conflict with the Settlement Class, or any argument that such amounts were "traded off" for lesser

14  class consideration.

15    21. As such, the provision as to the amount of attorneys' fees to be requested set forth in

16  the Settlement Agreement was negotiated under market conditions: Plaintiff's counsel wished to

17  maximize fees to compensate them, as the law encourages, for risk, innovation, and delay; and

18  Defendant wished to pay the minimum amount they could.  The result is an arm's-length

19  negotiated amount set by market forces, and resolved only after the other settlement terms had been

20  agreed to in principle, under the supervision of a mediator.  Such a process provides further indicia

21  of the reasonableness of this requested amount.

22    22. The resulting Proposed Settlement, which consists of cash and non-cash benefits

23  and has a total value of approximately $6,736,690.00, secures extraordinary relief for the Class.

24  Based on Defendant's records, the proposed Settlement Class includes approximately 319,395

25  persons who, from July 29, 2016, to and through April 1, 2021, enrolled in an automatically

26  renewing digital WaPo Subscription using a California billing address and who, during that time

27  period, were charged and paid one or more automatic renewal fee(s) in connection with such

28  subscription.

DECLARATION OF FREDERICK J. KLORCZYK III       7
CASE NO. 3:20-cv-05218-WHO

23.     Pursuant to the terms of the Proposed Settlement, every Settlement Class Member will be entitled to receive either an Automatic Account Credit Code for up to eight (8) weeks of a free Washington Post digital subscription (valued at up to $20), or, at their election, a *pro rata* cash payment from the Settlement Fund.  Class Members wishing to receive cash must make a cash election by submitting a valid Claim Form to the Settlement Administrator.

24.     Class Members who do nothing (*i.e.*, neither submit a valid Claim Form nor exclude themselves from the Settlement) will automatically receive codes for free access to WaPo products and services that normally require a paid subscription, with no expectation or obligation to continue using the services beyond the free period (the "Automatic Account Credit Codes").  The Automatic Account Credit Codes will be for either four (4) or eight (8) weeks of a free Washington Post digital subscription (valued at $10 and $20, respectively).

25.     The type of WaPo Subscription a particular Class Member is eligible to receive using the Automatic Account Credit Codes depends on whether his or her WaPo Subscription was active or inactive as of April 1, 2021, and the duration depends on whether the Class Member's most recently active WaPo Subscription was for an Annual or Four-Week renewal term. Settlement Class Members with Annual WaPo Subscriptions, whether active or inactive, will receive an Automatic Account Credit Code for eight (8) weeks of free subscription services, valued at $20.  Settlement Class Members with Four-Week WaPo Subscriptions, whether active or inactive, will receive an Automatic Account Credit Code for four (4) weeks of free subscription services, valued at $10.  Each Settlement Class Member with an Active WaPo Subscription will automatically receive an Automatic Account Credit Code for free weeks to his or her then-current digital WaPo subscription.  Settlement Class Members with Inactive WaPo Subscriptions will automatically receive an Automatic Account Credit Code for free weeks to a premium digital WaPo Subscription.

26.     Moreover, as part of the proposed Settlement, Defendant has agreed to provide automatic renewal terms on its checkout pages in a manner that is consistent with the requirements of Cal. Bus. & Prof. Code §§ 17600, *et seq*.  Specifically, Defendant has agreed to present to California subscribers the automatic renewal offer terms (including by when a user must cancel) in

a clear and conspicuous manner on the Checkout Page for any WaPo Subscription that will automatically renew, before the subscription or purchasing agreement and in visual proximity to the request for consent to the offer.  Defendant has also agreed to obtain prospective subscribers' affirmative consent to the agreement containing the automatic renewal terms in a manner that complies with the ARL.  Defendant has further agreed to disclose, in an acknowledgment email, information regarding how to cancel and by when cancellation must be affected, in a manner that that is capable of being retained by California consumers and otherwise complies with the ARL.  Additionally, Defendant will provide individuals with a California billing address who were enrolled in an active Annual WaPo Subscription (as of the execution of the Settlement Agreement) that did not yet renew as of 60 days after the execution of the Settlement Agreement with a one-time additional acknowledgement email at least 30 days before their next renewal date that provides those subscribers with notice that their subscription will renew and includes a clear link to directions on how to cancel that subscription.  Defendant has further agreed to provide individuals with a California billing address enrolled in an active Four-Week WaPo Subscription (as of 30 days after the execution of the Settlement Agreement) who have not yet renewed as of 60 days after the execution of the Settlement Agreement with a one-time additional acknowledgement email at least 7 days before their next renewal date that provides those subscribers with notice that their subscription will renew and includes a clear link to directions on how to cancel that subscription.

27.     After reaching an agreement in principle on the Settlement, my firm worked extensively with defense counsel to finalize and memorialize the agreement into a formal Class Action Settlement Agreement, including proposed class notice documents.  That process included multiple rounds of redlines and phone calls to discuss proposed edits.  Thus, the formal Settlement Agreement was reached as a result of extensive arm's-length negotiations between the Parties and their counsel.

28.     After finalizing and executing the Class Action Settlement Agreement, my firm prepared Plaintiff's Unopposed Motion for Preliminary Approval and Certification of a Settlement Class, which was filed on May 28, 2021.  *See* ECF No. 46.  The motion hearing was held before

Judge William H. Orrick on July 7, 2021, via Zoom.  ECF No. 47.  The following day, on July 8, 2021, the Court granted Plaintiff's Unopposed Motion.  *See* ECF No. 50.

29.     The Parties agreed to the terms of the Settlement through experienced counsel who possessed all the information necessary to evaluate the case, determined all the contours of the proposed class, and reached a fair and reasonable compromise after negotiating the terms of the Settlement at arms'-length and with the assistance of a neutral mediator.

30.     As noted above, the monetary and in-kind relief provided to the Settlement Class (*i.e.*, $6.7 million) represents an exceptional recovery.  Yet, this amount does not necessarily represent recoverable damages, let alone recoverable net damages.  Indeed, further litigation of this Action would present substantial risks to any potential Class recovery.

31.     Plaintiff and proposed Class Counsel recognize that, despite our belief in the strength of Plaintiff's claims and our confidence in Plaintiff's and the Class's ability to secure a favorable judgment at trial, the expense, duration, and complexity of protracted litigation would be substantial and the outcome of trial uncertain.  Thus, the Settlement secures a more proximate and more certain monetary benefit to the Class than continued litigation.

32.     Plaintiff and proposed Class Counsel are also mindful that absent a settlement, the success of Defendant's various defenses in this case could deprive the Plaintiff and the Settlement Class Members of any potential relief whatsoever.  This is especially true considering the sparse case law concerning application of the ARL.  Indeed, to date, we are only aware of one ARL case that has progressed through summary judgment, *see Ingalls v. Spotify USA, Inc.*, 2017 WL 3021037 (N.D. Cal. Jul. 17, 2017), and of two courts that have issued opinions on a contested class certification motion based on ARL violations, *see Robinson v. OnStar, LLC*, 2020 WL 364221 (S.D. Cal. Jan. 22, 2020) and *Roz v. Nestle Waters N Am., Inc.*, 2017 WL 6942657, at *3-6 (C.D. Cal. Sept. 13, 2017).  Defendant is also represented by highly experienced attorneys who have made clear that, absent a settlement, they were prepared to continue their vigorous defense of this case, including by filing a motion for summary judgment that would present significant risks to the Class.  Plaintiff and Class Counsel are also aware that Defendant would continue to challenge liability under the ARL, as well as to assert defenses on the merits, including that Plaintiff's

allegations are insufficient under Fed. R. Civ. P. 8 and 12(b)(6) and that WaPo achieved a level of compliance sufficient to qualify for the good faith safe harbor under Section 17604(b) of the ARL. Plaintiff is also aware Defendant will continue to challenge Plaintiff's standing under Article III of the Constitution as well as pursuant to California's consumer protection statutes, including Plaintiff's ability to show economic injury or causation and her ability to sue on behalf of unnamed class members.  Indeed, ARL litigation is in the nascent stages, and thus, the scope of the statute is in dispute.  Defendant would have also vigorously contested the certification of a litigation class. Even if Plaintiff's claims were to proceed past class certification and summary judgment, this case would ultimately devolve into an uncertain "battle of the experts."  Defendant would surely present expert testimony and/or reports showing that the omissions at issue pertain to nonmaterial terms, and Plaintiff's expert evidence would indicate that the missing disclosures are indeed material to prospective subscribers, giving rise to Defendant's duty to disclose such information.  Thus, although Plaintiff had confidence in her claims, there could be no guarantee that the Class would be certified or prevail at trial.  Looking beyond trial, Plaintiff is aware that Defendant could appeal the merits of any adverse decision.  Simply put, a favorable outcome was not assured.

33.     By settling, Plaintiff and the Class avoid these risks, as well as the delays and risks of a lengthy trial and appellate process.  The Settlement will provide Settlement Class Members with monetary and in-kind benefits that are immediate, certain, and substantial, and will avoid the obstacles that might have prevented them from obtaining relief.

34.     Plaintiff and Class Counsel therefore believe that the relief provided by the Settlement weighs heavily in favor of a finding that the Settlement is fair, reasonable, and adequate, and well within the range of approval.

35.     The Parties have selected JND Legal Administration ("JND") to act as the Settlement Administrator.  JND is a firm with extensive experience handling all aspects of legal administration and has administered settlements in hundreds of class actions.

36.     Since the Court granted preliminary approval, my firm has worked with JND to carry out the Court-ordered notice plan.  Specifically, my firm helped compile and review the contents of the required notice to State Attorneys General pursuant to 28 U.S.C. § 1715, reviewed

the final claim and notice forms, and reviewed and tested the settlement website before it launched.

37.     In conformity with the Court's Order Granting Preliminary Approval of Class Action Settlement, Conditionally Certifying Settlement Class, Appointing Class Representative, Appointing Class Counsel, and Approving Notice Plan (the "Preliminary Approval Order"), JND represents that, as of September 3, 2021, it emailed 314,265 notices to Settlement Class Members, of which 5,694 emails bounced back as undeliverable, and that it sent another 799 notices by U.S. Mail, including to Class Members' street addresses associated with 797 of the 5,694 undeliverable emails.  Thus, notice has already been disseminated to 309,370 of the 319,395 Settlement Class Members (approximately 96.9% of the Class).  JND also developed and hosted a dedicated settlement website with downloadable forms and online claim submission, and a 24-hour toll-free Interactive Voice Response ("IVR") telephone line.  As of this writing, and, out of the hundreds of thousands of Class Members, only 11 Class Members have requested to be excluded from the Class, and no Class Members have objected to the Settlement.

38.     Since class notice was disseminated, my firm has worked with JND on a weekly basis to monitor settlement claims and any other issues that may arise.  My firm has also fielded calls from Settlement Class Members and assisted them with filing claims.

39.     My firm undertook this matter on a contingency basis.  Through August 26, 2021, my firm expended 620.6 hours in this case.  My firm's lodestar in this case, based on current billing rates, is $355,307.50.  Attached hereto as **Exhibit 2** are my firm's detailed billing diaries for this matter, as well as a summary of the same.  I have personally reviewed all of my firm's time entries associated with this case, and have used billing judgment to ensure that duplicative and unnecessary time has been excluded and that only time reasonably devoted to the litigation has been included.  My firm's time entries were regularly and contemporaneously recorded by me and the other timekeepers pursuant to firm policy and have been maintained in the computerized records of my firm.

40.     In addition to the time enumerated above, I estimate that my firm will incur an additional 50-75 hours of future work in connection with the preparation of Plaintiff's Motion for Final Approval, the fairness hearing, coordinating with JND, monitoring settlement administration,

1    and responding to Settlement Class Member inquiries.

2         41.    Due to the commitment of time and capital investment required to litigate this

3    action, my firm had to forego other work, including hourly non-contingent matters, and other class

4    action matters.

5         42.    Included within **Exhibit 2** is a chart setting forth the current hourly rates charged for

6    lawyers and staff at my firm.  Based on my knowledge and experience, the hourly rates charged by

7    my firm are within the range of market rates charged by attorneys of equivalent experience, skill,

8    and expertise.  These are the same hourly rates that we actually charge to our regular hourly clients

9    who have retained us for non-contingent matters, and which are actually paid by those clients.  As

10   a matter of firm policy, we do not discount our regular hourly rates for non-contingent hourly

11   work.  I have personal knowledge of the range of hourly rates typically charged by counsel in our

12   field in California, New York, Florida, and elsewhere, both on a current basis and in the past.  In

13   determining my firm's hourly rates from year to year, my partners and I have consciously taken

14   market rates into account and have aligned our rates with the market.

15        43.    Through August 31, 2021, my firm has also expended $8,427.92 in out-of-pocket

16   costs and expenses in connection with the prosecution of this case.  Attached as **Exhibit 3** is an

17   itemized list of those costs and expenses.  These costs and expenses are reflected in the records of

18   my firm and were necessary to prosecute this litigation.  Cost and expense items are billed

19   separately, and such charges are not duplicated in my firm's billing rates.

20        44.    Through my practice, I have become familiar with the non-contingent market rates

21   charged by attorneys in California, New York, Florida, and elsewhere (my firm's offices are in

22   Walnut Creek, California, New York City, and Miami, Florida).  This familiarity has been obtained

23   in several ways:  (1) by litigating attorneys' fee applications; (2) by discussing fees with other

24   attorneys; (3) by obtaining declarations regarding prevailing market rates filed by other attorneys

25   seeking fees; and (4) by reviewing attorneys' fee applications and awards in other cases, as well as

26   surveys and articles on attorneys' fees in legal newspapers and treatises.  The information I have

27   gathered shows that my firm's rates are in line with the non-contingent market rates charged by

28   attorneys of reasonably comparable experience, skill, and reputation for reasonably comparable

---

DECLARATION OF FREDERICK J. KLORCZYK III                                    13
CASE NO. 3:20-cv-05218-WHO

class action work.  In fact, comparable hourly rates have been found reasonable by various courts for reasonably comparable services, including:

i. *Pearlman v. Cablevision Systems Corp.*, 2019 WL 3974358 (E.D.N.Y. Aug. 20, 2019), approving partner rates up to $875.

ii. *Dover v. British Airways, PLC*, No. 12-cv-05567-RJD-CLP, ECF No. 321 (E.D.N.Y. Oct. 9, 2018), approving partner rates up to $875.

iii. *Laydon v. Mizuho Bank, Ltd.*, No. 1:12-cv-03419-GBD (S.D.N.Y. Dec. 7, 2017), approving partner rates of $875 to $975 and associate rates of $325 to $600, as set forth in ECF No. 837.

iv. *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *17 (S.D.N.Y. April 26, 2016), approving partner rates of $834 to $1,125 and associate rates of $411 to $714.

v. *In re Platinum & Palladium Commod. Litig.*, No. 10-cv-3617, 2015 U.S. Dist. LEXIS 98691, at *13 (S.D.N.Y. July 7, 2015) (Slip Op.), approving billing rates of $950 and $905 per hour and referring to a recent National Law Journal survey yielding an average hourly partner billing rate of $982 in New York.

vi. *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, No. 1:08-md-01963-RWS, 909 F. Supp. 2d 259, 271-72 (S.D.N.Y. 2012), approving fee award based on hourly rates ranging from $275 to $650 for associates and $725 to $975 for partners, as set forth in ECF No. 302-5.

vii. *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07 1827 SI, MDL, No. 1827 (N.D. Cal. 2013), an antitrust class action, in which the court found blended hourly rates of $1000, $950, $861, $825, $820, and $750 per hour reasonable for the lead class counsel.

viii. *Williams v. H&R Block Enterprises, Inc.*, No. RG08366506 (Alameda County Superior Ct. Nov. 8, 2012), Order of Final Approval and Judgment, a wage and hour class action, in which the court found the hourly rates of $785, $775, and $750 reasonable for the more senior class counsel.

ix. *Luquetta v. The Regents of the Univ. of California*, No.CGC-05-443007 (San Francisco Superior Ct. Oct. 31, 2012), Order Granting Plaintiffs' Motion for Common Fund Attorneys' Fees and Expenses, a class action to recover tuition overcharges in which the court found the hourly rates of $850, $785, $750, and $700 reasonable for Plaintiffs' more experienced counsel.

x. *Pierce v. County of Orange*, 905 F. Supp. 2d 1017 (C.D. Cal. 2012), a civil rights class action brought by pre-trial detainees, in which the court approved a lodestar-based, *inter alia*, on 2011 rates of $850 and $825 per hour.

xi. *Holloway et. al. v. Best Buy Co., Inc.*, No. 05-5056 PJH (N.D. Cal. 2011) (Order dated November 9, 2011), a class action alleging that Best Buy discriminated

against female, African American and Latino employees by denying them promotions and lucrative sales positions, in which the court approved lodestar-based rates of up to $825 per hour.

xii.    *Californians for Disability Rights, Inc., et al. v. California Department of Transportation, et al.*, 2010 U.S. Dist. LEXIS 141030 (N.D. Cal. 2010), adopted by Order Accepting Report and Recommendation filed February 2, 2011, a class action in which the court found reasonable 2010 hourly rates of up to $835 per hour.

xiii.   *Credit/Debit Card Tying Cases*, JCCP No. 4335 (San Francisco County Superior Court Aug. 23, 2010), Order Granting Plaintiffs' Motion for Attorneys' Fees, Expenses, and Incentive Awards, an antitrust class action, in which the court, before applying a 2.0 lodestar multiplier, found reasonable 2010 hourly rates of $975 for a 43-year attorney, $950 for a 46-year attorney, $850 for 32 and 38 year attorneys, $825 for a 35-year attorney, $740 for a 26-year attorney, $610 for a 13-year attorney, and $600 for a 9-year attorney, and $485 for a 5-year attorney.

xiv.    *Savaglio, et al. v. WalMart*, No. C-835687-7 (Alameda County Superior Court Sep. 10, 2010), Order Granting Class Counsel's Motion for Attorneys' Fees, a wage and hour class action, in which the court found reasonable, before applying a 2.36 multiplier, rates of up to $875 per hour for a 51-year attorney,$750 for a 39-year attorney, and $775 for a 33-year attorney.

xv.     *Qualcomm, Inc. v. Broadcom, Inc.*, Case No. 05-CV-1958-B, 2008 WL 2705161 (S.D. Cal. 2008), in which the court found the 2007 hourly rates requested by Wilmer Cutler, Pickering, Hale & Dorr LLP reasonable; those rates ranged from$45 to $300 for staff and paralegals, from $275 to $505 for associates and counsel, and from $435 to $850 for partners.

45.    The reasonableness of my firm's hourly rates is also supported by several surveys of legal rates, including the following:

i.     In an article entitled "On Sale: The $1,150-Per Hour Lawyer," written by Jennifer Smith and published in the Wall Street Journal on April 9, 2013, the author describes the rapidly growing number of lawyers billing at $1,150 or more revealed in public filings and major surveys.  The article also notes that in the first quarter of 2013, the 50 top-grossing law firms billed their partners at an average rate between $879 and $882 per hour.  A true and correct copy of this article is attached hereto as **Exhibit 4**.

ii.    In an article published April 16, 2012, the Am Law Daily described the 2012 Real Rate Report, an analysis of $7.6 billion in legal bills paid by corporations over a five-year period ending in December 2011.  A true and correct copy of that article is attached hereto as **Exhibit 5**.  That article confirms that the rates charged by experienced and well-qualified attorneys have continued to rise over this five-year period, particularly in large urban areas like the San Francisco Bay Area.  It also shows, for example that the top quartile of lawyers bill at an average of "just under $900 per hour."

iii.     Similarly, on February 25, 2011, the Wall Street Journal published an article entitled "Top Billers."  A true and correct copy of that article is attached hereto as **Exhibit 6**.  That article listed the 2010 and/or 2009 hourly rates for more than 125 attorneys, in a variety of practice areas and cases, who charged $1,000 per hour or more.  Indeed, the article specifically lists *eleven* (11) Gibson Dunn & Crutcher attorneys billing at $1,000 per hour or more.

iv.     On February 22, 2011, the ALM's Daily Report listed the 2006-2009 hourly rates of numerous San Francisco attorneys.  A true and correct copy of that article is attached hereto as **Exhibit 7**.  Even though rates have increased significantly since that time, my firm's rates are well within the range of rates shown in this survey.

v.      The Westlaw CourtExpress Legal Billing Reports for May, August, and December 2009 (attached hereto as **Exhibit 8**) show that as far back as 2009, attorneys with as little as 19 years of experience were charging $800 per hour or more, and that the rates requested here are well within the range of those reported.  Again, current rates are significantly higher.

vi.     The National Law Journal's December 2010, nationwide sampling of law firm billing rates (attached hereto as **Exhibit 9**) lists 32 firms whose highest rate was $800 per hour or more, eleven firms whose highest rate was $900 per hour or more, and three firms whose highest rate was $1,000 per hour or more.

vii.    On December 16, 2009, The American Lawyer published an online article entitled "Bankruptcy Rates Top $1,000 in 2008-2009."  That article is attached hereto as **Exhibit 10**.  In addition to reporting that several attorneys had charged rates of $1,000 or more in bankruptcy filings in Delaware and the Southern District of New York, the article also listed 18 firms that charged median partner rates of from $625 to $980 per hour.

viii.   According to the National Law Journal's 2014 Law Firm Billing Survey, law firms with their largest office in New York have average partner and associate billing rates of $882 and $520, respectively.  *See* Karen Sloan, *$1,000 Per Hour Isn't Rare Anymore; Nominal Billing Levels Rise, But Discounts Ease Blow*, National Law Journal (Jan. 13, 2014).  The survey also shows that it is common for fees for partners in New York firms to exceed $1,000 an hour.  *Id.*  A true and correct copy of this survey is attached hereto as **Exhibit 11**.

ix.     On June 30, 2021, Law360 published an article entitled "Billing Rates Continue Upward Climb, Especially In BigLaw."  A true and correct copy of that article is attached hereto as **Exhibit 12**.  That article discusses a LexisNexis CounselLink legal trends report released on June 30, 2021 showing that "average partner hourly rates jumped year over year by 3.5% in 2020, slightly higher than the 3.3% jump from 2018 to 2019.

46.     My firm's rates are set taking into account our unique experience and track record of success winning 6 of 6 class action trials.  We charge these same rates to clients who retain us

on an hourly basis, and we do not discount them.  My firm's rates have been deemed reasonable by Courts across the country, including in California, New York, Michigan, Illinois, Missouri, and New Jersey for example:

    i.    *Taylor v. Trusted Media Brands, Inc.*, No. 7:16-cv-01812 (S.D.N.Y. Feb. 1, 2018) (Final Judgment And Order Of Dismissal With Prejudice).  A true and correct copy of the transcript from the Final Approval Hearing in *Trusted Media Brands* is attached hereto as **Exhibit 13**.

    ii.    *Russett v. Northwestern Mutual Life Insurance Co.*, No. 7:19-cv-07414 (S.D.N.Y. Oct. 6, 2020) (Final Judgment And Order Of Dismissal With Prejudice).

    iii.    *Edwards v. Hearst Communications, Inc.*, No. 1:15-cv-09279 (S.D.N.Y. Apr. 24, 2019) (Final Judgment And Order Of Dismissal With Prejudice).

    iv.    *Rodriguez v. CitiMortgage, Inc.*, No. 7:11-cv-4718 (S.D.N.Y. Oct. 6, 2015), (concluding during the fairness hearing that Bursor & Fisher's rates for two of its partners, Joseph Marchese and Scott Bursor, were "reasonable").

    v.    *Perez v. Rash Curtis & Associates*, 2020 WL 1904533, at *20 (N.D. Cal. Apr. 17, 2020) (concluding that "blended rate of $634.48 is within the reasonable range of rates").

    vi.    *In re Haier Freezer Consumer Litig.*, No. C11-02911 EJD (N.D. Cal. Oct. 25, 2013) (Final Judgment And Order Granting Plaintiffs' Motion For Final Approval Of Class Action Settlement And For Award Of Attorneys' Fees, Costs And Incentive Awards).

    vii.    *Kokoszki v. Playboy Enterprises, Inc.*, No. 2:19-cv-10302 (E.D. Mich. Aug. 19, 2020) (Final Judgment And Order Of Dismissal With Prejudice).

    viii.    *Moeller v. American Media, Inc.*, No. 2:16-cv-11367 (E.D. Mich. Sept. 28, 2017) (Order And Judgment Of Dismissal With Prejudice).

    ix.    *In re Michaels Stores Pin Pad Litigation*, No. 1:11-cv-03350 (N.D. Ill. Apr. 17, 2013) (Order Approving Settlement).

    x.    *In re Blue Buffalo Company, Ltd. Marketing and Sales Practices Litigation*, No. 4:14-md-02562 (E.D. Mo. June 16, 2016) (Order Awarding Fees And Costs).

    xi.    *Rossi v. The Procter & Gamble Co.*, No. 11-7238 (D.N.J. Oct. 3, 2013) (Final Approval Order And Judgment).

47.    No court has ever cut my firm's fee application by a single dollar on the ground that our hourly rates were not reasonable.

48.    As aforementioned, my firm, Bursor & Fisher, P.A., has significant experience in

litigating class actions of similar size, scope, and complexity to the instant action.  *See* Firm Resume of Bursor & Fisher, P.A., a true and accurate copy of which is attached hereto as **Exhibit 14**; *see also* Preliminary Approval Hearing Transcript in *Russett, et al. v. The Northwestern Mutual Life Ins. Co.*, No. 19-cv-07414-KMK (S.D.N.Y.) ("NWM Hearing Tr."), a true and accurate copy of which is attached hereto as **Exhibit 15**; *see also id.,* ECF No. 51 ("10/6/20 Final Approval Order") (finally approving $595,000 class-wide settlement).

49.     My firm is also currently serving as plaintiff's counsel in a number of substantially similar putative class actions pursuant to the ARL.  *See, e.g.*, *Dutcher v. Google LLC, et al.*, No. 20-cv-366905 (Cal. Super. Ct.), filed June 5, 2020; *Moses v. The New York Times Company*, No. 1:20-cv-04658-RA (S.D.N.Y.), filed June 17, 2020; *Morrell v. WW International, Inc.*, No. 1:20-cv-09912-JGK (S.D.N.Y.), filed November 11, 2020; *Mendez v. LinkedIn Corp.*, No. 21-cv-378575 (Cal. Super. Ct.), filed March 24, 2021; and *Armstrong v. ZeniMax Media, Inc.*, No. 21STCV26988 (Cal. Super. Ct.), filed July 22, 2021.  In fact, in *Moses*, my firm recently negotiated a class-wide settlement under California's ARL, pursuant to which the defendant, The New York Times Company, agreed to "automatically provide over $3,900,000 worth of access codes … to Class Members who do nothing during the claims process," and to "establish a non-reversionary $1,650,000 cash Settlement Fund which will be used to pay all approved claims by class members[.]"  Memorandum of Points and Authorities in Support of Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement in *Moses v. The New York Times Company*, No. 1:20-cv-04658-RA (S.D.N.Y.) (ECF No. 42) ("Moses Preliminary Approval Brief"), a true and accurate copy of which is attached hereto as **Exhibit 16**.  Thus, the total value of the proposed settlement in Moses was approximately $5,563,000, to be distributed among a class of nearly 900,000 California subscribers.  *Id*.  Finding that the *Moses* settlement was "fair, reasonable, and adequate, and in the best interests of the Settlement Class" and that it "provides substantial relief to the Settlement Class[,]" the Southern District of New York appointed my firm as Class Counsel and granted preliminary approval on May 12, 2021.  *See* Order Granting Preliminary Approval in *Moses v. The New York Times Company*, No. 1:20-cv-04658-RA (S.D.N.Y.) (ECF No. 43) ("Moses Preliminary Approval Order"), a true and accurate copy of

which is attached hereto as **Exhibit 17**.  The final approval hearing is set for September 10, 2021.

50.     Further, since December 2010, my firm has been court-appointed Class Counsel or Interim Class Counsel by numerous courts across the country, including in this Circuit.  *See, e.g.*, *In re Sensa Weight Loss Litig.*, Case No. 4:11-cv-01650-YGR (N.D. Cal. Mar. 2, 2012); *In re Haier Freezer Consumer Litig.*, 2013 WL 2237890 (N.D. Cal. May 21, 2013); *Hendricks v. StarKist Co.*, Case No. 4:13-cv-00729-HSG (N.D. Cal. July 23, 2015); *In re NVIDIA GTX 970 Graphics Card Litig.*, Case No. 3:15-cv-00760-CRB (N.D. Cal. May 8, 2015); *McMillion v. Rash Curtis & Associates*, Case No. Case 4:16-cv-03396-YGR (N.D. Cal. Sep. 6, 2017); *Lucero v. Solarcity Corp.*, Case No. 3:15-CV-05107-RS (N.D. Cal. Sep. 15, 2017); *Gasser v. Kiss My Face, LLC* (N.D. Cal. Oct. 23, 2017); *Williams v. Facebook, Inc.*, Case No. 3:18-cv-01881-RS (N.D. Cal. Jun. 26, 2018); *Bayol v. Health-Ade*, Case No. 4:18-cv-01462-KAW (N.D. Cal. Aug. 23, 2018); *West v. California Service Bureau*, Case No. 4:16-cv-03124-YGR (N.D. Cal. Sep. 12, 2018).

51.     My firm has also been recognized by courts across the country for its expertise in litigating Rule 23 class action claims to trial.  *See, e.g.*, Ex. 13, Firm Resume; *see also* Ex. 14, NWM Hearing Tr. At 21:1-4 ("[Bursor & Fisher, P.A.] has extensive experience litigating precisely these types of actions, and that's why they've been appointed in numerous cases to be lead counsel."); *Williams v. Facebook, Inc.*, No. 3:18-cv-01881, ECF No. 51 (N.D. Cal June 26, 2018) ("[The] Bursor firm … ha[s] extensive experience in handling class actions and complex litigation, including products liability and consumer protection cases; appear[s] to have knowledge of applicable law; and ha[s] extensive resources.") (appointing Bursor & Fisher class counsel to represent a putative nationwide class of all persons who installed Facebook Messenger applications and granted Facebook permission to access their contact list); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. Feb. 25, 2014) ("Bursor & Fisher, P.A., are class action lawyers who have experience litigating consumer claims. … The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in five class action jury trials since 2008."); *In re Welspun Litigation*, Case No. 16-cv-06792-RJS (S.D.N.Y. Jan. 26, 2017) (appointing Bursor & Fisher interim lead counsel to represent a proposed nationwide class of purchasers of mislabeled Egyptian cotton bedding products).

52.     Moreover, as noted above, my firm has served as trial counsel for class action plaintiffs in six jury trials and has won all six, with recoveries ranging from $21 million to $299 million.

53.     I am of the opinion that Ms. Jordan's active involvement in this case was critical to its ultimate resolution.  She took her role as class representative seriously, devoting significant amounts of time and effort to protecting the interests of the class.  Without her willingness to assume the risks and responsibilities of serving as class representative, I do not believe such a strong result could have been achieved.

54.     Ms. Jordan equipped my firm with critical details regarding her experiences with Defendant.  She assisted my firm in investigating her claims, detailing her account history and the automatic renewal charges associated with her WaPo Subscription, supplied supporting documentation, aided in drafting the Complaint, and produced documents in informal discovery conducted in advance of mediation.  Throughout the litigation, Ms. Jordan held regular meetings with Class Counsel to receive updates on the progress of the case and to discuss strategy.  Further, Ms. Jordan was prepared to testify at deposition and trial, if necessary, and she was actively consulted during the settlement process.

55.     In short, Ms. Jordan assisted my firm in pursuing this action on behalf of the class, and her involvement in this case has been nothing short of essential.

I declare under penalty of perjury that the above and foregoing is true and accurate. Executed this 3rd day of September, 2021, at New York, NY.

         */s Frederick J. Klorczyk III*
          Frederick J. Klorczyk III

**EXHIBIT 1**

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III (State Bar. No. 320783)
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: fklorczyk@bursor.com

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com
              jvenditti@bursor.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH JORDAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WP COMPANY LLC, d/b/a THE WASHINGTON POST,<br><br>Defendant. | Case No. 3:20-cv-05218-WHO<br><br>**STIPULATION OF CLASS ACTION SETTLEMENT AND RELEASE**<br><br>Judge:  Hon. William H. Orrick |

This Agreement ("Agreement" or "Settlement Agreement") is entered into by and among (i) Plaintiff Deborah Jordan ("Plaintiff"); (ii) the Settlement Class (as defined herein); and (iii) Defendant WP Company LLC d/b/a The Washington Post ("Defendant" or "WaPo").  The Settlement Class and Plaintiff are collectively referred to as the "Plaintiffs" unless otherwise noted.  The Plaintiffs and the Defendant are collectively referred to herein as the "Parties."  This Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims (as defined herein), upon and subject to the terms and conditions of this Agreement, and subject to the final approval of the Court.

## **RECITALS**

A.     This putative class action was filed on July 29, 2020, in the United States District Court for the Northern District of California.  The material allegations of the action are that Defendant enrolled Plaintiff and other Settlement Class Members in automatic renewal subscriptions without first presenting the consumer with the automatic renewal offer terms in a clear and conspicuous manner; charged the consumer's credit card, debit card, or third party payment account without first obtaining the consumer's affirmative consent to an agreement containing clear and conspicuous disclosure of the automatic renewal offer terms; and failed to provide the consumer with an acknowledgment that included disclosure of the automatic renewal offer terms, cancellation policy, and information regarding how to cancel.  Based on Defendant's alleged conduct, the Complaint sought monetary and injunctive relief and brought claims for: (1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (2) conversion; (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; (4) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (5) unjust enrichment / restitution; (6) negligent misrepresentation; and (7) fraud.  (ECF No. 1.)

B.     After Plaintiff filed her Complaint, the Parties engaged in a Rule 26(f) planning conference and a Rule 16 scheduling conference.  (ECF No. 16.)

C.     On September 21, 2020, Defendant filed a motion to dismiss under Rule 12(b)(6) and Rule 9(b), arguing that Plaintiff failed to state a claim upon which relief could be granted and

failed to plead her claims with sufficient particularity. (ECF No. 21.) Among its arguments, Defendant maintained that it had met all of the pre-purchase requirements under the ARL, including providing clear and conspicuous disclosures of all of the required ARL terms prior to purchase, and obtaining Plaintiff and other class members' consent to such terms at the time of purchase.

D.     On October 5, 2020, Plaintiff filed her First Amended Class Action Complaint ("FAC") as of right. (ECF No. 22.) In addition to claims for relief brought by Plaintiff's original Complaint, the FAC contains a request for damages under the CLRA at Count IV. (*See id.* ¶ 104).

E.     On October 19, 2020, Defendant filed a motion to dismiss Plaintiff's FAC for failure to state a claim upon which relief could be granted under Rule 12(b)(6) and for failure to plead claims with sufficient particularity under Rule 9(b). (ECF No. 23.) Defendant again argued that it had met all of the pre-purchase requirements under the ARL, including providing clear and conspicuous disclosures of all of the required ARL terms prior to purchase, and obtaining Plaintiff and other class members' consent to such terms at the time of purchase, and further argued that Plaintiff had failed to set forth any basis for claims of fraud and negligent misrepresentation.

F.     On November 19, 2020, before Plaintiff's opposition brief was due to be filed, the Parties filed a Joint Stipulation and Proposed Order with the Court, indicating that the Parties had agreed to explore early resolution of the case through private mediation and requesting that the Court enter an order staying all upcoming deadlines pending settlement discussions, including Plaintiff's deadline to file an opposition to Defendant's motion to dismiss. (ECF No. 28.) On November 20, 2020, the Court entered an order granting the Parties' requests. (ECF No. 29.) On March 22, 2021 and March 30, 2021, the Court entered orders extending the stay of the action. (ECF Nos. 35 and 37.)

G.     From the outset of the case, including during the pendency of the motion to dismiss, the Parties engaged in direct communications, and as part of their obligations under Fed. R. Civ. P. 26, discussed the prospect of an early resolution. Those discussions eventually led to an agreement between the Parties to engage in early mediation, which the Parties agreed would take place before Jill R. Sperber, Esq., who is an experienced neutral affiliated with Judicate West.

H.      As part of the mediation, the Parties exchanged informal discovery, including on issues such as the size and scope of the putative class.  This information was sufficient for the Parties to assess the strengths and weakness of the claims and defenses.

I.      The Parties participated in two mediation sessions with Jill R. Sperber, Esq., which were both conducted by Zoom.  The first session took place on March 16, 2021 and lasted approximately nine hours.  The parties promptly arranged for a second mediation session which took place on March 25, 2021 and lasted nearly six hours.  The Parties engaged in good faith negotiations, which at all times were at arms' length.  Towards the end of the second mediation session, the Parties agreed to all material terms of a settlement in this case.

J.      At all times, Defendant has denied and continues to deny any wrongdoing whatsoever and has denied and continues to deny that it committed any wrongful act or violation of law or duty alleged in the Action, and has opposed and continues to oppose certification of a litigation class.  Defendant believes that the claims asserted in the Action do not have merit and that Defendant would have prevailed on its motion to dismiss, at summary judgment or at trial. Nonetheless, taking into account the uncertainty and risks inherent in any litigation, Defendant has concluded it is desirable and beneficial that the Action be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in this Agreement.  This Agreement is a compromise, and the Agreement, any related documents, and any negotiations resulting in it shall not be construed as or deemed to be evidence of or an admission or concession of liability or wrongdoing on the part of Defendant, or any of the Released Parties (defined below), with respect to any claim of any fault or liability or wrongdoing or damage whatsoever or with respect to the certifiability of a litigation class.

K.      Plaintiff believes that the claims asserted in the Action against Defendant have merit and that she would have prevailed at summary judgment and/or trial.  Nonetheless, Plaintiff and Class Counsel recognize that Defendant has raised factual and legal defenses that present a risk that Plaintiff may not prevail.  Plaintiff and Class Counsel also recognize the expense and delay associated with continued prosecution of the Action against Defendant through class certification, summary judgment, trial, and any subsequent appeals.  Plaintiff and Class Counsel also have taken

into account the uncertain outcome and risks of litigation, especially in complex class actions, as well as the difficulties inherent in such litigation.  Therefore, Plaintiff believes it is desirable that the Released Claims be fully and finally compromised, settled, and resolved with prejudice.  Based on its evaluation, Class Counsel has concluded that the terms and conditions of this Agreement are fair, reasonable, and adequate to the Settlement Class, and that it is in the best interests of the Settlement Class to settle the claims raised in the Action pursuant to the terms and provisions of this Agreement.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED** by and among Plaintiff, the Settlement Class, and each of them, and Defendant, by and through its undersigned counsel that, subject to final approval of the Court after a hearing or hearings as provided for in this Settlement Agreement, in consideration of the benefits flowing to the Parties from the Agreement set forth herein, that the Action and the Released Claims will be finally and fully compromised, settled, and released, and the Action will be dismissed with prejudice, upon and subject to the terms and conditions of this Agreement.

## AGREEMENT

1.      **DEFINED TERMS.**

As used in this Settlement Agreement, the following terms have the meanings specified below:

1.1      **"Action"** means *Jordan v. WP Company LLC*, Case No. 3:20-cv-05218-WHO, pending in the United States District Court for the Northern District of California.

1.2      **"Active Class Members"** or **"Active Subscribers"** means Settlement Class Members with at least one WaPo Subscription that was active as of April 1, 2021.

1.3      **"Active Annual Class Members"** means Active Class Members whose most recent WaPo Subscription was an Annual WaPo Subscription as of April 1, 2021.

1.4      **"Active Four-Week Class Members"** means Active Class Members whose most recent WaPo Subscription was a Four-Week Subscription as of April 1, 2021.

**1.5** **"Alternate Judgment"** means a form of final judgment that may be entered by the Court herein but in a form other than the form of Judgment provided for in this Agreement and where none of the Parties elects to terminate this Settlement by reason of such variance.

**1.6** **"Annual WaPo Subscription"** means a WaPo Subscription with a billing period of one year.

**1.7** **"Approved Claim"** means a Claim Form submitted by a Settlement Class Member for cash payment from the Settlement Fund that is: (a) submitted timely and in accordance with the directions on the Claim Form and the provisions of the Settlement Agreement, as determined by the Settlement Administrator; (b) fully and truthfully completed by a Settlement Class Member with all of the information requested in the Claim Form; (c) signed by the Settlement Class Member, physically or electronically under penalty of perjury; and (d) approved by the Settlement Administrator pursuant to the provisions of this Agreement.

**1.8** **"Automatic Account Credit Codes"** means codes for free access to various WaPo-branded subscription products made available to Active and Inactive Subscribers who do not submit an Approved Claim by the Claims Deadline. Automatic Account Credit Codes shall be freely transferable and shall not expire.

**1.9** **"Claimant"** means a Settlement Class Member who submits a Claim Form for cash payment as described in paragraph 2.2(f) of this Settlement Agreement.

**1.10** **"Claim Form"** means the document substantially in the form attached hereto as **Exhibit A**, as approved by the Court. The Claim Form shall be submitted by Settlement Class Members seeking a cash payment pursuant to this Settlement Agreement. The Claim Form will be available online at the Settlement Website (defined at paragraph 1.50 below).

**1.11** **"Claims Deadline"** means the date by which all Claim Forms must be postmarked or received, including by electronic submission via the Settlement Website, to be considered timely and will be set as a date no later than forty-five (45) days following the dissemination of Notice to the Settlement Class by the Settlement Administrator, pursuant to the terms herein. The Claims Deadline will be clearly set forth in the Preliminary Approval Order, and will be stated on the Notice and the Claim Form.

1     **1.12** **"Class Counsel"** means Frederick J. Klorczyk III of the law firm of Bursor &

2     Fisher, P.A.

3     **1.13** **"Class Period"** means the period of time from July 29, 2016, to and through April

4     1, 2021.

5     **1.14** **"Class Representative"** means the named Plaintiff in this Action, Deborah Jordan.

6     **1.15** **"Court"** means the United States District Court for the Northern District of

7     California, the Honorable William H. Orrick presiding, or any judge who will succeed him as the

8     Judge in this Action.

9     **1.16** **"Defendant"** or **"WaPo"** means WP Company LLC d/b/a *The Washington Post*.

10    **1.17** **"Defendant's Counsel"** means Alexei Klestoff of the law firm of ZwillGen Law

11    LLP and Jacob A. Sommer and Zachary Lerner of the law firm of ZwillGen Law PLLC.

12    **1.18** **"Effective Date"** means the date ten (10) days after which all of the events and

13    conditions specified in paragraph 9.1 have been met and have occurred, provided that this

14    Agreement has not been terminated in accordance with the provisions of Section 6 below.

15    **1.19** **"Escrow Account"** means the separate, interest-bearing escrow account to be

16    established by the Settlement Administrator under terms acceptable to all Parties at a depository

17    institution insured by the Federal Deposit Insurance Corporation.  The Settlement Fund shall be

18    deposited by Defendant into the Escrow Account in accordance with the terms of this Agreement

19    and the money in the Escrow Account shall be invested in the following types of accounts and/or

20    instruments and no other:  (i) demand deposit accounts and/or (ii) time deposit accounts and

21    certificates of deposit, in either case with maturities of forty-five (45) days or less.  The costs of

22    establishing and maintaining the Escrow Account shall be paid from the Settlement Fund.

23    **1.20** **"Fee Award"** means the amount of attorneys' fees and reimbursement of expenses

24    awarded by the Court to Class Counsel, which will be paid out of the Settlement Fund.

25    **1.21** **"Final Approval Date"** means one (1) day following the latest of the following

26    events: (i) the date upon which the time expires for filing or noticing any appeal of the Court's

27    Settlement Approval Order and Final Judgment approving the Settlement Agreement, if no appeal

28    has been filed; (ii) if there is an appeal or appeals, other than an appeal or appeals solely with

respect to the Fee Award, the date of completion, in a manner that finally affirms and leaves in place the Final Judgment without any material modification, of all proceedings arising out of the appeal or appeals (including, but not limited to, the expiration of all deadlines for motions for reconsideration or petitions for review and/or *certiorari*, all proceedings ordered on remand, and all proceedings arising out of any subsequent appeal or appeals following decisions on remand); or (iii) the date of final dismissal of any appeal or the final dismissal of any proceeding on *certiorari*.

      **1.22** **"Final"** means, with respect to any court order, including, without limitation, the Final Judgment, that such order represents a final and binding determination of all issues within its scope and is not subject to further review on appeal or otherwise.  An order becomes "Final" when: (i) no appeal has been filed and the prescribed time for commencing any appeal has expired; or (ii) an appeal has been filed and either (a) the appeal has been dismissed and the prescribed time, if any, for commencing any further appeal has expired, or (b) the order has been affirmed in its entirety and the prescribed time, if any, for commencing any further appeal has expired.  Any appeal or other proceeding pertaining solely to any order issued with respect to any application for attorneys' fees and expenses and/or Incentive Awards pursuant to Section 8 below, shall not in any way delay or prevent the Final Judgment from becoming Final.

      **1.23** **"Final Approval Hearing"** means the hearing before the Court where the Parties will request the Final Judgment to be entered by the Court approving the Settlement Agreement, the Fee Award, and the Incentive Award to the Class Representative.

      **1.24** **"Final Judgment"** means the Final Judgment and Order to be entered by the Court approving the Agreement after the Final Approval Hearing, which is substantially in the form of **Exhibit H** attached hereto.

      **1.25** **"Four-Week WaPo Subscription"** means a WaPo Subscription with a billing period of four weeks or one month.

      **1.26** **"Inactive Class Members"** or **"Inactive Subscribers"** means Settlement Class Members who did not have any active WaPo Subscription as of April 1, 2021.

      **1.27** **"Inactive Annual Class Members"** means Inactive Class Members whose most recent WaPo Subscription was an Annual WaPo Subscription.

1   **1.28**   **"Inactive Four-Week Class Members"** means Inactive Class Members whose

2   most recent WaPo Subscription was a Four-Week WaPo Subscription.

3   **1.29**   **"Incentive Award"** means any award approved by the Court that is payable to the

4   Plaintiff from the Settlement Fund.

5   **1.30**   **"Notice Plan"** means the Settlement Administrator's plan to disseminate Notice to

6   Settlement Class Members, as set forth in paragraph 4.1 below.  The Notice Plan will include a

7   short form notice, email notice, long form notice, and internet notice.

8   **1.31**   **"Net Settlement Fund"** means the amount of the Settlement Fund remaining after

9   payment of claims administration and notice costs, incentive award to the Class Representative,

10  and the Fee Award.

11  **1.32**   **"Notice"** means the notice of this proposed Class Action Settlement Agreement and

12  Final Approval Hearing, which is to be sent to the Settlement Class substantially in the manner set

13  forth in this Agreement, consistent with the requirements of Due Process, Rule 23, and

14  substantially in the form of **Exhibits A, B, C, D**, and **E** hereto.

15  **1.33**   **"Notice and Other Administrative Costs"** means all costs and expenses actually

16  incurred by the Settlement Administrator in the publication of Notice, establishment of the

17  Settlement Website, providing CAFA notice, the processing, handling, reviewing, and paying of

18  claims made by Claimants, paying taxes and tax expenses related to the Settlement Fund (including

19  all federal, state, or local taxes of any kind and interest or penalties thereon, as well as expenses

20  incurred in connection with determining the amount of and paying any taxes owed and expenses

21  related to any tax attorneys and accountants).

22  **1.34**   **"Notice Date"** means the publication of notice pursuant to paragraph 4.1(b), which

23  shall be no later than twenty-eight (28) days after the Preliminary Approval Order.

24  **1.35**   **"Objection/Exclusion Deadline"** means the date by which a written objection to

25  this Settlement Agreement or a request for exclusion submitted by a Person within the Settlement

26  Class must be made, which shall be designated as a date no later than forty-five (45) days after the

27  Notice Date and no sooner than fourteen (14) days after papers supporting the Fee Award are filed

28

with the Court and posted to the Settlement Website referenced in paragraph 4.1(e) below, or such other date as ordered by the Court.

1.36    **"Person"** shall mean, without limitation, any individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouse, parent, child, guardian, associate, co-owners, heirs, predecessors, successors, representatives, or assigns.  "Person" is not intended to include any governmental agencies or governmental actors, including, without limitation, any state Attorney General office.

1.37    **"Plaintiff"** means Deborah Jordan.

1.38    **"Preliminary Approval"** means the Court's entry of an order preliminarily approving the terms and conditions of this Settlement Agreement, including the manner of providing, and content of, the notice to Settlement Class Members.

1.39    **"Preliminary Approval Date"** means the date on which the Court enters an order granting Preliminary Approval.

1.40    **"Preliminary Approval Order"** means the order preliminarily approving the Settlement Agreement, conditionally certifying the Settlement Class for settlement purposes, and directing notice thereof to the Settlement Class, which will be agreed upon by the Parties and submitted to the Court in conjunction with Plaintiffs' motion for preliminary approval of the Agreement.  The Parties' proposed form of Preliminary Approval Order is attached hereto as **Exhibit G**.

1.41    **"Released Claims"** means any and all causes of action or claims for relief, whether in law or equity, including but not limited to injunctive relief, actual damages, nominal damages, statutory damages, punitive damages, exemplary or multiplied damages, restitution, disgorgement, expenses, attorneys' fees and costs, and/or any other form of consideration whatsoever (including "Unknown Claims" as defined below), whether in law or in equity, accrued or un-accrued, direct, individual or representative, of every nature and description whatsoever, that were brought or could have been brought in the Action relating to any and all Releasing Parties, any WaPo Subscription

associated with any of them, or that in any way relate to or arise out of Defendant's automatic renewal and/or continuous service programs in California from July 29, 2016, to and through April 1, 2021, including but not limited to any of the facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures to act related thereto.

**1.42** **"Released Parties"** means WP Company LLC, as well as any and all of its respective present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parent companies, subsidiaries, licensors, licensees, associates, affiliates, employers, agents, consultants, independent contractors, insurers, and customers, including without limitation employees of the foregoing, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, underwriters, shareholders, lenders, auditors, investment advisors, legal representatives, successors in interest, assigns and companies, firms, trusts, and corporations.

**1.43** **"Releasing Parties"** means Plaintiff, those Settlement Class Members who do not timely opt out of the Settlement Class, each WaPo Subscription associated with such Settlement Class Member, and all of their respective present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parent companies, subsidiaries, associates, affiliates, employers, employees, agents, consultants, independent contractors, insurers, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, underwriters, shareholders, lenders, auditors, investment advisors, legal representatives, successors in interest, assigns and companies, firms, trusts, and corporations.

**1.44** **"Settlement Administration Expenses"** means the expenses incurred by the Settlement Administrator in providing Notice (including CAFA notice), processing claims, responding to inquiries from members of the Settlement Class, mailing checks or distributing e-payments for Approved Claims, and related services, paying taxes and tax expenses related to the Settlement Fund (including all federal, state or local taxes of any kind and interest or penalties thereon, as well as expenses incurred in connection with determining the amount of and paying any taxes owed and expenses related to any tax attorneys and accountants), as well as all expenses

related to the resolution of any disputed claims by Jill R. Sperber, Esq., as described below in paragraph 5.3.

**1.45** **"Settlement Administrator"** means a reputable administration company that has been selected jointly by the Parties and approved by the Court to perform the duties set forth in this Agreement, including but not limited to serving as Escrow Agent for the Settlement Fund, overseeing the distribution of Notice, as well as the processing and payment of Approved Claims to the Settlement Class as set forth in this Agreement, handing all approved payments out of the Settlement Fund, and handling the determination, payment and filing of forms related to all federal, state and/or local taxes of any kind (including any interest or penalties thereon) that may be owed on any income earned by the Settlement Fund.  Class Counsel's assent to this Agreement shall constitute consent on behalf of each and every member of the Settlement Class as defined herein to disclose all information required by the Settlement Administrator to perform the duties and functions ascribed to it herein.

**1.46** **"Settlement Class"** means all Persons who, from July 29, 2016, to and through April 1, 2021, enrolled in an automatically renewing WaPo Subscription using a California billing address and who, during that time period, were charged and paid one or more automatic renewal fees in connection with such subscription.  Excluded from the Settlement Class are: (1) any Judge or Magistrate presiding over this Action and members of their families; (2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former officers, directors, agents, attorneys, and employees; (3) Persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors or assigns of any excluded Persons.

**1.47** **"Settlement Class Member"** means a Person who falls within the definition of the Settlement Class.

**1.48** **"Settlement Fund"** means the non-reversionary total cash fund that shall be established by Defendant for purposes of this settlement in the total amount of $2,400,000.00 USD to be deposited into the Escrow Account, according to the schedule set forth herein, plus all interest earned thereon.  The Settlement Fund shall be used for payment of the following: (i) Approved

Claims for cash benefits submitted by Settlement Class Members pursuant to paragraph 2.2 below; (ii) the Notice and Other Administrative Costs actually incurred by the Settlement Administrator, as described in paragraph 1.33 above;  (iii) the Fee Award, as defined and described in paragraphs 1.20 and 8.1 below; and (iv) any Incentive Award to the Plaintiff, not to exceed $5,000.00 USD, as may be ordered by the Court and as described herein at paragraphs 1.29 and 8.3.  The Settlement Fund shall be kept in the Escrow Account with permissions granted to the Settlement Administrator to access said funds until such time as the listed payments are made. The Settlement Administrator shall be responsible for all tax filings with respect to any earnings on the Settlement Fund and the payment of all taxes that may be due on such earnings.  The Settlement Fund represents the total extent of Defendant's monetary obligations under this Agreement.  The payment of the Settlement Amount by Defendant fully discharges the Defendant and the other Released Parties' financial obligations (if any) in connection with the Settlement, meaning that no Released Party shall have any other obligation to make any payment into the Escrow Account or to any Settlement Class Member, or any other Person, under this Agreement.  In no event shall the total monetary obligation with respect to this Agreement on behalf of Defendant exceed two million four hundred thousand dollars ($2,400,000).

**1.49**    **"Settlement Value"** means the Settlement Fund ($2,400,000) plus the market value of the total amount of Automatic Account Credit Codes made available to Active Class Members and Inactive Class Members.  The Settlement Value per this calculation as of May 28, 2021 is approximately $6,762,480.00.

**1.50**    **"Settlement Website"** means a website to be established, operated, and maintained by the Settlement Administrator for purposes of providing notice and otherwise making available to the Settlement Class Members the documents, information, and online claims submission process referenced in paragraphs 2.2 and 4.1, below.

**1.51**    **"Short Form Notice"** means the Court-approved form of notice for publication to Settlement Class Members, pursuant to the Notice Plan.

**1.52**    **"Unknown Claims"** means claims that could have been raised in the Action and that any or all of the Releasing Parties do not know or suspect to exist, which, if known by him or

her, might affect his or her agreement to release the Released Parties or the Released Claims or might affect his or her decision to agree, object, or not to object to the Settlement.  Upon the Effective Date, the Releasing Parties will be deemed to have, and will have, expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits of § 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Upon the Effective Date, the Releasing Parties also will be deemed to have, and will have, waived any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, or the law of any jurisdiction outside of the United States, which is similar, comparable, or equivalent to § 1542 of the California Civil Code.  The Releasing Parties acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is their intention to finally and forever settle and release the Released Claims, notwithstanding any Unknown Claims they may have, as that term is defined in this paragraph.

**1.53** **"WaPo All-Access Digital Subscription"** means a WaPo Subscription advertised as an all-access digital subscription or basic digital subscription.

**1.54** **"WaPo Subscriptions"** means all of Defendant's digital subscription offerings, including the WaPo All-Access Digital Subscription and the WaPo Premium Digital Subscription.

**1.55** **"WaPo Premium Digital Subscription"** means a WaPo Subscription advertised as a premium digital subscription.

**2.** **SETTLEMENT RELIEF.**

**2.1** Defendant shall cause to be paid into the Escrow Account the amount of the Settlement Fund ($2,400,000 USD), specified in paragraph 1.48 of this Agreement, within 30 days

after the Effective Date.  *See* paragraph 1.19 above.  Once Defendant makes its payment to the Escrow Fund, all risk of loss shall pass to the Escrow Fund.

    **2.2**    **Benefits For Settlement Class Members**.  Settlement Class Members will be entitled to the following relief:

    **(a)**    Active Annual Class Members shall be entitled to:

        1.  Do nothing and receive an Automatic Account Credit Code for eight (8) weeks of their then-current WaPo Subscription through an access code sent to the email account they use to subscribe to the WaPo Subscription, valued at $20.00; or

        2.  File a valid claim and receive a *pro rata* cash payment of 2 shares (expected to be $20) from the Net Settlement Fund.

        3.  The Claim Form provided to Active Annual Subscribers shall include information about how to cancel their account.

    **(b)**    Active Four-Week Class Members shall be entitled to:

        1.  Do nothing and receive an Automatic Account Credit Code for four (4) weeks of their then-current WaPo Subscription through an access code sent to the email account they use to subscribe to the WaPo Subscription, valued at $10.00; or

        2.  File a valid claim and receive a *pro rata* cash payment of 1 share (expected to be $10) from the Net Settlement Fund .

        3.  The Claim Form provided to Active Four-Week Subscribers shall include information about how to cancel their account.

    **(c)**    Inactive Annual Class Members may elect to either:

        1.  Do nothing and receive an Automatic Account Credit Code for eight (8) weeks of a free WaPo Premium Digital Subscription, valued at $20.00 through an access code sent to the email account they used to subscribe to the WaPo Subscription; or

2.  File a valid claim and receive a *pro rata* cash payment of 2 shares (expected to be $20) from the Net Settlement Fund.

**(d)**   Inactive Four-Week Class Members may elect to either:

1.   Do nothing and receive an Automatic Account Credit Code for four (4) weeks of a free WaPo Premium Digital Subscription, valued at $10.00 through an access code sent to the email account they used to subscribe to the WaPo Subscription; or

2.  File a valid claim and receive a *pro rata* cash payment of 1 share (expected to be $10) from the Net Settlement Fund.

**(e)**   Settlement Class Members who do not submit a valid Claim Form electing to receive cash will receive an Automatic Account Credit Code, as specified above, based on whether they are deemed Active Annual Class Members, Active Four-Week Class Members, Inactive Annual Class Members, or Inactive Four-Week Class Members as defined in paragraphs 1.3-1.4 and 1.27-1.28 above. *See also* paragraphs 1.2, 1.6, 1.25-1.26.  Defendant shall make the Automatic Account Credit Codes available to the Settlement Administrator within 60 days of the Effective Date.  Within 7 days of the Automatic Account Credit Codes becoming available, the Settlement Administrator will send email notice, using the email addresses WaPo provided to the Settlement Administrator and language to be agreed upon by the Parties, to all Settlement Class Members who did not file a valid claim advising as to the availability of the Automatic Account Credit Codes.  No payment or billing information will be required for an Inactive Class Member to use the Automatic Account Credit Code.  The Automatic Account Credit Codes will not expire and may be freely transferred. If an Active Class Member whose WaPo Subscription was purchased on or through a third-party platform or service (the Apple App Store, the Google Play Store, or Amazon) is unable to redeem an Automatic Account Credit Code, WaPo may provide that Active Class Member with substitute compensation of equal value.

**(f)**   Settlement Class Members wishing to receive cash must make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator.  Settlement Class Members shall have until the Claims Deadline to submit a Claim Form for approval by the

Settlement Administrator as an Approved Claim.  Each Settlement Class Member who submits an Approved Claim will receive a *pro rata* payment from the Settlement Fund in the form of a check or e-payment, issued and mailed by the Settlement Administrator within 60 days of the Effective Date.

(g)     The Settlement Administrator will be responsible for reviewing all claims to determine their validity.  The Settlement Administrator will reject any claim that does not comply in any material respect with the instructions on the Claim Form (defined at paragraph 1.10 above) or the terms of paragraph 1.7 above (defining "Approved Claim"), or that is submitted after the Claims Deadline specified at paragraph 1.11 above.  Defendant has the right to audit the claims process for evidence of fraud or error; provided, however, that the Settlement Administrator or the Court shall be the final arbiter of a claim's validity.

(h)     Each claimant who submits an invalid Claim Form to the Settlement Administrator must be given a notice of the Claim Form's deficiency and an opportunity to cure the deficiency within 21 days of the date of the notice.

(i)     All cash payments issued to Settlement Class Members via check will state on the face of the check that it will expire and become null and void unless cashed within one hundred and eighty (180) days after the date of issuance.  If a check issued to a Settlement Class Member is not cashed within one hundred and eighty (180) days after the date of issuance, such funds shall revert to the Legal Aid Association of California, a 501(c)(3) entity, or, if the intended beneficiary is unable to receive these funds, other non-sectarian, not-for-profit organization(s) with a similar mission in the State of California recommended by Class Counsel and Defendant, and as approved by the Court.

(j)     If an Automatic Account Credit Code emailed to a Settlement Class Member (using the email address specified in Defendant's records) is returned as non-deliverable, the Settlement Administrator shall send an Automatic Account Credit Code to the Settlement Class Member's billing or mailing address to which Notice was sent pursuant to paragraph 4.1 below via First Class U.S. Mail.  If either (i) Defendant does not have such Settlement Class Member's billing or mailing address in its records or (ii) such First Class U.S. Mail is returned as non-

deliverable, then the Automatic Account Credit Code shall be considered non-deliverable, and 180 days after the Effective Date, any non-deliverable Automatic Account Credit Codes shall revert to one or more non-sectarian, not-for-profit organization(s) or school(s) recommended by Class Counsel and Defendant, and as approved by the Court.

  **2.3**   **Prospective Relief.** Defendant agrees to provide automatic renewal terms on its checkout pages in a manner that is consistent with the requirements of Cal. Bus. & Prof. Code §§ 17600, *et seq.* Specifically, Defendant agrees to present to California subscribers on the checkout page for any WaPo Subscription that will automatically renew, the automatic renewal offer terms associated with such subscription (including by when a user must cancel) in a clear and conspicuous manner before the subscription or purchasing agreement and in visual proximity to the request for consent to the offer. Defendant will obtain affirmative consent to the agreement containing the automatic renewal terms in a manner that complies with the ARL. Defendant further agrees to disclose, in a manner that complies with the ARL, how to cancel and by when in an acknowledgment email that is capable of being retained by California consumers. Defendant further agrees to provide Persons with a California billing address enrolled in an active Annual WaPo Subscription (as of the execution of the Settlement Agreement) who have not yet renewed as of 60 days after the execution of the Settlement Agreement with a one-time additional acknowledgement email at least 30 days before their next renewal date that provides those subscribers with notice that their subscription will renew and includes a clear link to directions on how to cancel that subscription. Defendant further agrees to provide Persons with a California billing address enrolled in an active Four-Week WaPo Subscription (as of 30 days after the execution of the Settlement Agreement) who have not yet renewed as of 60 days after the execution of the Settlement Agreement with a one-time additional acknowledgement email at least 7 days before their next renewal date that provides those subscribers with notice that their subscription will renew and includes a clear link to directions on how to cancel that subscription.

**3.**   **RELEASE.**

  **3.1**   The obligations incurred pursuant to this Settlement Agreement shall be a full and final disposition of the Action and any and all Released Claims, as against all Released Parties.

**3.2** Upon the Effective Date, the Releasing Parties, and each of them, shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Parties, and each of them. Further, upon the Effective Date, and to the fullest extent permitted by law, each Settlement Class Member, including Plaintiff, shall, either directly, indirectly, representatively, or in any capacity, be permanently barred and enjoined from filing, commencing, prosecuting, intervening in, or participating (as a class member or otherwise) in any lawsuit, action, or other proceeding in any jurisdiction (other than participation in the Settlement as provided herein) against any Released Party based on the Released Claims.

**4.      NOTICE TO THE CLASS.**

**4.1** The Notice Plan shall consist of the following:

**(a)** *Settlement Class List*. Defendant shall produce an electronic list from its records that includes the names, and last known e-mail and, if available, U.S. Mail addresses that, according to its records, belong to Persons with WaPo Subscriptions within the Settlement Class. The electronic list shall also differentiate between Active Annual Class Members, Active Four-Week Class Members, Inactive Annual Class Members, and Inactive Four-Week Class Members, and shall include the Settlement Class Member's WaPo Subscriptions. This electronic document shall be called the "Class List," and shall be provided to the Settlement Administrator. In no event shall the Class List be provided to the Settlement Administrator later than fourteen (14) days prior to the date Notice shall be disseminated. This Class List is confidential and shall not be used for any other purposes beyond providing notice to the Settlement Class and assisting with the determination of valid claims. Class Counsel's assent to this Agreement shall constitute consent on behalf of each and every member of the Settlement Class as defined herein to disclose this information as stated in this paragraph.

**(b)** *Direct Notice to Settlement Class Members*. No later than the twenty-eight (28) days from entry of the Preliminary Approval Order, the Settlement Administrator shall send notice to the Active and Inactive Class Members via email, to the email address specified in Defendant's records, in the form attached as **Exhibit B**. If an email notice to an Active Class

Member is returned as non-deliverable, the Settlement Administrator shall send the notice in the form attached as **Exhibit C** to the Settlement Class Member's billing or mailing address (if specified in Defendant's records) via First Class U.S. Mail, together with a postcard Claim Form with return postage prepaid.  If an email notice to an Inactive Class Member is returned as non-deliverable, the Settlement Administrator shall send the notice in the form attached as **Exhibit D** to the Settlement Class Member's billing or mailing address via First Class U.S. Mail, together with a postcard Claim Form with return postage prepaid.

          **(c)**     For Settlement Class Members without an email address, the Settlement Administrator shall send the Notice via First Class U.S. Mail, together with a postcard Claim Form with return postage prepaid.

          **(d)**     If any Notice is returned as non-deliverable, and a forwarding address is provided, the Settlement Administrator shall re-mail the Notice to the forwarding address within five (5) days.  If any Notice is returned as non-deliverable, and no forwarding address is provided, the Settlement Administrator shall attempt to ascertain a valid address for the affected Settlement Class Member by seeking change of address information through the U.S. Postal Service's National Change of Address Link, and shall re-mail the Notice within five (5) days to the address(es) that are found.  The Settlement Administrator shall have no obligation to send Notices beyond those obligations specified herein.

          **(e)**     *Settlement Website.*  Within ten (10) days from entry of the Preliminary Approval Order, Notice shall be provided on a website at an available URL (such as, for example, www.CANewspaperRenewalSettlement.com) which shall be obtained, administered and maintained by the Settlement Administrator and shall include the ability to file Claim Forms online, provided that such Claim Forms, if signed electronically, will be binding for purposes of applicable law and contain a statement to that effect.  The Notice provided on the Settlement Website shall be substantially in the form of **Exhibit E** hereto.

          **(f)**     *CAFA Notice.*  Pursuant to 28 U.S.C. § 1715, not later than ten (10) days after the Agreement is filed with the Court, the Settlement Administrator shall cause to be served

upon the Attorney General of the United States and any other required government official notice

of the proposed settlement as required by law, subject to paragraph 5.1 below.

      **4.2**     The Notice shall advise the Settlement Class of their rights, including the rights to

be excluded from or object to the Settlement Agreement or any of its terms.  The Notice shall

specify that any objection to the Settlement Agreement, and any papers submitted in support of

said objection, shall be considered by the Court at the Final Approval Hearing only if, on or before

the Objection/Exclusion Deadline approved by the Court and specified in the Notice, the Person

making the objection files notice of an intention to do so and at the same time (a) files copies of

such papers he or she proposes to be submitted at the Final Approval Hearing with the Clerk of the

Court, or alternatively, if the objection is from a Settlement Class Member represented by counsel,

files any objection through the Court's CM/ECF system, and (b) sends copies of such papers by

mail, hand, or overnight delivery service to Class Counsel and Defendant's Counsel.

      **4.3**     Any Settlement Class Member who intends to object to this Agreement must present

the objection in writing to the Settlement Administrator, postmarked on or before the

Objection/Exclusion deadline approved by the Court and specified in the Notice, which must be

personally signed by the objector, and must include:  (1) the objector's name and address; (2) an

explanation of the basis upon which the objector claims to be a Settlement Class Member; (3) all

grounds for the objection, including all citations to legal authority and evidence supporting the

objection; (4) the name and contact information of any and all attorneys representing, advising, or

in any way assisting the objector in connection with the preparation or submission of the objection

or who may profit from the pursuit of the objection (the "Objecting Attorneys"); and (5) a

statement indicating whether the objector intends to appear at the Final Approval Hearing (either

personally or through counsel who files an appearance with the Court in accordance with the Local

Rules).

      **4.4**     If a Settlement Class Member or any of the Objecting Attorneys has objected to any

class action settlement where the objector or the Objecting Attorneys asked for or received any

payment in exchange for dismissal of the objection, or any related appeal, without any modification

to the settlement, then the objection must include a statement identifying each such case by full case caption and amount of payment received.

**4.5** A Settlement Class Member may request to be excluded from the Settlement Class by sending a written request postmarked on or before the Objection/Exclusion Deadline approved by the Court and specified in the Notice. To exercise the right to be excluded, a Person in the Settlement Class must timely send a written request for exclusion to the Settlement Administrator providing his/her name and address, a signature, the name and number of the case, and a statement that he or she wishes to be excluded from the Settlement Class for purposes of this Settlement. A request to be excluded that does not include all of this information, or that is sent to an address other than that designated in the Notice, or that is not postmarked within the time specified, shall be invalid, and the Person(s) serving such a request shall be a member(s) of the Settlement Class and shall be bound as a Settlement Class Member by this Agreement, if approved. Any member of the Settlement Class who validly elects to be excluded from this Agreement shall not: (i) be bound by any orders or the Final Judgment; (ii) be entitled to relief under this Settlement Agreement; (iii) gain any rights by virtue of this Agreement; or (iv) be entitled to object to any aspect of this Agreement. The request for exclusion must be personally signed by each Person requesting exclusion. So-called "mass" or "class" opt-outs shall not be allowed. To be valid, a request for exclusion must be postmarked or received by the date specified in the Notice. Upon receiving any request(s) for exclusion, the Settlement Administrator shall stamp on the original the date it was received and shall promptly notify Class Counsel and Defendant's Counsel of such request(s) no later than two (2) calendar days after receiving any request. The Settlement Administrator shall indicate whether such request is timely received, and provide copies of the request(s) for exclusion, the mailing envelope, and any accompanying documentation, by email. The Parties and their respective counsel agree that they will make no effort to suggest, solicit, facilitate or otherwise encourage potential Settlement Class Members to opt out of the Settlement Class.

**4.6** The Final Approval Hearing shall be no earlier than one hundred and thirty five (135) days after the date Preliminary Approval is granted.

5.      **SETTLEMENT ADMINISTRATION.**

**5.1**      The Settlement Administrator shall, under the supervision of the Court, administer the relief provided by this Settlement Agreement by processing Claim Forms in a rational, responsive, cost effective, and timely manner, consistent with the terms of this Agreement.  The Settlement Administrator shall maintain reasonably detailed records of its activities under this Agreement.  The Settlement Administrator shall maintain all such records as are required by applicable law in accordance with its normal business practices and such records will be made available to Class Counsel and Defendant's Counsel upon request.  The Settlement Administrator shall also provide reports and other information to the Court as the Court may require.  The Settlement Administrator shall provide Class Counsel and Defendant's Counsel with regular reports at weekly intervals containing information concerning Notice, administration, and implementation of the Settlement Agreement.  Should the Court request, the Parties shall submit a timely report to the Court summarizing the work performed by the Settlement Administrator, including a report of all amounts from the Settlement Fund paid to Settlement Class Members on account of Approved Claims.  Without limiting the foregoing, the Settlement Administrator shall:

**(a)**      Forward to Defendant's Counsel, with copies to Class Counsel, all original documents and other materials received in connection with the administration of the Settlement, and all copies thereof, within thirty (30) days after the date on which all Claim Forms have been finally approved or disallowed in accordance with the terms of this Agreement;

**(b)**      Provide Class Counsel and Defendant's Counsel with drafts of all administration related documents, including but not limited to CAFA Notices, follow-up class notices or communications with Settlement Class Members, telephone scripts, website postings or language or other communications with the Settlement Class, at least five (5) days before the Settlement Administrator is required to or intends to publish or use such communications, unless Class Counsel and Defendant's Counsel agree to waive this requirement in writing on a case by case basis;

**(c)**      Receive requests to be excluded from the Settlement Class and other requests and promptly provide to Class Counsel and Defendant's Counsel copies thereof.  If the

Settlement Administrator receives any exclusion forms or other requests after the deadline for the submission of such forms and requests, the Settlement Administrator shall promptly provide copies thereof to Class Counsel and Defendant's Counsel;

> **(d)** Provide weekly reports to Class Counsel and Defendant's Counsel, including without limitation, reports regarding the number of Claim Forms received, the number approved by the Settlement Administrator, and the categorization and description of Claim Forms rejected, in whole or in part, by the Settlement Administrator; and

> **(e)** Make available for inspection by Class Counsel or Defendant's Counsel the Claim Forms received by the Settlement Administrator at any time upon reasonable notice.

**5.2** The Settlement Administrator shall be obliged to employ reasonable procedures to screen claims for abuse or fraud and deny Claim Forms where there is evidence of abuse or fraud. The Settlement Administrator shall determine whether a Claim Form submitted by a Settlement Class Member is an Approved Claim by determining if the Person is on the Class List and shall reject Claim Forms that fail to (a) comply with the instructions on the Claim Form or the terms of this Agreement, or (b) provide full and complete information as requested on the Claim Form. If a Person submits a timely Claim Form by the Claims Deadline where the Person appears on the Class List but the Claim Form is not otherwise complete, then the Settlement Administrator shall give such Person one (1) reasonable opportunity to provide any requested missing information, which information must be received by the Settlement Administrator no later than thirty (30) calendar days after the Claims Deadline. If the Settlement Administrator receives such information more than thirty (30) days after the Claims Deadline, then any such claim shall be denied. The Settlement Administrator may contact any Person who has submitted a Claim Form to obtain additional information necessary to verify the Claim Form.

**5.3** Defendant's Counsel and Class Counsel shall have the right to challenge the acceptance or rejection of a Claim Form submitted by Settlement Class Members. The Settlement Administrator shall follow any agreed decisions of Class Counsel and Defendant's Counsel as to the validity of any disputed submitted Claim Form. To the extent Class Counsel and Defendant's Counsel are not able to agree on the disposition of a challenge, the disputed claim shall be

submitted to Jill R. Sperber, Esq., of Judicate West.  Ms. Sperber will charge the Judicate West hourly rate for providing such services to the Settlement Class, and all expenses related thereto will be paid by the Settlement Administrator from the Settlement Fund.  Ms. Sperber's determination as to the disputed claim shall be final and binding on the Parties.

**5.4**    In the exercise of its duties outlined in this Agreement, the Settlement Administrator shall have the right to reasonably request additional information from the Parties or any Settlement Class Member.

**5.5**    Defendant, the Released Parties, and Defendant's Counsel shall have no responsibility for, interest in, or liability whatsoever with respect to:  (i) any act, omission, or determination by Class Counsel, or the Claims Administrator, or any of their respective designees or agents, in connection with the administration of the settlement or otherwise; (ii) the management, investment, or distribution of the Settlement Fund; (iii) the allocation of Net Settlement Funds to Settlement Class Members or the implementation, administration, calculation or interpretation thereof; (iv) the determination, administration, calculation, or payment of any claims asserted against the Settlement Fund; (v) any losses suffered by, or fluctuations in value of, the Settlement Fund; or (vi) the payment, reporting, or withholding of any taxes, tax expenses, or costs incurred in connection with the taxation of the Settlement Fund or the filing of any federal, state, or local returns.

**5.6**    To allow a calculation of the *pro rata* payments to Settlement Class Members, no later than twenty-one (21) days before any distribution of Settlement Funds must occur, the Settlement Administrator shall submit to Class Counsel and Defendant's Counsel a final and total invoice for all of the Settlement Administrator's services.

**5.7**    All taxes and tax expenses shall be paid out of the Settlement Fund, and shall be timely paid by the Settlement Administrator pursuant to this Agreement and without further order of the Court.  Any tax returns or reporting forms prepared for the Settlement Fund (as well as the election set forth therein) shall be consistent with this Agreement and in all events shall reflect that all taxes on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided herein.  The Released Parties shall have no responsibility or liability for the acts or

omissions of the Settlement Administrator or its agents with respect to the reporting or payment of taxes or tax expenses.

**5.8**     The Settlement administrator shall, as *cy pres*, direct that funds related to uncashed checks, as set forth in Section 2.2(i) above, are distributed to the Legal Aid Association of California, a 501(c)(3) entity, or, if the intended beneficiary is unable to receive these funds, other non-sectarian, not-for-profit organization(s) with a similar mission in the State of California recommended by Class Counsel and Defendant, and as approved by the Court.

**6**     **TERMINATION OF SETTLEMENT.**

**6.1**     Subject to Section 9 below, Defendant or the Class Representative on behalf of the Settlement Class, shall have the right to terminate this Agreement by providing written notice of the election to do so ("Termination Notice") to all other Parties hereto within twenty-one (21) days of any of the following events:  (i) the Court's refusal to grant Preliminary Approval of this Agreement in any material respect; (ii) the Court's refusal to grant Final Approval of this Agreement in any material respect; (iii) the Court's refusal to enter the Final Judgment in this Action in any material respect; (iv) the date upon which the Final Judgment is vacated, modified or reversed in any material respect by the Court, the Court of Appeals or the Supreme Court; or (v) the date upon which an Alternate Judgment as defined in paragraphs 1.5 and 9.1(d) of this Agreement is vacated, modified, or reversed in any material respect by the Court, the Court of Appeals, or the Supreme Court.

**6.2**     If, prior to the filing of the Final Approval Motion, Persons who otherwise would be members of the Settlement Class have timely requested exclusion from the Settlement Class in accordance with the provisions of the Notice, and such Persons in the aggregate constitute more than one-half of a percent (.5%) of the Settlement Class, Defendant shall have, in its sole and absolute discretion, the option to terminate this settlement by giving notice as set forth in paragraph 6.1 above.

**6.3**     If Defendant seeks to terminate the Settlement Agreement on the basis of paragraph 6.2 above, the Parties agree that any dispute as to whether Defendant may invoke paragraph 6.2 to terminate the Agreement that they cannot resolve amongst themselves after reasonable efforts,

1   notwithstanding that the Agreement will have been filed with and preliminarily approved by the

2   Court, the dispute shall be submitted to Jill Sperber, Esq. of Judicate West.  Ms. Sperber will

3   charge the Judicate West hourly rate for providing such services to the Settlement Class, and all

4   expenses related thereto will be paid by the Settlement Administrator from the Settlement Fund.

5   Ms. Sperber's determination as to the disputed claim shall be final and binding on the Parties.

6           If the Parties agree, or the neutral mediator rules, that one of the conditions provided in

7   paragraph 6.2 above has been satisfied, Defendant may exercise its option to terminate the

8   Agreement only if Defendant's Counsel provides Class Counsel with written notice no later than

9   twenty-eight (28) calendar days prior to the Final Approval Hearing.  If it appears that dispute

10  resolution efforts will not be completed before fourteen (14) days in advance of the Fairness

11  Hearing, the Parties will jointly seek an adjournment of the Final Approval Hearing to allow time

12  for this process to be completed.

13  **7      PRELIMINARY APPROVAL ORDER AND FINAL APPROVAL ORDER.**

14          **7.1**     Promptly after the execution of this Settlement Agreement, Class Counsel shall

15  submit this Agreement together with its Exhibits to the Court and shall move the Court for

16  Preliminary Approval of the settlement set forth in this Agreement; certification of the Settlement

17  Class for settlement purposes only; appointment of Class Counsel and the Class Representative;

18  and entry of a Preliminary Approval Order substantially in the form of **Exhibit G** hereto, which

19  order shall set a Final Approval Hearing date and approve the Notice and the Claim Form for

20  dissemination substantially in the form of **Exhibits A, B, C**, **D**, and **E** hereto.  The Preliminary

21  Approval Order shall also authorize the Parties, without further approval from the Court, to agree

22  to and adopt such amendments, modifications and expansions of the Settlement Agreement and its

23  implementing documents (including all Exhibits to this Agreement) so long as they are consistent

24  in all material respects with the terms of the Settlement Agreement and do not limit or impair the

25  rights of the Settlement Class or materially expand the obligations of Defendant.

26          **7.2**     At the time of the submission of this Agreement to the Court as described above,

27  Class Counsel shall request that, after Notice is given, the Court hold a Final Approval Hearing and

28  approve the settlement of the Action as set forth herein.

**7.3**     After Notice is given, the Parties shall request and seek to obtain from the Court a Final Judgment substantially in the form of **Exhibit H** hereto, which will (among other things):

(a)     find that the Court has personal jurisdiction over all Settlement Class Members and that the Court has subject matter jurisdiction to approve the Agreement, including all Exhibits thereto;

(b)     approve the Settlement Agreement and the proposed settlement as fair, reasonable, and adequate as to, and in the best interests of, the Settlement Class Members; direct the Parties and their counsel to implement and consummate the Agreement according to its terms and provisions; and declare the Agreement to be binding on, and have *res judicata* and preclusive effect in all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiffs and Releasing Parties;

(c)     find that the Notice implemented pursuant to the Agreement (1) constitutes the best practicable notice under the circumstances; (2) constitutes notice that is reasonably calculated, under the circumstances, to apprise the Settlement Class of the pendency of the Action, their right to object to or exclude themselves from the proposed Agreement, and to appear at the Final Approval Hearing; (3) is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and (4) meets all applicable requirements of the Federal Rules of Civil Procedure, the Due Process Clause of the United States Constitution, and the rules of the Court;

(d)     find that the prerequisites for a class action under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b) have been satisfied for settlement purposes for the Settlement Class in that: (1) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (2) there are questions of law and fact common to the Settlement Class Members; (3) the claims of the Class Representative are typical of the claims of the Settlement Class they seek to represent; (4) the Class Representative has and will continue to fairly and adequately represent the interests of the Settlement Class for purposes of entering into the Settlement Agreement; (5) the questions of law and fact common to Settlement Class Members predominate over any questions affecting any individual Settlement Class Member; (6) the Settlement Class is

ascertainable; and (7) a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.

(e)     dismiss the Action (including all individual claims and Settlement Class Claims presented thereby) on the merits and with prejudice, without fees or costs to any party except as provided in the Settlement Agreement;

(f)     incorporate the Release set forth above, make the Release effective as of the date of the Effective Date, and forever discharge the Released Parties as set forth herein;

(g)     permanently bar and enjoin all Settlement Class Members from filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in any lawsuit or other action in any jurisdiction based on the Released Claims;

(h)     without affecting the finality of the Final Judgment for purposes of appeal, retain jurisdiction as to all matters relating to administration, consummation, enforcement, and interpretation of the Settlement Agreement and the Final Judgment, and for any other necessary purpose;

(i)     close the case; and

(j)     incorporate any other provisions, as the Court deems necessary and just, provided that such other provisions do not materially abridge, enlarge or modify any rights or responsibilities of the Released Parties or Settlement Class Members under this Agreement.

## 8     CLASS COUNSEL'S ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES; INCENTIVE AWARD.

**8.1**     Defendant agrees that Class Counsel may apply to the Court to receive from the Settlement Fund, subject to Court approval, attorneys' fees, costs, and expenses not to exceed $2,000,000.00.  Plaintiff will petition the Court for an award of such attorneys' fees, costs, and expenses, and Defendant agrees to take no position on Class Counsel's petition for attorneys' fees, costs, and expenses if limited to this amount.  Class Counsel, in turn, agrees to seek no more than this amount from the Court in attorneys' fees, costs, and expenses.  In no event shall Defendant be obligated to pay or reimburse Class Counsel an amount greater than $2,000,000.00. Payment of the Fee Award shall be made from the Settlement Fund and should the Court award less than the

1  amount sought by Class Counsel, the difference in the amount sought and the amount ultimately

2  awarded pursuant to this paragraph shall remain in the Settlement Fund for *pro rata* distribution to

3  Settlement Class Members in distributions for Approved Claims.

4      **8.2**    The Fee Award shall be payable by the Settlement Administrator within ten (10)

5  days after entry of the Court's Final Judgment, subject to Class Counsel executing the Undertaking

6  Regarding Attorneys' Fees and Costs (the "Undertaking") attached hereto as **Exhibit F**, and

7  providing all payment routing information and tax I.D. numbers for Class Counsel.  Payment of the

8  Fee Award shall be made from the Settlement Fund by wire transfer to Bursor & Fisher, P.A., in

9  accordance with wire instructions to be provided by Bursor & Fisher, P.A., and completion of

10  necessary forms, including but not limited to W-9 forms.  Notwithstanding the foregoing, if for any

11  reason the Final Judgment is reversed or rendered void as a result of an appeal(s) then Class

12  Counsel shall return such funds to the Defendant.  Additionally, should any parties to the

13  Undertaking dissolve, merge, declare bankruptcy, become insolvent, or cease to exist prior to the

14  final payment to Settlement Class Members, those parties shall execute a new undertaking

15  guaranteeing repayment of funds within 14 days of such an occurrence.

16      **8.3**    Defendant agrees that, subject to Court approval, the Settlement Administrator may

17  pay an Incentive Award to the Class Representative from the Settlement Fund, in addition to any

18  settlement payment as a result of a valid claim pursuant to this Agreement, in the amount of up to

19  five thousand dollars ($5,000).  Defendant shall not object to or otherwise challenge, directly or

20  indirectly, Class Counsel's application for the Incentive Award to the Class Representative if

21  limited to this amount.  Class Counsel, in turn, agrees to seek no more than this amount from the

22  Court as the Incentive Award for the Class Representative.  Should the Court award less than this

23  amount, the difference in the amount sought and the amount ultimately awarded pursuant to this

24  paragraph shall remain in the Settlement Fund for *pro rata* distribution to Settlement Class

25  Members in distributions for Approved Claims.  Such Incentive Award shall be paid from the

26  Settlement Fund (in the form of a check to the Class Representative that is sent care of Class

27  Counsel), within five (5) days after entry of the Final Judgment if there have been no objections to

28

the Settlement Agreement, and, if there have been such objections, within five (5) days after the Effective Date.

**9       CONDITIONS OF SETTLEMENT; EFFECT OF DISAPPROVAL, CANCELLATION, OR TERMINATION.**

    **9.1**     The Effective Date of this Settlement Agreement shall not occur unless and until ten (10) days after each of the following events occurs and shall be the date upon which the last (in time) of the following events occurs:

              **(a)**     the Parties and their counsel have executed this Agreement;

              **(b)**     the Court has entered the Preliminary Approval Order;

              **(c)**     the Court has entered an order finally approving the Agreement, following Notice to the Settlement Class and a Final Approval Hearing, as provided in the Federal Rules of Civil Procedure, and has entered the Final Judgment, or a judgment consistent with this Agreement in all material respects; and

              **(d)**     the Final Judgment has become Final, as defined above, or, if the Court enters an Alternate Judgment, such Alternate Judgment becomes Final.

    **9.2**     If some or all of the conditions specified in paragraph 9.1 are not met, or if the settlement set forth in this Agreement is not approved by the Court or is terminated or fails to become effective in accordance with its terms, then this Settlement Agreement shall be canceled and terminated subject to paragraph 6.1 above, unless Class Counsel and Defendant's Counsel mutually agree in writing to proceed with this Agreement. If any Party is in material breach of the terms hereof, any other Party, provided that it is in substantial compliance with the terms of this Agreement, may terminate this Agreement on notice to all of the Settling Parties. Notwithstanding anything herein, the Parties agree that the Court's failure to approve, in whole or in part, Class Counsel's request for payment of attorneys' fees, costs and/or expenses, and/or the request for Incentive Award payments set forth in Section 8 above shall not prevent the Agreement from becoming effective, nor shall it be grounds for termination.

    **9.3**     If this Agreement is terminated or fails to become effective for the reasons set forth in Section 6 and/or paragraphs 9.1-9.2 above, the Parties shall be restored to their respective

positions in the Action as of the moment just prior to the signing of this Agreement. In such event, any Final Judgment or other order entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*, and the Parties shall be returned to the *status quo ante* with respect to the Action as if this Agreement had never been entered into. Within five (5) days after written notification of termination as provided in this Agreement is sent to the other Parties, the Settlement Fund (including accrued interest thereon), less any Settlement Administration costs actually incurred, paid or payable and less any taxes and tax expenses paid, due or owing, shall be refunded by the Settlement Administrator to Defendant, based upon written instructions provided by Defendant's Counsel. If the Final Settlement Order and Judgment or any part of it is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Class Counsel shall, within thirty (30) days repay to Defendant, based upon written instructions provided by Defendant's Counsel, the full amount of the attorneys' fees and costs paid to Class Counsel from the Settlement Fund, including any accrued interest. If the attorney fees and costs awarded by the Court or any part of them are vacated, modified, reversed, or rendered void as a result of an appeal, Class Counsel shall within thirty (30) days repay to Defendant, based upon written instructions provided by Defendant's Counsel, the attorneys' fees and costs paid to Class Counsel and/or Class Representative from the Settlement Fund, in the amount vacated or modified, including any accrued interest.

**10     MISCELLANEOUS PROVISIONS.**

**10.1**     The Parties (a) acknowledge that it is their intent to consummate this Settlement Agreement, and (b) agree, subject to their fiduciary and other legal obligations, to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Agreement, to exercise their reasonable best efforts to accomplish the foregoing terms and conditions of this Agreement, to secure final approval, and to defend the Final Judgment through any and all appeals. Class Counsel and Defendant's Counsel agree to cooperate with one another in seeking Court approval of the Settlement Agreement, entry of the Preliminary Approval Order,

and the Final Judgment, and to promptly agree upon and execute all such other documentation as may be reasonably required to obtain final approval of the Agreement.

10.2    The Parties intend this Settlement Agreement to be a final and complete resolution of all disputes between them with respect to the Released Claims by Plaintiff and the Settlement Class (and each or any of them) on the one hand, against the Released Parties (and each or any of them) on the other hand.

10.3    The Parties have relied upon the advice and representation of counsel, selected by them, concerning their respective legal liability for the claims hereby released.  The Parties have read and understand fully the above and foregoing agreement and have been fully advised as to the legal effect thereof by counsel of their own selection and intend to be legally bound by the same.

10.4    Whether or not the Effective Date occurs or the Settlement Agreement is terminated, neither this Agreement nor the Settlement contained herein or any term, provision, or definition therein, nor any act or communication performed or document executed in the course of negotiating, implementing, or seeking approval pursuant to or in furtherance of this Agreement or the Settlement:

(a)    is, may be deemed, or shall be used, offered or received in any civil, criminal or administrative proceeding in any court, administrative agency, arbitral proceeding or other tribunal against the Released Parties, or each or any of them, as an admission, concession or evidence of, the validity of any Released Claims, the truth of any fact alleged by the Plaintiff, the deficiency of any defense that has been or could have been asserted in the Action, the violation of any law or statute, the definition or scope of any term or provision, the reasonableness of the settlement amount or the Fee Award, or of any alleged wrongdoing, liability, negligence, or fault of the Released Parties, or any of them.  Defendant, while continuing to deny all allegations of wrongdoing and disclaiming all liability with respect to all claims, considers it desirable to resolve the action on the terms stated herein to avoid further expense, inconvenience, and burden, and therefore has determined that this settlement is in Defendant's best interests.  Any public statements made by Plaintiffs or Class Counsel will be consistent with this paragraph and Class

Counsel will not issue any press release concerning this Agreement or the settlement contained herein;

(b)     is, may be deemed, or shall be used, offered or received against any Released Party, as an admission, concession or evidence of any fault, misrepresentation or omission with respect to any statement or written document approved or made by the Released Parties, or any of them;

(c)     is, may be deemed, or shall be used, offered or received against the Released Parties, or each or any of them, as an admission or concession with respect to any liability, negligence, fault or wrongdoing or statutory meaning as against any Released Parties, or supporting the certification of a litigation class, in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.  However, the settlement, this Agreement, and any acts performed and/or documents executed in furtherance of or pursuant to this Agreement and/or Settlement may be used in any proceedings as may be necessary to effectuate the provisions of this Agreement.  Further, if this Settlement Agreement is approved by the Court, any Party or any of the Released Parties may file this Agreement and/or the Final Judgment in any action that may be brought against such Party or Parties in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim;

(d)     is, may be deemed, or shall be construed against Plaintiff, the Settlement Class, the Releasing Parties, or each or any of them, or against the Released Parties, or each or any of them, as an admission or concession that the consideration to be given hereunder represents an amount equal to, less than or greater than that amount that could have or would have been recovered after trial; and

(e)     is, may be deemed, or shall be construed as or received in evidence as an admission or concession against Plaintiff, the Settlement Class, the Releasing Parties, or each and any of them, or against the Released Parties, or each or any of them, that any of Plaintiff's claims

are with or without merit or that damages recoverable in the Action would have exceeded or would have been less than any particular amount.

10.5    The Parties acknowledge that: (a) any certification of the Settlement Class as set forth in this Agreement, including certification of the Settlement Class for settlement purposes in the context of Preliminary Approval, shall not be deemed a concession that certification of a litigation class is appropriate, or that the Settlement Class definition would be appropriate for a litigation class, nor would Defendant be precluded from challenging class certification in further proceedings in the Action or in any other action if the Settlement Agreement is not finalized or finally approved; (b) if the Settlement Agreement is not finally approved by the Court for any reason whatsoever, then any certification of the Settlement Class will be void, the Parties and the Action shall be restored to the status quo ante, and no doctrine of waiver, estoppel or preclusion will be asserted in any litigated certification proceedings in the Action or in any other action; and (c) no agreements made by or entered into by Defendant in connection with the Settlement may be used by Plaintiff, any person in the Settlement Class, or any other person to establish any of the elements of class certification in any litigated certification proceedings, whether in the Action or any other judicial proceeding.

10.6    No person or entity shall have any claim against the Class Representative, Class Counsel, the Settlement Administrator or any other agent designated by Class Counsel, or the Released Parties and/or their counsel, arising from distributions made substantially in accordance with this Agreement.  The Parties and their respective counsel, and all other Released Parties shall have no liability whatsoever for the investment or distribution of the Settlement Fund or the determination, administration, calculation, or payment of any claim or nonperformance of the Settlement Administrator, the payment or withholding of taxes (including interest and penalties) owed by the Settlement Fund, or any losses incurred in connection therewith.

10.7    All proceedings with respect to the administration, processing and determination of Claims and the determination of all controversies relating thereto, including but not limited to disputed questions of law and fact with respect to the validity of Claims, and the enforcement of the Release and Covenant not to Sue set forth herein, shall be subject to the jurisdiction of the

Court, which shall have exclusive jurisdiction to protect and effectuate the Final Order and Judgment.

**10.8** The headings used herein are used for the purpose of convenience only and are not meant to have legal effect.

**10.9** The waiver by one Party of any breach of this Agreement by any other Party shall not be deemed as a waiver of any other prior or subsequent breaches of this Agreement.

**10.10** All of the Exhibits to this Agreement are material and integral parts thereof and are fully incorporated herein by this reference.

**10.11** This Agreement and its Exhibits set forth the entire agreement and understanding of the Parties with respect to the matters set forth herein, and supersede all prior negotiations, agreements, arrangements and undertakings with respect to the matters set forth herein. No representations, warranties or inducements have been made to any Party concerning this Settlement Agreement or its Exhibits other than the representations, warranties and covenants contained and memorialized in such documents. This Agreement may be amended or modified only by a written instrument signed by or on behalf of all Parties or their respective successors-in-interest.

**10.12** Except as otherwise provided herein, each Party shall bear its own costs.

**10.13** Plaintiff represents and warrants that she has not assigned any claim or right or interest therein as against the Released Parties to any other Person or Party and that she is fully entitled to release the same.

**10.14** Each counsel or other Person executing this Settlement Agreement, any of its Exhibits, or any related settlement documents on behalf of any Party hereto, hereby warrants and represents that such Person has the full authority to do so and has the authority to take appropriate action required or permitted to be taken pursuant to the Agreement to effectuate its terms.

**10.15** This Agreement may be executed in one or more counterparts. Signature by digital means, facsimile, or in PDF format will constitute sufficient execution of this Agreement. All executed counterparts and each of them shall be deemed to be one and the same instrument. A complete set of original executed counterparts shall be filed with the Court if the Court so requests.

**10.16**   This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto and the Released Parties.

**10.17**   The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Agreement, and all Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in this Agreement.

**10.18**   This Settlement Agreement shall be governed by and construed in accordance with the substantive laws of the State of California without giving effect to its conflict of laws provisions.

**10.19**   This Agreement is deemed to have been prepared by counsel for all Parties, as a result of arm's-length negotiations among the Parties.  Because all Parties have contributed substantially and materially to the preparation of this Agreement, it shall not be construed more strictly against one Party than another.

**10.20**   Where this Agreement requires notice to the Parties, such notice shall be sent to the undersigned counsel:  Frederick J. Klorczyk III, Bursor & Fisher, P.A., 888 Seventh Avenue, New York, NY 10019, fklorczyk@bursor.com; Zachary Lerner, ZwillGen PLLC, 1900 M Street NW, Suite 250, Washington D.C. 20036, zach@zwillgen.com.

1

**IT IS SO AGREED TO BY THE PARTIES**:

2

3    Dated:  May 28, 2021                    **DEBORAH JORDAN**

4

5                                    By: _Deborah Jordan_____

                                    Deborah Jordan, individually and as representative of

6                                    the Class

7

8    Dated:  May __, 2021                    **WP COMPANY LLC**

9                                    By: _____

10                                    Name: _____

11                                    Title: _____

12

13    **IT IS SO STIPULATED BY COUNSEL:**

14

15    Dated:  May 28, 2021                    **BURSOR & FISHER, P.A.**

16

17                                    By: _____

                                    Frederick J. Klorczyk III

18

19    Dated:  May __, 2021                    **ZWILLGEN PLLC**

20

21                                    By: _____

22                                    Name: _____

                                    Title: _____

23

24

25

26

27

28

**IT IS SO AGREED TO BY THE PARTIES**:

Dated: May __, 2021                 **DEBORAH JORDAN**

By: _____
Deborah Jordan, individually and as representative of
the Class

Dated: May 28, 2021            **WP COMPANY LLC**

By: _____
Name: John Kennedy
Title: VP, General Counsel

**IT IS SO STIPULATED BY COUNSEL:**

Dated: May __, 2021                 **BURSOR & FISHER, P.A.**

By: _____
Frederick J. Klorczyk III

Dated: May __, 2021                 **ZWILLGEN PLLC**

By: _____
Name: _____
Title: _____

**IT IS SO AGREED TO BY THE PARTIES**:

Dated: May __, 2021                    **DEBORAH JORDAN**

By: _____
Deborah Jordan, individually and as representative of
the Class

Dated: May __, 2021                    **WP COMPANY LLC**

By: _____
Name: _____
Title: _____

**IT IS SO STIPULATED BY COUNSEL:**

Dated: May __, 2021                    **BURSOR & FISHER, P.A.**

By: _____
Frederick J. Klorczyk III

Dated: May 12, 2021                    **ZWILLGEN PLLC**

By: _____
Name: Jacob Sommer
Title: Shareholder

**EXHIBIT A**

# WASHINGTON POST SETTLEMENT CLAIM FORM

**THIS CLAIM FORM MUST BE SUBMITTED ONLINE OR POSTMARKED BY [_____], 2021 AND MUST BE FULLY COMPLETED, BE SIGNED, AND MEET ALL CONDITIONS OF THE SETTLEMENT AGREEMENT.**

**Instructions:** To elect to receive a *pro rata* cash payment instead of an Automatic Account Credit Code, fill out each section of this form and sign where indicated.

First Name: _____ Last Name: _____

Address: _____

City: _____ State: _____ Zip Code: _____

Email Address (**please provide the email address associated with your WaPo Subscription**): ‐

_____

Contact Phone #: (_____) _____–_____ (You may be contacted if further information is required.)

If you received notice of the Settlement by e-mail or postal mail, please provide the Class Member ID from the notice:

_____ _____ _____ _____ _____ _____ _____

Mailing Address Associated With Your WaPo Subscription(s) (**if different than above**):

Street Address: _____

City: _____ State:_____ Zip Code: _____

Class Member Verification: By submitting this Claim Form and checking the boxes below, I declare that I believe I am a member of the Settlement Class and that the following statements are true (each box must be checked to receive a payment):

☐ I enrolled in an automatically renewing digital WaPo Subscription between July 29, 2016 and April 1, 2021, using a California billing address and, during that time period, was charged and paid one or more renewal fee(s) in connection with such subscription.

☐ I have not filed or submitted an Opt-Out or requested to be excluded from this Settlement.

☐ I have not submitted any other Claim for a WaPo Subscription in my name and have not authorized any other person or entity to do so, and know of no other person or entity having done so on my behalf. If I maintained subscription(s) in my name jointly with any other person or entity, only one Claim has or will be submitted for such subscription(s).

☐ Under penalty of perjury, all information in this Claim Form is true and correct to the best of my knowledge and belief.

Payment Options: Please select one of the following payment options (**if no election is made, the default payment option will be *pro rata* cash payment via Check**):

☐ Check          ☐ PayPal

Signature: _____ Print Name: _____

Date:_____/_____/ _____

Before you complete and submit this Claim Form by mail or online, you should read and be familiar with the information contained in this notice and available at: www.CANewspaperRenewalSettlement.com.

The Settlement Administrator will review your Claim Form; you may be required to submit additional documentation to validate your claim. If accepted, you will receive a *pro rata* share of the Settlement Fund in the form of a check by mail or via e-payment. This process takes time, please be patient. Filing a Claim Form does not affect the status of any active WaPo Subscription you may have. You may cancel your WaPo Subscription in your account settings prior to your next renewal to avoid future charges.

**Questions? Visit www.CANewspaperRenewalSettlement.com or call 1-800-555-5555.**

**EXHIBIT B**

<u>LEGAL NOTICE</u>

**IF YOU WERE A CALIFORNIA RESIDENT WHO ENROLLED IN AND WAS AUTOMATICALLY BILLED FOR A WASHINGTON POST SUBSCRIPTION AT ANY TIME BETWEEN JULY 29, 2016 AND APRIL 1, 2021, YOU MAY BENEFIT FROM A PROPOSED CLASS ACTION SETTLEMENT**

*Jordan v. WP Company LLC*, Case No. 3:20-cv-05218-WHO (N.D. Cal.)

**WHAT IS THIS NOTICE ABOUT?**

A Proposed Settlement has been reached in a class action lawsuit in the United States District Court, Northern District of California (the "Action") against WP Company LLC ("WaPo") that may affect your rights. California subscribers to WaPo's four-week and annual digital subscription offerings (collectively, the "WaPo Subscriptions") allege that WaPo automatically renewed their subscriptions and charged their payment methods without first providing certain disclosures and obtaining the requisite authorizations, in violation of California law. WaPo denies these claims. The Court has not ruled in favor of Plaintiff or WaPo. Instead, the parties agreed to a Proposed Settlement to avoid the expense and risks of continuing the lawsuit.

**AM I A MEMBER OF THE CLASS?**

The class is defined as all persons who, from July 29, 2016, to and through April 1, 2021, enrolled in an automatically renewing digital WaPo Subscription using a California billing and who, during that time period, were charged and paid one or more automatic renewal fee(s) in connection with such subscription.

**WHAT DOES THE SETTLEMENT PROVIDE?**

Subject to Court approval, the parties have agreed to a Settlement under which WaPo will provide class members with a total value of $6,762,480 in cash and non-cash benefits. You may either (1) do nothing and receive an Automatic Account Credit Code for either four (4) or eight (8) weeks of a free Washington Post digital subscription, depending on whether your most recent subscription renewed on a four-week or annual basis, or (2) submit a valid claim and obtain a prorated cash payment, instead of an Automatic Account Credit Code, which Class Counsel estimates, based on expected claims rates, to be $20 for subscribers whose most recent subscription was an annual subscription and $10 for subscribers whose most recent subscription was a four-week subscription. The claim amount may be subject to *pro rata* increase or decrease depending on the number of claims submitted.

**WHAT ARE MY RIGHTS?**

You have a choice of whether to stay in the Class or not, and you must decide this now. If you stay in the Class, you will be legally bound by all orders and judgments of the Court, and you won't be able to sue, or continue to sue, WaPo as part of any other lawsuit involving the same facts or claims that are in this lawsuit. This is true even if you do nothing by not submitting a claim.

1. <u>File a Claim and Receive Cash</u>. Class Members who wish to receive cash instead of an Automatic Account Credit Code **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____],

2021. You can get a Claim Form on the Internet at www.CANewspaperRenewalSettlement.com. Read the instructions carefully, fill out the form, and submit it online on or before [_____], 2021. Alternatively, you may also submit a Claim Form by mailing it to the following address: [_____]. It must be postmarked no later than [_____], 2021.

2. <u>Do Nothing and Receive an Automatic Account Credit Code</u>. Class Members who do nothing will receive to the email address on file for your WaPo Subscription an Automatic Account Credit Code for either four (4) or eight (8) weeks of a free Washington Post digital subscription, depending on whether your most recent WaPo Subscription renewed on a four-week or an annual basis. If your most recent subscription was an annual WaPo Subscription, you will receive an Automatic Account Credit Code for eight (8) weeks of a free Washington Post digital subscription, valued at $20.00. If your most recent subscription was a four-week WaPo Subscription, you will receive an Automatic Account Credit Code for four (4) weeks of a free Washington Post digital subscription, valued at $10.00. If you were an active WaPo subscriber as of April 1, 2021, your Automatic Account Credit Code will provide free weeks of your then-current WaPo digital subscription. If you were an inactive WaPo subscriber as of that date, your Automatic Account Credit Code will provide free weeks of a WaPo premium digital subscription. The Automatic Account Credit Code will be sent to the email address on file for your WaPo Subscription, can be redeemed online to receive your free weeks of a digital subscription, never expire, and are freely transferrable. If an active class member (as of April 1, 2021) whose WaPo Subscription was purchased on or through a third-party platform or service (the Apple App Store, the Google Play Store, or Amazon) is unable to redeem an Automatic Account Credit Code, WaPo may provide that active class member with substitute compensation of equal value.

3. <u>You Can Object to the Settlement</u>. If you believe the Settlement is unsatisfactory, you may file a written objection with the Clerk of the Court for the Northern District of California and send copies to the following Counsel representing the Class and WaPo:

| Plaintiff's Counsel | WaPo's Counsel |
|---|---|
| Frederick J. Klorczyk III | Jacob Sommer |
| Neal J. Deckant | Zachary Lerner |
| Julia K. Venditti | Alexei Klestoff |
| Bursor & Fisher, P.A. | ZwillGen PLLC |
| 1990 N. California Blvd. | 1900 M Street NW |
| Suite 940 | Suite 250 |
| Walnut Creek, CA 94596 | Washington, DC 20036 |

4. <u>You Can "Opt Out" of the Settlement</u>.  If you exclude yourself from the Class – which is sometimes called "opting-out" of the Class – you won't get any Settlement Benefits from the Proposed Settlement.  You will also be responsible for any attorney's fees and costs you incur if you choose to pursue your own lawsuit.  Such notice must include your name, current address, signature, and a statement that you want to be excluded from *Jordan v. WP Company LLC*, Case No. 3 :20-cv-05218-WHO (N.D. Cal.), no later than [_____], 2021.  Send the written notice to [_____].

<u>THE FAIRNESS HEARING</u>

On [_____], 2021, at [_____], the Court will hold a hearing in the United States District Court for the Northern District of California to determine: (1) whether the Proposed Settlement is fair, reasonable, and adequate and should receive final approval; and (2) whether the application for Plaintiff's attorneys' fees of up to $2,000.000.00, inclusive of reimbursement of out-of-pocket expenses, should be granted. Objections to the Proposed Settlement by Class Members will be considered by the Court, but only if such objections are filed in writing with the Court and sent to Plaintiff's and WaPo's counsel by [_____], 2021, as explained above. Class Members who support the Proposed Settlement need not appear at the hearing or take any other action to indicate their approval.  You may hire your own lawyer to appear in Court for you if you wish, but if you do, you will be responsible for paying that lawyer on your behalf.

**HOW CAN I GET MORE INFORMATION?**

If you have questions or want a detailed notice or other documents about this lawsuit and your rights, visit the website at www.CANewspaperRenewalSettlement.com.  You may also contact the Settlement Administrator by email at [_____], or by writing to: [_____].

By order of the United States District Court for the Northern District of California.

**EXHIBIT C**

**COURT AUTHORIZED NOTICE OF CLASS ACTION AND PROPOSED SETTLEMENT**

Jordan v. WP Company LLC
P.O. Box ####
City, State ZIP CODE

FIRST-CLASS MAIL
U.S. POSTAGE PAID
CITY, ST
PERMIT NO. XXXX

OUR RECORDS
INDICATE YOU WERE
CHARGED AND PAID AN
AUTOMATIC RENEWAL
FEE BY THE
WASHINGTON POST.
YOU MAY BENEFIT FROM
A CLASS ACTION
SETTLEMENT.

By Order of the Court
Dated: [_____], 2021

Postal Service: Please do not mark barcode
<<Barcode>>

Active Class Member ID: <<Refnum>>

<<FirstName>> <<LastName>>
<<BusinessName>>
<<Address>>
<<Address2>>
<<City>>, <<ST>> <<Zip>>-<<zip4>>

[[POSTAL CODE AREA]]

A proposed settlement has been reached in a class action lawsuit alleging that Defendant WP Company LLC d/b/a *The Washington Post* ("WaPo") unlawfully charged its California customers for auto-renewal subscriptions without proper disclosures as required by California law. WaPo denies these claims in the lawsuit and contends that it did nothing wrong. The Court did not resolve the claims and defenses raised in this action. Nor has the Court determined that WaPo did anything wrong. The parties have agreed to settle the dispute to avoid the cost and risk of a trial.

**Am I a Class Member?** Our records indicate that you had an **active** automatic renewal subscription with WaPo as of April 1, 2021, and therefore may be a Class Member. Class Members are all persons who, from July 29, 2016, to and through April 1, 2021, enrolled in any digital WaPo Subscription using a California billing address and who, during that time period, were charged and paid one or more automatic renewal fee(s) in connection with such subscription.

**What Can I Get?** If approved by the Court, the Settlement will provide a total of $6,762,480 in cash and non-cash benefits to the Settlement Class, including payment of all claims, all notice and administration expenses, approved attorneys' fees and costs, and an incentive award to the named plaintiff. You may submit a valid claim and receive a *pro rata* cash payment from the Settlement Fund via check once the Settlement becomes final, depending on whether your most recent WaPo Subscription was Annual or Four-Week. Based on the expected claims rates, Class Counsel estimates that your cash payment will be for $20 if your most recent subscription was an Annual WaPo Subscription, or for $10 if your most recent subscription was a Four-Week WaPo Subscription. Alternatively, if you do nothing, and as long as you don't exclude yourself from the Settlement Class, you will receive an Automatic Account Credit Code for either four (4) or eight (8) free weeks of your then-current WaPo Subscription, depending on whether your most recent subscription renewed on a Four-Week or Annual basis. If you were an Active Four-Week Subscriber as of April 1, 2021 and do nothing, you will receive an Automatic Account Credit Code for an additional four (4) free weeks of your then-current WaPo Subscription, valued at $10. If you were an Active Annual Subscriber as of April 1, 2021 and do nothing, you will receive an Automatic Account Credit Code for an additional eight (8) free weeks of your then-current WaPo Subscription, valued at $20. The Automatic Account Credit Code will be sent to the email address on file for your WaPo Subscription, can be redeemed online to receive your free weeks of a digital subscription, never expire, and may be freely transferred. If an active class member (as of April 1, 2021) whose WaPo Subscription was purchased on or through a third-party platform or service (the Apple App Store, the Google Play Store, or Amazon) is unable to redeem an Automatic Account Credit Code, WaPo may provide that active class member with substitute compensation of equal value.

**How Do I Get My Payment?** Class Members who wish to receive cash instead of an Automatic Account Credit Code **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____], 2021. If you fail to submit a timely Claim Form electing to receive cash and do not exclude yourself from the Settlement, then you will receive an Automatic Account Credit Code for either four (4) or eight (8) weeks of a free Washington Post digital subscription, depending on whether you were a Four-Week or Annual Subscriber. In either case, the Automatic Account Credit Code will be provided to the email address on file for your WaPo Subscription. You do not need to do anything to receive an email with your Automatic Account Credit Code.

**What are My Other Options?** You may exclude yourself from the Settlement Class by sending a letter to the Settlement Administrator, **postmarked no later than [_____], 2021.** If you exclude yourself, you cannot get a settlement cash payment or an Automatic Account Credit Code, but you keep any rights you may have to sue WaPo over the legal issues in the lawsuit. If you don't exclude yourself from the Settlement Class, then you and/or your lawyer also have the right to appear before the Court, at your own cost, to object to the proposed settlement, if you wish to do so, but you don't have to. **Your written objection must be filed and postmarked no later than [_____], 2021**. Specific instructions about how to object to, or exclude yourself from, the Settlement are available at **www.CANewspaperRenewalSettlement.com.** If you do nothing, and the Court approves the Settlement, you will be bound by all of the Court's orders and judgments, and your claims relating to the fees charged by WaPo will be released.

**Who Represents Me?** The Court has appointed Bursor & Fisher, P.A. to represent the class. These attorneys are called Class Counsel. You will not be charged for these lawyers. If you want to be represented by your own lawyer in this case, you may hire one at your expense.

**When Will the Court Consider the Proposed Settlement?** The Court will hold the Final Approval Hearing at **[____] p.m. on [_____], 2021** at the San Francisco United

States Courthouse, Courtroom 2, 450 Golden Gate Avenue, San Francisco, CA 94102. At that hearing, the Court will: hear any objections concerning the fairness of the Settlement; determine the fairness of the Settlement and/or whether to approve Class Counsel's request for attorneys' fees and costs; and decide whether to award the Class Representative up to $5,000 from the Settlement Fund for her services in helping to bring and settle this case. WaPo has agreed that Class Counsel may be paid attorneys' fees out of the Settlement Fund in an amount to be determined by the Court. Class Counsel is entitled to seek no more than $2,000,000.00, but the Court may award less than this amount.

**How Do I Get More Information?** This is only a summary. For more information, including the full Notice, Claim Form, and Settlement Agreement go to: **www.CANewspaperRenewalSettlement.com**, contact the Settlement Administrator at **1-[TOLL-FREE-NUMBER]** or Jordan v. WP Company LLC, c/o Settlement Administrator, PO Box ####, [City, State ZIP].

**EXHIBIT D**

**COURT AUTHORIZED NOTICE OF CLASS ACTION AND PROPOSED SETTLEMENT**

Jordan v. WP Company LLC
P.O. Box ####
City, State ZIP CODE

FIRST-CLASS MAIL
U.S. POSTAGE PAID
CITY, ST
PERMIT NO. XXXX

OUR RECORDS INDICATE YOU WERE CHARGED AND PAID AN AUTOMATIC RENEWAL FEE BY THE WASHINGTON POST. YOU MAY BENEFIT FROM A CLASS ACTION SETTLEMENT.

By Order of the Court
Dated: [_____], 2021

Postal Service: Please do not mark barcode
<<Barcode>>

Inactive Class Member ID: <<Refnum>>

<<FirstName>> <<LastName>>
<<BusinessName>>
<<Address>>
<<Address2>>
<<City>>, <<ST>> <<Zip>>-<<zip4>>

[[POSTAL CODE AREA]]

A proposed settlement has been reached in a class action lawsuit alleging that Defendant WP Company LLC d/b/a *The Washington Post* ("WaPo") unlawfully charged its California customers automatic renewal fees for digital subscriptions without providing adequate notices required by California law. WaPo denies the claims in the lawsuit and contends that it did nothing wrong. The Court did not resolve the claims and defenses raised in this action. Nor has the Court determined that WaPo did anything wrong. The parties have agreed to settle the dispute to avoid the cost and risk of a trial.

**Am I a Class Member?** Our records indicate that you **formerly** had an automatic renewal subscription with WaPo as of April 1, 2021, and therefore **may be a Class Member.** Class Members are all persons who, from July 29, 2016, to and through April 1, 2021, enrolled in any digital WaPo Subscription using a California billing address and who, during that time period, were charged and paid one or more automatic renewal fee(s) in connection with such subscription.

**What Can I Get?** If approved by the Court, the Settlement will provide a total of $6,762,480 in cash and non-cash benefits to the Settlement Class, including payment of all claims, all notice and administration expenses, approved attorneys' fees and costs, and an incentive award to the named plaintiff. You may submit a valid claim and receive a *pro rata* cash payment from the Settlement Fund via check once the settlement becomes final, depending on whether your most recent WaPo Subscription was Annual or Four-Week. Based on the expected claims rates, Class Counsel estimates that your cash payment will be for $20 if your most recent subscription was an Annual WaPo Subscription, or for $10 if your most recent subscription was a Four-Week WaPo Subscription. Alternatively, if you do nothing, and as long as you don't exclude yourself from the Settlement Class, you will receive an Automatic Account Credit Code for either four (4) or eight (8) weeks of a free Washington Post premium digital subscription, depending on whether your most recent WaPo Subscription renewed on a Four-Week or Annual basis. Inactive Annual Class Members will receive an Automatic Account Credit Code for eight (8) weeks of a free Washington Post premium digital subscription (valued at $20.00), and Inactive Four-Week Class Members will receive an Automatic Account Credit Code for four (4) weeks of a free Washington Post premium digital subscription (valued at $10.00). In either case, there is no expectation or obligation to continue using or paying for the services beyond the free period. The Automatic Account Credit Code will be sent to the email address on file for your WaPo Subscription, can be redeemed online to receive your free weeks of a digital subscription, never expire, and may be freely transferred.

**How Do I Get My Payment?** Class Members who wish to receive cash instead of an Automatic Account Credit Code **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____], 2021. If you fail to submit a timely Claim Form electing to receive cash and do not exclude yourself from the Settlement, then you will receive an Automatic Account Credit Code for either four (4) or eight (8) weeks of a free Washington Post premium digital subscription, depending on whether you were a Four-Week or Annual Subscriber. In either case, the Automatic Account Credit Code will be provided to the email address on file for your WaPo Subscription. You do not need to do anything to receive an email with your Automatic Account Credit Code.

**What are My Other Options?** You may exclude yourself from the Settlement Class by sending a letter to the Settlement Administrator, **postmarked no later than [_____], 2021**. If you exclude yourself, you cannot get a settlement cash payment or an Automatic Account Credit Code, but you keep any rights you may have to sue WaPo over the legal issues in the lawsuit. If you don't exclude yourself from the Settlement Class, then you and/or your lawyer also have the right to appear before the Court, at your own cost, to object to the proposed settlement, if you wish to do so, but you don't have to. **Your written objection must be filed and postmarked no later than [_____], 2021**. Specific instructions about how to object to, or exclude yourself from, the Settlement are available at **www.CANewspaperRenewalSettlement.com.** If you do nothing, and the Court approves the Settlement, you will be bound by all of the Court's orders and judgments, and your claims relating to the fees charged by WaPo will be released.

**Who Represents Me?** The Court has appointed Bursor & Fisher, P.A., to represent the class. These attorneys are called Class Counsel. You will not be charged for these lawyers. If you want to be represented by your own lawyer in this case, you may hire one at your expense.

**When Will the Court Consider the Proposed Settlement?** The Court will hold the Final Approval Hearing at [____] p.m. on [_____], 2021 at the San Francisco United States Courthouse, Courtroom 2, 450 Golden Gate Avenue, San Francisco, CA 94102. At that hearing, the Court will: hear any objections concerning the fairness of the

Settlement; determine the fairness of the Settlement; decide whether to approve Class Counsel's request for attorneys' fees and costs; and decide whether to award the Class Representatives $7,500.00 for their Settlement efforts and other services in prosecuting to settle this case. WP Company LLC agrees that Class Counsel may be paid attorneys' fees out of the Settlement Fund in an amount to be determined by the Court. Class Counsel is entitled to seek no more than $2,000,000.00, but the Court may award less than this amount.

**How Do I Get More Information?** This is only a summary. For more information, including the full Notice, Claim Form, and Settlement Agreement go to: **www.CANewspaperRenewalSettlement.com**, contact the Settlement Administrator at **1-[TOLL-FREE-NUMBER]** or Jordan v. WP Company LLC, c/o Settlement Administrator, PO Box ####, [City, State ZIP].

**EXHIBIT E**

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA
*Jordan v. WP Company LLC*, Case No. 3:20-cv-05218-WHO (N.D. Cal.)

**IF YOU WERE A CALIFORNIA RESIDENT WHO ENROLLED IN AND WAS AUTOMATICALLY BILLED FOR A WASHINGTON POST SUBSCRIPTION AT ANY TIME BETWEEN JULY 29, 2016 AND APRIL 1, 2021, YOU MAY BENEFIT FROM A PROPOSED CLASS ACTION SETTLEMENT**

*A federal court authorized this notice.  This is not a solicitation from a lawyer.*

- A Proposed Settlement has been reached in a class action lawsuit against Defendant WP Company LLC d/b/a *The Washington Post* ("Defendant" or "WaPo"). The class action lawsuit alleges that WaPo automatically renewed its customers' annual and four-week digital subscription offerings (the "WaPo Subscriptions") and charged customers' payment methods without providing the disclosures and authorizations required by California law. WaPo denies these claims. The Court has not ruled in favor of Plaintiff or WaPo. Instead, the parties agreed to a Proposed Settlement to avoid the expense and risks of continuing the lawsuit.

- The class is defined as all persons who, from July 29, 2016, to and through April 1, 2021, enrolled in an automatically renewing digital WaPo Subscription using a California billing address and who, during that time period, were charged and paid one or more automatic renewal fee(s) in connection with such subscription.

- Those included in the Settlement will be entitled to receive an Automatic Account Credit Code for either four (4) or eight (8) weeks of a free Washington Post digital subscription (valued at $10 and $20, respectively), based on whether the class members' most recent subscription renewed on a four-week or annual basis. If you are an active WaPo subscriber as of April 1, 2021, your Automatic Account Credit Code will provide free weeks of your then-current WaPo digital subscription. If you were an inactive WaPo subscriber as of that date, your Automatic Account Credit Code will provide free weeks of a WaPo premium digital subscription. Alternatively, class members are entitled to receive, at their election, a *pro rata* (meaning proportional) cash payment from the Settlement Fund, which Class Counsel estimates to be $20 for annual subscribers and $10 for four-week subscribers, based on expected claims rates.

- Class members wishing to receive cash instead of an Automatic Account Credit Code must make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator. Class members who neither submit a valid Claim Form nor exclude themselves from the Settlement will receive an Automatic Account Credit Code for either four (4) or eight (8) weeks of free access to WaPo's digital products and services that normally require a paid subscription. The Automatic Account Credit Code will be sent to the email address on file for your WaPo Subscription, can be redeemed online to receive your free weeks of a digital subscription, never expire, and are freely transferrable. If an active class member (as of April 1, 2021) whose WaPo Subscription was purchased on or through a third-party platform or service (the Apple App Store, the Google Play Store, or Amazon) is unable to redeem an Automatic Account Credit Code, WaPo may provide that active class member with substitute compensation of equal value.

- Read this Notice carefully. Your legal rights are affected whether you act or don't act.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | If you had an **active annual** WaPo Subscription as of April 1, 2021 and do not submit a timely Claim Form electing to receive cash or exclude yourself from the Settlement, once the Settlement becomes Final, you will receive an Automatic Account Credit Code for eight (8) free weeks of your then-current WaPo Subscription, valued at $20.00.<br><br>If you had an **active four-week** WaPo Subscription as of April 1, 2021 and do nothing, you will receive an Automatic Account Credit Code for four (4) free weeks of your then-current WaPo Subscription, valued at $10.00.<br><br>If you had an **inactive** WaPo Subscription as of April 1, 2021 and your most recent WaPo Subscription was **annual**, and you do nothing, you will receive an Automatic Account Credit Code for eight (8) weeks of a free Washington Post premium digital subscription, valued at $20.00, with no expectation or obligation to continue using or paying the services beyond the free period.<br><br>If you had an **inactive** WaPo Subscription as of April 1, 2021 and your most recent WaPo Subscription renewed every **four weeks**, and you do nothing, you will receive an Automatic Account Credit Code for four (4) weeks of a free Washington Post premium digital subscription, valued at $10.00, with no expectation or obligation to continue using or paying the services beyond the free period.<br><br>Alternatively, as described further below, regardless of whether your WaPo Subscription was active or inactive as of April 1, 2021, you may file a claim that will, if valid, entitle you to receive prorated cash payment(s) from the Settlement Fund in the form of a check, issued and mailed by the Settlement Administrator, instead of an Automatic Account Credit Code. |

| **SUBMIT A CLAIM FORM BY [_____], 2021** | To receive cash instead of an Automatic Account Credit Code, you **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____], 2021. |
| --- | --- |
| **EXCLUDE YOURSELF FROM THE CLASS BY [_____], 2021** | You will receive no benefits, but you will retain any rights you currently have to sue WaPo about the alleged claims in this case. Excluding yourself is the only option that allows you to ever bring or maintain your own lawsuit against WaPo regarding the allegations in this case ever again. |
| **OBJECT BY [_____], 2021** | Write to the Court explaining why you don't like the Settlement and think it shouldn't be approved. Filing an objection does not exclude you from the Settlement. |

These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

The Court in charge of this action has preliminarily approved the Settlement as fair, reasonable, and adequate, and must decide whether to give final approval to the Settlement. The relief provided to Class Members will be provided only if the Court gives final approval to the Settlement and, if there are any appeals, after the appeals are resolved in favor of the Settlement. *Please be patient*.

## BASIC INFORMATION

### 1. Why was this Notice issued?

The Court authorized this Notice because you have a right to know about a proposed Settlement of this class action lawsuit and about your options, before the Court decides whether to give final approval to the Settlement. This Notice explains the lawsuit, the Settlement, and your legal rights.

The Honorable William H. Orrick, of the U.S. District Court for the Northern District of California, is overseeing this case. The case is called *Jorden v. WP Company LLC*, Case No. 3:20-cv-05218-WHO. The person who sued is called the Plaintiff. The Defendant is WP Company LLC, doing business as *The Washington Post.* This notice will also call the defendant "WaPo" for short.

### 2. What is a class action?

In a class action, one or more people called class representatives (in this case, Deborah Jordan) sue on behalf of a group or a "class" of people who have similar claims. In a class action, the court resolves the issues for all class members, except for those who exclude themselves from the Class.

### 3. What is this lawsuit about?

This lawsuit claims that WaPo violated California law by automatically renewing its customers' subscriptions and charging customers' payment methods without first providing certain disclosures and obtaining the requisite authorizations. WaPo denies the claims in the lawsuit and contends that it did nothing wrong and denies that class certification is warranted or appropriate. The Court did not resolve the claims and defenses raised in this action. Nor has the Court determined that WaPo did anything wrong or that this matter should be certified as a class action except if the Settlement is fully approved by the Court. Rather, the Parties have, without admitting liability, agreed to settle the lawsuit to avoid the uncertainties and expenses associated with ongoing litigation.

### 4. Why is there a Settlement?

The Court has not decided whether the Plaintiff or WaPo should win this case. Instead, both sides agreed to a Settlement. That way, they avoid the uncertainties and expenses associated with ongoing litigation, and Class Members will get compensation sooner rather than, if at all, after a trial.

**The issuance of this Notice is not an expression of the Court's opinion on the merit or the lack of merit of the Representative Plaintiff's claims or the defenses in the lawsuit. Both parties recognize that to resolve the issues raised in the lawsuit would be time-consuming, uncertain, and expensive.**

### WHO'S INCLUDED IN THE SETTLEMENT?

### 5. How do I know if I am in the Settlement Class?

The Court decided that everyone who fits the following description is a member of the **Settlement Class**:

All persons who, from July 29, 2016, to and through April 1, 2021, enrolled in a digital WaPo Subscription using a California billing address and who, during that time period, were charged and paid one or more automatic renewal fee(s) in connection with such subscription.

### THE SETTLEMENT BENEFITS

### 6. What does the Settlement provide?

*Monetary Relief*: A Settlement Fund has been created with a value of approximately $6,762,480, consisting of $2,400,000 in cash benefits and approximately $4,362,480 in Automatic Account Credit Codes. The Settlement Fund Class Member payments, as well as the cost to administer the Settlement, the cost to inform people about the Settlement, attorneys' fees, and an award to the Class Representative, will come out of this fund (*see* Question 12).

*Prospective Relief*: WaPo has agreed to provide automatic renewal terms on its checkout pages in a manner that is consistent with the requirements of Cal. Bus. & Prof. Code §§ 17600, *et seq.* Specifically, WaPo has agreed to present on the checkout page the automatic renewal offer terms (including by when a user must cancel) in a clear and conspicuous manner before the subscription or purchasing agreement and in visual proximity to the request for consent to the offer and obtain affirmative consent to the agreement containing the automatic renewal terms in a manner that complies with the ARL.

WaPo has further agreed to disclose, in a manner that complies with the ARL, how to cancel and by when in an acknowledgment email that can be retained by California consumers. WaPo has further agreed to provide California subscribers enrolled in an active annual WaPo Subscription (as of the execution of the Settlement Agreement) who have not yet renewed as of 60 days after the execution of the Settlement Agreement with a one-time additional acknowledgement email at least 30 days before their next renewal date that provides those subscribers with notice that their subscription will renew and includes a clear link to directions on how to cancel that subscription. WaPo also agreed to provide California subscribers enrolled in an active four-week WaPo Subscription (as of 30 days after the execution of the Settlement Agreement) who have not yet renewed as of 60 days after the execution of the Settlement Agreement with a one-time additional acknowledgement email at least 7 days before their next renewal date that provides those subscribers with notice that their subscription will renew and includes a clear link to directions on how to cancel that subscription.

A detailed description of the Settlement benefits can be found in the Settlement Agreement which can be found in the 'Documents' section of the website.

## 7. How can I get a payment from the Settlement?

Once the Settlement becomes Final, each class member is eligible to receive an Automatic Account Credit Code for free use of WaPo's digital subscriptions for four (4) or eight (8) weeks, or submit a valid claim and receive a *pro rata* cash payment from the Settlement Fund, which Class Counsel estimates to be $20 for Annual Class Members and $10 for Four-Week Class Members based on expected claims rates.

If you do not submit a valid Claim Form by the claims deadline, and if you don't exclude yourself from the Settlement Class, you will receive to the email address on file for your WaPo Subscription an Automatic Account Credit Code for free use of WaPo's digital services and products that normally require a paid subscription. If you had an **active annual** WaPo Subscription as of April 1, 2021 and do nothing, you will receive an Automatic Account Credit Code for eight (8) weeks of free subscription services of your then-current WaPo Subscription, valued at $20.00. If you had an **active four-week** WaPo Subscription as of April 1, 2021 and do nothing, you will receive an Automatic Account Credit Code for four (4) weeks of free subscription services of your then-current WaPo Subscription, valued at $10.00. If you did not have an active subscription as of April 1, 2021, but your most recent subscription was an annual WaPo Subscription (**inactive annual**) and do nothing, you will receive an Automatic Account Credit Code for eight (8) weeks of a free Washington Post premium digital subscription, valued at $20.00, with no expectation or obligation to continue using or paying the services beyond the free period. If you did not have an active WaPo Subscription as of April 1, 2021, but your most recent subscription was a four-week

subscription (**inactive four-week**) and do nothing, you will receive an Automatic Account Credit Code for four (4) weeks of a free Washington Post premium digital subscription, valued at $10.00, with no expectation or obligation to continue using or paying the services beyond the free period.  No payment or billing information will be required for an inactive Class Member to use the Automatic Account Credit Code.  The Automatic Account Credit Code will be sent to the email address on file for your WaPo Subscription, can be redeemed online to receive your free weeks of a digital subscription, will not expire, and may be freely transferred. If an active class member (as of April 1, 2021) whose WaPo Subscription was purchased on or through a third-party platform or service (the Apple App Store, the Google Play Store, or Amazon) is unable to redeem an Automatic Account Credit Code, WaPo may provide that active class member with substitute compensation of equal value.

If you wish to receive cash instead of an Automatic Account Credit Code, you **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____], 2021.  Claim Forms can be found and submitted online, or you may have received a Claim Form in the mail as a postcard attached to a summary of this Notice.  To submit a Claim Form on-line or to request a paper copy, go to www.CANewspaperRenewalSettlement.com.

## 8. When will I get my payment?

The hearing to consider the fairness of the settlement is scheduled for [_____], **2021**. If the Court approves the Settlement, eligible Class Members whose claims were approved by the Settlement Administrator will receive their payment after the Settlement has been finally approved and/or after any appeals process is complete. Class Members who do nothing will automatically receive their settlement benefits in the form of the free Automatic Account Credit Codes sent to the email address on file for their WaPo Subscriptions. Class members who submit valid Claims Forms by the by the claims deadline will receive their payment in the form of a check, and all checks will expire and become void 180 days after they are issued.

### REMAINING IN THE SETTLEMENT

## 9. What am I giving up if I stay in the Class?

If the Settlement becomes final, you will give up your right to sue WaPo and other Released Parties for the claims being resolved by this Settlement. The specific claims you are giving up against WaPo are described in the Settlement Agreement. You will be "releasing" WaPo and certain of its affiliates, employees, and representatives as described in Section 3.2 of the Settlement Agreement. Unless you exclude yourself (*see* Question 13), you are "releasing" the claims, regardless of whether you submit a claim. The Settlement Agreement is available through the "Documents" section of the website.

The Settlement Agreement describes the released claims with specific descriptions, so read it carefully. If you have any questions you can talk to the lawyers listed in Question 11 for free, or you can talk to your own lawyer if you have questions about what this means.

## 10. What happens if I do nothing at all?

If you had an **active annual** WaPo Subscription as of April 1, 2021 and you do nothing, you will receive an Automatic Account Credit Code for eight (8) weeks of free subscription services of your then-current WaPo Subscription, valued at $20.00. If you had an **active four-week** WaPo Subscription as of April 1, 2021 and you do nothing, you will receive an Automatic Account Credit Code for four (4) weeks of free subscription services of your then-current WaPo Subscription, valued at $10.00. If you did not have an active subscription as of April 1, 2021 and your most recent subscription was an annual WaPo Subscription (**inactive annual**), and you do nothing, you will receive an Automatic Account Credit Code for eight (8) weeks of a free Washington Post premium digital subscription, valued at $20.00, with no expectation or obligation to continue using or paying the services beyond the free period. If you did not have an active subscription as of April 1, 2021 and your most recent subscription was a four-week WaPo Subscription (**inactive four-week**), and you do nothing, you will receive an Automatic Account Credit Code for four (4) weeks of a free Washington Post premium digital subscription, valued at $10.00, with no expectation or obligation to continue using or paying the services beyond the free period. No payment or billing information will be required for an inactive Class Member to use the Automatic Account Credit Code. The Automatic Account Credit Code will be sent to the email address on file for your WaPo subscription, can be redeemed online to receive your free weeks of a digital subscription, will not expire, and may be freely transferred. If an active class member (as of April 1, 2021) whose WaPo Subscription was purchased on or through a third-party platform or service (the Apple App Store, the Google Play Store, or Amazon) is unable to redeem an Automatic Account Credit Code, WaPo may provide that active class member with substitute compensation of equal value.

Automatic Account Credit Codes will be issued so that they: (i) will not expire; (ii) will be freely transferrable, subject to reasonable measures to prevent fraud, duplicating, or counterfeiting of vouchers (including, but not limited to, requirements for printing and authentication, and use of serial numbers, UPC coding, specialized ink and/or paper, watermarks, and/or holograms, and/or physical delivery-all subject to specification by Defendant); (iii) will be redeemable exclusively online, for exclusively digital subscriptions; and (iv) will be redeemable in exchange for either four (4) or eight (8) weeks of a free digital WaPo Subscription (valued at $10 and $20, respectively), depending on whether your most recent WaPo Subscription renewed on a four-week or annual basis.

Automatic Account Credit Codes will be distributed to you after the deadline to appeal the Settlement Approval Order and Final Judgment has passed, assuming no appeal is filed.

### THE LAWYERS REPRESENTING YOU

**11. Do I have a lawyer in the case?**

The Court has appointed Bursor & Fisher, P.A to be the attorneys representing the Settlement Class. They are called "Class Counsel." They believe, after conducting an extensive investigation, that the Settlement Agreement is fair, reasonable, and in the best interests of the Settlement Class. You will not be charged for these lawyers. If you want to be represented by your own lawyer in this case, you may hire one at your expense.

**12. How will the lawyers be paid?**

Any Class Counsel attorneys' fees and costs awarded by the Court will be paid out of the Settlement Fund in an amount to be determined by the Court. The fee petition will seek no more than $2,000,000.00; the Court may award less than this amount. Under the Settlement Agreement, any amount awarded to Class Counsel will be paid out of the Settlement Fund.

Subject to approval by the Court, the Class Representative may be paid up to $5,000 from the Settlement Fund.

### EXCLUDING YOURSELF FROM THE SETTLEMENT

| **13. How do I get out of the Settlement?** |
| --- |

To exclude yourself from the Settlement, you must mail or otherwise deliver a written request for exclusion stating that you want to be excluded from the *Jordan v. WP Company LLC*, Case No. 3:20-cv-05218-WHO Settlement. Your letter or request for exclusion must also include your name, your address, your signature, the name and number of this case, and a statement that you wish to be excluded. You must mail or deliver your exclusion request postmarked no later than **[_____], 2021**, to:

> Jordan v. WP Company LLC
> c/o Settlement Administrator
> PO Box ####
> City, State ZIP CODE

| **14. If I don't exclude myself, can I sue WaPo for the same thing later?** |
| --- |

No. Unless you exclude yourself, you give up any right to sue WaPo for the claims being resolved by this Settlement.

| **15. If I exclude myself, can I get anything from this Settlement?** |
| --- |

No. If you exclude yourself, you will not receive any settlement benefits.

### OBJECTING TO THE SETTLEMENT

| **16. How do I object to the Settlement?** |
| --- |

If you are a Class Member and do not exclude yourself from the Settlement Class, you can object to the Settlement if you don't like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must file with the Court a letter or brief stating that you object to the Settlement in *Jordan v. WP Company LLC*, Case No. 3:20-cv-05218-WHO and identify all your reasons for your objections (including citations and supporting evidence) and attach any materials you rely on for your objections. Your letter or brief must also include your name, your address, the basis upon which you claim to be a Class Member, the name and contact information of any and all attorneys representing, advising, or in any way assisting you in connection with your objection, and your signature. If you, or an attorney assisting you with your objection, have ever objected to any class action settlement where you or the objecting attorney has asked for

or received payment in exchange for dismissing the objection (or any related appeal) without modification to the settlement, you must include a statement in your objection identifying each such case by full case caption. You must also mail or deliver a copy of your letter or brief to Class Counsel and WaPo's Counsel listed below.

Class Counsel will file with the Court and post on the website its request for attorneys' fees on or about [_____], 2021.

If you want to appear and speak at the Final Approval Hearing to object to the Settlement, with or without a lawyer (explained below in answer to Question Number 20), you must say so in your letter or brief and file the objection with the Court and mail a copy to these two different places postmarked no later than [_____], 2021. **IF YOU DO NOT TIMELY MAKE YOUR OBJECTION, YOU WILL BE DEEMED TO HAVE WAIVED ALL OBJECTIONS AND WILL NOT BE ENTITLED TO SPEAK AT THE FAIRNESS HEARING.**

| Court | Plaintiff's Counsel | WaPo's Counsel |
|---|---|---|
| The Honorable William H. Orrick United States District Court Northern District of California 450 Golden Gate Avenue San Francisco, CA 94102 | Frederick J. Klorczyk III Neal J. Deckant Julia K. Venditti Bursor & Fisher, P.A. 1990 N. California Blvd., Suite 940 Walnut Creek, CA 94596 | Jacob Sommer Zachary Lerner Alexei Klestoff ZwillGen PLLC 1900 M Street NW, Suite 250 Washington, DC 20036 |

**17. What's the difference between objecting and excluding myself from the Settlement?**

Objecting simply means telling the Court that you don't like something about the Settlement. You can object only if you stay in the Class. Excluding yourself from the Class is telling the Court that you don't want to be part of the Class. If you exclude yourself, you have no basis to object because the Settlement no longer affects you.

### THE COURT'S FINAL APPROVAL HEARING

**18. When and where will the Court decide whether to approve the Settlement?**

The Court will hold the Final Approval Hearing **at X:00 p.m. on [_____], 2021**, in Courtroom 2 at the San Francisco United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102. The purpose of the hearing will be for the Court to determine whether to approve the Settlement as fair, reasonable, adequate, and in the best interests of the Class; to consider the Class Counsel's request for attorneys' fees and expenses; and to consider the request for an incentive award to the Class Representative. At that hearing, the Court will be available to hear any timely filed objections and arguments concerning the fairness of the Settlement.

The hearing may be postponed to a different date or time without notice, so it is a good

idea to check www.CANewspaperRenewalSettlement.com or call toll free 1-XXX-XXX-XXXX. If, however, you timely objected to the Settlement and advised the Court that you intend to appear and speak at the Final Approval Hearing, you will receive notice of any change in the date of such Final Approval Hearing.

**19. Do I have to come to the hearing?**

No. Class Counsel will answer any questions the Court may have. But you are welcome to come at your own expense. If you send an objection or comment, you don't have to come to Court to talk about it. As long as you filed and mailed your written objection on time, the Court will consider it. You may also pay another lawyer to attend, but it's not required.

**20. May I speak at the hearing?**

Yes. So long as you timely filed an objection to the settlement, you may ask the Court for permission to speak at the Fairness Hearing, but do not have to.  To do so, you must include in your letter or brief objecting to the settlement a statement saying that it is your "Notice of Intent to Appear in *Jordan v. WP Company LLC*, Case No. 3:20-cv-05218-WHO." It must include your name, address, telephone number and signature as well as the name and address of your lawyer, if one is appearing for you. Your objection and notice of intent to appear must be filed with the Court and postmarked no later than **[_____], 2021**, and be sent to the addresses listed in Question 16.

GETTING MORE INFORMATION

**21. Where do I get more information?**

This Notice summarizes the Settlement.

More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at www.CANewspaperRenewalSettlement.com. You may also write with questions to Jordan v. WP Company LLC c/o Settlement Administrator, PO Box ####, City, XX ZIP CODE. You can call the Settlement Administrator at 1-800-555-5555 if you have any questions.  Before doing so, however, please read this full Notice carefully. You may also find additional information elsewhere on the case website. Please do not telephone the Court to inquire about the Settlement or the claims process.

**EXHIBIT F**

1

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III (State Bar. No. 320783)

2

888 Seventh Avenue
New York, NY  10019

3

Telephone: (646) 837-7150
Facsimile: (212) 989-9163

4

E-Mail: fklorczyk@bursor.com

5

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)

6

Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940

7

Walnut Creek, CA  94596
Telephone: (925) 300-4455

8

Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com

9

　　　　jvenditti@bursor.com

10

*Attorneys for Plaintiff*

11

12

**IN THE UNITED STATES DISTRICT COURT**

13

**NORTHERN DISTRICT OF CALIFORNIA**

14

DEBORAH JORDAN, individually and on
behalf of all others similarly situated,

15

16

　　　　　　　Plaintiff,

17

　　　v.

18

WP COMPANY LLC, d/b/a THE
WASHINGTON POST,

19

　　　　　　　Defendant.

20

Case No. 3:20-cv-05218-WHO

**STIPULATION REGARDING
UNDERTAKING RE: ATTORNEYS'
FEES AND COSTS**

Judge:  Hon. William H. Orrick

21

22

23

24

25

26

27

28

Plaintiff Deborah Jordan ("Plaintiff"), on behalf of the putative class, and Defendant WP Company LLC d/b/a *The Washington Post* ("Defendant" or "WaPo") (collectively, the "Parties"), by and through and including their undersigned counsel, stipulate and agree as follows:

WHEREAS, Scott A. Bursor ("Class Counsel"), individually and as principal of his law firm, Bursor & Fisher P.A. ("the Firm"), desire to give an undertaking (the "Undertaking") for repayment of their award of attorney fees and costs, approved by the Court; and

WHEREAS, the Parties agree that this Undertaking is in the interests of all Parties and in service of judicial economy and efficiency.

NOW, THEREFORE, the undersigned Class Counsel, on behalf of himself as an individual and as principal of the Firm, hereby submits himself and the Firm to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.[1]

By receiving any payments pursuant to the Settlement Agreement, the Firm and its shareholders, members, and/or partners submit to the jurisdiction of the United States District Court for the Northern District of California for the enforcement of and any and all disputes relating to or arising out of the reimbursement obligation set forth herein and the Settlement Agreement.

In the event that the settlement, Settlement Agreement, Judgment, or any part of it is reduced, vacated, overturned, reversed, or rendered void as a result of an appeal, or the settlement or Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Class Counsel and the Firm shall, within ten (10) days repay to WaPo, based upon written instructions provided by WaPo's Counsel, the full amount of the attorneys' fees and costs paid to Class Counsel in this matter, including any accrued interest.

In the event the attorneys' fees and costs awarded by the Court or any part of them are reduced, vacated, modified, reversed, or rendered void as a result of an appeal or otherwise, Class Counsel and the Firm shall, within ten (10) days repay to WaPo, based upon written instructions provided by WaPo's Counsel, the attorneys' fees and costs paid to Class Counsel and/or the Class

---

[1] Capitalized terms used herein without definition have the meanings given to them in the Class Action Settlement Agreement.  *See* Klorczyk Decl. Ex. 1.

Representatives in this matter in the amount vacated or modified, including any accrued interest.

This Undertaking and all obligations set forth herein shall terminate upon the Effective Date of the Settlement, defined as the date ten (10) days after all of the following events and conditions have been met and have occurred, provided that this Agreement has not been terminated in accordance with the provisions of Section 6 of the Settlement Agreement:  (a) the Parties and their counsel have executed this Agreement; (b) the Court has entered the Preliminary Approval Order; (c) the Court has entered an order finally approving the Agreement, following Notice to the Settlement Class and a Final Approval Hearing, as provided in the Federal Rules of Civil Procedure, and has entered the Final Judgment, or a judgment consistent with this Agreement in all material respects; and (d) the Final Judgment has become Final, as defined in the Settlement Agreement, or, if the Court enters an Alternate Judgment, such Alternate Judgment becomes Final. If any appeal of the Final Order and Judgment, or any order awarding attorneys' fees, costs/expenses or service awards/payments is filed, the Undertaking shall not terminate unless and until a final, non-appealable order affirming the Final Order and Judgment or any order awarding attorneys' fees, costs/expenses and service awards/payments is entered.

In the event Class Counsel and the Firm fail to repay to WaPo any attorneys' fees and costs that are owed to it pursuant to this Undertaking, the Court may, upon application of WaPo, and notice to Class Counsel and the Firm, summarily issue orders, including but not limited to judgments, attachment orders against Class Counsel and the Firm, and findings for sanctions and/or contempt of court.

The undersigned attorney stipulates, warrants, and represents that he has both actual and apparent authority to enter into this Stipulation, agreement, and Undertaking, individually and on behalf of the Firm.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury that they have read and understand the foregoing and that it is true and correct.

1   **IT IS SO STIPULATED:**

2

3   DATED: May 28, 2021                    **BURSOR & FISHER, P.A.**

4

5                                          By: Scott A. Bursor, individually and on behalf of

6                                          Bursor & Fisher, P.A.

7                                          *Attorneys for Plaintiff and the Putative Class*

8

9   DATED: May __, 2021                    **ZWILLGEN PLLC**

10

11

12                                         By: _____

13                                         *Attorneys for Defendant WP Company LLC*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **IT IS SO STIPULATED:**

2

3    DATED: May __, 2021                    **BURSOR & FISHER, P.A.**

4

5                                           _____
                                           By: Scott A. Bursor, individually and on behalf of
6                                          Bursor & Fisher, P.A.

7                                          *Attorneys for Plaintiff and the Putative Class*

8

9    DATED: May 12, 2021                    **ZWILLGEN PLLC**

10

11                                          _____
12                                         By: JACOB SOMMER

13                                         *Attorneys for Defendant WP Company LLC*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT G**

1 | **BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III (State Bar. No. 320783)
2 | 888 Seventh Avenue
New York, NY  10019
3 | Telephone: (646) 837-7150
Facsimile: (212) 989-9163
4 | E-Mail: fklorczyk@bursor.com

5 | **BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
6 | Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
7 | Walnut Creek, CA  94596
Telephone: (925) 300-4455
8 | Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com
9 |        jvenditti@bursor.com

10 | *Attorneys for Plaintiff*

11 |

12 | **IN THE UNITED STATES DISTRICT COURT**

13 | **NORTHERN DISTRICT OF CALIFORNIA**

14 | DEBORAH JORDAN, individually and on
behalf of all others similarly situated,

Case No. 3:20-cv-05218-WHO

15 |

16 | Plaintiff,

**[PROPOSED] ORDER GRANTING
PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT
AGREEMENT, CONDITIONALLY
CERTIFYING SETTLEMENT
CLASS, APPOINTING CLASS
REPRESENTATIVE, APPOINTING
CLASS COUNSEL, AND
APPROVING NOTICE PLAN**

17 | v.

18 | WP COMPANY LLC, d/b/a THE
WASHINGTON POST,

19 | Defendant.

20 | Judge:  Hon. William H. Orrick

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

---

[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. 3:20-CV-05218-WHO

WHEREAS, a proposed class action is pending before the Court entitled *Jordan v. WP Company LLC*, No. 3:20-cv-05218-WHO;

WHEREAS, Plaintiff Deborah Jordan ("Plaintiff") and WP Company LLC ("Defendant" or "WaPo") (collectively, the "Parties"), have entered into a Settlement Agreement, which, together with the exhibits attached thereto, sets forth the terms and conditions for a proposed class action settlement which would dispose of the Action with prejudice as to WaPo and bind plaintiff and all class members to a full release of their claims, upon the terms and conditions set forth therein (the "Settlement Agreement"); and

WHEREAS, the Court has considered all papers submitted on Plaintiff's Motion for Preliminary Approval and Certification of a Settlement Class, including the Settlement Agreement and all exhibits attached thereto, records and prior proceedings to date in this matter, and good cause appearing based on the record,

**IT IS HEREBY ORDERED, DECREED, AND ADJUDGED** as follows:

1.      The Parties have agreed to settle and dismiss with prejudice this Action in accordance with the terms and conditions of the Settlement Agreement, inclusive of its exhibits. The definitions in the Settlement Agreement are hereby incorporated herein as though fully set forth in this Order, and all other terms and phrases in this Order shall have the same meaning as ascribed to them in the Settlement Agreement.

2.      This Court finds that it has jurisdiction over the subject matter and all Parties to the Action, including the proposed Settlement Class, pursuant to 28 U.S.C. 1332(d)(2).

3.      The Court finds that, subject to the Final Approval Hearing, the Settlement Agreement, including all exhibits thereto, is preliminarily approved as fair, reasonable, and adequate, and in the best interests of the Settlement Class set forth below.  The Court further finds that the Settlement Agreement substantially fulfills the purposes and objectives of the class action, and provides substantial relief to the Settlement Class without the risks, burdens, costs, or delay associated with continued litigation, trial, and/or appeal.  The Settlement is not a finding or admission of liability by the Defendant or any other person, nor a finding of the validity of any claims asserted in the Action or of any wrongdoing or any violation of law.

4.      Plaintiff, by and through her counsel, has investigated the pertinent facts and has

evaluated the risks associated with continued litigation, trial and/or appeal.  The Court finds that

the Settlement Agreement: (a) is the result of arm's-length negotiations between the parties and

experienced counsel; (b) is sufficient to warrant notice of the settlement and the Final Approval

Hearing to be disseminated to the Settlement Class; (c) meets all applicable requirements of law,

including Federal Rule of Civil Procedure 23 and the Class Action Fairness Act ("CAFA"), 28

U.S.C. § 1715.

**Conditional Certification of the Settlement Class**

5.      For purposes of settlement only:  (a) Frederick J. Klorczyk III of Bursor & Fisher,

P.A., is appointed Class Counsel for the Settlement Class; and (b) Deborah Jordan is appointed

Class Representative.  The Court finds that these attorneys are competent and capable of exercising

the responsibilities of Class Counsel and that Plaintiff will adequately protect the interests of the

Settlement Class defined below.

6.      For purposes of settlement only and for purposes of disseminating Class Notice, and

without prejudice to Defendant's right to contest class certification if the Settlement Agreement is

not finally approved, the Court conditionally certifies the following Settlement Class as defined in

the Settlement Agreement, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e):

> All persons who, from July 29, 2016, to and through April 1, 2021,
> enrolled in any of Defendant's digital subscription offerings using a
> California billing address and who, during that time period, were
> charged and paid one or more automatic renewal fee(s) in connection
> with such subscription.[1]

7.      The Court finds, subject to the Final Approval Hearing referred to in paragraph  23

below, that the Settlement Agreement is fundamentally fair, adequate, and reasonable, and, solely

within the context of and for the purposes of settlement only, that the Settlement Class satisfies the

requirements of Rule 23 of the Federal Rules of Civil Procedure, specifically, that: the Settlement

---

[1] Excluded from the Settlement Class are: (1) any Judge or Magistrate presiding over this Action
and members of their families; (2) Defendant, Defendant's subsidiaries, parent companies,
successors, predecessors, and any entity in which Defendant or its parents have a controlling
interest and their current or former officers, directors, agents, attorneys, and employees; (3)
Persons who properly execute and file a timely request for exclusion from the class; and (4) the
legal representatives, successors or assigns of any excluded Persons.

Class is so numerous that joinder of all members is impracticable; there are questions of fact and law common to the Settlement Class; the claims of the Class Representative are typical of the claims of the members of the Settlement Class; the Class Representative and Class Counsel will fairly and adequately protect the interests of the members of the Settlement Class; common questions of law or fact predominate over questions affecting individual members; and a class action is a superior method for fairly and efficiently adjudicating the Action.

8.     If the Settlement Agreement does not receive the Court's final approval, or if final approval is reversed on appeal, or if the Settlement Agreement is terminated or otherwise fails to become effective, the Court's conditional grant of class certification shall be vacated, null, and void in all respects, and the Class Representative and the Settlement Class will once again bear the burden of establishing the propriety of class certification for purposes of litigation. In such case, neither the conditional certification of the Settlement Class for settlement purposes, nor any other act relating to the negotiation or execution of the Settlement Agreement shall be considered as a factor in connection with any class certification issue(s).

**Notice and Administration**

9.     The Court approves, as to form, content, and distribution, the Notice Plan set forth in the Settlement Agreement, including Claim Form attached to the Settlement Agreement as Exhibit A, the Notice Plan and all forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B, C, D, and E attached thereto, and finds that such Notice is reasonable and the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure. The Court also finds that the Notice constitutes valid, due and sufficient notice to all persons entitled thereto, and meets the requirements of Due Process. The Court further finds that the Notice is reasonably calculated to, under all circumstances, reasonably apprise members of the Settlement Class of the pendency of this action, the terms of the Settlement Agreement, and the right to object to the settlement and to exclude themselves from the Settlement Class. In addition, the Court finds that no notice other than that specifically identified in the Settlement Agreement is necessary in this Action. The Parties, by agreement, may revise the Notice and Claim Form in ways that are not material, or in

ways that are appropriate to update those documents for purposes of accuracy or formatting.

10.     The Court approves the request for the appointment of JND Legal Administration ("JND") as Settlement Administrator of the Settlement Agreement.

11.     Pursuant to paragraph 4.1 of the Settlement Agreement, the Settlement Administrator is directed to publish the Notice and Claim Form on the Settlement Website and to send direct notice by email and U.S. Mail in accordance with the Notice Plan called for by the Settlement Agreement.  The Settlement Administrator shall also maintain the Settlement Website to provide full information about the Settlement and allow for the filing of claims online.  The Settlement Website shall prominently display all Settlement deadlines for Settlement Class Members as well as notify the Settlement Class to object to the Settlement Agreement, request exclusion from the Class and appear at the Settlement Hearing.

**Submission of Claims and Requests for Exclusion from Settlement Class**

12.     Members of the Settlement Class who wish to receive benefits in the form of pro rata cash payments under the Settlement Agreement must complete and submit a timely and valid Claim Form(s) in accordance with the instructions contained therein.  All Claim Forms must be postmarked or received by the Settlement Administrator by _____ [*suggested date of 73 days after entry of this Order*].

13.     Members of the Settlement Class who do not submit a valid Claim Form by the Claims Deadline will receive an Automatic Accout Credit Code based on whether their WaPo Subscription was four-week or annual and active or inactive as of April 1, 2021, issued via email by the Settlement Administrator, unless they exclude themselves from the Settlement.

14.     Any person falling within the definition of the Settlement Class may, upon valid and timely request, exclude themselves or "opt out" from the Settlement Class.  Any such person may do so if, on or before the Objection/Exclusion Deadline of _____ [*suggested date of 73 days after entry of this Order*] they comply with the exclusion procedures set forth in the Settlement Agreement and Notice.  Any Settlement Class Members so excluded shall neither be bound by the terms of the Settlement Agreement nor entitled to any of its benefits.

15.     Any members of the Settlement Class who elect to exclude themselves or "opt out"

of the Settlement Agreement must file a written request with the Settlement Administrator, received or postmarked no later than the Objection/Exclusion Deadline.  The request for exclusion must comply with the exclusion procedures set forth in the Settlement Agreement and Notice and include the Settlement Class Member's name and address, a signature, the name and number of the case, and a statement that he or she wishes to be excluded from the Settlement Class for the purposes of this Settlement.  Each request for exclusion must be submitted individually.  So called "mass" or "class" opt-outs shall not be allowed.

16.    Individuals who opt out of the Settlement Class relinquish all rights to benefits under the Settlement Agreement and will not release their claims.  However, members of the Settlement Class who fail to submit a valid and timely request for exclusion shall be bound by all terms of the Settlement Agreement and the Final Judgment, regardless of whether they have requested exclusion from the Settlement Agreement or received any benefit or award from the settlement.

17.    No request for exclusion may be made on behalf of a group of Settlement Class Members who do not share a single WaPo Subscription.  "Mass" opt outs and/or attempts to opt out a "class" shall not be allowed.

**Appearance and Objections**

18.    At least twenty-one (21) calendar days before the Final Approval Hearing, any person who falls within the definition of the Settlement Class and who does not request exclusion from the Settlement Class may enter an appearance in the Action, at their own expense, individually or through counsel of their own choice.  Any Settlement Class Member who does not enter an appearance will be represented by Class Counsel.

19.    Any members of the Settlement Class who have not timely filed a request for exclusion may object to the fairness, reasonableness, or adequacy of the Settlement Agreement or to a Final Judgment being entered dismissing the Action with prejudice in accordance with the terms of the Settlement Agreement, or to the attorneys' fees and expense reimbursement sought by Class Counsel in the amounts specified in the Notice, or to the award to the Class Representative as set forth in the Notice and Settlement Agreement.  At least fourteen (14) days prior to the

Objection/Exclusion Deadline, papers supporting the Fee Award shall be filed with the court and posted to the settlement website.  Members of the Settlement Class may object on their own, or may do so through separate counsel at their own expense.

20.     To object, Settlement Class Members must sign and file a written objection no later than on or before the Objection/Exclusion Deadline of _____ [*suggested date of 73 days after entry of this Order*].  To be valid, the objection must comply with the objection procedures set forth in the Settlement Agreement and Notice, and include his or her name and address; an explanation of the basis upon which he or she claims to be a Settlement Class Member; a signature; all grounds for the objection, including all citations to legal authority and evidence supporting the objection; the name and contact information of any and all attorneys representing, advising, or in any way assisting him or her in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection (the "Objecting Attorneys"); and a statement indicating whether he or she intends to appear at the Final Approval Hearing (either personally or through counsel who files an appearance with the Court in accordance with Northern District of California Local Rules).  If a Settlement Class Member or any of the Objecting Attorneys has objected to any class action settlement where the objector or the Objecting Attorneys asked for or received any payment in exchange for dismissal of the objection, or any related appeal, without any modification to the settlement, then the objection must include a statement identifying each such case by full case caption.

21.     Members of the Settlement Class who fail to file and serve timely written objections in compliance with the requirements of this paragraph and the Settlement Agreement shall be deemed to have waived any objections and shall be foreclosed from making any objections (whether by appeal or otherwise) to the Settlement Agreement or to any of the subjects listed in paragraph 3 above, which include the following:  (a) whether the proposed settlement of the Action on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and should be given final approval by the Court; (b) whether a judgment and order of dismissal with prejudice should be entered; (c) whether to approve the Fee Award to Class Counsel; and (d) whether to approve the payment of an incentive award to the Class

Representative.

22.     To be valid, objections must be filed with the Court and sent to the following: Class Counsel Frederick J. Klorczyk III of Bursor & Fisher, P.A., 888 Seventh Avenue, New York, NY 10019; and Defendant WP Company LLC's Zachary Lerner of ZwillGen PLLC, 1900 M Street NW, Suite 250, Washington D.C. 20036.  In addition, any objections made by a Class member represented by counsel must be filed through the Court's CM/ECF system.

**Final Approval Hearing**

23.     The Final Approval Hearing shall be held before this Court on _____ [*at least 120 days after entry of this Order*], at **2:00 p.m.** in Courtroom 2, 17th Floor, at the San Francisco United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, to determine:  (a) whether the proposed settlement of the Action on the terms and conditions provided for in the Settlement Agreement (including as it may be modified prior to the Final Hearing date) is fair, reasonable, and adequate and should be given final approval by the Court; (b) whether a judgment and order of dismissal with prejudice should be entered; (c) whether to approve the Fee Award to Class Counsel; and (d) whether to approve the payment of an incentive award to the Class Representative.  The Court may adjourn the Final Approval Hearing without further notice to members of the Settlement Class.  The new date of Hearing, if any, shall be published on the Court's docket and on the Settlement Website.

24.     Class Counsel shall file papers in support of their Fee Award and Class Representative's incentive award (collectively, the "Fee Petition") with the Court on or before _____ [*suggested date of 52 days after entry of this Order, i.e., 14 days before Objection/Exclusion Deadline*].  Defendant may, but is not required to, file a response to Class Counsel's Fee Petition with the Court on or before _____ [*suggested date of 21 days before Final Approval hearing*].  Class Counsel may file a reply in support of their Fee Petition with the Court on or before _____ [*suggested date of 14 days before Final Approval hearing*].

25.     Papers in support of final approval of the Settlement Agreement and any supplementation to the Fee Petition shall be filed with the Court on or before _____

1   [*suggested date of 14 days before Final Approval hearing*].

2   **<u>Further Matters</u>**

3        26.      All further proceedings in the Action are ordered stayed until Final Judgment or

4   termination of the Settlement Agreement, whichever occurs earlier, except for those matters

5   necessary to obtain and/or effectuate final approval of the Settlement Agreement.  Additionally,

6   pending this Court's determination as to whether to finally approve the Settlement, the Court

7   hereby prohibits and/or enjoins any other person, entity or counsel (other than successful opt-outs

8   to this Settlement) from representing or from commencing, prosecuting, participating in or

9   assisting in any lawsuit or proceeding against the Released Parties on any matters within the scope

10   of the Released Claims).

11        27.      Absent prior approval from this Court, Plaintiff and Class Counsel, shall not issue

12   any press release, advertisement, internet posting, or any other public statement (to the media or

13   otherwise), or make any other extrajudicial statements concerning the facts and circumstances of

14   this action or the disclosures exchanged between the parties, with the exception of the notices to be

15   distributed to the Settlement Class Members in accordance with this Settlement.  Any

16   communications between Class Counsel and any individual Settlement Class Members seeking

17   inquiries shall be limited to providing publicly available information contained in the notices

18   provided to the Settlement Class Members, and Class Counsel shall in no way make any

19   disparaging statements about WaPo or the Released Parties in responding to any such inquiries.

20        28.      Members of the Settlement Class shall be bound by all determinations and

21   judgments in the Action, whether favorable or unfavorable.

22        29.      The Court retains jurisdiction to consider all further applications arising out of or

23   connected with the proposed Settlement Agreement.  The Court may approve the Settlement, with

24   such modifications as may be agreed to by the Parties, if appropriate, without further notice to the

25   Class.

26        30.      All Settlement Class Members who do not timely exclude themselves from the

27   Settlement:  (a) shall be bound by the provisions of the Settlement Agreement and all proceedings,

28   determinations, orders and judgments in the Action relating thereto, including, without limitation,

the Judgment or Alternate Judgment, if applicable, and the Releases provided for therein, whether

favorable or unfavorable to the Settlement Class or Settlement Class Member; and (b) shall forever

be barred and enjoined from directly or indirectly filing, commencing, instituting, prosecuting,

maintaining, participating in, or intervening (as class members or otherwise) in any action, suit,

cause of action, arbitration, claim, demand, or other proceeding in any jurisdiction, whether in the

United States or elsewhere, on their own behalf or in a representative capacity, that is based upon

or arises out of any or all of the Released Claims against WaPo and the other Released Parties, as

more fully described in the Settlement Agreement, whether or not a Claim Form is required or

submitted.

31.     Neither this Order, the Settlement Agreement including the exhibits thereto, the

negotiations leading to the execution of the Settlement Agreement, nor any proceedings taken

pursuant to or in connection with the Settlement Agreement and/or approval of the Settlement (a)

shall be referred to or offered against any of the Releasees as evidence of, or constructed as, or

deemed to be evidence of any presumption, concession or admission by any of the Releasees with

respect to the truth of any allegation, the validity of any claim or the deficiency of any defense that

has been or could have been asserted in the Action or in any other litigation, including the

appropriateness of a litigation class, or of any liability, negligence, fault, or other wrongdoing of

any kind of any of the Releasees, in any civil, criminal or administrative action or proceeding, or

(b) shall be construed against any of the Releasees or Releasing Parties as an admission, concession

or presumption that the consideration to be given represents the amount which could be or would

have been recovered after trial; provided, however, that notwithstanding the foregoing, if the

Settlement Agreement is approved by the Court, the Parties and Releasees and their respective

counsel may file or refer to the Settlement Agreement or the Judgment in any action that may be

brought to enforce its terms.

32.     In accordance with the Settlement Agreement, if the Settlement Agreement is not

approved by the Court, each party will have the option of having the Action revert to its status as if

the Settlement Agreement had not been negotiated, made, or filed with the Court.  In such event,

the parties will retain all rights as if the Settlement Agreement was never agreed upon.

33.     If the Settlement Agreement is terminated pursuant to the provisions of the Settlement Agreement or for any reason whatsoever the approval of it does not become Final then (i) the Settlement Agreement shall be null and void, including any provision related to the award of attorneys' fees, and shall have no further force and effect with respect to any party in this Action, and shall not be used in this Action or in any other proceeding for any purpose; (ii) all negotiations, proceedings, documents prepared, and statements made in connection therewith shall be without prejudice to any person or party hereto, shall not be deemed or construed to be an admission by any party of any act, matter, or proposition, and shall not be used in any manner or for any purpose in any subsequent proceeding in this Action or in any other action in any court or other proceeding, provided, however, that the termination of the Settlement Agreement shall not shield from subsequent discovery any factual information provided in connection with the negotiation of this Settlement Agreement that would otherwise be discoverable; (iii) other than as expressly preserved by the Settlement Agreement in the event of its termination, the Settlement Agreement shall have no further force and effect with respect to any party and shall not be used in the Action or any other proceeding for any purpose; and (iv) any party may elect to move the Court pursuant to the provisions of this paragraph, and none of the non-moving parties (or their counsel) shall oppose any such motion.

34.     Pending final determination of whether the proposed Settlement Agreement should be approved, neither Plaintiff nor any Settlement Class Member, directly or indirectly, in a representative or any other capacity, shall commence or prosecute against Defendant and the other Released Parties any action or proceeding in any court or tribunal asserting any of the Released Claims.

35.     The Parties and their counsel shall meet and confer and work together in good faith to effectuate the terms of the Settlement Agreement and this Order. The Court may, upon proper notice and motion, resolve any disputes between the parties concerning the Settlement Agreement and this Order.

IT IS SO ORDERED, this _____ day of _____, 2021.


_____
Hon. Judge William H. Orrick
United States District Court

**EXHIBIT H**

1

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III (State Bar. No. 320783)

2

888 Seventh Avenue
New York, NY 10019

3

Telephone: (646) 837-7150
Facsimile: (212) 989-9163

4

E-Mail: fklorczyk@bursor.com

5

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)

6

Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940

7

Walnut Creek, CA 94596
Telephone: (925) 300-4455

8

Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com

9

          jvenditti@bursor.com

10

*Attorneys for Plaintiff*

11

12

**IN THE UNITED STATES DISTRICT COURT**

13

**NORTHERN DISTRICT OF CALIFORNIA**

14

DEBORAH JORDAN, individually and on
behalf of all others similarly situated,

15

16

                Plaintiff,

17

        v.

18

WP COMPANY LLC, d/b/a THE
WASHINGTON POST,

19

                Defendant.

20

| | |
|---|---|
| | Case No. 3:20-cv-05218-WHO |
| | **[PROPOSED] FINAL APPROVAL ORDER AND JUDGMENT** |
| | Judge: Hon. William H. Orrick |

21

22

23

24

25

26

27

28

On [DATE], this Court granted preliminary approval of the proposed class action settlement agreement between the parties (the "Settlement Agreement" or "Settlement"). The Court also provisionally certified a Settlement Class for settlement purposes, approved the procedure for giving notice and forms of Notice, and set a final approval hearing to take place on [DATE]. The Settlement Class is defined as: all Persons who, from July 29, 2016, to and through April 1, 2021, enrolled in any of Defendant's digital subscription offerings using a California billing address and who, during that time period, were charged and paid one or more automatic renewal fee(s) in connection with such subscription. Excluded from this definition are the Released Parties. Settlement Class Members who exclude themselves from the Settlement, pursuant to the procedures set forth in Paragraph 4.5 of the Settlement, shall no longer thereafter be Settlement Class Members and shall not be bound by the Settlement and shall not be eligible to make a claim for any benefit under the terms of the Settlement.

On [DATE], the Court held a duly noticed final approval hearing to consider: (1) whether the terms and conditions of the Settlement are fair, reasonable and adequate; (2) whether a judgment should be entered dismissing the complaint on the merits and with prejudice in favor of Defendant and against all persons or entities who are Settlement Class members herein who have not requested exclusion from the Settlement Class; and (3) whether and in what amount to award attorneys' fees, costs and expenses to Class Counsel and whether and in what amount to make an incentive award to Plaintiff Deborah Jordan.

The Court, having considered all matters submitted to it at the hearing and otherwise, and it appearing that the Class Notice substantially in the form approved by the Court was given in the manner that the Court ordered to persons who purchased the WaPo Subscriptions at issue, as ordered by the Court, and having considered and determined that the proposed settlement of the claims of the Settlement Class Members against Defendant, as well as the release of Defendant and the Released Parties, and the awards of attorneys' fees, costs, and expenses and incentive award requested, are fair, reasonable and adequate, **HEREBY ORDERS, DECREES, AND ADJUDGES** as follows:

1        1.      The definitions in the Settlement Agreement and the Court's Preliminary Approval

2   Order are hereby incorporated herein as though fully set forth in this Order, and all other terms and

3   phrases in this Order shall have the same meaning as ascribed to them in the Settlement Agreement

4   and in the Court's Preliminary Approval Order, and/or in any Order of this Court prior to the entry

5   of final Judgment.

6        2.      The Court finds that the prerequisites for a settlement class under Federal Rules of

7   Civil Procedure ("Fed. R. Civ. P.") 23(a) and (b)(3) have been satisfied, for purposes of settlement

8   only, in that: (a) the number of Settlement Class Members is so numerous that joinder of all

9   members thereof is impracticable; (b) there are questions of law and fact common to the Settlement

10  Class; (c) the claims of the Class Representative are typical of the claims of the Settlement Class

11  she seeks to represent; (d) the Class Representative has and will fairly and adequately represent the

12  interests of the Settlement Class; (e) the questions of law and fact common to the Settlement Class

13  Members predominate over any questions affecting any individual Settlement Class Member; and

14  (f) a class action is superior to the other available methods for the fair and efficient adjudication of

15  the controversy.

16       3.      The Court finds that the requirements of Rule 23(e) of the Federal Rule of Civil

17  Procedure and other laws and rules applicable to final settlement approval of class actions have

18  been satisfied, and the Court approves the settlement of this Action as memorialized in the

19  Settlement Agreement as being fair, just reasonable and adequate to the Settlement Class and its

20  members.  The Court further finds that the Settlement Agreement substantially fulfills the purposes

21  and objectives of the class action, and provides substantial relief to the Settlement Class without

22  the risks, burdens, costs or delays associated with continued litigation, trial and/or appeal.  The

23  Settlement is not a finding or admission of liability by the Defendant or any other person, nor a

24  finding of the validity of any claims asserted in the Action or of any wrongdoing or any violation

25  of law.

26       4.      Pursuant to Fed. R. Civ. P. 23, this Court hereby finally certifies this action, for

27  purposes of settlement, a class action on behalf of all Persons who, from July 29, 2016, to and

28  through April 1, 2021, enrolled in any of Defendant's digital subscription offerings using a

California billing address and who, during that time period, were charged and paid one or more automatic renewal fee(s) in connection with such subscription. Excluded from this definition are the Released Parties. Settlement Class Members who exclude themselves from the Settlement, pursuant to the procedures set forth in Paragraph 4.5 of the Settlement Agreement, shall no longer thereafter be Settlement Class Members and shall not be bound by the Settlement Agreement and shall not be eligible to make a claim for any benefit under the terms of this Settlement Agreement.

5.     The Court appoints Frederick J. Klorczyk III of Bursor & Fisher, P.A., as Class Counsel for the Settlement Class. The Court designates Plaintiff Deborah Jordan as the Class Representative.

6.     Notice of the pendency of this action as a class action and of the proposed settlement was given to Settlement Class Members in a manner reasonably calculated to provide the best notice practicable under the circumstances. The form and method of notifying the Settlement Class of the pendency of the Action as a class action and of the terms and conditions of the proposed Settlement met the requirements of Fed. R. Civ. P. 23, due process, and any other applicable law, and constituted due and sufficient notice to all persons and entities entitled thereto. In addition, the Court finds that Defendant fully satisfied any obligation to provide Notice of the proposed Settlement Agreement to the public officials designated under the Class Action Fairness Act, 28 U.S.C. § 1715, to receive such notice, as set forth in the Defendant's Notice of Compliance with 28 U.S.C. § 1715.

7.     The Court has considered and finds Class Counsel and the Class Representative have adequately represented the Class. Plaintiff, by and through her counsel, has investigated the pertinent facts and law, and has evaluated the risks associated with continued litigation, class certification, trial, and/or appeal. The Court finds that the Settlement Agreement was reached in the absence of collusion, is the product of informed, good-faith, arms-length negotiations between the parties and their capable and experienced counsel.

8.     The Court finds that the Settlement is effective in appropriately distributing relief to the Settlement Class in light of the claims and defenses asserted, that the method of processing Settlement Class Member claims is reasonable and appropriate, and that the Settlement Agreement

treats all Settlement Class Members equitably relative to each other.

9.     The Court has evaluated this overall reaction of the Class to the Settlement, and finds that the overall acceptance of the Settlement Agreement by Settlement Class Members supports the Court's conclusion that the Settlement Agreement is in all respects fair, reasonable, adequate, and in the best interests of the Class.

10.     The Parties are directed to consummate the Settlement Agreement in accordance with its terms and conditions.

11.     Defendant shall implement (if it has not done so already) the Prospective Relief described in Paragraph 2.3 of the Settlement Agreement within a reasonably practicable time from the date of this order.

12.     JND Legal Administration ("JND") is finally appointed to continue to serve as the Claims Administrator as provided in the Settlement Agreement.  The Claims Administrator is directed to process all Authorized Claims in accordance with the Settlement Agreement.  Class Counsel and Counsel for Defendant are hereby authorized to employ all reasonable procedures in connection with administration of the Settlement Agreement that are not materially inconsistent with this Order or the Settlement Agreement.

13.     The Claims Administrator shall administer the Escrow Account, which is a Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1.  The Claims Administrator, as administrator of the fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall be solely responsible for filing or causing to be filed all informational and other tax returns as may be necessary or appropriate (including, without limitation, the returns described in Treasury Regulation § 1.468B-2(k)) for the Escrow Account.  The Claims Administrator shall also be responsible for causing payment to be made from the Escrow Account of any Taxes and Tax Expenses owed.  None of the Releasees, Plaintiff, Class Counsel, or Counsel for Defendant shall have any liability or responsibility for any such Taxes or Tax Expenses, or any required filings regarding same.

14.     There shall be no recourse to any Defendant, Releasee, Released Party or their counsel, or to the Class Representative or Class Counsel, or to the Claims Administrator or to this

1    Court, for any determination made by the Claims Administrator pursuant to its responsibilities

2    under the Settlement Agreement.  In addition, notwithstanding anything else in this Order, if the

3    Claims Administrator or any Party has reason to believe that a false or fraudulent Claim has been

4    submitted in this Settlement, or that any Claim has been submitted under false pretenses, the

5    Claims Administrator may reject the Claim.

6          15.     The allowance or disallowance by the Court of any Fee Award or Incentive Award

7    have been considered by the Court separately from the Court's consideration of the fairness,

8    reasonableness and adequacy of the Settlement.  Any Order or proceeding related to the application

9    for an award of fees, costs and expenses, or any appeal from any Fee Award or Incentive Award or

10    other order relating thereto, shall not operate to terminate or cancel the Settlement Agreement, nor

11    affect or delay the finality of this Final Order and Judgment.

12          16.     Pursuant to Fed. R. Civ. P. 23(h), the Court hereby awards Class Counsel attorneys'

13    fees, costs, and expenses in the amount of $_____.  The Court also orders payment of

14    an incentive award(s) in the amount(s) of $_____ to Plaintiff Deborah Jordan.  These amounts

15    are to be paid in the time and manner described in the Settlement Agreement.

16          17.     The Action is hereby dismissed with prejudice and without costs as against

17    Defendant and the Released Parties.

18          18.     Class Representative and all Settlement Class Members (except any such person

19    who has filed a proper and timely request for exclusion) and all persons acting on behalf of or in

20    concert with any of the above, are hereby permanently barred and enjoined from instituting,

21    commencing or prosecuting, either directly or in any other capacity, any and all of the Released

22    Claims against any of the Released Parties.  The Court finds that issuance of the permanent

23    injunction described in this paragraph is necessary and appropriate in aid of the Court's jurisdiction

24    over this Action and to protect and effectuate this Order.

25          19.     Effective as of the Final Settlement Approval Date, each and all of the Settlement

26    Class Members (except any such person who has filed a proper and timely request for exclusion)

27    shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally, and

28    forever released, relinquished, and discharged, and shall be forever barred from asserting,

instituting, or maintaining against any or all of the Released Parties, any and all causes of action or

claims for relief, whether in law or equity, including but not limited to injunctive relief, actual

damages, nominal damages, statutory damages, punitive damages, exemplary or multiplied

damages, restitution, disgorgement, expenses, attorneys' fees and costs, and/or any other form of

consideration whatsoever (including Unknown Claims), whether in law or in equity, accrued or un-

accrued, direct, individual or representative, of every nature and description whatsoever, that were

brought or could have been brought in the Action relating to any and all Releasing Parties, any

WaPo Subscription associated with any of them, or that in any way relate to or arise out of

Defendant's automatic renewal and/or continuous service programs in California from July 29,

2016, to and through April 1, 2021, including but not limited to any of the facts, transactions,

events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures to

act related thereto.  Plaintiff, the Settlement Class, and the Releasing Parties each individually

covenant not to bring any Released Claim and expressly agree that this Release will be, and may be

raised as, a complete defense to and will preclude any action or proceeding encompassed by the

release(s) contained herein in respect to any WaPo Subscription associated with a Class Member.

     20.    Neither the Settlement Agreement, nor any of its terms and provisions, nor any of

the negotiations or proceedings connected with it, nor any of the documents or statements referred

to therein shall be:

     (a)    offered by any person or received against Defendant as evidence or

construed as or deemed to be evidence of any presumption, concession, or admission by Defendant

of the truth of the facts alleged by the Class Representative or any Settlement Class Member or the

validity of any claim that has been or could have been asserted in the Action or in any litigation, or

other judicial or administrative proceeding, or the deficiency of any defense that has been or could

have been asserted in the Action or in any litigation, or of any liability, negligence, fault or

wrongdoing of Defendant;

     (b)    offered by any person or received against Defendant as evidence of a

presumption, concession or admission of any fault, misrepresentation or omission with respect to

any statement or written document approved or made by Defendant or any other wrongdoing by

Defendant;

(c)     offered by any person or received against Defendant as evidence of a presumption, concession, or admission with respect to any liability, negligence, fault, or wrongdoing, or in any way referred to for any other reason against any of the settling parties, in any civil, criminal, or administrative action or proceeding; provided, however, that nothing contained in this paragraph shall prevent the Settlement Agreement from being used, offered, or received in evidence in any proceeding to approve, enforce, or otherwise effectuate the Settlement or the Settlement Approval Order and Final Judgment, or in which the reasonableness, fairness, or good faith of the parties in participating in the Settlement (or any agreement or order relating thereto) is an issue, or to enforce or effectuate provisions of the Settlement, the Settlement Approval Order and Final Judgment, the releases as to the Released Parties.

21.    Claims documents in this case, and all materials and data held by the Claims Administrator regarding the Settlement Class, including the Class List, shall be strictly confidential and not subject to publication or disclosure, and shall not be used for any other purposes beyond providing notice to the Settlement Class and assisting with the determination of valid claims. No person other than the Parties and their counsel, the Claims Administrator, and the Court shall be permitted to obtain or review any Claim Form, or any decision of the Claims Administrator with respect to accepting or rejecting any Claim, except as provided for herein or upon Court Order for good cause shown.

22.    This Settlement Approval Order and Final Judgment constitutes a judgment within the meaning and for purposes of Rule 54 of the Federal Rules of Civil Procedure. Without affecting the finality of the Settlement Approval Order and Final Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) the disposition of the settlement benefits; (b) the settling parties for purposes of construing, enforcing and administering the Settlement Agreement; and (c) enforcement of the Stipulation and Order Regarding Undertaking Re: Attorneys' Fees and Costs.

23.    Without further order of the Court, the settling parties may agree to reasonably necessary extensions of time to carry out any of the provisions of the Settlement Agreement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      24.     In the event that the Final Settlement Approval Date does not occur, this Settlement Approval Order and Final Judgment shall automatically be rendered null and void and shall be vacated and, in such event, all orders entered in connection herewith, except the Stipulation and Order Regarding Undertaking Re: Attorneys' Fees and Costs, shall be null and void.

      IT IS SO ORDERED, this _____ day of _____, 2021.

 

_____
Hon. Judge William H. Orrick
United States District Court Judge,
Northern District of California

**EXHIBIT 2**

**Washington Post ARL Lodestar through 08/26/2021**

| ATTY | HOURS | RATE | TOTAL |
|------|-------|------|-------|
| SAB | 65.1 | $ 1,000.00 | $65,100.00 |
| LTF | 2.6 | $ 1,000.00 | $2,600.00 |
| NJD | 103.2 | $ 750.00 | $77,400.00 |
| FJK | 175.4 | $ 700.00 | $122,780.00 |
| PLF | 0.9 | $ 675.00 | $607.50 |
| JKV | 236.2 | $ 325.00 | $76,765.00 |
| DLS | 7.4 | $ 300.00 | $2,220.00 |
| RSR | 2.1 | $ 300.00 | $630.00 |
| MCS | 11 | $ 275.00 | $3,025.00 |
| JGM | 0.2 | $ 275.00 | $55.00 |
| JMF | 15.9 | $ 250.00 | $3,975.00 |
| ASM | 0.6 | $ 250.00 | $150.00 |
| | 620.6 | | $355,307.50 |
| | | Expenses: | $8,427.92 |
| | | **Total:** | $363,735.42 |

## **B&F HOURLY RATES**

(As of 8/17/2021)

### **2021**

| Timekeeper (Class Year) (Title) | 2021 Rate |
|---|---|
| Scott A. Bursor (1997) (Partner) | $1,000 |
| L. Timothy Fisher (1997) (Partner) | $1,000 |
| Joseph I. Marchese (2002) (Partner) | $900 |
| Joel D. Smith (2006) (Partner) | $850 |
| Josh D. Arisohn (2007) (Partner) | $825 |
| Sarah N. Westcot (2009) (Partner) | $800 |
| Neal J. Deckant (2011) (Partner) | $750 |
| Yitz Z. Kopel (2012) (Partner) | $725 |
| Yeremey O. Krivoshey (2013) (Partner) | $700 |
| Frederick J. Klorczyk (2013) (Partner) | $700 |
| Philip L. Fraietta (2014) (Partner) | $675 |
| Rachel L. Miller (2015) | $500 |
| Alec M. Leslie (2016) (Associate) | $450 |
| Andrew J. Obergfell (2016) (Associate) | $450 |
| Blair E. Reed (2017) (Associate) | $375 |
| Stephen A. Beck (2018) (Associate) | $350 |
| Brittany S. Scott (2019) (Associate) | $325 |
| Max S. Roberts (2019) (Associate) | $325 |
| Sean Litteral (2019) (Associate) | $325 |
| Matthew A. Girardi (2020) (Associate) | $325 |
| Julian C. Diamond (2020) (Associate) | $325 |
| Julia K. Venditti (2020) (Associate) | $325 |
| Christopher Reilly (2020) (Associate) | $325 |
| Debbie L. Schroeder (Senior Litigation Support Specialist) | $300 |
| Rebecca S. Richter (Senior Litigation Support Specialist) | $300 |
| Erin M. Wald (Senior Litigation Support Specialist) | $300 |
| J. Georgina McCulloch (Senior Litigation Support Specialist) | $275 |
| Molly C. Sasseen (Senior Litigation Support Specialist) | $275 |
| Steven E. Riley (Litigation Support Specialist) | $250 |
| Judy Fontanilla (Litigation Support Specialist) | $250 |
| Amanda Larson (Litigation Support Specialist) | $250 |
| Amy S. Michel-Arce (Litigation Support Specialist) | $250 |
| Erike S. Grossbard (Litigation Support Specialist) | $250 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| DATE | MATTER | M No. | ATTY | DESCRIPTION | TIME |
|---|---|---|---|---|---|
| 2020.06.24 | Washington Post ARL | 683 | JKV | Reviewed research into claims against WaPo (.3) | 0.3 |
| 2020.06.24 | Washington Post ARL | 683 | JMF | Emailed inquiry and scheduled call. | 0.2 |
| 2020.06.24 | Washington Post ARL | 683 | JMF | Researched terms and conditions regarding auto renewal law and sent to JKV for review. | 1.5 |
| 2020.06.25 | Washington Post ARL | 683 | JKV | Call w/ JMF re: investigation (.2); Drafted research memo & sent email to FJK & NJD re: same (.2) | 0.4 |
| 2020.06.25 | Washington Post ARL | 683 | JMF | Reviewed ARL research with JKV and discussed PSI | 0.5 |
| 2020.06.26 | Washington Post ARL | 683 | JKV | Call w/ JMF re: follow-up w/ WaPo inquiry & next steps (.3) | 0.3 |
| 2020.06.26 | Washington Post ARL | 683 | JMF | Called inquiry, sent retainer agreement, and discussed with JKV | 0.5 |
| 2020.06.29 | Washington Post ARL | 683 | FJK | Attention to case theory w/ internal team (.8) | 0.8 |
| 2020.06.29 | Washington Post ARL | 683 | JKV | Began researching / drafting complaint (.6) | 0.6 |
| 2020.06.29 | Washington Post ARL | 683 | JKV | Forwarded completed retainer to team (.1); continued researching / drafting complaint (1.1) | 1.2 |
| 2020.06.29 | Washington Post ARL | 683 | JKV | Conf. w/ JMF re: following up w/ client re: [PRIVILEGED] (.1) | 0.1 |
| 2020.06.29 | Washington Post ARL | 683 | JKV | Reviewed email from client re: [PRIVILEGED] & sent reply email re: same (.1) | 0.1 |
| 2020.06.29 | Washington Post ARL | 683 | JMF | Opened new matter. | 0.1 |
| 2020.06.29 | Washington Post ARL | 683 | SAB | Developed pleading strategy for Washington post ARL claims | 1.3 |
| 2020.07.01 | Washington Post ARL | 683 | JKV | Drafted CLRA demand letter (.2) | 0.2 |
| 2020.07.01 | Washington Post ARL | 683 | JKV | Continued researching & drafting complaint (.5) | 0.5 |
| 2020.07.02 | Washington Post ARL | 683 | ASM | Mail out demand letter via cert. mail | 0.2 |
| 2020.07.02 | Washington Post ARL | 683 | NJD | Reviewed CLRA letter | 0.6 |
| 2020.07.14 | Washington Post ARL | 683 | JKV | Continued researching & drafting complaint (.5) | 0.5 |
| 2020.07.14 | Washington Post ARL | 683 | JKV | Continued researching & drafting complaint (.3) | 0.3 |
| 2020.07.14 | Washington Post ARL | 683 | SAB | Revised draft complaint | 2.3 |
| 2020.07.15 | Washington Post ARL | 683 | FJK | Revised draft complaint (1.3); developed strategy w/ S. Bursor (.9) | 2.2 |
| 2020.07.15 | Washington Post ARL | 683 | JMF | Scheduled follow-up call with plaintiff. | 0.2 |
| 2020.07.15 | Washington Post ARL | 683 | SAB | Developed pleading strategy w/ F. Klorczyk | 2.8 |
| 2020.07.16 | Washington Post ARL | 683 | JKV | Call w/ JMF re: following up with client re: [PRIVILEGED] (.2) | 0.2 |
| 2020.07.16 | Washington Post ARL | 683 | JKV | Review JMF notes from client call (.1) | 0.1 |
| 2020.07.16 | Washington Post ARL | 683 | JMF | Followed up with plaintiff and discussed intake notes with JKV. | 0.7 |
| 2020.07.16 | Washington Post ARL | 683 | SAB | Revised draft complaint and developed pleading strategy | 2.2 |
| 2020.07.27 | Washington Post ARL | 683 | JKV | Continued researching & drafting complaint (2.1) | 2.1 |
| 2020.07.28 | Washington Post ARL | 683 | FJK | Analyzed & further revised draft complaint (1.8) | 1.8 |
| 2020.07.28 | Washington Post ARL | 683 | JKV | Continued researching & drafting complaint (1.1) | 1.1 |
| 2020.07.28 | Washington Post ARL | 683 | JKV | Continued researching & drafting complaint (2.4) | 2.4 |
| 2020.07.28 | Washington Post ARL | 683 | JKV | Continued researching & drafting complaint (5.2) | 5.2 |
| 2020.07.28 | Washington Post ARL | 683 | SAB | Revised draft complaint | 3.5 |
| 2020.07.29 | Washington Post ARL | 683 | ASM | Mail new copy of demand letter | 0.1 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| | | | | | |
|---|---|---|---|---|---|
| 2020.07.29 | Washington Post ARL | 683 | DLS | Reviewed complaint; finalized and filed | 1.0 |
| 2020.07.29 | Washington Post ARL | 683 | FJK | Analyzed S. Bursor redlines (.8); attention to finalizing complaint and strategy with N. Deckant & J. Venditti (2.1); analyzed research results & conf w/ internal team re same (.8) | 3.7 |
| 2020.07.29 | Washington Post ARL | 683 | JKV | Finished drafting complaint & circulated to team for review (.7) | 0.7 |
| 2020.07.29 | Washington Post ARL | 683 | JKV | Conf. w/ team re: CLRA demand letter lost in mail & filing ASAP (.1); Conf. w/ paralegal re: sending second letter (.1) | 0.2 |
| 2020.07.29 | Washington Post ARL | 683 | JKV | Reviewed NJD redlines to draft complaint (.3); Email exchange w/ team re: same (.1) | 0.4 |
| 2020.07.29 | Washington Post ARL | 683 | JKV | Proof read complaint last time, made revisions, & finalized (1.1); Prepared CCS & Summons, converted CLRA letter in exhibit form, finalized all docs and forwarded to team for final review & email to team explaining same, & uploaded docs to be filed to Box (.7) | 1.8 |
| 2020.07.29 | Washington Post ARL | 683 | JKV | Call with D.Schroeder re: filing complaint in ND Cal (.4) | 0.4 |
| 2020.07.29 | Washington Post ARL | 683 | NJD | Reviewing draft complaint and discussion of filing timing and strategy | 2.1 |
| 2020.07.29 | Washington Post ARL | 683 | SAB | Reviewed results of legal research, developed pleading strategy, revised draft complaint | 3.8 |
| 2020.07.30 | Washington Post ARL | 683 | ASM | Prepare pleading template | 0.3 |
| 2020.07.30 | Washington Post ARL | 683 | FJK | Conf w/ internal team re response to demand letter & attention to next steps (.7) | 0.7 |
| 2020.07.30 | Washington Post ARL | 683 | JKV | Reviewed WaPo D counsel response to 7/2 CLRA demand letter (.1); email exchange with team re same (.1) | 0.2 |
| 2020.07.30 | Washington Post ARL | 683 | JKV | Reviewed court's 7/30 order setting initial CMC & ADR deadlines (.1); computed and calendared pre-trial deadlines (.2); email exchange with team re: same & whether to consent or decline to magistrate (.2) | 0.5 |
| 2020.07.30 | Washington Post ARL | 683 | JKV | Updated weekly status sheet (.1); email to team re: same (.1) | 0.2 |
| 2020.07.30 | Washington Post ARL | 683 | JMF | Served complaint. | 0.7 |
| 2020.07.30 | Washington Post ARL | 683 | NJD | Reviewed and discussed WaPo's response to CLRA letter (.2) | 0.2 |
| 2020.07.31 | Washington Post ARL | 683 | JKV | Received confirmation email re: service on D, calendared deadline to respond, email exchange w/ team re same (.1); Updated Weekly Status Sheet re: service date & D's deadline to respond (.1) | 0.2 |
| 2020.08.03 | Washington Post ARL | 683 | JMF | Sent proof of service to MCS for filing. | 0.1 |
| 2020.08.03 | Washington Post ARL | 683 | MCS | Filed proof of service. | 0.7 |
| 2020.08.05 | Washington Post ARL | 683 | FJK | Attention to emails from defense counsel & conf w/ N. Deckant re same (.3); | 0.3 |
| 2020.08.05 | Washington Post ARL | 683 | NJD | Scheduling call with defense counsel with FJK | 0.3 |
| 2020.08.06 | Washington Post ARL | 683 | FJK | Call w/ N. Deckant & Z. Lerner (.3) & call w/ N. Deckant re same (.3); attention to developing litigation strategy (.5) | 1.1 |
| 2020.08.06 | Washington Post ARL | 683 | NJD | Call with FJK and defense counsel re extension, resolution | 0.6 |
| 2020.08.12 | Washington Post ARL | 683 | FJK | Analyzed proposed stip, email w/ N. Deckant re same (.2); attention to magistrate consent with internal team & emails re same (.4); attention to schedule (.3) | 0.9 |
| 2020.08.12 | Washington Post ARL | 683 | MCS | Drafted, finalized, and filed MJ Consent form. | 1.7 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| 2020.08.12 | Washington Post ARL | 683 | NJD | Coordination with FJK and JV about consent or declination to magistrate judge | 0.4 |
|---|---|---|---|---|---|
| 2020.08.12 | Washington Post ARL | 683 | NJD | Attention to scheduling with JV, JFK | 0.3 |
| 2020.08.26 | Washington Post ARL | 683 | NJD | Discussed reassignment with LTF.  Calendared new dates.  Discussed with team. | 0.8 |
| 2020.08.27 | Washington Post ARL | 683 | NJD | Calendared new dates | 0.4 |
| 2020.09.15 | Washington Post ARL | 683 | FJK | Reviewed Google decision (.4) & discussed same w/ N. Deckant & J. Venditii (.4); attention to litigation strategy w/ S. Bursor (.8) | 1.6 |
| 2020.09.15 | Washington Post ARL | 683 | JKV | Reviewed Mayron v. Google decision (.4); Discussed implications of & strategy for distinguishing same with FJK and NJD (.4) | 0.8 |
| 2020.09.15 | Washington Post ARL | 683 | NJD | Reviewed Google decision (.4).  Discussed with FJK and JKV (.4). | 0.8 |
| 2020.09.15 | Washington Post ARL | 683 | SAB | Read Google decision and multiple conferences re same with various team members | 1.3 |
| 2020.09.16 | Washington Post ARL | 683 | FJK | Worked on developing strategy for amending complaint (.8) | 0.8 |
| 2020.09.16 | Washington Post ARL | 683 | SAB | Developed pleading strategy for amending complaint | 1.3 |
| 2020.09.22 | Washington Post ARL | 683 | SAB | Developed pleading strategy for amending complaint in light of Google ruling | 1.8 |
| 2020.09.23 | Washington Post ARL | 683 | SAB | Drafted redlines to proposed amended complaint | 1.7 |
| 2020.09.24 | Washington Post ARL | 683 | SAB | Drafted redlines to proposed amended complaint | 1.9 |
| 2020.10.05 | Washington Post ARL | 683 | FJK | Analyzed redlines to draft FAC & conf w/ N. Deckant re same (1); reviewed final FAC (.9) | 1.9 |
| 2020.10.05 | Washington Post ARL | 683 | MCS | Finalize and file amended complaint | 1.8 |
| 2020.10.05 | Washington Post ARL | 683 | NJD | Prepared and filed amended complaint with MS | 1.5 |
| 2020.10.16 | Washington Post ARL | 683 | JKV | Conf. w/ NJD re: approaching deadline for D to answer, requesting extension for reply, drafting MTD opp, due date and internal deadlines (.3) | 0.3 |
| 2020.10.16 | Washington Post ARL | 683 | NJD | Discussed MTD opposition and scheduling with JKV.  Reviewed case calendar and next steps. | 0.4 |
| 2020.10.19 | Washington Post ARL | 683 | FJK | Conf w/ internal team re litigation strategy (.5); | 0.5 |
| 2020.10.19 | Washington Post ARL | 683 | JKV | Drafted email to opposing counsel re: scheduling call to meet & confer (.2); Forwarded draft email to NJD for review & email exchange re: same (.1); edited draft email & sent to D counsel of record (.2) | 0.5 |
| 2020.10.19 | Washington Post ARL | 683 | JKV | Updated calendar with new dates (.2); | 0.2 |
| 2020.10.19 | Washington Post ARL | 683 | NJD | Discussed ARL matters in conference call with PF, FJK, and JKV.  Discussed afterward via text with JKV. | 1.2 |
| 2020.10.19 | Washington Post ARL | 683 | NJD | Strategizing re briefing and extension strategy.  Discussed same with JKV. | 0.4 |
| 2020.10.19 | Washington Post ARL | 683 | NJD | Videoconferences and teleconferences w/ SAB re litigation strategy | 2.2 |
| 2020.10.19 | Washington Post ARL | 683 | SAB | Multiple videoconfs. & teleconfs. w/ N. Deckant re litigation strategy | 2.2 |
| 2020.10.20 | Washington Post ARL | 683 | DLS | Made edits to stipulation and proposed order; finalized and filed | 1.0 |
| 2020.10.20 | Washington Post ARL | 683 | JKV | Reviewed MTD, research & email exchange w/ team re: implication of Mayron v. Google decision and counter-arguments (2.0) | 2.0 |
| 2020.10.20 | Washington Post ARL | 683 | JKV | Conf. w/ NJD re: holding off on request for extension (.1) | 0.1 |
| 2020.10.20 | Washington Post ARL | 683 | JKV | Conf. w/ NJD re: stip redlines and requesting extension (.1); Emailed OC with redlines to stip & request 3-week extension to respond to MTD (.4) | 0.5 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| 2020.10.20 | Washington Post ARL | 683 | JKV | Prepared ADR certification & outreach to client re [PRIVILEGED] (.8) | 0.8 |
|---|---|---|---|---|---|
| 2020.10.20 | Washington Post ARL | 683 | LTF | Discussed scheduling stipulation with Debbie Schroeder and Neal Deckant. | 0.3 |
| 2020.10.20 | Washington Post ARL | 683 | NJD | Coordinated the filing of the extension request.  Discussed with LTF, JKV, and DS. | 1.5 |
| 2020.10.20 | Washington Post ARL | 683 | NJD | Discussions w/ SAB and JKV re motion to dismiss, with prep and analysis | 2.7 |
| 2020.10.20 | Washington Post ARL | 683 | SAB | Analyzed motion to dismiss including multiple discussions w/ J. Venditti & N. Deckant re same | 2.7 |
| 2020.10.21 | Washington Post ARL | 683 | JKV | Called client re: [PRIVILEGED] (.1) | 0.1 |
| 2020.10.21 | Washington Post ARL | 683 | JKV | Finalized ADR certification w/ D. Schroeder & email to client re [PRIVILEGED] (.3) | 0.3 |
| 2020.10.23 | Washington Post ARL | 683 | JKV | Retrieved from pacer and reviewed order resetting deadlines and setting briefing schedule, uploaded to box, re-calendared relevant deadlines, and email exchange with NJD re: same (.6) | 0.6 |
| 2020.10.23 | Washington Post ARL | 683 | JKV | Conf. w/ NJD re: meaning of order resetting deadlines / calculating new deadline to M&C per Rule 26(f) & re-calendared due date to 12/23 (.2) | 0.2 |
| 2020.10.23 | Washington Post ARL | 683 | SAB | Developed discovery strategy | 0.6 |
| 2020.10.26 | Washington Post ARL | 683 | FJK | Analyzed MTD brief (1.4) | 1.4 |
| 2020.11.11 | Washington Post ARL | 683 | FJK | Developed MTD strategy w/ internal team (1.2) | 1.2 |
| 2020.11.11 | Washington Post ARL | 683 | JKV | Reviewed ND Cal local rules and prepared template for MTD opp brief (.8); Started researching and drafting MTD opp (1); Drafted TOC & sent email to FJK & NJD re: template, TOC, & local rules on formatting (.5) | 2.3 |
| 2020.11.11 | Washington Post ARL | 683 | JKV | Continued researching & drafting MTD opp (3.0) | 3.0 |
| 2020.11.11 | Washington Post ARL | 683 | NJD | MTD opposition coordination and discussion with JKV.  Reviewed outline and answered questions. | 0.8 |
| 2020.11.11 | Washington Post ARL | 683 | SAB | Developed litigation strategy and advised team re MTD opposition | 1.9 |
| 2020.11.12 | Washington Post ARL | 683 | JKV | Continued researching & drafting MTD opp (2.7) | 2.7 |
| 2020.11.12 | Washington Post ARL | 683 | JKV | Continued researching & drafting MTD opp (1.5); Call w/ N. Deckant re: MTD opp (.2) | 1.7 |
| 2020.11.12 | Washington Post ARL | 683 | NJD | Strategy call with JKV re MTD opposition drafting | 0.3 |
| 2020.11.12 | Washington Post ARL | 683 | SAB | Developed strategy for MTD oppn including multiple teleconfs. w/ team members re same | 1.5 |
| 2020.11.13 | Washington Post ARL | 683 | FJK | Strategy calls re MTD opposition (.8) | 0.8 |
| 2020.11.13 | Washington Post ARL | 683 | JKV | Continued researching & drafting MTD opp (1.1) | 1.1 |
| 2020.11.13 | Washington Post ARL | 683 | JKV | Continued researching & drafting MTD opp (2.0) | 2.0 |
| 2020.11.14 | Washington Post ARL | 683 | FJK | Attention to settlement strategy & teleconfs w/ S. Bursor re same (2.2) | 2.2 |
| 2020.11.14 | Washington Post ARL | 683 | SAB | Developed settlement strategy, including multiple teleconfs. w/ F. Klorczyk et al re same | 1.7 |
| 2020.11.15 | Washington Post ARL | 683 | JKV | Drafted internal memo re: potential issues in case (.4); Email exchange w/ NJD re: scheduling conference call to discuss same (.2) | 0.6 |
| 2020.11.16 | Washington Post ARL | 683 | FJK | Attention to factual issues w/ N. Deckant (.9) | 0.9 |
| 2020.11.16 | Washington Post ARL | 683 | JKV | Call w/ NJD to discuss issues that have come up in drafting MTD opp (.5) | 0.5 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| 2020.11.16 | Washington Post ARL | 683 | JKV | Call w/ NJD re: next steps (.4) | 0.4 |
|---|---|---|---|---|---|
| 2020.11.16 | Washington Post ARL | 683 | JKV | Correspondence w/ client re: [PRIVILEGED] (.5) | 0.5 |
| 2020.11.16 | Washington Post ARL | 683 | NJD | Discussion of MTD issues with JKV.  Discussed with FJK.  Reported back to JKV with strategy. | 1.9 |
| 2020.11.17 | Washington Post ARL | 683 | FJK | Attention to mediation strategy w/ S. Bursor & internal team (.9) | 0.9 |
| 2020.11.17 | Washington Post ARL | 683 | JKV | Conf w/ N. Deckant re MTD opp, strategy, next steps (.7); Called client re: [PRIVILEGED] (.1) | 0.8 |
| 2020.11.17 | Washington Post ARL | 683 | NJD | Conf w/ J. Venditti re next steps for litigation (.8) | 0.8 |
| 2020.11.17 | Washington Post ARL | 683 | SAB | Developed mediation strategy including mulitple discussions w/ F. Klorczyk et al re same | 1.3 |
| 2020.11.18 | Washington Post ARL | 683 | FJK | Attention to email from defense counsel & conf w/ internal team re next steps (.7); call w/ J. Sommer re resolution (.2) & update internal team re same & conf re next steps (.5); analyzed stip & email to J. Sommer re same (.3); conf w/ team re settlement strategy (.8) | 2.5 |
| 2020.11.18 | Washington Post ARL | 683 | JKV | Reviewed email from opposing counsel re: mediation (.1); conf. w/ team re: same (.1); Call w/ F.Klorczyk & P.Fraietta re: next steps (.2) | 0.4 |
| 2020.11.18 | Washington Post ARL | 683 | JKV | Drafted stipulation and proposed order to stay action pending mediation (.6) | 0.6 |
| 2020.11.18 | Washington Post ARL | 683 | JKV | Call w/ client re: [PRIVILEGED] (.2); Drafted & sent email to client re [PRIVILEGED] (.2) | 0.4 |
| 2020.11.18 | Washington Post ARL | 683 | LTF | Exchanged messages with Fred Klorczyk regarding settlement overture. | 0.1 |
| 2020.11.18 | Washington Post ARL | 683 | NJD | Scheduling mediation.  Got client approval.  Drafted stipulation to stay case with JKV. Discussions with FJK. | 0.9 |
| 2020.11.18 | Washington Post ARL | 683 | SAB | Developed mediation strategy including multiple conferences w/ F. Klorczyk and team members re same | 1.1 |
| 2020.11.19 | Washington Post ARL | 683 | DLS | Finalized and filed stip and proposed order; emailed prop order to Judge | 0.6 |
| 2020.11.19 | Washington Post ARL | 682 | FJK | Analyzed redlined stip (.1) & conf w/ J. Venditti re filing same (.1); updated S. Bursor re mediation & discussed strategy w/ internal team (.5) | 0.7 |
| 2020.11.19 | Washington Post ARL | 683 | JKV | Received and reviewed opposing counsel redlines to draft stip (.1); Finalized stip and re-circulated (.1) | 0.2 |
| 2020.11.19 | Washington Post ARL | 683 | JKV | Email exchange w/ F.Klorczyk re: stip (.1); email to D.Schroeder & M.Sasseen re: filing attached stip (.1) | 0.2 |
| 2020.11.25 | Washington Post ARL | 683 | FJK | Email to J. Sommer (.1); | 0.1 |
| 2020.12.04 | Washington Post ARL | 683 | FJK | Email to J. Sommer (.1); | 0.1 |
| 2020.12.04 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: emailing Jacob Sommer re: doc demands / scheduling mediation (.1) | 0.1 |
| 2020.12.09 | Washington Post ARL | 683 | JKV | Conf. w FJK re: scheduling mediation & Def counsel delay (.2); Conf. w/ NJD re: same & plan for drafting demurrer opp if 60 day stay runs out without resolution (.2) | 0.4 |
| 2020.12.09 | Washington Post ARL | 683 | NJD | Discussion of upcoming mediation and related scheduling items with team | 0.3 |
| 2020.12.11 | Washington Post ARL | 683 | FJK | Email to defense counsel (.1); | 0.1 |
| 2020.12.15 | Washington Post ARL | 683 | JKV | Email to team re: conference call with opposing counsel tomorrow (.1) | 0.1 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| Date | Matter | Code | Staff | Description | Hours |
|---|---|---|---|---|---|
| 2020.12.16 | Washington Post ARL | 683 | FJK | Call w/ J. Sommer (.4) & conf w/ team re same (.2); attention to mediation research w/ J. Venditti (1.2); conf w/ S. Bursor re strategy (.4) | 2.2 |
| 2020.12.16 | Washington Post ARL | 683 | JKV | ARL settlement research in preparation for upcoming mediation (2.7) | 2.7 |
| 2020.12.16 | Washington Post ARL | 683 | JKV | Research re: mediators used in other ARL settlements (.4) | 0.4 |
| 2020.12.16 | Washington Post ARL | 683 | SAB | Developed mediation strategy and prep for mediation | 1.5 |
| 2020.12.17 | Washington Post ARL | 683 | JKV | Continued research re: mediators (.4) | 0.4 |
| 2021.01.04 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: status report due 1/18 and mediation talks (.1) | 0.1 |
| 2021.01.05 | Washington Post ARL | 683 | FJK | Email to J. Sommer re mediation (.1); team meeting re strategy (.7) | 0.8 |
| 2021.01.05 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: scheduling mediation, end of stay of 1/18, and drafting MTD opp due 1/22 (.4); Conf. w/ FJK & NJD re: drafting joint status letter & request for extension of stay -- internal deadline set for Thurs 1/7/21 (.2) | 0.6 |
| 2021.01.05 | Washington Post ARL | 683 | JKV | Started drafting joint status letter (2.4) | 2.4 |
| 2021.01.05 | Washington Post ARL | 683 | NJD | Team meeting and coordination with FJK and JKV about the status update submission, and next steps | 0.6 |
| 2021.01.05 | Washington Post ARL | 683 | SAB | Developed litigation and settlement strategy and attended team meeting re same by phone | 1.2 |
| 2021.01.06 | Washington Post ARL | 683 | FJK | Conf w/ J. Venditti re next steps (.2); emails to mediators re availability (.3); research re mediators (.4) | 0.9 |
| 2021.01.06 | Washington Post ARL | 683 | JKV | Drafted stipulation for extension of stay (1.3) | 1.3 |
| 2021.01.06 | Washington Post ARL | 683 | NJD | Reviewed NJD redlines to draft stipulation, made revisions & re-circulated (.2) | 0.2 |
| 2021.01.06 | Washington Post ARL | 683 | NJD | Scheduling medation with FJK, and discussion of available mediators | 0.4 |
| 2021.01.11 | Washington Post ARL | 683 | DLS | Made edits and filed stipulation | 0.6 |
| 2021.01.11 | Washington Post ARL | 683 | FJK | Attention to emails & draft filings (.3); attention to medition scheduling (.3); conf w/ team re next steps (.3) | 0.9 |
| 2021.01.11 | Washington Post ARL | 683 | JKV | Follow up w/ team re: next steps in with regard to stip (.1) | 0.1 |
| 2021.01.11 | Washington Post ARL | 683 | JKV | Drafted email to defense counsel re: stip & circulated to NJD for review before sending to D (.2); email exchange with NJD re: same & sent email to opposing counsel (.1) | 0.3 |
| 2021.01.11 | Washington Post ARL | 683 | JKV | Email to Jake Sommer re: filing joint stipulation to extend stay (.1); Message to D.Schroeder re: same (.1); Conf. w/ team re: application of D counsel's electronic signature to stip (.1); Email exchange with J.Sommer re: same (.2) | 0.5 |
| 2021.01.11 | Washington Post ARL | 683 | JKV | Finalized stipulation and forwarded to D.Schroeder to be filed in ND Cal (.1) | 0.1 |
| 2021.01.11 | Washington Post ARL | 683 | JKV | Email exchange with D.Schroeder re: changing FJK address listed on stip (.1) | 0.1 |
| 2021.01.11 | Washington Post ARL | 683 | MCS | Fixed FJK notice of appearance, finalized and filed | 1.1 |
| 2021.01.11 | Washington Post ARL | 683 | NJD | Conferring with JKV and FJK about stipulation to extend stay | 0.3 |
| 2021.01.11 | Washington Post ARL | 683 | NJD | Conferring with JKV and FJK about scheduling the mediation | 0.3 |
| 2021.01.13 | Washington Post ARL | 683 | FJK | Email to Maureen re mediation questions (.1); email to J. Sommer re doc production (.1); | 0.2 |
| 2021.01.19 | Washington Post ARL | 683 | FJK | Analyzed & executed mediation agreement (.2); | 0.2 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| | | | | | |
|---|---|---|---|---|---|
| 2021.02.22 | Washington Post ARL | 683 | JKV | Conf. w/ team re: upcoming deadlines on calendar, retrieved and reviewed all stay orders entered in this case to determine whether calendared dates and deadlines have been vacated/postponed or are still operative, sent analysis of issue to team (.2); Conf. w/ team re: same (.3); Drafted email to defense counsel re: CMC & MTD hearing dates & forwarded to NJD for review before sending to D (.4); Email exchange with NJD re: same & sent draft email to defense counsel (.1) | 1.0 |
| 2021.02.22 | Washington Post ARL | 683 | NJD | Attention to calendar issue with 26(f) deadline coming up on Wednesday. | 0.7 |
| 2021.02.23 | Washington Post ARL | 683 | JKV | Updated calendared deadlines / moved CMC and MTD hearing back by 60 days (.1) | 0.1 |
| 2021.02.23 | Washington Post ARL | 683 | JKV | Email exchange with Defense counsel re: confirming upcoming pretrial deadlines with court (.1) | 0.1 |
| 2021.02.23 | Washington Post ARL | 683 | JKV | Email exchange w/ NJD re: motion hearing date (.1); Updated calendar re: same (.1); Updated weekly status tracking sheet (.1) | 0.3 |
| 2021.02.24 | Washington Post ARL | 683 | NJD | Review of new CMC dates | 0.3 |
| 2021.03.02 | Washington Post ARL | 683 | FJK | Attention to outstanding discovery with internal team (.4) & email to J. Sommer re same (.1); | 0.5 |
| 2021.03.02 | Washington Post ARL | 683 | NJD | Review of upcoming mediation deadlnies.  Discussed staffing and delegation of mediation brief with FJK, JKV. | 0.4 |
| 2021.03.03 | Washington Post ARL | 683 | FJK | Emails w/ J. Sommer re documents (.3); | 0.3 |
| 2021.03.03 | Washington Post ARL | 683 | NJD | Monitoring emails re production of mediation materials.  Discussed with FJK and JKV. | 0.4 |
| 2021.03.04 | Washington Post ARL | 683 | FJK | Attention to timing issues w/ team (.6). | 0.6 |
| 2021.03.04 | Washington Post ARL | 683 | JKV | Processed and save mediation production docs to box (.1); Sent email to team re: same (.1) | 0.2 |
| 2021.03.04 | Washington Post ARL | 683 | NJD | Monitoring production of mediation documents, and timing of submissions.  Discussed with team. | 0.6 |
| 2021.03.08 | Washington Post ARL | 683 | JKV | Reviewed and analyzed mediation production documents (.8) | 0.8 |
| 2021.03.08 | Washington Post ARL | 683 | NJD | Discussed mediation brief timing with team | 0.2 |
| 2021.03.09 | Washington Post ARL | 683 | FJK | Emails w/ H. Reed re mediation submissions & update team re same (.3); email re participant list (.1); executed confidentiality agreement (.1); emails w/ Z. Lerner (.3); | 0.8 |
| 2021.03.09 | Washington Post ARL | 683 | JKV | Email exchange w/ team re: mailing mediation statement to Jill Sperber by FedEx Overnight Saturday delivery, email address client used to enroll in WaPo subscription (.2) | 0.2 |
| 2021.03.09 | Washington Post ARL | 683 | JKV | Called client re: [PRIVILEGED] (.1) | 0.1 |
| 2021.03.09 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: extension for mediation statement (.1) | 0.1 |
| 2021.03.09 | Washington Post ARL | 683 | NJD | Discussing mediation statement with FJK | 0.3 |
| 2021.03.10 | Washington Post ARL | 683 | NJD | Update re mediation planning and status | 0.2 |
| 2021.03.12 | Washington Post ARL | 683 | FJK | Worked on mediation statement (1.8) | 1.8 |
| 2021.03.12 | Washington Post ARL | 683 | JKV | Reviewed/analyzed facts of case, allegations of complaint, etc., & sent internal memo re: assessment of strengths/weaknesses of case to team (.8) | 0.8 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| | | | | | |
|---|---|---|---|---|---|
| 2021.03.12 | Washington Post ARL | 683 | JKV | Further email exchange with team re: strength/weaknesses of case and mediation strategy (.4) | 0.4 |
| 2021.03.12 | Washington Post ARL | 683 | JKV | Exchanged messages with FJK re: class size, WaPo subscription options, client enrollment, etc. (.2) | 0.2 |
| 2021.03.12 | Washington Post ARL | 683 | JKV | Sent email to defense counsel re: email address client used to enroll in WaPo sub (.1) | 0.1 |
| 2021.03.12 | Washington Post ARL | 683 | NJD | Reviewed JKV's internal memo about case valuation and settlement prospects. Responded. | 0.4 |
| 2021.03.13 | Washington Post ARL | 683 | FJK | Worked on mediation statement & emails w/ N. Deckant & J. Venditti re same (6.5); | 6.5 |
| 2021.03.13 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: recent ARL settlements, reviewed draft mediation statement & sent email to FJK re: revisions (1.2) | 1.2 |
| 2021.03.13 | Washington Post ARL | 683 | NJD | Assisting with mediation statement and strategy discussion | 0.9 |
| 2021.03.13 | Washington Post ARL | 683 | SAB | Revised draft mediation statement | 3.3 |
| 2021.03.14 | Washington Post ARL | 683 | FJK | Revised & finalized mediation statement & drafted proposed term sheet (4.2) | 4.2 |
| 2021.03.14 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: draft mediation statement (.3) | 0.3 |
| 2021.03.14 | Washington Post ARL | 683 | NJD | Finalizing and serving mediation statement | 2.8 |
| 2021.03.14 | Washington Post ARL | 683 | SAB | Revised draft mediation statement | 3.8 |
| 2021.03.15 | Washington Post ARL | 683 | FJK | Conf w/ team re strategy for tomorrow's mediation (.6); conf w/ N. Deckant & J. Venditti re client (.4); attention to litigation strategy w/ team (.4); prep for tomorrow's mediation w/ S. Bursor (1.5); conf w/ J. Veditti & N. Deckant (.5); analyzed research from J. Venditti (.8) | 4.2 |
| 2021.03.15 | Washington Post ARL | 683 | JKV | Email to team re: research & launching new PSI campaign (.2) | 0.2 |
| 2021.03.15 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: client & correspondence with client re: [PRIVILEGED] (.3) | 0.3 |
| 2021.03.15 | Washington Post ARL | 683 | JKV | Call w/ client re: [PRIVILEGED], conf. w/ FJK re: same, sent email to defense counsel re: client email addresses (.2) | 0.2 |
| 2021.03.15 | Washington Post ARL | 683 | JKV | Attention to case strategy w/ FJK (.5) | 0.5 |
| 2021.03.15 | Washington Post ARL | 683 | JKV | Research re: decisions on final approval on camparable class action settlements for mediation purposes (4.7) | 4.7 |
| 2021.03.15 | Washington Post ARL | 683 | JKV | Continued research re: comparable settlements & sent internal memo to team re: same (1.3) | 1.3 |
| 2021.03.15 | Washington Post ARL | 683 | JKV | Downloaded / unzipped new mediation production & D's mediation statement & uploaded same docs to box (.2); Reviewed and analyzed D's mediation statement & sent message to team re: thoughts on same (.6) | 0.8 |
| 2021.03.15 | Washington Post ARL | 683 | SAB | Mediation prep w/ F. Klorczyk et al | 2.3 |
| 2021.03.16 | Washington Post ARL | 683 | FJK | Analyzed insurance policy & conf w/ internal team re same (1); mediation w/ J. Sperber, N. Deckant, and J. Venditti (8); conf w/ internal team re same (.2); call w/ P. Fraietta (.6); | 9.8 |
| 2021.03.16 | Washington Post ARL | 683 | JKV | Full day of mediation with Jill Sperber, starting at 8 am PDT | 9.2 |
| 2021.03.16 | Washington Post ARL | 683 | NJD | Discussion re MTD opposition and upcoming deadlines with FJK and JKV | 0.6 |
| 2021.03.16 | Washington Post ARL | 683 | NJD | Review of produced documents and prepare for mediation | 1.6 |
| 2021.03.16 | Washington Post ARL | 683 | NJD | Mediation with Jill Sperber | 9.1 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| 2021.03.16 | Washington Post ARL | 683 | PLF | Analyze insurance policy (0.4); Debrief with FJK re mediation and next steps (0.5) | 0.9 |
|---|---|---|---|---|---|
| 2021.03.16 | Washington Post ARL | 683 | SAB | Multiple teleconfs. w/ F. Klorczyk & N. Deckant re mediation strategy during mediation | 1.7 |
| 2021.03.17 | Washington Post ARL | 683 | FJK | Attention to next steps for settlement negotiations (2.5); conf w/ J. Venditti re research assignment (.4); conf w/ SAB re post-mediation negotiations (.8) | 3.7 |
| 2021.03.17 | Washington Post ARL | 683 | JKV | Research re: clickwrap/browsewrap/shrinkwrap agreements & enforceability & Conf. w/ FJK re: same (1.4) | 1.4 |
| 2021.03.17 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: additional settlement research, research questions to focus on, etc. (.4); researched similar class action settlements & made case law chart (5.8) | 6.2 |
| 2021.03.17 | Washington Post ARL | 683 | NJD | Attention to resolution | 0.7 |
| 2021.03.17 | Washington Post ARL | 683 | NJD | Prepare for upcoming mediation | 0.9 |
| 2021.03.17 | Washington Post ARL | 683 | SAB | Attention to post-mediation settlement negotiations | 0.8 |
| 2021.03.18 | Washington Post ARL | 683 | FJK | Analyzed research from J. Venditti & conf same (.8) | 0.8 |
| 2021.03.18 | Washington Post ARL | 683 | JKV | Continued researching ARL settlements & preparing case law chart, circulated internal memo re: same to team (2.2) | 2.2 |
| 2021.03.18 | Washington Post ARL | 683 | JKV | Continued settlement research & preparing CA state court ARL settlement chart (.3) | 0.3 |
| 2021.03.18 | Washington Post ARL | 683 | JKV | Researching ARL settlements and decisions re: same, finished preparing & circulated internal memo re: same to team (4.2) | 4.2 |
| 2021.03.18 | Washington Post ARL | 683 | JKV | Amassed & uploaded all exemplar ARL settlement agreements uploaded to box for FJK review before second mediation session (.2); Conf. w/ FJK re: ARL settlements (.1) | 0.3 |
| 2021.03.18 | Washington Post ARL | 683 | JMF | Contacted inquiries. | 0.5 |
| 2021.03.18 | Washington Post ARL | 683 | NJD | Attention to resolution | 0.4 |
| 2021.03.18 | Washington Post ARL | 683 | SAB | Attention to post-mediation settlement negotiations | 0.5 |
| 2021.03.19 | Washington Post ARL | 683 | DLS | Filed stipulation and proposed order; emailed to Judge | 0.5 |
| 2021.03.19 | Washington Post ARL | 683 | FJK | Drafted status letter & email to counsel re same (.9); finalized status letter & email to D. Schroeder re same (.2); attention to sttaus letter w/ internal team & email to J. Sommer re same (.3); revised letter w/ J. Venditti (.2); conf w/ S. Bursor re continued negotiations (.6) | 2.2 |
| 2021.03.19 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: mediation strategy (.3) | 0.3 |
| 2021.03.19 | Washington Post ARL | 683 | JKV | Drafted stip to further extend stay pending second mediation session, circulated draft to team, & conf. w/ FJK re: edits to same (.8); Finalized stipulation & forwarded to D.Schroeder for filing in ND Cal (.1) | 0.9 |
| 2021.03.19 | Washington Post ARL | 683 | JKV | Call w/ D.Schroeder re: filing stip, formatting, filing jx, etc. (.5) | 0.5 |
| 2021.03.19 | Washington Post ARL | 683 | NJD | Preparation, finalization, and filing of status update letter with FJK | 0.6 |
| 2021.03.19 | Washington Post ARL | 683 | SAB | Attention to post-mediation settlement negotiations | 0.7 |
| 2021.03.22 | Washington Post ARL | 683 | JKV | Reviewed order granting stipulation to extend stay & computed / re-calendar all relevant deadlines by 14 days & sent email to team re: same (.5) | 0.5 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| | | | | | |
|---|---|---|---|---|---|
| 2021.03.22 | Washington Post ARL | 683 | JKV | Email exchange w/ NJD re: keeping the MTD hearing and initial CMC calendared for 5/12 until officially re-set for the court & calendaring new hearing dates per stay extension as tentative until officially re-set, re-calendared deadlines in accordance w/ same (.3) | 0.3 |
| 2021.03.23 | Washington Post ARL | 683 | SAB | Attention to post-mediation settlement negotiations and prep for second mediation session | 1.5 |
| 2021.03.24 | Washington Post ARL | 683 | FJK | Conf w/ N. Deckant re tomorrow's mediation (.5); emails w/ J. Sperber (.3); prep for tomorrow's mediations w/ S. Bursor & internal team (1.4) | 2.2 |
| 2021.03.24 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: strategy at mediation tomorrow (1) | 1.0 |
| 2021.03.24 | Washington Post ARL | 683 | JKV | Reviewed and analyzed Def's terms sheet, prepared notes for team re: same (2.4); Uploaded terms sheet to case file on box (.1) | 2.5 |
| 2021.03.25 | Washington Post ARL | 683 | FJK | Prep for this morning's mediation (1.2); mediation w/ J. Sperber, N. Deckant, & J. Venditti (5.7); call w/ S. Bursor re settlement (.3); | 7.2 |
| 2021.03.25 | Washington Post ARL | 683 | JKV | Mediation via Zoom with Jill Sperber -- lasted from 4:59 AM until 10:37 AM | 5.7 |
| 2021.03.25 | Washington Post ARL | 683 | JKV | Conf. w/ FJK & NJD re: preparing settlement agreement, next steps (.2); Analyzed ND Cal case law re: settlement approval & sent email memo to FJK & NJD re: same (.4) | 0.6 |
| 2021.03.25 | Washington Post ARL | 683 | NJD | Mediation with Jill Sperber | 5.7 |
| 2021.03.25 | Washington Post ARL | 683 | SAB | Settlement negotiations and multiple teleconfs. w/ F. Klorczyk and N. Deckant during mediation session | 2.9 |
| 2021.03.25 | Washington Post ARL | 683 | SAB | Videoconf w/ F. Klorczyk re term sheet signed today (.2) | 0.2 |
| 2021.03.26 | Washington Post ARL | 683 | JKV | Drafted settlement agreement & forwarded to team for redlines (3.5) | 3.5 |
| 2021.03.28 | Washington Post ARL | 683 | FJK | Analyzed & revised draft settlement agreement & conf w/ N. Deckant re same (2.3) | 2.3 |
| 2021.03.28 | Washington Post ARL | 683 | SAB | Revised draft settlement agreement | 3.3 |
| 2021.03.29 | Washington Post ARL | 683 | FJK | Analyzed S. Bursor redlines (.6); attention to draft settlement agreement & conf w/ internal team re same (.7); finalized draft w/ J. Venditti & email to defense counsel re same (.4); prepared status stip & email to defense counsel re same (.3); | 2.0 |
| 2021.03.29 | Washington Post ARL | 683 | JKV | Reviewed & implemented NJD & FJK redlines to draft SA, circulated v.2 of SA to team & uploaded same to box (.3); Updated cross-references on SA & circulated v.3 / updloaded to box (.4) | 0.7 |
| 2021.03.29 | Washington Post ARL | 683 | NJD | Finalizing first draft of settlement agreement and emailing to defense counsel with FJK, JKV | 0.8 |
| 2021.03.30 | Washington Post ARL | 683 | FJK | Call w/ G. Haber re proposal request (.5); attention to emails w/ J. Sommer re draft stip & finalized same w/ J. Venditti (.5); | 1.0 |
| 2021.03.30 | Washington Post ARL | 683 | JKV | Reviewed & implemented defense counsel edits to draft Stip re Settlement Stay, conf. w/ team re: same, made additional edit to Stip, call w/ M.Sasseen re: filing final stip in ND Cal, finalized stip and forwarded to M.Sasseen for filing, and uploaded all draft and final versions of stip to box (.5) | 0.5 |
| 2021.03.30 | Washington Post ARL | 683 | JMF | Assisted with filing | 0.6 |
| 2021.03.30 | Washington Post ARL | 683 | MCS | Finalized and filed stip re stay. | 1.4 |
| 2021.03.31 | Washington Post ARL | 683 | JKV | Drafting SA exhibits (1.7) | 1.7 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| 2021.03.31 | Washington Post ARL | 683 | JKV | Continued drafting SA exhibits (2.5) | 2.5 |
|---|---|---|---|---|---|
| 2021.04.01 | Washington Post ARL | 683 | FJK | Team discussions re preliminary approval motion (.8) | 0.8 |
| 2021.04.01 | Washington Post ARL | 683 | JKV | Drafting preliminary approval motion (5.8) | 5.8 |
| 2021.04.01 | Washington Post ARL | 683 | JMF | Contacted inquiries and discussed with JKV. | 1.0 |
| 2021.04.01 | Washington Post ARL | 683 | LTF | Discussed preliminary approval motion and staffing with Fred Klorczyk and Neal Deckant and exchanged messages with Mr. Klorczyk and Mr. Deckant regarding same. | 1.2 |
| 2021.04.02 | Washington Post ARL | 683 | JKV | Drafting preliminary approval motion (1.8) | 1.8 |
| 2021.04.02 | Washington Post ARL | 683 | JKV | Continued drafting preliminary approval motion (3.7) | 3.7 |
| 2021.04.02 | Washington Post ARL | 683 | JKV | Continued drafting preliminary approval motion (.7) | 0.7 |
| 2021.04.02 | Washington Post ARL | 683 | JMF | Contacted leads and discussed with JKV. | 1.0 |
| 2021.04.02 | Washington Post ARL | 683 | LTF | Discussed preliminary approval motion and staffing with Mr. Deckant. | 0.2 |
| 2021.04.05 | Washington Post ARL | 683 | FJK | Call w/ N. Deckant re next steps (1); | 1.0 |
| 2021.04.05 | Washington Post ARL | 683 | JKV | Continued drafting preliminary approval motion (.9) | 0.9 |
| 2021.04.05 | Washington Post ARL | 683 | JKV | Continued drafting preliminary approval motion (1.2) | 1.2 |
| 2021.04.05 | Washington Post ARL | 683 | JKV | Continued drafting preliminary approval motion (1.1) | 1.1 |
| 2021.04.05 | Washington Post ARL | 683 | JKV | Continued drafting preliminary approval motion & circulated first draft to team for review/redlines (1.9) | 1.9 |
| 2021.04.05 | Washington Post ARL | 683 | JMF | Contacted leads. | 0.8 |
| 2021.04.05 | Washington Post ARL | 683 | NJD | Attention to settlement materials | 0.4 |
| 2021.04.05 | Washington Post ARL | 683 | SAB | Revised draft preliminary approval motion and related papers | 3.1 |
| 2021.04.06 | Washington Post ARL | 683 | FJK | Analyzed S. Bursor revisions (.8); email to J. Sommer (.1); call w/ J. Venditti & N. Deckant re next steps (1.8); analyzed & revised draft exhibits & email to J. Sommer re same (1.5); analyzed notice of appearance (.1); | 4.3 |
| 2021.04.06 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: PA brief, settlement approval timeline, next steps (.9); | 0.9 |
| 2021.04.06 | Washington Post ARL | 683 | JKV | Reviewed & implemented NJD redlines to draft PA motion & uploaded clean copy to box (.4) | 0.4 |
| 2021.04.06 | Washington Post ARL | 683 | JKV | Drafted NOA & circulated to FJK/NJD for review/approval (.6); Email exchange w/ team re: same (.1); Finalized NOA & forwarded to D.Schroeder & M.Sasseen for filing in ND Cal (.1) | 0.8 |
| 2021.04.06 | Washington Post ARL | 683 | MCS | Finalized and filed JKV notice of appearance. | 1.3 |
| 2021.04.06 | Washington Post ARL | 683 | NJD | Review and edits to draft preliminary approval brief | 2.7 |
| 2021.04.07 | Washington Post ARL | 683 | FJK | Analyzed & further revised draft preliminary approval brief (2.9); email to internal team (.1); email to J. Sommer (.1); attention to Orrick's rules (.3) | 3.4 |
| 2021.04.07 | Washington Post ARL | 683 | JKV | Reviewed Orrick's standing rules and N.D.Cal local civil rules for rules governing page extension requests & sent email to FJK re: same (.5) | 0.5 |
| 2021.04.07 | Washington Post ARL | 683 | JKV | Class cert / settlement approval research (.4) | 0.4 |
| 2021.04.07 | Washington Post ARL | 683 | JKV | Drafting motion for extension (.3) | 0.3 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| Date | Client | | | Description | |
|---|---|---|---|---|---|
| 2021.04.07 | Washington Post ARL | 683 | JKV | Continued drafting motion for extension, researched for other administrative motions to exceed page limits filed in ND Cal in order to determine correct stylization, finished first draft of admin motion, drafted proposed order, forwarded draft admin motion & proposed order to FJK & NJD in email re: concerns re: stylization (2.8) | 2.8 |
| 2021.04.07 | Washington Post ARL | 683 | JKV | Restyled and revised draft motion for extension of page limit & email exchange with NJD re: same (.6); Received/reviewed/accepted NJD redlines to draft motion & circulated clean copy for NJD to forward to Def counsel, uploaded clean copy of draft admin motion to box (.2) | 0.8 |
| 2021.04.07 | Washington Post ARL | 683 | NJD | Discussion with JKV re extension of page limits.  Reviewed Local Rules and assessed odds of success.  Reviewed case file and found L.R. 7-11 template.  Sent to JKV with internal memo and instructions for completion. | 1.4 |
| 2021.04.07 | Washington Post ARL | 683 | NJD | Revisions to motion for page extension with JKV | 0.9 |
| 2021.04.08 | Washington Post ARL | 683 | FJK | Attention to research w/ J. Venditti (.9) | 0.9 |
| 2021.04.08 | Washington Post ARL | 683 | JKV | Research re: ND Cal/9th Circuit settlement approval case law (2.1) | 2.1 |
| 2021.04.09 | Washington Post ARL | 683 | DLS | Assisted with filing adm. motion | 0.3 |
| 2021.04.09 | Washington Post ARL | 683 | JKV | Settlement approval research (2.3) | 2.3 |
| 2021.04.09 | Washington Post ARL | 683 | MCS | Finalized and filed administrative motion, sent proposed order to judge. | 2.5 |
| 2021.04.13 | Washington Post ARL | 683 | JKV | Updating ARL filed cases and settlement charts (1.2) | 1.2 |
| 2021.04.13 | Washington Post ARL | 683 | JKV | Reviewed/analyzed order granting preliminary approval of new ARL settlement in Bitdefender case & sent email to team re: same (.4); updated ARL settlement chart re: same (.1) | 0.5 |
| 2021.04.13 | Washington Post ARL | 683 | SAB | Revised draft preliminary approval brief and related documents | 1.4 |
| 2021.04.14 | Washington Post ARL | 683 | JKV | Researched and reviewed case law re: approval of ARL settlements (.8) | 0.8 |
| 2021.04.15 | Washington Post ARL | 683 | FJK | Email to J. Sommer re status & next steps (.2); conf w/ J. Venditti (.1); analyzed S. Bursor redlines (.7) | 1.0 |
| 2021.04.15 | Washington Post ARL | 683 | JKV | Researched/reviewed new ARL case filings & updated tracking sheets re: same (1.3) | 1.3 |
| 2021.04.15 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: call with defense counsel on Tuesday at 10:15 (.1) | 0.1 |
| 2021.04.16 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: prompting Jake to reply re: proposed conf call next week by sending invite (.1); Calendared conference call w/ defense counsel to discuss settlement & PA brief for Tues at 10:30 am (.1); Sent email to Jake re: dial-in information (.1) | 0.3 |
| 2021.04.19 | Washington Post ARL | 683 | JKV | Researched and analyzed new ARL filings & updated tracking charts re: same (.7) | 0.7 |
| 2021.04.19 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: poking defense counsel about conference call (.1) | 0.1 |
| 2021.04.20 | Washington Post ARL | 683 | FJK | Analyzed redlined documents from J. Sommer & conf w/ J. Venditti re same (1); call w/ J. Sommer & J. Venditti re revisions to settlmement documents (.6) & call w/ J. Venditti re same (.4); analyzed further redlines (1) | 3.0 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| | | | | | |
|---|---|---|---|---|---|
| 2021.04.20 | Washington Post ARL | 683 | JKV | Uploaded defense counsel's redlines to PA brief and settlement agreement to box (.1); reviewed/analyzed redlines to Settlement Agreement, made additional edits, & circulated redlined copy to FJK (.9); Reviewing/analyzing redlines to PA brief and making additional edits (.7) | 1.7 |
| 2021.04.20 | Washington Post ARL | 683 | JKV | Call w/ FJK & defense counsel re: redlines to SA, PA brief, & exhibits, and timeline for filing (.6); Call w/ FJK re: next steps (.4); Made further edits to draft SA & circulated (v.2) to FJK for review (.6) | 1.6 |
| 2021.04.20 | Washington Post ARL | 683 | JKV | Continued reviewing/analyzing redlines to PA brief - added discussion of relevant case law, made other additional edits, & forwarded to FJK for review (4.3) | 4.3 |
| 2021.04.21 | Washington Post ARL | 683 | FJK | Analyzed redlined settlement agreement and preliminary approval brief & call w/ J. Venditti re same (2.2); | 2.2 |
| 2021.04.21 | Washington Post ARL | 683 | JKV | Call w/ FJK re: PA brief (.1); Re-templated PA brief & settlement agreement for ND Cal & made additional edits to same (.7) | 0.8 |
| 2021.04.21 | Washington Post ARL | 683 | JKV | Continued implementing edits to draft SA & PA brief, circulated redlines and clean copies of same to defense counsel, uploaded updated SA & PA brief to box (.8) | 0.8 |
| 2021.04.22 | Washington Post ARL | 683 | FJK | Attention to def's redlines w/ J. Venditti (1.8); call w/ J. Venditti & J. Sommer re revisions to settlement agreement (.3); | 2.1 |
| 2021.04.22 | Washington Post ARL | 683 | JKV | Reviewed/analyzed Def's redlines to draft exhibits & made additional edits (1.2); Call w/ defense counsel re: redlines (.2); Continued reviewing/analyzing Def's redlines to draft exhibits and making additional edits & forwarded new redlined versions to FJK for review (.6) | 2.0 |
| 2021.04.23 | Washington Post ARL | 683 | FJK | Attention to exhibits & conf w/ J. Venditti re same (1.8) | 1.8 |
| 2021.04.23 | Washington Post ARL | 683 | JKV | Uploaded newest versions of SA exhibits to box & poked FJK re: reviewing same (.1) | 0.1 |
| 2021.04.23 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: redlines to exhibits, made further revisions, & circulated to defense counsel (.7) | 0.7 |
| 2021.04.27 | Washington Post ARL | 683 | JKV | Called client re: [PRIVILEGED] -- no answer, left voicemail (.1); Call w/ client re: same (.2) | 0.3 |
| 2021.04.28 | Washington Post ARL | 683 | FJK | Attention to immediate next steps & call w/ J. Venditti (1.1); | 1.1 |
| 2021.04.28 | Washington Post ARL | 683 | JKV | Call w/ FJK re: timeline for finalizing PA motion & supporting docs, whether to file stip & proposed order requesting short extension (.2) | 0.2 |
| 2021.04.28 | Washington Post ARL | 683 | JKV | Drafting FJK declaration ISO motion for PA (1.8) | 1.8 |
| 2021.04.28 | Washington Post ARL | 683 | JKV | Continued drafting FJK declaration ISO motion for PA (1.5) | 1.5 |
| 2021.04.28 | Washington Post ARL | 683 | JKV | Sent email to FJK re: action items for tomorrow (.1) | 0.1 |
| 2021.04.29 | Washington Post ARL | 683 | DLS | Reviewed preliminary approval procedures and discussed with Julia and Judy | 0.6 |
| 2021.04.29 | Washington Post ARL | 683 | FJK | Email to J. Sommer (.1); call w/ J. Venditti re declaration (.3); emails w/ internal team re scheudling (.5); call w/ J. Sommer (.3); conf w/ J. Venditti re stip (.2) & reviewed same (.2); analyzed updated documents (.6); conf w/ T. Fisher (.2) | 2.4 |

| | | | | | |
|---|---|---|---|---|---|
| 2021.04.29 | Washington Post ARL | 683 | JKV | Call w/ FJK re: draft declaration ISO PA motion, poking def counsel for redlines to PA brief, SA, & exhibits, and finalizing next steps revisions to make to draft disco responses & 7-day extension for serving same (.3) | 0.3 |
| 2021.04.29 | Washington Post ARL | 683 | JKV | Call w/ D.Schroeder re: issues with filing PA brief tomorrow (.2); Sent email to FJK re: concerns and recommendation that we seek short stay extension (.2); Conf. w/ FJK re: same (.1); Call with D.Schroeder re: same (.1); Reviewing ND Cal procedural guidance for class action settlements & sent FJK & NJD email re: same (.3); Email exchange with D.Schroeder re: plan to file stip and proposed order for extension (.1) | 1.0 |
| 2021.04.29 | Washington Post ARL | 683 | JKV | Prepared stipulation and proposed order re: 14-day stay extension & circulated to FJK for review/redlines (.6) | 0.6 |
| 2021.04.29 | Washington Post ARL | 683 | JKV | Proof read & finalized draft stip and proposed order and sent email to defense counsel circulating same for review/redlines/approval (.3) | 0.3 |
| 2021.04.29 | Washington Post ARL | 683 | JMF | Prepared lodestar. | 1.5 |
| 2021.04.29 | Washington Post ARL | 683 | LTF | Discussed preliminary approval motion with Debbie Schroeder and exchanged messages with Fred Klorczyk regarding same. | 0.4 |
| 2021.04.30 | Washington Post ARL | 683 | DLS | Made edits to stip and proposed order and filed | 0.5 |
| 2021.04.30 | Washington Post ARL | 683 | FJK | Attention to stip (.2); | 0.2 |
| 2021.04.30 | Washington Post ARL | 683 | JKV | Email exchange with def counsel re: redlines to draft stip & proposed order re: settlement stay, reviewed and accepted J.Sommer redlines to stip and finalized same (.2); saved final clean word and file-ready pdf versions of stip & proposed order to box (.1) | 0.3 |
| 2021.04.30 | Washington Post ARL | 683 | JKV | Sent D.Schroeder email re: filing final stip & proposed order in ND Cal under FJK's ECF (.1) | 0.1 |
| 2021.04.30 | Washington Post ARL | 683 | NJD | Review of order extending stay and updating calendar re same | 0.2 |
| 2021.05.03 | Washington Post ARL | 683 | NJD | Confer with defense counsel about request to push back CMC | 0.3 |
| 2021.05.04 | Washington Post ARL | 683 | JKV | Downloaded defense counsel's new revised versions of PA motion, SA, and SA exhibits, unzipped folder with redline versions for comparison, re-labeled and uploaded all docs to appropriate subfolder on box (.2); Reviewed/analyzed redlined PA motion, SA, and SA exhibits, and sent email to team re: same (1.1); Email exchange w/ NJD re: same (.1) | 1.4 |
| 2021.05.04 | Washington Post ARL | 683 | NJD | Finalizing exhibits and the Settlement Agreement with FJK and JKV | 0.8 |
| 2021.05.05 | Washington Post ARL | 683 | FJK | Analyzed def's redlines to settlment papers & team emails re same (1.6) | 1.6 |
| 2021.05.05 | Washington Post ARL | 683 | JKV | Reviewed def counsel redlines to draft PA motion and implemented further revisions (4.1) | 4.1 |
| 2021.05.05 | Washington Post ARL | 683 | JKV | Finished reviewing def counsel redlines to draft PA motion and implementing further revisions to same, circulated updated PA brief with redlines to team for review in email re: same (3.1) | 3.1 |
| 2021.05.06 | Washington Post ARL | 683 | FJK | Analyzed further redlined settlement documents & team emails re same (1.4) | 1.4 |
| 2021.05.06 | Washington Post ARL | 683 | JKV | Email to FJK re status (.1) | 0.1 |
| 2021.05.06 | Washington Post ARL | 683 | JKV | Reviewed def counsel redlines to SA, implemented additional revisions, & circulated updated SA to team for review in email re: same (3.1); Call w/ JMF re: same (.2) | 3.3 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| | | | | | |
|---|---|---|---|---|---|
| 2021.05.06 | Washington Post ARL | 683 | | Email exchange w/ NJD re: most recent redlines to PA brief and SA, accepted all redlines to PA brief and SA & saved clean copy of each, uploaded clean copies to box & circulated to team in email re: same (.7) | 0.7 |
| 2021.05.06 | Washington Post ARL | 683 | NJD | Reviewing edits to PA brief | 0.9 |
| 2021.05.06 | Washington Post ARL | 683 | NJD | Reviewing edits to Settlement Agreement | 0.6 |
| 2021.05.07 | Washington Post ARL | 683 | FJK | Analyzed working draft of prelim approval brief (1.1); analyzed redlined settlement (.6) | 1.7 |
| 2021.05.07 | Washington Post ARL | 683 | JKV | Working on PA motion - further revisions to PA brief, SA, & supporting exhibits (1.2) | 1.2 |
| 2021.05.07 | Washington Post ARL | 683 | JKV | Working on finalizing PA brief & supporting docs to be filed therewith (1.3); Email to team re: same (.2) | 1.5 |
| 2021.05.10 | Washington Post ARL | 683 | FJK | Team meeting (.6); call w/ N. Deckant (.3); call w/ J. Venditti (.4); settlement research (1.3) | 2.6 |
| 2021.05.10 | Washington Post ARL | 683 | JKV | Working on revisions to PA brief & FJK Declaration (1.2) | 1.2 |
| 2021.05.10 | Washington Post ARL | 683 | JKV | Conf. call w/ team re: finalizing PA motion, outstanding items on punch list (.4); Made updates to PA brief & FJK declaration based on team meeting, prepared list of outstanding action items, & sent internal memo to team re: same (1.2) | 1.6 |
| 2021.05.10 | Washington Post ARL | 683 | JKV | Further revised PA brief (.6) | 0.6 |
| 2021.05.10 | Washington Post ARL | 683 | JKV | Additional edits to PA brief & FJK declaration, circulated updated versions of same to team, conf. w/ NJD re: same (.7); call w/ FJK re: same (.2) | 0.9 |
| 2021.05.10 | Washington Post ARL | 683 | JKV | Reseach re other ARL settlements (.7) | 0.7 |
| 2021.05.10 | Washington Post ARL | 683 | NJD | Conference call with FJK and JKV | 0.5 |
| 2021.05.10 | Washington Post ARL | 683 | NJD | Review of JKV's email with open items.  Responded. | 0.4 |
| 2021.05.11 | Washington Post ARL | 683 | FJK | Attention to research & conf w/ team re next steps (1.5); emails w/ J. Sommer (.3); additional settlement research (.8) | 2.6 |
| 2021.05.11 | Washington Post ARL | 683 | JKV | Examining / analyzing 9th Circuit case law on reasonably attorney fee request & lodestar multipliers (1.6) | 1.6 |
| 2021.05.11 | Washington Post ARL | 683 | JKV | Continued researching settlement strategy (2.2) | 2.2 |
| 2021.05.11 | Washington Post ARL | 683 | NJD | Conf w/ team re next steps (.3) | 0.3 |
| 2021.05.12 | Washington Post ARL | 683 | FJK | Call w/ J. Sommer (.3); attention to settlement issues & research w/ team (2.5); call w/ T. Fisher (.3) & conf w/ team re same (.3) | 3.4 |
| 2021.05.12 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: call w/ defense counsel this morning about PA motion issues (.1) | 0.1 |
| 2021.05.12 | Washington Post ARL | 683 | JKV | Research re: ARL cases where final settlement approval was granted & updated ARL settlement chart re: same (1.6) | 1.6 |
| 2021.05.12 | Washington Post ARL | 683 | JKV | Updated and forwarded to team newest version of SA with ZG and JKV redlines (.2); Email exchange w/ NJD re: same (.1) | 0.3 |
| 2021.05.12 | Washington Post ARL | 683 | JKV | Reviewed and added to running word doc re: final approval and fee research & forwarded same to FJK (.3) | 0.3 |
| 2021.05.13 | Washington Post ARL | 683 | FJK | Attention to settlement issues & research w/ J. Venditti re same (2.5); | 2.5 |
| 2021.05.13 | Washington Post ARL | 683 | JKV | Researched other ARL settlement & conf w/ FJK re same (1.3) | 1.3 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| 2021.05.13 | Washington Post ARL | 683 | JKV | Prepared stip & proposed order re: stay extension & email to team re: same (.3) | 0.3 |
|---|---|---|---|---|---|
| 2021.05.14 | Washington Post ARL | 683 | FJK | Attention to next steps re schedule & stip w/ team (1) | 1.0 |
| 2021.05.14 | Washington Post ARL | 683 | JKV | Emails w/ team re stip & revised same (.4) | 0.4 |
| 2021.05.14 | Washington Post ARL | 683 | JKV | Reviewed email from defense counsel approving of draft stip and proposed order, email exchange re: same, & finalized draft stip and forwarded to D.Schroeder for filing in ND Cal (.1); Call w/ D.Schroeder re: filing same (.3) | 0.4 |
| 2021.05.14 | Washington Post ARL | 683 | NJD | Review of payment deadlines, the proposed schedule, and discussed same with FJK and JKV.  Reviewed funding deadlines and emails with defense counsel and the claims admin re same. | 1.6 |
| 2021.05.17 | Washington Post ARL | 683 | JKV | Reviewed Court's order re: stipulation (.1) | 0.1 |
| 2021.05.18 | Washington Post ARL | 683 | FJK | Conf w/ internal team re next steps (.5); email to J. Sommer (.1); | 0.6 |
| 2021.05.18 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re next steps (.2); Conf. w/ NJD re: same (.2); Updated personal & firmwide case tracking sheets re recent orders entered, motions filed, deadlines/hearings set/vacated, other developments (.5) | 0.9 |
| 2021.05.18 | Washington Post ARL | 683 | NJD | Discussion with FJK and JKV re next steps | 0.9 |
| 2021.05.19 | Washington Post ARL | 683 | FJK | Call w/ J. Sommer (.2) & conf w/ internal team re next steps (1) | 1.2 |
| 2021.05.19 | Washington Post ARL | 683 | JKV | Team meeting (1.0) | 1.0 |
| 2021.05.19 | Washington Post ARL | 683 | JKV | Attention to email from defense counsel & email to team re same (.3) | 0.3 |
| 2021.05.19 | Washington Post ARL | 683 | NJD | Review of Jake's email.  Researched rules regarding final approval and fees issues.  Wrote internal memo to team re same. | 0.8 |
| 2021.05.19 | Washington Post ARL | 683 | NJD | Discussion with FJK and JKV re next steps | 1.0 |
| 2021.05.20 | Washington Post ARL | 683 | FJK | Call w/ S. Bursor re prelim approval (.2); confs w/ N. Deckant & J. Venditti re filing strategy (1); reviewed redlined settlement agreement & email to J. Sommer re same (.8); | 2.0 |
| 2021.05.20 | Washington Post ARL | 683 | JKV | Conf. w/ FJK & NJD re: status of PA motion & supporting docs, next steps (.6) | 0.6 |
| 2021.05.20 | Washington Post ARL | 683 | NJD | Conference call with FJK and JKV about preliminary approval motion (1) | 1.0 |
| 2021.05.20 | Washington Post ARL | 683 | NJD | Attention to preliminary approval | 1.2 |
| 2021.05.21 | Washington Post ARL | 683 | FJK | Emails w/ R. Richter re lodestar (.2) & conf w/ team re same (.2); attention to approval strategy (1.5); | 1.9 |
| 2021.05.21 | Washington Post ARL | 683 | NJD | Attention to preliminary approval and related deadlines | 0.4 |
| 2021.05.21 | Washington Post ARL | 683 | NJD | Review of updated lodestar figures | 0.2 |
| 2021.05.21 | Washington Post ARL | 683 | RSR | Run lodestar and gather billing diaries (0.6) | 0.6 |
| 2021.05.24 | Washington Post ARL | 683 | FJK | Worked on prelim approval exhibits & emails w/ internal team re same (1.4); call w/ N/ Deckant (.3); | 1.7 |
| 2021.05.24 | Washington Post ARL | 683 | JKV | Revising PA brief & FJK declaration (.9) | 0.9 |
| 2021.05.24 | Washington Post ARL | 683 | JKV | Continued revising PA brief & FJK declaration (2.0) | 2.0 |
| 2021.05.24 | Washington Post ARL | 683 | JKV | Reviewed operative PA brief & sent email to team re: overlength issues, other potential additions/removals to same (.3) | 0.3 |
| 2021.05.24 | Washington Post ARL | 683 | JKV | Email exchange w/ FJK re: operative PA brief, current expenses (.2) | 0.2 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| Date | Matter | | Initials | Description | Hours |
|---|---|---|---|---|---|
| 2021.05.24 | Washington Post ARL | 683 | JKV | Conferred multiple times w/ team re: status of PA brief docs, finalizing same, & outstanding action items (.4) | 0.4 |
| 2021.05.24 | Washington Post ARL | 683 | NJD | Review of time records; compilation of updated lodestar, review, and discussion | 1.6 |
| 2021.05.24 | Washington Post ARL | 683 | NJD | Update with FJK and JKV about client call | 0.2 |
| 2021.05.24 | Washington Post ARL | 683 | NJD | Further review and comment on draft of preliminary approval briefing. | 0.7 |
| 2021.05.24 | Washington Post ARL | 683 | RSR | Conf. w/ NJD and FJK and updated time and expense records for Prelim Approval (.3) | 0.3 |
| 2021.05.25 | Washington Post ARL | 683 | FJK | Call w/ S. Bursor (.2); analyzed & finalized revised draft prelim approval brief w/ N. Deckant & J. Venditti (2.2); started analyzing time entries (.7); | 3.1 |
| 2021.05.25 | Washington Post ARL | 683 | JKV | Reviewed updated lodestar with additional SAB hours & sent email to team re: same (.4) | 0.4 |
| 2021.05.25 | Washington Post ARL | 683 | JKV | Reviewed diaries for billing entry errors (.3); Email exchange w/ FJK re: review of updated PA brief & FJK declaration (.1); Saved clean copies of updated PA brief & FJK declaration for team to review before circulating to defense counsel, uploaded same to box, & sent email to team re: same (.2) | 0.6 |
| 2021.05.25 | Washington Post ARL | 683 | JKV | Sent email to defense counsel re: updated PA brief (.3); Conf. w/ NJD re: next steps (.3) | 0.6 |
| 2021.05.25 | Washington Post ARL | 683 | JKV | Thouroughly reviewed diary entries re: hours billed to date & redacted any reference to privileged information (1.6) | 1.6 |
| 2021.05.25 | Washington Post ARL | 683 | NJD | Review and discussion re new lodestar calculation | 0.2 |
| 2021.05.25 | Washington Post ARL | 683 | NJD | Arranging and attending call with FJK re lodestar | 0.3 |
| 2021.05.25 | Washington Post ARL | 683 | NJD | Reviewed email thread re finalizing our internal edits to the PA brief.  Reviewed my edits from several days ago and checked calendar and next steps. | 0.3 |
| 2021.05.25 | Washington Post ARL | 683 | NJD | Discussion with JKV about finalizing preliminary approval brief, lodestar compilation, and next steps. | 0.3 |
| 2021.05.25 | Washington Post ARL | 683 | NJD | Correspondence with FJK and JKV about status of executing the Settlement Agreement.  Authorized copy for distribution to defense counsel. | 0.4 |
| 2021.05.25 | Washington Post ARL | 683 | NJD | Attention to preliminary approval and settlement agreement | 1.6 |
| 2021.05.25 | Washington Post ARL | 683 | RSR | Updated lodestar with SAB time (.1) | 0.1 |
| 2021.05.26 | Washington Post ARL | 683 | FJK | Attention to time entries (.8); analyzed current preliminary approval filings & conf w/ N. Deckant & J. Venditti re same (1.8) | 2.6 |
| 2021.05.26 | Washington Post ARL | 683 | JKV | Called client re: [PRIVILEGED] (.2); Conferred multiple times w/ team re: finalizing SA / poking defense counsel re: same, next steps (.4) | 0.6 |
| 2021.05.26 | Washington Post ARL | 683 | JKV | Conf. w/ team re: outstanding action items on punch list re: filing PA brief by Friday & sent email to J.Sommer circulating most recent version of exhibits & re: finalizing same (.2) | 0.2 |
| 2021.05.26 | Washington Post ARL | 683 | NJD | Finalizing settlement agreement and preliminary approval motion with team | 2.8 |
| 2021.05.27 | Washington Post ARL | 683 | FJK | Finished analyzing time entries (1.5); attention to preliminary approval documents w/ internal team (2.3) | 3.8 |
| 2021.05.27 | Washington Post ARL | 683 | JKV | Reviewed of updated lodestar figures and billing entries (.9) | 0.9 |
| 2021.05.27 | Washington Post ARL | 683 | JKV | Sent email to team re: updated lodestar figures & analysis of same (.3); Conf. w/ team re: having client sign SA today to hold in escrow (.1); Called client re: [PRIVILEGED] - no answer, left voicemail (.1) | 0.5 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| | | | | | |
|---|---|---|---|---|---|
| 2021.05.27 | Washington Post ARL | 683 | JKV | Reviewed updated SA from defense counsel & conf. w/ team re: redlined change of PA hearing date (.3); Call w/ client re: [PRIVILEGED] (.1); Reviewing Judge Orrick's motion calendar re: selecting a new PA hearing date that works for all parties (.2); Conference w/ NJD re: outstanding action items re: PA brief, next steps (.3); Final review of SA, finalized, & sent to client for execution via adobe esign (.4); Calls with client re: [PRIVILEGED] (.2) | 1.5 |
| 2021.05.27 | Washington Post ARL | 683 | JKV | Finalizing exhibits (.5); Additional revisions to PA brief & finalizing same (2.1); Call w/ NJD re: PA brief, new estimates of Def's total exposure (.4) | 3.0 |
| 2021.05.27 | Washington Post ARL | 683 | NJD | Reviewed lodestar and hours. | 1.6 |
| 2021.05.27 | Washington Post ARL | 683 | NJD | Finalizing Settlement Agreement, preliminary approval, etc. | 2.0 |
| 2021.05.28 | Washington Post ARL | 683 | DLS | Finalized and filed motion for preliminary approval; Prepared TOA | 2.3 |
| 2021.05.28 | Washington Post ARL | 683 | FJK | Finalized & filed preliminary approval motion and supporting documents w/ internal team (5.5) | 5.5 |
| 2021.05.28 | Washington Post ARL | 683 | JGM | Print Stipulation for SAB signature | 0.1 |
| 2021.05.28 | Washington Post ARL | 683 | JGM | Scan Doc, Save to Box and email | 0.1 |
| 2021.05.28 | Washington Post ARL | 683 | JKV | Conf. w/ team re: status of PA motion and supporting documentation/outstanding action items/next steps (.5); Edits to PA motion re: Def's estimated total exposure, finalized & circulated fully executed copies of SA & stipulated undertaking, & conf. multiple times with team re: same (1.3) | 1.8 |
| 2021.05.28 | Washington Post ARL | 683 | JKV | Finalizing PA motion docs & conferred multiple times with team re: same (.8) | 0.8 |
| 2021.05.28 | Washington Post ARL | 683 | JKV | Finalizing exhibits, attaching tabs, combining pdfs, etc., and email to team re: same (.7); Conf. w/ FJK re: review of final exhibits & forwarded same in combined pdf to defense counsel in email re: next steps (.3) | 1.0 |
| 2021.05.28 | Washington Post ARL | 683 | JKV | Reviewing final PA brief from defense counsel & finalizing same; conf. w/ NJD re: page limit issue; email to R.Richter re: adding tables to final PA brief & call w/ R.Richter re: same; reviewed & finalized FJK declaration & combined same with pdf'd exhibits; working to fix PA brief templating issue with R.Richter, D.Schroeder, & N.Deckant; Working to get all PA motion & associated docs finalized & filed w/ D.Schroeder | 4.5 |
| 2021.05.28 | Washington Post ARL | 683 | JMF | Assisted with finalizing preliminary approval mtn and filings. | 1.0 |
| 2021.05.28 | Washington Post ARL | 683 | LTF | Assisted with filing of preliminary approval motion. | 0.4 |
| 2021.05.28 | Washington Post ARL | 683 | NJD | Finalizing and filing preliminary approval motion | 2.7 |
| 2021.05.28 | Washington Post ARL | 683 | RSR | Updated lodestar for Prelim Approval due today (.2); formatted Prelim approval brief (.9) | 1.1 |
| 2021.06.01 | Washington Post ARL | 683 | FJK | Call w/ D. Schroeder re Friday's filing (.3); | 0.3 |
| 2021.06.01 | Washington Post ARL | 683 | JKV | Reviewed email from NJD re: logistical considerations related to noticed PA hearing on 7/7/21 (.1); Analyzed new Ninth Circuit decision in ConAgra Foods, reviewed notes re: ND Cal case law, email exchange w/ team re: same (.4) | 0.5 |
| 2021.06.01 | Washington Post ARL | 683 | JMF | Reviewed updated standing orders with DLS and prepared/sent courtesy copies. | 3.0 |
| 2021.06.01 | Washington Post ARL | 683 | NJD | Check on hearing staffing.  Emailed FJK re submitting form for attendance telephonically or by Zoom at preliminary approval hearing | 0.4 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| 2021.06.01 | Washington Post ARL | 683 | NJD | Reviewed latest Ninth Circuit authority on settlement approval.  Analyzed and wrote internal memo.  Discussed with team. | 0.8 |
|---|---|---|---|---|---|
| 2021.06.02 | Washington Post ARL | 683 | FJK | Emails w/ internal team, claims admin, and defense counsel re CAFA notice (.4); | 0.4 |
| 2021.06.02 | Washington Post ARL | 683 | NJD | CAFA notice with JFK | 0.4 |
| 2021.06.04 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: working with paralegals to prepare remote appearance request (.1); Updated firmwide status tracking sheet re: new filings & developments, current status of litigation (.1) | 0.2 |
| 2021.06.07 | Washington Post ARL | 683 | JKV | Reviewed ND Cal local rules & Judge Orrick's standing orders re: whether possible to request remote appearance at PA hearing and if so how to do so & conf. w/ team re: same (.6) | 0.6 |
| 2021.06.08 | Washington Post ARL | 683 | JKV | Conf. w/ team re: remote vs. in-person appearance at PA hearing on 7/7, covid restrictions and expiration of same, FJK travel logistics (.2) | 0.2 |
| 2021.06.29 | Washington Post ARL | 683 | FJK | Attention to travel arrangements for prelim approval hearing (.5); | 0.5 |
| 2021.06.29 | Washington Post ARL | 683 | JKV | Email exchange w/ FJK re: PA hearing on 7/7, travel plan and logistics (.1) | 0.1 |
| 2021.07.02 | Washington Post ARL | 683 | JKV | Conf. w/ team re: new meeting time on Tuesday to prep for PA hearing (.1); Conf. w/ JMF re: preparing PA hearing books (.1) | 0.2 |
| 2021.07.02 | Washington Post ARL | 683 | JKV | Working on TOC for PA hearing book / conf. w/ FJK re: same (.5); Sent email to JMF re: same (.1); Call w/ JMF re: same (.1) | 0.7 |
| 2021.07.02 | Washington Post ARL | 683 | JMF | Discussed prelim approval books with JKV. | 0.5 |
| 2021.07.05 | Washington Post ARL | 683 | FJK | Travel from CT to San Francisco for preliminary approval hearing (9) | 9.0 |
| 2021.07.06 | Washington Post ARL | 683 | FJK | Prep for prelim approval hearing (3.5) | 3.5 |
| 2021.07.06 | Washington Post ARL | 683 | JKV | Call w/ J.Fontanilla re: ETA on PA hearing book (.1) | 0.1 |
| 2021.07.06 | Washington Post ARL | 683 | JKV | Updated lodestar, conf. w/ FJK re: additional documents to include in PA hearing book, prepared same & sent JMF a revised TOC, conf. w/ JMF re: same (1.2); Prepared settlement comparison chart re: WaPo ARL vs. NYT ARL settlements, conf. w/ JMF re: adding comparison chart & ND Cal settlement guidelines to PA hearing book (.3); Reviewed v.3 of TOC for PA hearing book & email exchange w/ JMF re: same (.1); Conf. w/ team re: notice that PA hearing will be via zoom (.1); Reviewed final printed PA hearing book & conf. w/ FJK re: same (.6) | 2.3 |
| 2021.07.06 | Washington Post ARL | 683 | JKV | Prepared notes for FJK re: case law under CAFA (.8); Meeting with FJK & NJD to prepare for PA hearing tomorrow (.5) | 1.3 |
| 2021.07.06 | Washington Post ARL | 683 | JKV | Reviewed filed PA docs re: how credit codes are redeemed for inactive vs. active class members & conf. with FJK & NJD re: same (.8) | 0.8 |
| 2021.07.06 | Washington Post ARL | 683 | JKV | Conf. w/ FJK re: preparing for PA hearing (.3); Reviewed 9th circuit decision in Briseno case, Bluetooth decision, and related case law (.7) | 1.0 |
| 2021.07.06 | Washington Post ARL | 683 | JMF | Prepared books for attys. | 1.5 |
| 2021.07.06 | Washington Post ARL | 683 | NJD | Prep for preliminary approval hearing with FJK.  Discussion re same. | 2.6 |
| 2021.07.07 | Washington Post ARL | 683 | FJK | Emails w/ J. Sommer (.2); call w/ J. Sommer, Z. Lerner, N. Deckant, J. Venditti (.6); prep for today's hearing (2.8); argued preliminary approval hearing (.4); discuss next steps & schedule w/ N. Deckant & J. Venditti (.9) ; | 4.9 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| 2021.07.07 | Washington Post ARL | 683 | JKV | Reviewed new client docs & prepared chart re: client's renewal charges, forwarded same to J.Gavenman for inclusion in complaint (.3); Conf. w/ JG re: same (.1) | 0.4 |
|---|---|---|---|---|---|
| 2021.07.07 | Washington Post ARL | 683 | JKV | Prepared for PA hearing (.2); PA hearing w/ FJK (.2); Conf. w/ team re: same, next steps (.5); Reviewed filed PA docs & prepared chart re: all future SA dates & deadlines, conf. w/ team re: same (2.7); Prepared draft proposed order re: settlement approval deadlines & sent email to defense counsel re: same (.5) | 4.1 |
| 2021.07.07 | Washington Post ARL | 683 | NJD | Call with Jake with FJK in advance of hearing (.4).  Prep and debriefing (.4) | 0.8 |
| 2021.07.07 | Washington Post ARL | 683 | NJD | Prep and attend hearing | 1.8 |
| 2021.07.07 | Washington Post ARL | 683 | NJD | Discussion of post-PA dates, and reviewed relevant stipulations, with JKV and JFK | 3.5 |
| 2021.07.08 | Washington Post ARL | 683 | FJK | Travel from Bay Area back to east coast (10) | 10.0 |
| 2021.07.08 | Washington Post ARL | 683 | JKV | Reviewed defense counsel redlines to proposed settlement approval dates & deadlines & email exchange w/ NJD re: same (.3) | 0.3 |
| 2021.07.08 | Washington Post ARL | 683 | JKV | Further email exchanges w/ NJD re: settlement approval schedule (.2); Updated draft PO to reflect def counsel redlines to proposed schedule of dates & deadlines (.2); Conf. w/ NJD re: next steps (.1) | 0.5 |
| 2021.07.08 | Washington Post ARL | 683 | JKV | Updated Escrow Deadline listed on internal settlement approval timeline & sent email to defense counsel re: same circulating updated chart along with updated PO (.4) | 0.4 |
| 2021.07.08 | Washington Post ARL | 683 | JKV | Conf. w/ NJD re: filing updated PO (.1); Finalized updated PO & forwarded file-ready document to MSS for filing in ND Cal (.2); Reviewed local rules and Judge Orrick's standing orders re: when chamber copies are required & conf. w/ MSS re: no requirement to email chambers with word version of PO attached (.1) | 0.4 |
| 2021.07.08 | Washington Post ARL | 683 | JKV | Calendared all deadlines from order granting PA and settlement approval schedule & uploaded PA order to box (.3) | 0.3 |
| 2021.07.08 | Washington Post ARL | 683 | MCS | Filed revised proposed order, sent to Judge Orrick | 0.5 |
| 2021.07.08 | Washington Post ARL | 683 | NJD | Finalizing and submitting proposed PA order with dates with JKV | 2.4 |
| 2021.07.09 | Washington Post ARL | 683 | JKV | Sent email to JND, with all counsel of record cc'd, re: PA granted, schedule of all future settlement approval dates & deadlines, implementation of notice plan, upcoming deadline to publish settlement website, & next steps generally (.4); Updated notices and forms docs to conform with Court's instruction re: revision to waiver language & replaced placeholders for hearings/deadlines with the dates provided in the Court's order granting PA & forwarded redlined notices/forms to JND for publishing on settlement website (.7) | 1.1 |
| 2021.07.09 | Washington Post ARL | 683 | NJD | Attention to notice issues | 0.5 |
| 2021.07.12 | Washington Post ARL | 683 | NJD | Confer re status of notice website | 0.5 |
| 2021.07.13 | Washington Post ARL | 683 | NJD | Review and revisions to settlement website | 0.9 |
| 2021.07.15 | Washington Post ARL | 683 | NJD | Review of settlement website, important documents, claim form, and exclusion form. Provided edits and redlines to the claims administrator. | 0.8 |

Bursor Fisher, P.A. - Washington Post ARL Detailed Time Records Thru 08/26/21

| Date | Matter | | | Description | |
|------|--------|---|---|-------------|---|
| 2021.07.16 | Washington Post ARL | 683 | JKV | Reviewed settlement website, conf. w/ team re: same, & sent email to JND re: same (.5); Reviewed Law360 article re: PA hearing, email exchange w/ team re: same and ordering hearing transcript (.4) | 0.9 |
| 2021.07.16 | Washington Post ARL | 683 | NJD | Reviewed online notice website and gave revisions | 0.8 |
| 2021.07.26 | Washington Post ARL | 683 | NJD | Reviewed and redlined draft postcard notices | 0.6 |
| 2021.07.29 | Washington Post ARL | 683 | NJD | Reviewed and redlined online claim form | 0.4 |
| 2021.07.30 | Washington Post ARL | 683 | NJD | Monitoring the implementation of changes and updates to settlement website | 0.3 |
| 2021.08.05 | Washington Post ARL | 683 | NJD | Review of tax question, and wrote response | 0.6 |
| 2021.08.05 | Washington Post ARL | 683 | NJD | Further discussion of tax question with team, revised response | 0.3 |
| 2021.08.05 | Washington Post ARL | 683 | NJD | Sent response to class member re tax questions | 0.3 |
| 2021.08.06 | Washington Post ARL | 683 | JKV | Conf. w/ team re class member inquiry re tax consequences of settlement (.2) | 0.2 |
| 2021.08.06 | Washington Post ARL | 683 | JKV | Conf. w/ team re class member emails re court contact information & how to reply to same (.5); Sent email to class member re court contact information (.1) | 0.6 |
| 2021.08.06 | Washington Post ARL | 683 | NJD | Two more rounds of corresponance with Gary, re [PRIVILEGED] | 0.9 |
| 2021.08.06 | Washington Post ARL | 683 | NJD | Sending email to class member with JKV containing contact information for the Court, as requested | 0.4 |
| 2021.08.09 | Washington Post ARL | 683 | FJK | Attention to class member email & response to same w/ J. Venditti (.3); attention to next steps w/ internal team (.6) | 0.9 |
| 2021.08.09 | Washington Post ARL | 683 | JKV | Reviewed class member response to reply email & conf. w/ team re same (.3); Prepared draft reply email to class member & sent to team for review (.4); Conf. w/ NJD re approval of draft email & sent same to class member (.1) | 0.8 |
| 2021.08.09 | Washington Post ARL | 683 | NJD | Responded to new class member inquiry with JKV, JFK. | 0.4 |
| 2021.08.25 | Washington Post ARL | 683 | NJD | Attention to exclusion request / objection.  Circulated to team and discussed | 0.6 |
| 2021.08.26 | Washington Post ARL | 683 | NJD | Attention to Erenfeld opt-out letter, and discussion | 0.4 |

**EXHIBIT 3**

| | | | |
|---|---|---|---|
| **Bursor & Fisher, P.A. -- Washington Post ARL Expenses Thru 08/31/21** | | | |
| | | $400.00 | Court Fees |
| | | $213.82 | Service of Process Fees |
| | | $7,700.00 | Mediation Fees |
| | | $18.80 | Legal Research Fees |
| | | $95.30 | Catering & Meal Expenses |
| | | **$8,427.92** | **Total Expenses** |
| | | | |
| | | | |
| **Court Fees** | | | |
| | | | |
| DATE | MATTER | AMOUNT | DESCRIPTION |
| 2020.07.29 | Washington Post ARL | $400.00 | Courts USDC - Northern District Complaint |
| | | **$400.00** | **Total Court Fees** |
| | | | |
| | | | |
| **Service of Process Fees** | | | |
| | | | |
| DATE | MATTER | AMOUNT | DESCRIPTION |
| 2020.08.07 | Washington Post ARL | $213.82 | First Legal - Complaint Service |
| | | **$213.82** | **Total Service of Process Fees** |
| | | | |
| | | | |
| **Mediation Fees** | | | |
| | | | |
| DATE | MATTER | AMOUNT | DESCRIPTION |
| 2021.01.20 | Washington Post ARL | $5,050.00 | Judicate West |
| 2021.03.18 | Washington Post ARL | $2,650.00 | Judicate West |
| | | **$7,700.00** | **Total Mediation Fees** |
| | | | |
| | | | |
| **Legal Research Fees** | | | |
| | | | |
| DATE | MATTER | AMOUNT | DESCRIPTION |
| 2021.03.19 | Washington Post ARL | $18.80 | SD Superior Court ROA |
| | | **$18.80** | **Total Court Fees** |
| | | | |
| | | | |
| **Catering & Meal Expenses** | | | |
| | | | |
| DATE | MATTER | AMOUNT | DESCRIPTION |
| 2021.03.11 | Washington Post ARL | $31.50 | Doordash |
| 2020.03.17 | Washington Post ARL | $25.79 | Grubhub |
| 2020.03.17 | Washington Post ARL | $26.75 | Doordash |
| 2020.03.25 | Washington Post ARL | $11.26 | Café Dolce |
| | | **$95.30** | **Total  Catering & Meal Expenses** |
| | | | |
| | | | |

**EXHIBIT 4**

Case 3:20-cv-05218-WHO   Document 52-1   Filed 09/03/21   Page 142 of 330



News, Quotes, Companies, Videos    SEARCH

$1 A WEEK *for* 12 WEEKS   SUBSCRIBE NOW

Subscribe | Log In

U.S. EDITION    Tuesday, April 9, 2013 As of 4:48 PM EDT

Home   World   U.S.   **Business**   Tech   Markets   Market Data   Your Money   Opinion   Life & Culture   N.Y.   Real Estate   Management

Earnings   Economy   Health   Law   Autos   Management   Media & Marketing   Energy   Small Business   Startups   More industries ▼



U.S. BUSINESS                          1 of 12                      2 of 12                      3 of 12                      4 of 12

Eiji Toyoda, Driver of Global Expansion, Dies at 100

EA Taps Insider Andrew Wilson as CEO

'The Circle' Takes Vengeance on Google, Facebook

New Touch for iPhone

LAW  |  April 9, 2013, 4:48 p.m. ET

# On Sale: The $1,150-Per-Hour Lawyer

*Lawyer Fees Keep Growing, But Don't Believe Them. Clients Are Demanding, and Getting, Discounts*

| **Article** | Video | Stock Quotes | Comments (38) |

MORE IN LAW »

Email   Print

By JENNIFER SMITH

Top partners at leading U.S. law firms are charging more than ever before, yet those hourly rates aren't all they appear to be.



Top partners at leading U.S. law firms are charging more than ever – routinely $1,150 or more an hour -- but after discounts and write-offs the nosebleed rates aren't all they appear to be. Jennifer Smith reports. Photo: Getty Images.

Having blown past the once-shocking price tag of $1,000 an hour, some sought-after deal, tax and trial lawyers are commanding hourly fees of $1,150 or more, according to an analysis of billing rates compiled from public filings.

But, as law firms boost their standard rates, many are softening the blow with widespread discounts and write-offs, meaning fewer clients are paying full freight. As a result, law firms on average are actually collecting fewer cents on the dollar, compared with their standard, or "rack," rates, than they have in years.

Think of hourly fees "as the equivalent of a sticker on the car at a dealership," said legal consultant Ward Bower, a principal at Altman Weil Inc. "It's the beginning of a negotiation....Law firms think they are setting the rates, but clients are the ones determining what they're going to pay."



Star lawyers still can fetch a premium, and some of them won't budge on price. The number of partners billing $1,150-plus an hour has more than doubled since this time last year, according to Valeo Partners, a consulting firm that maintains a database of legal rates pulled from court filings and other publicly disclosed information. More than 320 lawyers in

the firm's database billed at that level in the first quarter of 2013, up from 158 a year earlier.

see how Knobbe Martens wins again and again. »

**Knobbe Martens**
INTELLECTUAL PROPERTY LAW

THE NEW PORTFOLIO TOOL ON WSJ.COM:
THE ULTIMATE INVESTMENT TRACKER
AVAILABLE EXCLUSIVELY FOR SUBSCRIBERS
LEARN MORE

provided by LikeAssets

**Don't Miss**                                                    [?]

  

Mossberg on Apple's New iPhones

Shark Eats Shark in Wild New Photo

Five False Assumptions About The Rich

**More in Law**

China's Baby-Milk Issues Flare Anew

**Popular Now**                                     What's This?

1   Where Job Growth Is Coming



That gilded circle includes tax experts such as Christopher Roman of King & Spalding LLP and Todd Maynes of Kirkland & Ellis LLP, intellectual-property partner Nader A. Mousavi of Sullivan & Cromwell LLP, and deal lawyers such as Kenneth M. Schneider of Paul, Weiss, Rifkind, Wharton & Garrison LLP.

Those lawyers and their firms either declined to comment or didn't reply to requests for comment.

When corporate legal departments need a trusted hand to fend off a hostile takeover or win a critical court battle, few general counsels will nitpick over whether a key lawyer is charging $900 an hour or $1,150 an hour. But for legal matters where their future isn't on the line, companies are pushing for—and winning—significant price breaks.

"We almost always negotiate rates down from the rack rates," said Randal S. Milch, general counsel for phone giant Verizon Communications Inc. [VZ +0.29%] The result, he said, is a "not-insignificant discount."

For the bread-and-butter work that many big law firms rely on, haggling has become the norm. Many clients grew accustomed to pushing back on price during the recession and continue to demand discounts.

Some companies insist on budgets for their legal work. If a firm billing by the hour exceeds a set cap, lawyers may have to write off some of that time.

Other clients refuse to work with firms who don't discount, lopping anywhere from 10% to 30% off their standard rates. Some may grant rate increases to individual partners or associates they deem worthy. Another tactic: locking in prices with tailored multiyear agreements with formulas governing whether clients grant or refuse a requested rate increase.

In practical terms, that means the gap between law firms' sticker prices and the amount of money they actually bill and collect from their clients is wider than it has been in years.

According to data collected by Thomson Reuters Peer Monitor, big law firms raised their average standard rate by about 9.3% over the past three years. But they weren't able to keep up on the collection side, where the increase over the same period was just 6%. Firms that used to collect on average about 92 cents for every dollar of standard time their lawyers worked in 2007, before the economic downturn, now are getting less than 85 cents. "That's a historic low," said James Jones, a senior fellow at the Center for the Study of the Legal Profession at Georgetown Law.

To be sure, things have certainly picked up some since the recession, when some clients flat-out refused to pay rate increases.

In the first quarter of 2013, the 50 top-grossing U.S. law firms boosted their partner rates by as much as 5.7%, billing on average between $879 and $882 an hour, according to Valeo Partners. Rates for junior lawyers, whose labors have long been a profit engine for major law firms, jumped even more.

While some clients resisted using associate lawyers during the downturn, refusing to pay hundreds of dollars an hour for inexperienced first- or second-year attorneys, the largest U.S. law firms have managed to send the needle back up again. This year, for the first time, the average rate for associates with one to four years of experience rose to $500 an hour, according to Valeo.

The increases continue the upward trend of 2012, when legal fees in general rose 4.8% and associate billing rates rose by 7.4%, according to a coming report by TyMetrix Legal Analytics, a unit of Wolters Kluwer, [WKL.AE +0.95%] and CEB, a research and advisory-services company. Those numbers are based on legal-spending data from more than 17,000 law firms.



**2** Steps to Better Foot Health

**3** Opinion: The Power of 218

**4** Shooting Suspect Had Record of Gun Use


**5** Jetpacks Are Coming—From New Zealand

Show 5 More


ticketmaster
SAN FRANCISCO 49ers
NFL Ticket Exchange
Sold by Fans. Verified by Ticketmaster.
BUY TICKETS ▶

**Press Release Marketing**
Effective Affordable Distribution. Attract New Clients Now. Learn How!
publicity.24-7pressrelease.com/

**SUPER PC Multiple Monitor**
The Original Multi-Monitor Store! Buy Multi-Screen Computers & Displays
www.Multi-Monitors.com

**world news cnn online**
Improve Network Infrastructure. Expert Advice & Industry Trends.
techtarget.com/Network-Structure

**Content from our Sponsors** [?]



HEBREW NATIONAL
A Southern Spin on Grilled Franks

DIVR.IT
Arroz con Pollo al Estilo Puertorriqueño

HCPLIVE
Kids with Neurological Disorders No More Likely to Get Flu Vaccine

More than a dozen leaders at major law firms declined to discuss rate increases on the record, though some said privately that the increase in associate rates could be caused in part by step increases as junior lawyers gain in seniority.

Joe Sims, an antitrust partner at Jones Day and former member of the firm's partnership committee, said clients don't mind paying for associates, as long as they feel they are getting their money's worth.

Sophisticated clients, he said, tend to focus on the overall price tag for legal work, not on individual rates. "They are more concerned about how many people are working on the project and the total cost of the project," Mr. Sims said. "Clients want value no matter who is on the job."

While a handful of elite lawyers have successfully staked out the high end—the deal teams at Wachtell, Lipton, Rosen & Katz, for example—legal experts say that client pressure to control legal spending means most law firms must be considerably more flexible on price.

"There will always be some 'bet the company' problem where a client will not quibble about rates," said Mr. Jones, the Georgetown fellow. "Unfortunately, from the law firms' standpoint, that represents a small percentage of the work."

**Write to** Jennifer Smith at jennifer.smith@wsj.com

JOIN THE DISCUSSION                                    MORE IN
38 Comments, add yours »                               Law »

Email    Print              Order Reprints

THE NEW PORTFOLIO TOOL ON WSJ.COM          LEARN MORE
THE ULTIMATE INVESTMENT TRACKER
AVAILABLE EXCLUSIVELY FOR SUBSCRIBERS

**OMVS Stock Pick Win**
Opportunities Abound with This Company—Invest Today, Free Info!
www.OnTheMoveSystems.com

**Mortgage Rates Hit 2.87%**
White House Program Cuts Up to $1k off Monthly Payments! (3.12% APR)
www.SeeRefinanceRates.com

**Warren Buffett Confesses**
Warren Buffetts Shocking Confession Will Change your Investing Strategy
www.MarketTrendSignal.com

**The End Of Obama?**
This looming scandal could ruin the 44th President and disrupt the...
StansberryResearch.com

**Don't Miss**


Model Behavior Storms Social Media


Top Five Cars at the Frankfurt Motor Show


How Gang Rape Is Changing India's Laws


Billionaire Builds High-End Resort Town in Swiss Alps

**You Might Like**

Woman Tries to Sell Daughter's Virginity

Jeep's new Wrangler makes a statement. You might not want to hear it

**Content from our Sponsors**
What's this?

Immigrant Scientists Launch Braintrust - Create 1000 American Jobs (Entrepreneur.com)

Living Together Before Marriage Stalls

Companies are increasingly choosing to generate their own power, delivering a jolt to utilities

Redbox's DVD-rental business is weaker than expected

Three Things Every Leader Should Do in a Meeting (The Inkjet Network)

Made in the west doesn't always work in asia (Singapore Sessions)

How Retailers Beat Amazon At Its Own Game: INFOGRAPHIC (Meet The Future of Retail)

The Worst Business Lawyer Habit: "Punchbowling" (Legal Productivity)

---

## Add a Comment

View All Comments (38)

JOURNAL COMMUNITY

Community rules

To add a comment please

**Log in**

**Create an Account**
Your real name is required for commenting.

☐ Track replies to my comment

CLEAR    POST

---

**$1 A WEEK** *for* **12 WEEKS**

**WSJ SUBSCRIBER'S CONTENT PROVIDES:**
• **WSJ Portfolio** a revolutionary investment tool that syncs and tracks all your investments
• **Mobile Apps** global news, in-depth analysis and real time quotes anytime anywhere
• **WSJ Weekend Travel,** real estate, personal finance and expanded lifestyle coverage

**SUBSCRIBE NOW**

---

## Editors' Picks



Antibiotics Losing Battle Against Bugs: Report



For TV Shows, It's a Seller's Market



Are You Ready for a Jetpack?



The 400 Richest Americans: Who's New on the List?



Steps to Better Foot Health

---

☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐    Subscribe / Login    Back to Top

---

| Customer Service | Policy | Advertise | Tools & Features | More |
| --- | --- | --- | --- | --- |
| Customer Center | Privacy Policy | Advertise | Apps | Register for Free |
| New! Live Help | Data Policy | Place a Classified Ad | Newsletters and Alerts | Reprints |
| Contact Us | Copyright Policy | Sell Your Home | Graphics & Photos | Content Partnerships |
| WSJ Weekend | Subscriber Agreement & Terms of Use | Sell Your Business | Columns | Conferences |
| Contact Directory | Your Ad Choices | Commercial Real Estate Ads | Topics | SafeHouse |
| Corrections | | Recruitment & Career Ads | Guides | Mobile Site |
| | | Franchising | Portfolio | News Archive |
| | | Advertise Locally | Old Portfolio | |

---

Jobs at WSJ

Copyright ©2013 Dow Jones & Company, Inc. All Rights Reserved

**EXHIBIT 5**

- Law.com Home
- Newswire
- LawJobs
- CLE Center
- LawCatalog
- Our Sites
- Advertise

An **ALM** Web site



THE
# AM LAW DAILY

- This Site
- Law.com Network
- Legal Web

Search the Legal Web    Go >>

- HOME
- THE AM LAW DAILY
- LITIGATION DAILY
- RANKINGS
- VIDEOS
- MAGAZINE
- ADVERTISE
- SUBSCRIBE
- FREE ACCESS
- CONTACT US
- EXILIADE

## THE AM LAW DAILY

- The Firms
- The Work
- The Score
- The Churn
- The Talent
- The Management
- The World
- The Life

## SURVEYS AND RANKINGS

- AM LAW 100
- AM LAW 200
- AM LAW TECH
- A-LIST
- GLOBAL 100
- CORPORATE SCORECARD
- DEALMAKERS OF
  THE YEAR
- MIDLEVEL ASSOCIATES SURVEY
- SUMMER ASSOCIATES SURVEY
- DIVERSITY SCORECARD
- PRO BONO SCORECARD
- LITIGATION DEPARTMENT OF
  THE YEAR
- LATERALS REPORT
- LAW FIRM LEADERS
- Lifetime Achievers
- Legal Intelligence
- WOMEN PARTNER WATCH

## MAGAZINE

- Current Issue
- Previous Issue
- Search Archive

## SPECIAL REPORTS

- Intellectual Property
- Labor & Employment
- LITIGATION
- FOCUS EUROPE
- ASIAN LAWYER
- STUDENT EDITION

## VIDEOS

## Bookstore

## Legal Recruiters
## Digital Edition

## Hall of Fame

## ALM EVENTS

## SUBSCRIBE

## ADVERTISE

## ABOUT US

## FEATURED SPONSORS

## LAW.COM NETWORK

- Sites
- Jobs
- Verdicts
- LawCatalog
- Experts
- Online CLE
- Legal Intelligence
- Events
- Resources
- Law Firm Papers
- Court Reporters
- Legal Dictionary
- Legal Blogs

## The Firms

April 16, 2012 5:20 PM

### When It Comes to Billing, Latest Rate Report Shows the Rich Keep Getting Richer

Posted by Sara Randazzo

Hourly rates just keep rising—and the best-paid lawyers are raising their rates faster than everyone else.

Those are two of the key findings contained in the 2012 Real Rate Report, an analysis of $7.6 billion in legal bills paid by corporations over a five-year period ending in December 2011. The report, released Monday, is the second such collaboration between TyMetrix, a company that manages and audits

legal bills for corporate legal departments, and the Corporate Executive Board.

Many of the new rate report's findings echo those contained in the 2010 study, including the fact that rates keep going up, almost across the board, and that the cost of a given matter can vary dramatically depending on a law firm's size and location and its relationship with a particular client.

At the same time, this year's study shows that the legal sector is becoming increasingly bifurcated, with top firms raising rates faster than those at the bottom of the market and large firms charging a premium price based purely on their size.

"What it's really showing is that there's an increased premium being paid for experience and expertise," says Julie Peck, vice president of strategy and market development at TyMetrix. "Some parts of the lawyer market are able to raise rates much more quickly, and are more impervious to economic forces then others."

To compile the current rate report, TyMetrix received permission from its clients to examine legal fees billed to 62 companies across 17 industries including energy, finance, retail, technology, insurance, and health care. The bills, which represent the amount actually paid by the companies in question rather than the amount initially charged, came from more than 4,000 firms in 84 metropolitan areas around the country. Every firm on the 2011 Am Law 100 is represented in the data.

The report's key data points include:

**A Widening Gap:** Hourly rates charged by lawyers in the legal sector's upper echelon grew faster between 2009 and 2011 than those charged by lawyers toiling on the lower rungs. Particularly striking was the jump in associate rates billed by those falling in the report's top quartile: 18 percent on average, to just over $600 per hour. Rates billed by top quartile partners, meanwhile, rose 8 percent, to just under $900 per hour. In the bottom quartile, associate rates rose 4 percent and partner rates rose 3 percent during the same period.

**The Recession's (Minor) Toll:** Even amid the economic downturn, the cost of an hour of a lawyer's time continued to rise faster than key measures of inflation. That said, the legal industry wasn't completely immune to the broader economy's slowdown. After rising 8.2 percent between 2007 and 2008, hourly rates rose just 2.3 percent in 2009. Law firms bounced back a bit last year, with rates climbing 5.1 percent, to an average of $530 an hour.

**Location Counts:** Not surprisingly, lawyers working in major metropolitan areas—where, as the rate report notes, rents are typically higher—are the priciest. An address in Boston, Chicago, Los Angeles, San Francisco, or Washington, D.C., alone adds about $161 to the hourly rate charged by an individual lawyer. Those six cities and Baltimore, Houston, Philadelphia, and San Jose are the ten U.S. markets with the highest hourly rates. With an average partner rate topping $700 per hour and average associate rate of more than $450 per hour, New York is the most expensive market in the country. The least expensive? Riverside, California, where the average partner bills at under $250 per hour and associates bill at just over $300 an hour.

**In the Minority:** A small group of lawyers—12 percent—bucked the trend toward higher fees and actually lowered rates between 2009 to 2011—and 3 percent trimmed rates by $50 or more per hour. (Most of those in the rate-cutting camp were based outside the big six markets identified above.) At the other end of the spectrum, 52 percent of lawyers increased rates by between $25 and $200 or more per hour. Another 18 percent increased rates by less than $25 per hour, and the final 18 percent held rates steady.

**First-Year Blues:** Even before the recession hit, clients balked at paying for what they considered on-the-job training for first-year associates. The latest rate report is likely to reinforce that reluctance, given its finding that using entry-level lawyers adds as much as 20 percent to the cost of a legal matter. The report offers evidence that firms may be accommodating clients on this front: The percentage of bills attributed to entry-level associates dropped from 7 percent in 2009 to 2.9 percent last year.

**Ties That Bind:** The more work one firm handles for a client—and the longer the client relationship extends—the higher the average rate the firm charges. For companies that paid one firm $10 million or more in a single year, the average hourly rate paid was $553 in 2011. By comparison, clients that limited their spending on an individual firm to $500,000 paid that firm an average of $319 per hour.

**Four-Digit Frontier:** Data has consistently shown that many lawyers hesitate to charge more than $1,000 an hour, and in 2011 just under 3 percent of the lawyers covered by the rate report had broken that barrier. Of those, the vast majority were working in the six main legal markets identified above and 60 percent of the time, they billed in increments of one hour or less.

**Playing Favorites:** Across all practice areas, 90 percent of lawyers charged different clients different rates for similar types of work. (The figure for mergers and acquisitions lawyers was 100 percent.) The differences from client to client can be extreme, and were even more pronounced in the current report than in the 2010 edition. Rates charged by intellectual property specialists, for instance, had a median variance of 23.1 percent, while lawyers doing commercial and contract work showed a 18.7 percent median difference.

**Who's Doing What?** A closer look at law firm bills for work performed on litigation and intellectual property assignments shows that the kind of timekeeper billing on a matter varies by practice type. On patent matters, the report shows, 47 percent of hours billed on average are attributed to paralegals, and 37 percent by partners. By comparison, paralegals account for just 8 percent of the work done on labor and employment litigation hours, while partners handle 45 percent.

Make a comment

Comments (1)
Save & Share: Facebook | Del.ic.ious | Digg It | Email |

Reprints & Permissions

## Comments

Report offensive comments to The Am Law Daily.

The Big Law law firm is a dinosaur - a dieing species. This kind of self-interested greed will ultimately kill the beast.

When It Comes to Billing, Latest Rate Report Shows the Rich Keep Ge...   http://amlawdaily.typepad.com/amlawdaily/2012/04/report-rates-kee...

Comment By Publicus - April 17, 2012 at 11:50 AM

**Verify your Comment**

**Previewing your Comment**

Posted by: |

This is only a preview. Your comment has not yet been posted.

Post   Edit

Your comment could not be posted. Error type:

Your comment has been saved. Comments are moderated and will not appear until approved by the author. Post another comment

The letters and numbers you entered did not match the image. Please try again.

As a final step before posting your comment, enter the letters and numbers you see in the image below. This prevents automated programs from posting comments.

Having trouble reading this image? View an alternate.

Continue

**Post a comment**

If you have a TypeKey or TypePad account, please Sign In

Name:

Email Address:(Not displayed with comment.)

URL:

▢ Remember personal info?

Comments:

Preview   Post

theamlawdaily@alm.com

Popular Pages Today

1. When It Comes to Billing, Latest Rate Report Shows the Rich Keep Getting Richer  28.88%
2. Dewey Losses Accelerate; Nine More New York Partners Head to the Exits  21.67%
3. Latest Dewey Losses Span the Globe, Push 2012 Departure Figure Above 60  16.61%
4. The Am Law Daily  8.49%
5. Nine IP Litigators Jump from Duane Morris to Cozen  6.57%
6. The Am Law Daily  5.54%
7. O'Melveny Adds Top Capital Markets Partner from Shearman in New York  4.50%
8. With St. Louis Firm Fading, Show Me State Rivals Eye Possible Hires  3.88%
9. Which Firms Are Cashing in on Dewey Departures?  2.26%
10. Paul Weiss Takes Lead on Two Private Equity Deals  2.17%

4/17/2012 10:07 AM

**EXHIBIT 6**

Top Billers - The Wall Street Journal Online - Interactive Graphics          http://online.wsj.com/public/resources/documents/st_TOPRATE0222_20...

More | News, Quotes, Companies, Video |   | SEARCH |

Friday, February 25, 2011 As of 9:34 AM PST

Today's Paper   Columns   Blogs   Topics   Journal Community

Home   World   U.S.   New York   Business   Markets   Tech   Personal Finance   Life & Culture   Opinion   Careers   Real Estate
Small Business

FEBRUARY 23, 2011

# Top Billers

Top attorneys in the U.S. are asking for as much as $1,250 an hour, according to recent court filings, significantly more than in previous years, as they take advantage of big clients willing to pay top dollar even amid the downturn. The move is contributing to price inflation across the struggling $100 billion global corporate law firm industry, where lawyers often study rival attorney fee filings in bankruptcy cases. See which attorneys had some of the highest-known hourly rates in 2010 and 2009. Click on column headers to sort.

<< first   < prev   1 | 2 | 3 |  next >   last >>

| Name | Firm | Practice Area 1 | Practice Area 2 | Practice Area 3 | Hourly Rate | Case Name | Date |
|---|---|---|---|---|---|---|---|
| Radke, Kirk A. | Kirkland & Ellis LLP | Corporate | | | $1,250 | Reader's Digest Association Inc | 2010 |
| Taplin, Ian | Kirkland & Ellis LLP | Tax | | | $1,220 | Visteon Corp. | 2010 |
| Schmidt, Gerhard | Weil Gotshal | Finance | Corporate | Mergers and Acquisition | $1,165 | Alerts International | 2010 |
| Gon, Michele Y.L. | Baker McKenzie | Real Estate | Mergers and Acquisition | Intellectual Property | $1,163 | Motors Liquidation Company | 2010 |
| Shutzer, Andrew | Cleary Gottlieb | Bankruptcy | | | $1,160 | Truvo | 2010 |
| McDonald, Michael | Cleary Gottlieb | Corporate | Mergers and Acquisition | | $1,160 | Truvo | 2010 |
| Vandermeersch, Dirk | Cleary Gottlieb | Environmental Litigation | Litigation | | $1,130 | Truvo | 2010 |
| Reding, Jacques | Cleary Gottlieb | Bankruptcy | Mergers and Acquisition | Equities | $1,130 | Truvo | 2010 |
| McArdle, Wayne P. | Gibson Dunn | Corporate | | | $1,110 | Lehman Brothers Holding Inc | 2010 |
| DuBois, Pierre-André | Kirkland & Ellis LLP | Intellectual Property | | | $1,105 | Reader's Digest Association Inc | 2010 |
| Scheler, Brad | Fried Frank | Bankruptcy | | | $1,100 | Stations Casinos | 2010 |
| Lewin-Smith, Guy | Debevoise & Plimpton LLP | Corporate | | | $1,080 | MIG Inc | 2010 |
| Brown, Michael | Jones Day | Finance | Litigation | Regulatory | $1,075 | Lehman Brothers Holding Inc | 2010 |
| Coffey, Lee | Jones Day | Litigation | International Law | Energy | $1,075 | Lehman Brothers Holding Inc | 2010 |
| Stueck, Barnaby C. | Jones Day | Bankruptcy | | | $1,075 | Lehman Brothers Holding Inc | 2010 |
| Karlan, Michael A. | Gibson Dunn | Litigation | | | $1,075 | Almatis | 2010 |
| Brockway, David | Bingham McCutchen | Corporate | | | $1,065 | Lehman Brothers Holding Inc | 2010 |
| Magee, John B. | Bingham McCutchen | Tax | | | $1,065 | Lehman Brothers Holding Inc | 2010 |
| Nelson, William F. | Bingham McCutchen | Tax | | | $1,065 | Lehman Brothers Holding Inc | 2010 |
| Pisillo, Bernie | Shearman & Sterling LLP | Tax | | | $1,065 | Worldspace | 2010 |
| Meyerson, Lee | Simpson Thacher | Capital Markets | Mergers and Acquisition | | $1,050 | Washington Mutual | 2010 |
| Neogos, Peter | Milbank Tweed | Finance | | | $1,050 | Sea Launch Company | 2010 |
| Clayton, Lewis | Paul Weiss | Intellectual Property | | | $1,050 | SP Wind Down Inc | 2010 |
| Fleder, Robert | Paul Weiss | Labor and Employment | | | $1,050 | SP Wind Down Inc | 2010 |
| Rothenberg, Peter | Paul Weiss | Corporate | Tax | | $1,050 | SP Wind Down Inc | 2010 |
| Baronsky, Kenneth J. | Milbank Tweed | Bankruptcy | Mergers and Acquisition | Securities Litigation | $1,050 | Stations Casinos | 2010 |
| Palmer, Deryck A. | Cadwalader | Finance | Bankruptcy | Mergers and Acquisition | $1,050 | Lyondell Chemical Company | 2010 |
| Aronzon, Paul | Milbank Tweed | Bankruptcy | | | $1,050 | Lehman Brothers Holding Inc | 2010 |

| Name | Firm | Practice Area 1 | Practice Area 2 | Practice Area 3 | Hourly Rate | Case Name | Date |
|---|---|---|---|---|---|---|---|
| Brej, Gregory | Milbank Tweed | Bankruptcy | | | $1,050 | Midway Games Inc | 2010 |
| Dunne, Dennis | Milbank Tweed | Bankruptcy | | | $1,050 | Lehman Brothers Holding Inc | 2010 |
| Schiff, Kenneth E. | Weil Gotshal | Mergers and Acquisitions | | | $1,030 | Extended Stay Inc | 2010 |
| Kar, Partha | Kirkland & Ellis LLP | Bankruptcy | | | $1,000 | Reader's Digest Association Inc | 2010 |
| Budd, Thomas M. | Gibson Dunn | Finance | | | $1,027 | Lehman Brothers Holding Inc | 2010 |
| Moore, Robert Jay | Milbank Tweed | Bankruptcy | | | $1,025 | Calm Jumper | 2010 |
| Dakin-Grimm, Linda | Milbank Tweed | Litigation | | | $1,025 | Lehman Brothers Holding Inc | 2010 |
| Davis, Trayton M. | Milbank Tweed | Finance | Bankruptcy | Investment Funds Litigation | $1,025 | Lehman Brothers Holding Inc | 2010 |
| Grushkin, Jay D. | Milbank Tweed | International Law | Finance | Transportation | $1,025 | Lehman Brothers Holding Inc | 2010 |
| Heller, David S. | Lehman Watkins | Bankruptcy | | | $1,025 | In re: NEC Holdings Corp. | 2010 |
| Hirschfeld, Michael | Milbank Tweed | Tax | Real Estate | Finance | $1,025 | Lehman Brothers Holding Inc | 2010 |
| Magold, Rainer | Milbank Tweed | Finance | | | $1,025 | Lehman Brothers Holding Inc | 2010 |
| Tomback, Andrew E. | Milbank Tweed | Litigation | Finance | | $1,025 | Lehman Brothers Holding Inc | 2010 |
| Sharp, Richard | Milbank Tweed | Litigation | | | $1,025 | Lehman Brothers Holding Inc | 2010 |
| Clewy, Kari J.K. | Paul Hastings | Corporate | | | $1,021 | Lehman Brothers Holding Inc | 2010 |
| Eagan, Mark J. | Paul Hastings | Real Estate | | | $1,021 | Lehman Brothers Holding Inc | 2010 |
| O'Sullivan, Ronan P. | Paul Hastings | Corporate | Real Estate | | $1,021 | Lehman Brothers Holding Inc | 2010 |
| Lincer, Richard S. | Cleary Gottlieb | Corporate | Finance | Mergers and Acquisition | $1,020 | Truvo | 2010 |
| Duncan, James A. | Cleary Gottlieb | Finance | Tax | | $1,020 | Truvo | 2010 |
| Passiso, James | Cleary Gottlieb | Tax | | | $1,020 | Truvo | 2010 |
| Gorin, William F. | Cleary Gottlieb | Corporate | Government | Capital Markets | $1,020 | Truvo | 2010 |
| Moloney, Thomas J. | Cleary Gottlieb | Bankruptcy | Litigation | Finance | $1,020 | Truvo | 2010 |

<< first  < prev   1 | 2 | 3 |  next >  last >>

*Source: Valeo partners, Washington, D.C. Notes: Based on recent filings in a range of bankruptcy cases. Some lawyers may have standard hourly rates above what they charged in these cases.*
(See correction.)
Write to the Online Journal's editors at newseditors@wsj.com
Return To Top

**WSJ.com Account:**
My Account
Subscriber, Billing Info

**Create an Account:**
Register for Free
Subscribe Now

**Help & Information Center:**
Help
Customer Service
Contact Us
New on WSJ.com
Tour the new Journal

**About:**
News Licensing
Advertising
Advertise Locally
Conferences
About Dow Jones
Privacy Policy - Updated
Subscriber Agreement &
Terms of Use - Updated
Copyright Policy
Jobs at WSJ.com

**WSJ.com:**
Site Map
Home
World
U.S.
New York
Business
Markets
Market Data
Tech
Personal Finance
Life & Style
Opinion
Autos
Careers
Real Estate
Small Business
Student Journal
Corrections

**Tools & Formats:**
Today's Paper
Video Center
Graphics
Columns
Blogs
Topics
Guides
Alerts
Newsletters
Mobile
Tablet Edition
Podcasts
RSS Feeds
Journal Community
WSJ on Twitter
WSJ on Facebook
WSJ on Foursquare
My Journal

**Digital Network**
WSJ.com
Marketwatch.com
Barrons.com
SmartMoney.com
AllThingsD.com
FINS: Finance, IT Jobs, Sales Jobs
BigCharts.com
Virtual Stock Exchange
WSJ Radio
Professional Journal.com
WSJ U.S. Edition
WSJ Asia Edition
WSJ Europe Edition
WSJ India Page
Foreign Language Editions:

Top Billers - The Wall Street Journal Online - Interactive Graphics    http://online.wsj.com/public/resources/documents/st_TOPRATE0222_20...

More | News, Quotes, Companies, Video | SEARCH |

Friday, February 25, 2011 As of 9:34 AM PST

Today's Paper · Columns · Blogs · Topics · Journal Community

Home · World · U.S. · New York · Business · Markets · Tech · Personal Finance · Life & Culture · Opinion · Careers · Real Estate

Small Business

FEBRUARY 23, 2011

# Top Billers

Top attorneys in the U.S. are asking for as much as $1,250 an hour, according to recent court filings, significantly more than in previous years, as they take advantage of big clients willing to pay top dollar even amid the downturn. The move is contributing to price inflation across the struggling $100 billion global corporate law firm industry, where lawyers often study rival attorney fee filings in bankruptcy cases. See which attorneys had some of the highest-known hourly rates in 2010 and 2009. Click on column headers to sort.

<< first  < prev  | 1 | 2 | 3 |  next >  last >>

| Name | Firm | Practice Area 1 | Practice Area 2 | Practice Area 3 | Hourly Rate | Case Name | Date |
|------|------|-----------------|-----------------|-----------------|-------------|-----------|------|
| Aleksander, Nicholas P.B. | Gibson Dunn | Tax | | | $1,018 | Lehman Brothers Holding Inc | 2010 |
| Rocher, Philip | Gibson Dunn | Litigation | | | $1,018 | Lehman Brothers Holding Inc | 2010 |
| Thomas, Andrew S.V. | Gibson Dunn | Corporate | | | $1,018 | Lehman Brothers Holding, Inc | 2010 |
| Blyth, Mark | Linklaters | Litigation | | | $1,016 | Nortel Networks | 2010 |
| Cox, Tim | Linklaters | Corporate | | | $1,016 | Nortel Networks | 2010 |
| Sachdev, Neel V. | Kirkland & Ellis LLP | Corporate | | | $1,015 | Visteon Corp. | 2010 |
| Mayo, David | Paul Weiss | Tax | | | $1,015 | BP Wind Down Inc | 2010 |
| Cohen, Joel | Gibson Dunn | Bankruptcy | | | $1,014 | Almatis | 2010 |
| Sullivan, Peter | Gibson Dunn | Intellectual Property | Litigation | | $1,014 | Almatis | 2010 |
| Trinklein, Jeffrey | Gibson Dunn | Tax | Employee Benefits | Energy | $1,014 | Almatis | 2010 |
| Vance, Janet L. | Gibson Dunn | Finance | Corporate | | $1,014 | Almatis | 2010 |
| Buffone, Steven P. | Gibson Dunn | Energy | Corporate | Finance | $1,009 | Almatis | 2010 |
| Jowitt, Justin S. | Paul Hastings | Finance | | | $1,000 | Lehman Brothers Holding Inc | 2010 |
| Ganter, Fred R. | Dewey LeBoeuf LLP | Finance | Tax | Corporate | $1000 | Ambac | 2010 |
| Vyskocil, Mary Kay | Simpson Thacher | Insurance | Litigation | | $1000 | Washington Mutual | 2010 |
| Brown, Alvin | Simpson Thacher | Employee Benefits | Executive Compensation | | $1000 | American Safety Razor Company | 2010 |
| Etherton, Joanne | Weil Gotshal | Mergers and Acquisitions | | | $1000 | Lehman Brothers Holding Inc | 2010 |
| McCahill, Dominic T. | Weil Gotshal | Bankruptcy | | | $1000 | Lehman Brothers Holding Inc | 2010 |
| Tringali, Joseph F. | Simpson Thacher | Litigation | Antitrust | Intellectual Property | $1000 | American Safety Razor Company | 2010 |
| Franchia, Michael | Weil Gotshal | Mergers and Acquisitions | | | $1000 | Lehman Brothers Holding Inc | 2010 |
| Keller, Andy | Simpson Thacher | Corporate | Energy | | $1000 | Lehman Brothers Holding Inc | 2010 |
| Neve, Douglas | Weil Gotshal | Antitrust | Finance | Mergers and Acquisition | $1000 | Motors Liquidation Company | 2010 |
| Norwood, Andrew N. | Weil Gotshal | Finance | | | $1000 | Lehman Brothers Holding Inc | 2010 |
| Ostrager, Barry R. | Simpson Thacher | Litigation | | | $1000 | Washington Mutual | 2010 |
| Horspool, Anthony | Weil Gotshal | Bankruptcy | | | $1000 | Lehman Brothers Holding Inc | 2010 |
| Kelly, Jacky | Weil Gotshal | Bankruptcy | Finance | | $1000 | Lehman Brothers Holding Inc | 2010 |
| Nicklin, Michael | Weil Gotshal | Bankruptcy | Finance | Equities | $1000 | Lehman Brothers Holding Inc | 2010 |
| Shankland, Matthew | Weil Gotshal | Alternative Dispute Resolution | | | $1000 | Lehman Brothers Holding Inc | 2010 |
| Martin, Stefan | Allen & Overy LLP | Labor and Employment | | | $1,152 | BearingPoint | 2009 |

1 of 3

Top Billers - The Wall Street Journal Online - Interactive Graphics          http://online.wsj.com/public/resources/documents/st_TOPRATE0222_20...

| Name | Firm | Practice Area 1 | Practice Area 2 | Practice Area 3 | Hourly Rate | Case Name | Date |
|---|---|---|---|---|---|---|---|
| Huber, John J. | Latham Watkins | Capital Market | | | $1,120 | Aviza Technology | 2009 |
| Reynolds, Michael | Allen & Overy LLP | Mergers and Acquisitions | | | $1,111 | Chemtura Corp. | 2009 |
| Norley, Lyndon E. | Kirkland & Ellis LLP | Bankruptcy | | | $1,110 | Chemtura Corp. | 2009 |
| Norley, Lyndon E. | Kirkland & Ellis LLP | Bankruptcy | | | $1,100 | Reader's Digest Association Inc | 2009 |
| Reiss, John M. | White & Case | Mergers and Acquisitions | Equities | | $1,100 | Heartland Automotive Holdings | 2009 |
| Gillespie, Stephen | Kirkland & Ellis LLP | Corporate | | | $1,080 | Chemtura Corp. | 2009 |
| Nakata, Nobuo | Allen & Overy LLP | Corporate | | | $1,077 | BearingPoint | 2009 |
| Brown, Stephen | Latham Watkins | Employee Benefits | | | $1,065 | Aviza Technology | 2009 |
| Chandoi, Kenneth D. | Latham Watkins | Mergers and Acquisitions | | | $1,065 | Aviza Technology | 2009 |
| Finn, Sean | Latham Watkins | Tax | | | $1,065 | Aviza Technology | 2009 |
| Safran, Lawrence | Latham Watkins | Finance | | | $1,065 | Aviza Technology | 2009 |
| Verburg, Leonard | Allen & Overy LLP | Labor and Employment | | | $1,065 | BearingPoint | 2009 |
| Lee-Lim, Jiyeon | Latham Watkins | International Law | Tax | | $1,065 | Spansion | 2009 |
| Pistilo, Bernie | Shearman & Sterling LLP | Tax | | | $1,065 | Worldspace | 2009 |
| Salder, Michael A. | Latham Watkins | Bankruptcy | | | $1,065 | Spansion | 2009 |
| Eckkemmers, Christiaan | Allen & Overy LLP | Corporate | | | $1,062 | BearingPoint | 2009 |
| Pohl, Timothy | Skadden | Bankruptcy | Litigation | | $1,050 | Verasun Energy Corporation | 2009 |
| Lauria, Thomas | White & Case | Bankruptcy | | | $1,050 | Global Safety Textiles | 2009 |
| Mulaney, Charles W. | Skadden | Mergers and Acquisitions | | | $1,050 | Hartmarx | 2009 |
| Rosen, Mathew A. | Skadden | Tax | | | $1,050 | Hartmarx | 2009 |
| Zminsky, Bruce | Cadwalader | Bankruptcy | | | $1,050 | TH Agriculture | 2009 |

<<first   <prev  1  2  3  next>  last>>

Source: Valeo partners, Washington, D.C. Notes: Based on recent filings in a range of bankruptcy cases. Some lawyers may have standard hourly rates above what they charged in these cases.

(See correction.)

Write to the Online Journal's editors at newseditors@wsj.com
Return To Top

2/25/2011 9:39 AM

**WSJ.com Account:**
My Account
Subscriber Billing Info

**Create an Account:**
Register for Free
Subscribe Now

**Help & Information Center:**
Help
Customer Service
Contact Us
New on WSJ.com
Tour the new Journal

**About:**
News Licensing
Advertising
Advertise Locally
Conferences
About Dow Jones
Privacy Policy - Updated
Subscriber Agreement &
Terms of Use - Updated
Copyright Policy
Jobs at WSJ.com

**WSJ.com:**
Site Map
Home
World
U.S.
New York
Business
Markets
Market Data
Tech
Personal Finance
Life & Style
Opinion
Autos
Careers
Real Estate
Small Business
Student Journal
Corrections

**Tools & Formats:**
Today's Paper
Video Center
Graphics
Columns
Blogs
Topics
Guides
Alerts
Newsletters
Mobile
Tablet Edition
Podcasts
RSS Feeds
Journal Community
WSJ on Twitter
WSJ on Facebook
WSJ on Foursquare
My Journal

**Digital Network**
WSJ.com
MarketWatch.com
Barrons.com
SmartMoney.com
AllThingsD.com
FINS: Finance, IT Jobs, Sales Jobs
BigCharts.com
Virtual Stock Exchange
WSJ Radio
ProfessorJournal.com
WSJ U.S. Edition
WSJ Asia Edition
WSJ Europe Edition
WSJ India Page

Foreign Language Editions:

Top Billers - The Wall Street Journal Online - Interactive Graphics    http://online.wsj.com/public/resources/documents/st_TOPRATE0222_20...

More ▾  [ News, Quotes, Companies, Video ]  [ SEARCH ]

Friday, February 25, 2011 As of 9:34 AM PST

Today's Paper  Columns  Blogs  Topics  Journal Community

Home  World  U.S.  New York  Business  Markets  Tech  Personal Finance  Life & Culture  Opinion  Careers  Real Estate
Small Business

FEBRUARY 23, 2011

# Top Billers

Top attorneys in the U.S. are asking for as much as $1,250 an hour, according to recent court filings, significantly more than in previous years, as they take advantage of big clients willing to pay top dollar even amid the downturn. The move is contributing to price inflation across the struggling $100 billion global corporate law firm industry, where lawyers often study rival attorney fee filings in bankruptcy cases. See which attorneys had some of the highest-known hourly rates in 2010 and 2009. Click on column headers to sort.

<< first  < prev  [ 1 ][ 2 ]  3  next>  list >>

| Name | Firm | Practice Area 1 | Practice Area 2 | Practice Area 3 | Hourly Rate | Case Name | Date |
|------|------|-----------------|-----------------|-----------------|-------------|-----------|------|
| Milmoe, J. Gregory | Skadden | Bankruptcy | | | $1,050 | Interstate Bakeries | 2009 |
| Braun, Ellen | Allen & Overy LLP | Antitrust | | | $1,038 | Chemtura Corp. | 2009 |
| Stroll, Neal | Skadden | Antitrust | | | $1,035 | Verasun Energy Corporation | 2009 |
| Hayman, Linda C. | Skadden | Corporate | Mergers and Acquisition | | $1,035 | Interstate Bakeries | 2009 |
| Neckles, Peter J. | Skadden | Finance | | | $1,032 | Interstate Bakeries | 2009 |
| MacLachlan, James | Baker McKenzie | Tax | | | $1,029 | Milacron | 2009 |
| Keck, Colleen | Allen & Overy LLP | Corporate | Intellectual Property | | $1,028 | BearingPoint | 2009 |
| Keither, Eileen | Allen & Overy LLP | Mergers and Acquisitions | | | $1,028 | BearingPoint | 2009 |
| Feuillet, Francois | Vinson & Elkins | Capital Markets | Energy | International Law | $1,028 | MPF Holding US LLC and Official Committee Of Unsecured Creditors | 2009 |
| Riemer, David | Skadden | Tax | | | $1,026 | Mark IV Industries | 2009 |
| Davenport II, Kirk | Latham Watkins | Capital Markets | | | $1,025 | Dayton Superior | 2009 |
| Clayton, Leslie | Paul Weiss | Intellectual Property | | | $1,025 | Tronox | 2009 |
| Fisch, Peter | Paul Weiss | Real Estate | | | $1,025 | Tronox | 2009 |
| Kornberg, Alan | Paul Weiss | Bankruptcy | | | $1,025 | Tronox | 2009 |
| Schimek, Terry | Paul Weiss | Finance | | | $1,025 | Tronox | 2009 |
| Smith, Mark | Skadden | Corporate | | | $1,013 | Mark IV Industries | 2009 |
| Hyde, Mark | Clifford Chance | Bankruptcy | | | $1,006 | Lyondell Chemical Company | 2009 |
| Butters, James | Clifford Chance | Mergers and Acquisitions | | | $1,006 | Lyondell Chemical Company | 2009 |
| Safferstein, Jeffrey | Paul Weiss | Bankruptcy | | | $1,005 | Samsonite Company | 2009 |
| Meyerson, Lisa | Simpson Thacher | Capital Markets | Mergers and Acquisition | | $1000 | Washington Mutual | 2009 |
| Finley, John | Simpson Thacher | Mergers and Acquisitions | | | $1000 | Lehman Brothers Holding Inc | 2009 |
| Gover, Alan | White & Case | Bankruptcy | | | | Hospital Partners | 2009 |

<< first  < prev  [ 1 ][ 2 ]  3  next>  list >>

Source: Valeo partners, Washington, D.C. Notes: Based on recent filings in a range of bankruptcy cases. Some lawyers may have standard hourly rates above what they charged in these cases.
(See correction.)
Write to the Online Journal's editors at newseditors@wsj.com
Return To Top

**EXHIBIT 7**

An ALM web site

# DAILY REPORT

4:19 P.M. EST
Tuesday, February 22, 2011

Get premium access 30-day trial
Subscribe now for under $1 a day
Receive free daily headlines



Home | News Sections | Court Opinions | Court Calendars | Public Notices | Bench Guide | How to Advertise | Contact Us

Going Rate Home Page >>   All records for firms in San Francisco CA United States

* Click on any firm, Practice Area, Firm, City, State, Country, Graduation or Practice Year for related rates

| Name | Title | Practice Area | Firm | City | State | Country | Graduated Law School | Practicing Since | 2006 Rates | 2007 Rates | 2008 Rates | 2009 Rates |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adelson, Eliot A. | Partner | Litigation | Kirkland and Ellis | San Francisco | CA | United States | | | | | | |
| Agarwood, Aaron L. | Associate | | Jones Day | San Francisco | CA | United States | | | | | 520 | |
| Alinoff, Hans J. | Associate | | Kirkland and Ellis | San Francisco | CA | United States | | | 430 | | | |
| Baker, James P. | Partner | Employee Benefits and Exec Comp | Jones Day | San Francisco | CA | United States | | | 260 | | | 750 |
| Bass, Eric | Associate | | Farella Braun and Martel | San Francisco | CA | United States | 1960 | 1960 | | 400 | 745 | 775 |
| Benveniste, Peter J. | Partner | Business Restructuring and Reorganization | Jones Day | San Francisco | CA | United States | 1974 | 1974 | | | | |
| Bering, Scott M. | Associate | Business and Finance | Morgan Lewis and Bockius | San Francisco | CA | United States | 2007 | 2008 | | | 595 | 345 |
| Berkenblit, David M. | Partner | Commercial Litigation | Pachulski, Stang, Ziehl and Jones | San Francisco | CA | United States | | | | | | |
| Boesch, Martha | Partner | Realistic Corporate Criminal Investigations | Jones Day | San Francisco | CA | United States | 1995 | 1995 | | | | 725 |
| Borookin, Jeffrey | Partner | White Collar Crime, Commercial Litigation | Keel and Gates | San Francisco | CA | United States | | | | 525 | 590 | |
| Brown, Donald W. | Partner | Business and Finance | Covington and Burling | San Francisco | CA | United States | 1996 | 1996 | 640 | | | 550 |
| Browning, J. Taylor | Associate | Tort and Environmental Litigation | Morgan Lewis and Bockius | San Francisco | CA | United States | | 1994 | | | | 590 |
| Buonaiuto, Brenda N. | Partner | | Kirkland and Spalding | San Francisco | CA | United States | | | | | | |
| Castro, Ruth Ann | Associate | Environmental | Farella Braun and Martel | San Francisco | CA | United States | | | | 380 | 675 | |
| Christianson, C. Brophy | Associate | Corporate Finance and Health care | O'Melveny and Myers | San Francisco | CA | United States | | | | | | |
| Christian, Ryan M. | Associate | Business Restructuring and Reorganization | Kirkland and Ellis | San Francisco | CA | United States | 2001 | 2001 | 315 | | | 525 |
| Correa, Michaeline | Associate | Business Restructuring and Reorganization | Jones Day | San Francisco | CA | United States | | | | | | |
| Crosby, Peter J. | Counsel | Employment | Jones Day | San Francisco | CA | United States | 1984 | 1984 | | 565 | 565 | 505 |
| Danby, Doug | Partner | Business Transactions | Farella Braun and Martel | San Francisco | CA | United States | | | | 510 | | |
| Dibble, Sara | Partner | Complex Commercial | Farella Braun and Martel | San Francisco | CA | United States | | | | 460 | | |
| Dodge, Benjamin | | | Heller Ehrman | San Francisco | CA | United States | | | | 285 | | |
| Dinah, Megan | | Securities Litigation | Heller Ehrman | San Francisco | CA | United States | | | | 575 | | |
| Dobrydneski, Daniel T. | Associate | Trial | Jones Day | San Francisco | CA | United States | 2007 | 2007 | | | | 350 |
| Douglass, Scott | Partner | Construction | Farella Braun and Martel | San Francisco | CA | United States | | | 425 | 525 | | |
| Dunc, Heather | Associate | | DLA Piper | San Francisco | CA | United States | | | | | | |

1 2 3 4

Currently showing 1-25 of 98 results

About ALM | About Law.com | Customer Support | Reprints | Privacy Policy | Terms & Conditions
Copyright 2011 ALM Media Properties, LLC. All rights reserved.

ALM

An ALM web site

# DAILY REPORT

Home | News Sections | Court Opinions | Court Calendar | Public Notices

4:36 P.M. EST
Tuesday, February 22, 2011

Get premium access 30-day trial
Subscribe now for under $1 a day
Receive free daily headlines

How to Advertise    Contact Us

**Going Rate Home Page >>**

All records for firms in San Francisco CA United States

*Click on any Title, Practice Area, Firm, City, State, Country, Graduation or Practice Year for related cited

| Name | Title | Practice Area | Firm | City | State | Country | Graduated Law School | Practicing Since | 2006 Rates | 2007 Rates | 2008 Rates | 2009 Rates |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Egan, Chantelle C. | Associate | Trial | Jones Day | San Francisco | CA | United States | 2006 | | | | | 325 |
| Eikenberg, Robert L. | Partner | Bankruptcy | Goodby Godward Kronish | San Francisco | CA | United States | | | | | 665 | |
| Engel, G. Larry | Partner | Bankruptcy and Restructuring | Morrison and Foerster | San Francisco | CA | United States | | | | | 775 | 535 |
| Espinosa, Christy | Associate | Labor and Employment | Farella Braun and Martel | San Francisco | CA | United States | | | | 330 | | |
| Ford, Roger J. | Partner | | Jones Day | San Francisco | CA | United States | 1975 | 1975 | 540 | | | |
| Frank, Michael T. | Partner | Bankruptcy and Restructuring | DLA Piper | San Francisco | CA | United States | | | | | 515 | |
| Fried, Joshua M. | Partner | | Pachulski, Stang, Ziehl and Jones | San Francisco | CA | United States | | | | | | |
| Fredericks, John E. | Partner | Corporate | Kirkland and Ellis | San Francisco | CA | United States | | | | | 535 | |
| Garrett, Nathaniel P. | Associate | Issues and Appeals | Jones Day | San Francisco | CA | United States | 2006 | 2008 | 355 | 355 | | 375 |
| Gerdling, Tyler | Associate | Bankruptcy and Creditors Rights | Farella Braun and Martel | San Francisco | CA | United States | | | | | | |
| Glazier, Dean | Partner | Bankruptcy and Creditors Rights | Farella Braun and Martel | San Francisco | CA | United States | | | 615 | 605 | | |
| Goldner, Neil | Partner | Bankruptcy and Creditors Rights | Farella Braun and Martel | San Francisco | CA | United States | | | 745 | 745 | | |
| Green, John | Partner | Insurance Coverage | Farella Braun and Martel | San Francisco | CA | United States | | | | 610 | | |
| Hankuk, Jan | Partner | Commercial Trial | Howrey | San Francisco | CA | United States | | | | 695 | | |
| Hiatt, Daniel | Associate | Employment | Frost, Hastings, Akroleby and Walker | San Francisco | CA | United States | | | | 300 | | |
| Hooten, Frederick D. | Partner | | Orrick, Herrington and Sutcliffe | San Francisco | CA | United States | | | 605 | | | |
| Humphreys, Lynn M. | Of Counsel | Litigation | Morrison and Foerster | San Francisco | CA | United States | | | | 355 | 560 | |
| Jain, Nancy | Associate | Global Capital Markets | Hansen and Watkins | San Francisco | CA | United States | | | | 490 | | |
| Jonson, Alan | Partner | Business Litigation | Farella Braun and Martel | San Francisco | CA | United States | | | | | | |
| Kaczmarek, Scott D. | Partner | | Morgan Lewis and Bockius | San Francisco | CA | United States | 1994 | 1994 | 465 | | 500 | 550 |
| Keegan, Christopher W. | Associate | Business and Finance | Kirkland and Ellis | San Francisco | CA | United States | | | 415 | | 500 | |
| Kelfer, Tobias S. | Partner | | Jones Day | San Francisco | CA | United States | 1990 | 1990 | | | | |
| Kim, Jenny | Associate | Business Restructuring and Reorganization | DLA Piper | San Francisco | CA | United States | | | 260 | | | |
| Kirschner, Carl | Partner | Hospitality | OMcKveny and Myers | San Francisco | CA | United States | | | | 490 | 800 | 750 |
| Koufestani, Saef | Partner | | Farella Braun and Martel | San Francisco | CA | United States | | | | | | |

1 2 3 4

Currently showing 26-50 of 96 results

About ALM | About Law.com | Customer Support | Reprints | Privacy Policy | Terms & Conditions
Copyright 2011 ALM Media Properties, LLC. All rights reserved.

ALM

An ALM web site

# DAILY REPORT

Home | News Sections | Court Opinions | Court Calendars | Public Notices | Bench Guide | How to Advertise | Contact Us

4:36 P.M EST
Tuesday, February 22, 2011

Get premium access 30-day trial
Subscribe now for under $1 a day
Receive free daily headlines

## Going Rate Home Page >>   All records for firms in San Francisco CA United States

* Click on any Title, Practice Area, Firm, City, State, Country, Graduation or Practice Year for related rates

| Name | Title | Practice Area | Firm | City | State | Country | Graduated Law School | Practicing Since | 2005 Rates | 2007 Rates | 2008 Rates | 2009 Rates |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Laubach, Justin | Counsel | Corporate Finance | OMelveny and Myers | San Francisco | CA | United States | 1997 | 1997 | | | 940 | |
| Marshall, Robert G. | Partner | Employee Benefits and Exec Comp | Jones Day | San Francisco | CA | United States | | | | | | 625 |
| Mason, Cary | Associate | Restructuring and Insolvency | Farella Braun and Martel | San Francisco | CA | United States | | | | 245 | | |
| McDaniels, Keith | Partner | Trial Practice | Winston and Strawn | San Francisco | CA | United States | | | | | 540 | |
| McDonald, Brian D. | Associate | | Jones Day | San Francisco | CA | United States | 2002 | 2002 | | | | 500 |
| McKune, Mark E. | Partner | | Kirkland and Ellis | San Francisco | CA | United States | | | | | | |
| Myers, William A. | Partner | Business and Finance Insurance Liability and Recovery | Morgan, Lewis and Bockius | San Francisco | CA | United States | 1992 | 1993 | | | 580 | 995 |
| Myers, Martin H. | Partner | | Jones Day | San Francisco | CA | United States | 1987 | 1987 | | | | 700 |
| Nagai, Ashii | Associate | Litigation | Farella Braun and Martel | San Francisco | CA | United States | | | | | | |
| Nidel, Casey M. | Associate | Banking and Finance | Kirkland and Ellis | San Francisco | CA | United States | | | | | 395 | |
| Olson, James C. | Partner | Labor and Employment | Jones Day | San Francisco | CA | United States | 1979 | 1979 | | 245 | | |
| Old, Amanda M. | Associate | Litigation | Jones Day | San Francisco | CA | United States | | | | | | 300 |
| Osgood, Megan C.E. | Associate | Litigation | Kirkland and Ellis | San Francisco | CA | United States | | | | | | 285 |
| Patten, Keda | Associate | Labor and Employment | OMelveny and Myers | San Francisco | CA | United States | | | | | | 395 |
| Petsonk, Karen H. | Of Counsel | California Employment Counseling | Morgan, Lewis and Bockius | San Francisco | CA | United States | | | | | | 570 |
| Polack, Thomas R. | Partner | | Paul, Hastings, Janofsky and Walker | San Francisco | CA | United States | | | 750 | | | |
| Potvin, Alex | Associate | Corporate | Farella Braun and Martel | San Francisco | CA | United States | 2008 | | | 465 | 360 | |
| Reignpaul, Raman | Associate | | Paul Hastings Janofsky and Walker | San Francisco | CA | United States | | | | | | |
| Ritchey, Katherine S. | Partner | Trial Practice | Jones Day | San Francisco | CA | United States | 1995 | 1995 | | | 625 | |
| Ritter, Peter | Partner | Business Tax and Investment Funds | OMelveny and Myers | San Francisco | CA | United States | | | | 675 | | |
| Roche, Laura | Associate | Business Litigation | Farella Braun and Martel | San Francisco | CA | United States | 2003 | 2003 | | 485 | 475 | 500 |
| Rodriguez, Noel | Associate | Trial Practice | Jones Day | San Francisco | CA | United States | 1999 | 1999 | | | | 455 |
| Salick, Cheryl | Counsel | Tort and Environmental Litigation | King and Spalding | San Francisco | CA | United States | | | | | | |
| Schisbert, William | Partner | Private Clients | Farella Braun and Martel | San Francisco | CA | United States | | | | 725 | 695 | |
| Selting, Jerolyn | Of Counsel | Family Wealth Group | Farella Braun and Martel | San Francisco | CA | United States | | | | 450 | | |

1 2 3 4

Currently showing 51-75 of 96 results

About ALM | About Law.com | Customer Support | Reprints | Privacy Policy | Terms & Conditions
Copyright 2011 ALM Media Properties, LLC. All rights reserved.

ALM

An ALM web site

# DAILY REPORT

4:38 P.M. EST
Tuesday, February 22, 2011

Home | News Sections | Court Opinions | Court Calendars | Public Notices | How to Advertise | Contact Us

Get premium access 30-day trial
Subscribe now for under $1 a day
Receive free daily headlines

Going Rate Home Page >>   All records for firms in San Francisco CA United States

Bonus Guide

*Click on any Title, Practice Area, Firm, City, State, County, Graduation Year or Practice Year for related items

| Name | Title | Practice Area | Firm | City | State | Country | Graduated Law School | Practicing Since | 2006 Rates | 2007 Rates | 2008 Rates | 2009 Rates |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shepard, Michael | Associate | Securities Litigation | Heller Ehrman | San Francisco | CA | United States | | | | 750 | | |
| Shin, Susan | Associate | Labor and Employment | Horton and Williams | San Francisco | CA | United States | | | | | | 260 |
| Slough, Leah | Associate | Commercial Litigation | K and L Gates | San Francisco | CA | United States | 2008 | 2008 | | 280 | 325 | |
| Spooner, Leo | Associate | Commercial Disputes | Kingsand Spalding | San Francisco | CA | United States | | | | | | 390 |
| Stephens, Eric | Associate | Business Transactions | Farella Braun and Martel | San Francisco | CA | United States | | 2003 | | 430 | 410 | |
| Stewart, Rhonda L. | Associate | Litigation | Arnold and Porter | San Francisco | CA | United States | | | | | 395 | |
| Thelen, Veronica (Ronnie) | Associate | | McKelvey and Myers | San Francisco | CA | United States | | | | | | |
| Thomason, Brent | Associate | Tax | Farella Braun and Martel | San Francisco | CA | United States | | | | | 440 | |
| Tognoli, Christine D. | Associate | | Paul, Hastings, Janofsky and Walker | San Francisco | CA | United States | | | | | | |
| Triplett, Holden | Associate | | Farella Braun and Martel | San Francisco | CA | United States | | | 325 | | | |
| Trudelle, Robert A. | Partner | Business Restructuring and Reorganization | Jones Day | San Francisco | CA | United States | | 1999 | | 295 | | |
| Ulland, Suzanne | Partner | Finance, Corporate and Bankruptcy | McKelvey and Myers | San Francisco | CA | United States | | | | 725 | 620 | |
| Vogt, Gary M. | Senior Legal Assistant | Litigation | Kirtland and Ellis | San Francisco | CA | United States | | | | | | |
| Wagoner, Kristine | Associate | Business Transactions | Farella Braun and Martel | San Francisco | CA | United States | | | | 295 | 285 | |
| Wald, Gregory A. | Similar Attorney | Labor/Employment | Squire Sanders and Dempsey | San Francisco | CA | United States | | | | | 480 | |
| Wessels, Kelly | Associate | Litigation | Kirtland and Ellis | San Francisco | CA | United States | | | | 520 | 395 | |
| Whalen, Joe | Partner | Insurance and Risk Management | Farella Braun and Martel | San Francisco | CA | United States | | | | | | |
| Wilde, Jack L. | Associate | Restructuring | Kirtland and Ellis | San Francisco | CA | United States | | | 385 | | | |
| Wilson, Elizabeth | Counsel | Bankruptcy and Creditors Rights | McKelvey and Myers | San Francisco | CA | United States | | | | | 565 | |
| Woodruff, Kelly | Partner | New Century Financial Corp | Farella Braun and Martel | San Francisco | CA | United States | | | | 485 | | |
| Zwiebelman, Michael | | | Heller Ehrman | San Francisco | CA | United States | | | | 515 | | |

1 2 3 4

Currently showing 76-96 of 96 results

ALM

About ALM | About Law.com | Customer Support | Reprints | Privacy Policy | Terms & Conditions
Copyright 2011 ALM Media Properties, LLC. All rights reserved.

**EXHIBIT 8**

# Westlaw CourtExpress

## LEGAL BILLING REPORT

VOLUME 11, NUMBER 1

May 2009

# BY BILLING RATE

# California Rate Report

| | PROFESSIONAL | FIRM | GRADUATED | ADMITTED | STATE | RATE | HOURS | TOTAL $ |
|---|---|---|---|---|---|---|---|---|
| P | Kelly, Jr., Daniel | Davis Polk & Wardwell (CA) | 1986 | 1990 | CA | $ 955.00 | 17.00 | 16,235.00 |
| P | Cowles, Julia | Davis Polk & Wardwell (CA) | 1990 | 1990 | CA | 860.00 | 1.10 | 946.00 |
| P | O'Melveny, Scott | O'Melveny & Myers LLP (CA) | 1975 | 1975 | CA | 850.00 | 0.50 | 425.00 |
| P | Tuchin, Michael | Klee, Tuchin, Bogdanoff & Stern, LLP | 1990 | 1990 | CA | 799.00 | 0.80 | 639.20 |
| P | Ballsch, Karen | Weil, Gotshal & Manges LLP (CA) | 1986 | 1986 | CA | 790.00 | 4.50 | 3,555.00 |
| P | Arnold, Dennis | Gibson Dunn & Crutcher, LLP (CA) | 1975 | 1978 | CA | 780.00 | 108.40 | 84,552.00 |
| QC | Montis, Michael | Hennigan Bennett & Dorman LLP | 1979 | 1979 | CA | 760.00 | 126.40 | 96,075.00 |
| P | Averich, Craig | White & Case LLP (CA) | 1984 | 1984 | CA | 760.00 | 0.23 | 176.00 |
| P | Kharasch, Ira D. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1982 | 1982 | CA | 725.00 | 0.80 | 580.00 |
| P | Konrad, Alan | White & Case LLP (CA) | 1984 | 1984 | CA | 690.00 | 100.80 | 69,552.00 |
| P | Lamb, Peter | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1982 | 1982 | CA | 680.00 | 10.10 | 6,868.00 |
| P | Irving, Jeanne E. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1981 | 1981 | CA | 675.00 | 19.10 | 12,892.50 |
| A | Kwun, Charles | Munger Tolles & Olson LLC | 1997 | 1998 | CA | 665.00 | 176.20 | 117,173.00 |
| P | Gordin, Ronald | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1997 | 1997 | CA | 650.00 | 27.30 | 17,745.00 |
| P | Brown, Kenneth H. | Pachulski Stang Ziehl Young Jones & Weintraub, LLP | 1977 | 1977 | CA | 650.00 | 23.10 | 15,015.00 |
| P | Fidler, David | Klee, Tuchin, Bogdanoff & Stern, LLP | 1997 | 1997 | CA | 650.00 | 0.50 | 325.00 |
| P | Weissmann, Henry | Munger Tolles & Olson LLC | 1987 | 1987 | CA | 645.00 | 35.60 | 22,962.00 |
| P | Bertenthal, David M. | Pachulski Stang Ziehl Young Jones & Weintraub LLC | 1989 | 1993 | CA | 635.00 | 0.80 | 508.00 |
| P | Montgomery, Cromwell | Gibson Dunn & Crutcher, LLP (CA) | 1970 | 1970 | CA | 625.00 | 17.80 | 11,125.00 |
| A | Brown, Dennis | Gibson Dunn & Crutcher, LLP (CA) | 1970 | 1970 | CA | 610.00 | 13.50 | 8,235.00 |
| A | Newman, Samuel | Gibson Dunn & Crutcher, LLP (CA) | 2001 | 2001 | CA | 600.00 | 183.70 | 110,220.00 |
| P | Darahan, Shiva | Munger Tolles & Olson LLC | 2003 | 2003 | CA | 600.00 | 124.60 | 74,760.00 |
| P | Vincent, Garth | Munger Tolles & Olson LLC | 1989 | 1988 | CA | 600.00 | 20.90 | 12,540.00 |
| P | Scott, Melanie | Munger Tolles & Olson LLC | 2004 | 2004 | CA | 590.00 | 0.50 | 295.00 |
| P | Buchanan, Laura | White & Case LLP (CA) | 1991 | 1991 | CA | 590.00 | 0.20 | 118.00 |
| A | Ger Kwarto-chen, B. | Klee, Tuchin, Bogdanoff & Stern, LLP | 2003 | 2003 | CA | 580.00 | 28.50 | 16,530.00 |
| P | Edraki, David | Weil, Gotshal & Manges LLP (CA) | 2003 | 2003 | CA | 570.00 | 2.90 | 1,653.00 |
| P | Heintz, Jeffrey | Gibson Dunn & Crutcher, LLP (CA) | 1984 | 1984 | CA | 550.00 | 35.10 | 19,305.00 |
| P | Fried, Joshua | Munger Tolles & Olson LLC | 1995 | 1995 | CA | 535.00 | 21.40 | 11,449.00 |
| P | Rulton, James | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1997 | 1997 | CA | 525.00 | 25.80 | 13,545.00 |
| P | Morse, Joshua | Munger Tolles & Olson LLC | 2000 | 2000 | CA | 505.00 | 13.10 | 6,615.50 |
| A | Matelic, Michael | Hennigan Bennett & Dorman LLP | 2005 | 2005 | CA | 500.00 | 36.50 | 18,250.00 |
| A | Barshop, Melissa | Weil, Gotshal & Manges LLP (CA) | 2006 | 2006 | CA | 470.00 | 14.00 | 6,580.00 |
| A | Liu, Leslie | Gibson Dunn & Crutcher, LLP (CA) | 2006 | 2006 | CA | 475.00 | 4.50 | 2,137.50 |
| A | Hochleutner, Brian | Weil, Gotshal & Manges LLP (CA) | 2005 | 2005 | CA | 450.00 | 508.30 | 228,733.00 |
| A | Kaufman, Derek | Munger Tolles & Olson LLC | 2005 | 2005 | CA | 435.00 | 0.30 | 130.50 |
| A | Nathan, Joseph | Munger Tolles & Olson LLC | 2007 | 2007 | CA | 415.00 | 25.20 | 10,458.00 |
| A | Jasper, M. Lance | Munger Tolles & Olson LLC | 2006 | 2006 | CA | 400.00 | 96.20 | 38,480.00 |
| A | Eskandari, Barney | Munger Tolles & Olson LLC | 2006 | 2006 | CA | 400.00 | 8.80 | 3,520.00 |
| A | Rubic, Evandra E. | O'Melveny & Myers LLP (CA) | 2006 | 2006 | CA | 395.00 | 8.40 | 3,318.00 |

# California Rate Report

| PROFESSIONAL | FIRM | GRADUATED | ADMITTED | STATE | RATE | HOURS | TOTAL |
|---|---|---|---|---|---|---|---|
| A  Schneider, Bradley | Munger Tolles & Olson LLC | 2004 | 2004 | CA | $ 385.00 | 1.30 | $ 513.50 |
| A  Reason, Matthew | Weil, Gotshal & Manges LLP (CA) | 2006 | 2006 | CA | 355.00 | 13.50 | 4,792.50 |
| A  Guzman, Tanya | O'Melveny & Myers LLP (CA) | 2007 | 2007 | CA | 330.00 | 2.50 | 825.00 |
| PP  Nardo, Ross | O'Melveny & Myers LLP (CA) | | | | 260.00 | 6.20 | 1,612.00 |
| PP  Frankson, Kaitha | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 225.00 | 27.60 | 6,210.00 |
| Jeffries, Patricia J. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 225.00 | 0.40 | 90.00 |
| PP  Pearson, Sanda | Pachulski Stang Ziehl Young Jones & Weintraub, LLP | | CA | | 215.00 | 1.90 | 408.50 |
| PP  Floyd, Kevin | Klee, Tuchin, Bogdanoff & Stern, LLP | | | | 210.00 | 0.30 | 63.00 |
| PP  Koois, Cheryl | Hanrahan Bennett & Dorman LLP | | | | 205.00 | 2.20 | 451.00 |
| CNA  Pioman, Sherrie | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 125.00 | 2.60 | 325.00 |

# Westlaw CourtExpress

## LEGAL BILLING REPORT

VOLUME 11, NUMBER 2

August 2009

## BY BILLING RATE

## California rate Report

| | PROFESSIONAL | FIRM | GRADUATED | ADMITTED | STATE | RATE | HOURS | TOTAL |
|---|---|---|---|---|---|---|---|---|
| P | Tolles, Stephen L. | Gibson Dunn & Crutcher, LLP (CA) | 1982 | 1982 | CA | $ 860.00 | 0.10 | $ 86.00 |
| P | Patterson, Thomas | Klee, Tuchin, Bogdanoff & Stern, LLP | 1984 | 1984 | CA | 850.00 | 225.00 | 191,250.00 |
| P | Tuchin, Michael | Klee, Tuchin, Bogdanoff & Stern, LLP | 1990 | 1990 | CA | 850.00 | 74.40 | 63,240.00 |
| P | Stern, David | Klee, Tuchin, Bogdanoff & Stern, LLP | 1975 | 1975 | CA | 850.00 | 32.90 | 27,965.00 |
| P | Issler, Paul S. | Gibson Dunn & Crutcher, LLP (CA) | 1986 | 1986 | CA | 840.00 | 6.35 | 5,334.00 |
| P | Arnold, Dennis | Gibson Dunn & Crutcher, LLP (CA) | 1975 | 1976 | CA | 840.00 | 4.10 | 3,444.00 |
| P | Timmons, Brian | Quinn Emanuel Urquhart Oliver & Hedges, LLP | 1991 | 1991 | CA | 820.00 | 72.80 | 59,696.00 |
| P | Blatteck, Karen | Weil, Gotshal & Manges LLP (CA) | 1986 | 1986 | CA | 810.00 | 40.40 | 32,724.00 |
| P | Zieh, Dean A. | Pachulski Stang Zieh Young Jones & Weintraub (CA) | 1978 | 1978 | CA | 795.00 | 20.30 | 16,138.50 |
| P | Glinoga, Danielle | Quinn Emanuel Urquhart Oliver & Hedges, LLP | 1993 | 1994 | CA | 775.00 | 9.50 | 7,362.50 |
| P | Averch, Craig | White & Case LLP (CA) | 1984 | 1984 | CA | 750.00 | 189.20 | 141,900.00 |
| P | Keller, Tobias | Jones Day (CA) | 1990 | 1990 | CA | 750.00 | 1.90 | 1,425.00 |
| P | Baker, James | Jones Day (CA) | 1980 | 1980 | CA | 750.00 | 0.20 | 150.00 |
| P | Winsten, Eric D. | Quinn Emanuel Urquhart Oliver & Hedges, LLP | 1999 | 1999 | CA | 740.00 | 7.10 | 5,254.00 |
| P | Ong, Johanna Y. | Quinn Emanuel Urquhart Oliver & Hedges, LLP | 1997 | 1997 | CA | 740.00 | 6.30 | 4,662.00 |
| P | Kornfeld, Alan | Pachulski Stang Zieh Young Jones & Weintraub (CA) | 1987 | 1987 | CA | 725.00 | 10.10 | 7,322.50 |
| P | Bjork, Jeffrey E | Sidley Austin Brown & Wood LLP (CA) | 1997 | 1998 | CA | 700.00 | 110.90 | 77,630.00 |
| P | Mayer, Martin | Jones Day (CA) | 1987 | 1987 | CA | 700.00 | 26.50 | 18,550.00 |
| A | Grassgreen, Debra I. | Pachulski Stang Zieh Young Jones & Weintraub (CA) | 1991 | 1992 | CA | 695.00 | 4.50 | 3,127.50 |
| P | Persson, Mark E. | White & Case LLP (CA) | 1981 | 1982 | CA | 685.00 | 117.70 | 80,624.50 |
| A | Arash, Dora | Gibson Dunn & Crutcher, LLP (CA) | 1995 | 1995 | CA | 675.00 | 39.40 | 26,595.00 |
| P | Gorsch, Ronald | White & Case LLP (CA) | 2001 | 2001 | CA | 665.00 | 221.50 | 147,297.50 |
| P | Montgomery, Cromwell | Gibson Dunn & Crutcher, LLP (CA) | 1997 | 1997 | CA | 635.00 | 2.50 | 1,587.50 |
| P | Newman, Samuel | Gibson Dunn & Crutcher, LLP (CA) | 2001 | 2001 | CA | 610.00 | 11.50 | 7,015.00 |
| A | Dahahini, Shiva | White & Case LLP (CA) | 2003 | 2003 | CA | 600.00 | 217.50 | 130,500.00 |
| P | Scott, Melanie | White & Case LLP (CA) | 2004 | 2004 | CA | 600.00 | 74.90 | 44,940.00 |
| P | Trodella, Robert | Jones Day (CA) | 1996 | 1996 | CA | 600.00 | 35.30 | 21,180.00 |
| P | Ger Kwang-chen, B. | Weil, Gotshal & Manges LLP (CA) | 2003 | 2003 | CA | 580.00 | 54.20 | 31,436.00 |
| OC | Metcalf, Brian | Klee, Tuchin, Bogdanoff & Stern, LLP | 1999 | 1999 | CA | 575.00 | 12.40 | 7,130.00 |
| A | Eidel, David | Gibson Dunn & Crutcher, LLP (CA) | 2003 | 2003 | CA | 570.00 | 0.50 | 285.00 |
| C | Crosby IV, Peter | Jones Day (CA) | 1984 | 1984 | CA | 565.00 | 13.30 | 7,514.50 |
| A | Martin, Jill | White & Case LLP (CA) | 2006 | 2006 | CA | 550.00 | 45.80 | 25,190.00 |
| A | Correa, Micheahine | Jones Day (CA) | 2001 | 2001 | CA | 525.00 | 1.70 | 892.50 |
| QC | Brandt, Gina F. | Pachulski Stang Zieh Young Jones & Weintraub (CA) | 1976 | 1976 | CA | 525.00 | 1.30 | 682.50 |
| A | Matelic, Michael | Weil, Gotshal & Manges LLP (CA) | 2005 | 2005 | CA | 500.00 | 175.30 | 87,650.00 |
| A | Rodriguez, Noel | Jones Day (CA) | 2003 | 2003 | CA | 500.00 | 41.80 | 20,900.00 |
| A | Heyn, Matthew | Klee, Tuchin, Bogdanoff & Stern, LLP | 2003 | 2003 | CA | 495.00 | 111.80 | 55,341.00 |
| A | Barshop, Melissa | Gibson Dunn & Crutcher, LLP (CA) | 2006 | 2006 | CA | 470.00 | 4.10 | 1,927.00 |
| A | Liu, Leslie | Weil, Gotshal & Manges LLP (CA) | 2006 | 2006 | CA | 465.00 | 302.70 | 140,755.50 |
| A | Chun, Sidney | White & Case LLP (CA) | 2008 | 2008 | CA | 460.00 | 162.10 | 74,566.00 |

# California rate Report

| PROFESSIONAL | FIRM | GRADUATED | ADMITTED | STATE | RATE | HOURS | $ TOTAL |
|---|---|---|---|---|---|---|---|
| A. Morrison, Kelley M | White & Case LLP (CA) | 2008 | 2008 | CA | $ 460.00 | 105.50 | 48,530.00 |
| A. Hawk, Jonathan | White & Case LLP (CA) | 2007 | 2007 | CA | 460.00 | 20.30 | 9,338.00 |
| P. Phillip, Laurence | McKenna Long & Aldridge LLP (CA) | 1997 | 1997 | CA | 450.00 | 15.00 | 6,750.00 |
| P. Larsen, J David | McKenna Long & Aldridge LLP (CA) | 1997 | 1997 | CA | 450.00 | 10.00 | 4,500.00 |
| A. Guess, David | Klee, Tuchin, Bogdanoff & Stern, LLP | 2005 | 2005 | CA | 430.00 | 366.70 | 157,681.00 |
| A. Fitzmartin, Courtney | Klee, Tuchin, Bogdanoff & Stern, LLP | 2005 | 2005 | CA | 430.00 | 23.20 | 9,976.00 |
| A. Dickerson Matthew | Sidley Austin Brown & Wood LLP (CA) | 2007 | 2007 | CA | 426.00 | 25.30 | 10,752.90 |
| A. Tran, William | Sidley Austin Brown & Wood LLP (CA) | 2006 | 2006 | CA | 425.00 | 5.40 | 2,295.00 |
| A. Nathan, Joseph | Weil, Gotshal & Mances LLP (CA) | 2007 | 2007 | CA | 415.00 | 61.50 | 25,522.50 |
| A. Wilson, Lorna S. | Gibson Dunn & Crutcher LLP (CA) | 2008 | 2008 | CA | 400.00 | 4.00 | 1,600.00 |
| A. Smoots, Ariella | Sidley Austin Brown & Wood LLP (CA) | 2008 | 2008 | CA | 375.00 | 49.30 | 18,487.50 |
| A. Deerihan, Kevin | Klee, Tuchin, Bogdanoff & Stern, LLP | 2008 | 2008 | CA | 300.00 | 4.70 | 1,410.00 |
| A. Guess, David | Klee, Tuchin, Bogdanoff & Stern, LLP | 2008 | 2008 | CA | 300.00 | 2.10 | 630.00 |
| A. Elliot, Kerin | Klee, Tuchin, Bogdanoff & Stern, LLP | 2008 | 2008 | CA | 250.00 | 4.90 | 1,225.00 |
| LIB. Forrester, Leslie A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 225.00 | 8.50 | 1,912.50 |
| PP. Harris, Denise A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 225.00 | | |
| PP. Harris, Michelle | McKenna Long & Aldridge LLP (CA) | | | CA | 215.00 | 40.60 | 8,729.00 |
| PP. Pearson, Sands | Klee, Tuchin, Bogdanoff & Stern, LLP | | | | 215.00 | 36.00 | 7,740.00 |
| PP. Brown, Thomas J. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 195.00 | 2.00 | 390.00 |
| LIB. Jones, Carla H. | Gibson Dunn & Crutcher, LLP (CA) | | | | 165.00 | 0.50 | 82.50 |

# Westlaw CourtExpress

## LEGAL BILLING REPORT

VOLUME 11, NUMBER 3

December 2009

# BY BILLING RATE

# California Rate Report

| | PROFESSIONAL | FIRM | GRADUATED | ADMITTED | STATE | RATE | HOURS | TOTAL $ |
|---|---|---|---|---|---|---|---|---|
| P | Pachulski, Richard M. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1978 | 1979 | CA | $ 865.00 | 287.62 | $ 232,416.30 |
| P | Patterson, Thomas | Klee, Tuchin, Bogdanoff & Stern, LLP | 1984 | 1984 | CA | 850.00 | 392.60 | 333,710.00 |
| P | Tuchin, Michael | Klee, Tuchin, Bogdanoff & Stern, LLP | 1990 | 1990 | CA | 850.00 | 201.40 | 171,190.00 |
| P | Stern, David | Klee, Tuchin, Bogdanoff & Stern, LLP | 1975 | 1975 | CA | 850.00 | 68.80 | 58,480.00 |
| P | Pachulski, Richard M. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1979 | 1979 | CA | 850.00 | 68.00 | 57,800.00 |
| P | Pachulski, Richard M. | Gibson Dunn & Crutcher, LLP (CA) | 1976 | 1976 | CA | 840.00 | 1.00 | 840.00 |
| A | Arnold, Dennis | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1978 | 1976 | CA | 825.00 | 256.25 | 211,406.25 |
| P | Ziehl, Dean A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1978 | | CA | 820.00 | 240.60 | 197,282.00 |
| P | Threricos, Brian | Quinn Emanuel Urquhart Oliver & Hedges, LLP | 1991 | 1991 | CA | 820.00 | 60.20 | 65,764.01 |
| P | Lyons, Duane | Quinn Emanuel Urquhart Oliver & Hedges, LLP | 1986 | 1986 | CA | 785.00 | 157.30 | 226,053.50 |
| P | Orgel, Robert B. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1981 | 1981 | CA | 785.00 | 158.50 | 124,602.50 |
| P | Richards, Jeremy | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1980 | 1981 | CA | 785.00 | 94.00 | 74,790.00 |
| P | Ziehl, Dean A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1978 | 1978 | CA | 785.00 | 20.30 | 16,135.50 |
| P | Ziehl, Dean A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1978 | 1978 | CA | 740.00 | 54.00 | 39,960.00 |
| P | Weston, Eric D. | Quinn Emanuel Urquhart Oliver & Hedges, LLP | 1999 | 1999 | CA | 740.00 | 11.20 | 6,288.00 |
| P | Grassgreen, Debra I. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1991 | 1992 | CA | 735.00 | 10.10 | 7,322.50 |
| C | Kornfeld, Alan | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1987 | 1987 | CA | 695.00 | 5.50 | 3,822.50 |
| C | Celine, Andrew | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1983 | 1983 | CA | 695.00 | 3.40 | 2,363.00 |
| P | Parker, Daryl | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1969 | 1970 | CA | 675.00 | 60.80 | 41,040.00 |
| C | Ziehl, Dean A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1966 | 1987 | CA | 675.00 | 16.60 | 11,205.00 |
| C | Mahoney, James | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1966 | 1987 | CA | 675.00 | 14.80 | 9,990.00 |
| P | Arash, Dara | Gibson Dunn & Crutcher, LLP (CA) | 1995 | 1995 | CA | 650.00 | 1.40 | 910.00 |
| P | Dervos, Norm | Klee, Tuchin, Bogdanoff & Stern, LLP | 2001 | 2001 | CA | 610.00 | 3.70 | 2,257.00 |
| A | Newman, Samuel | Gibson Dunn & Crutcher, LLP (CA) | 1987 | 1987 | CA | 585.00 | 100.80 | 59,976.00 |
| A | Newmark, Victoria | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1998 | 1997 | CA | 585.00 | 32.50 | 19,337.50 |
| A | Cho, Shirley | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1997 | 1997 | CA | 595.00 | 19.40 | 11,543.00 |
| C | Hochman, Harry | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1987 | 1987 | CA | 575.00 | 57.60 | 33,120.00 |
| C | DiKettman, Jennifer | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1998 | 1998 | CA | 575.00 | 1.40 | 805.00 |
| A | Metcalf, Brian | Klee, Tuchin, Bogdanoff & Stern, LLP | 1999 | 1999 | CA | 575.00 | 0.70 | 402.50 |
| OC | Ong, Joanna W. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 1976 | 1976 | CA | 525.00 | 1.30 | 682.50 |
| OC | Brandt, Gina F. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 2003 | 2003 | CA | 495.00 | 109.70 | 54,301.50 |
| OC | Thien, Matthew | Klee, Tuchin, Bogdanoff & Stern, LLP | 1999 | 1999 | CA | 495.00 | 0.50 | 247.50 |
| A | Brown, Glenn | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | 2006 | 2006 | CA | 470.00 | 2.10 | 987.00 |
| A | Bashian, Melissa | Gibson Dunn & Crutcher, LLP (CA) | 2006 | 2006 | CA | 465.00 | 9.80 | 4,557.00 |
| A | Liu, Leslie | Weil Gotshal & Mances LLP (CA) | 2006 | 2006 | CA | 465.00 | 2.70 | 1,215.00 |
| P | Philip, Laurence | McKenna Long & Aldridge LLP (CA) | 1997 | 1997 | CA | 460.00 | 402.60 | 1,312,478.00 |
| A | Guess, Joseph | Klee, Tuchin, Bogdanoff & Stern, LLP | 2005 | 2005 | CA | 450.00 | 17.40 | 7,743.00 |
| PP | Santas, Joseph C. | Quinn Emanuel Urquhart Oliver & Hedges, LLP | | | CA | 330.00 | 16.60 | 4,980.00 |
| A | Eliot, Klein | Klee, Tuchin, Bogdanoff & Stern, LLP | 2008 | 2008 | CA | 300.00 | 20.30 | 5,075.00 |
| PP | Lucroia, Katrina | Quinn Emanuel Urquhart Oliver & Hedges, LLP | | | CA | 250.00 | | |
| UB | Forrester, Leslie A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 250.00 | 4.90 | 1,225.00 |

# California Rate Report

| | PROFESSIONAL | FIRM | GRADUATED | ADMITTED | STATE | RATE | HOURS | TOTAL |
|---|---|---|---|---|---|---|---|---|
| LIG | Forrester, Leslie A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | $ 250.00 | 1.80 | $ 450.00 |
| PP | Harris, Denise A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 225.00 | 47.90 | 10,777.50 |
| PP | Harris, Denise A. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 225.00 | 8.50 | 1,912.50 |
| PP | Harmon, Felice | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 225.00 | 0.40 | 90.00 |
| PP | Harmon, Felice | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 215.00 | 60.40 | 12,986.00 |
| PP | Grydner, Michelle | McKenna Long & Aldridge LLP (CA) | | | | 215.00 | 52.40 | 11,266.00 |
| PP | Pearson, Sandra | Klee, Tuchin, Bogdanoff & Stern LLP | | | | 215.00 | 52.40 | 11,266.00 |
| PP | Brown, Thomas J. | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 195.00 | 59.75 | 11,651.25 |
| PP | Matteo, Mike | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 195.00 | 6.00 | 1,170.00 |
| PP | Brown, Thomas J | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 195.00 | 2.00 | 390.00 |
| LS | Everhart, Christine | McKenna Long & Aldridge LLP (CA) | | | | 185.00 | 3.00 | 540.00 |
| PP | Sann, Andrew | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 150.00 | 16.90 | 2,535.00 |
| PP | Bass, John | Pachulski Stang Ziehl Young Jones & Weintraub (CA) | | | | 150.00 | 0.80 | 120.00 |

**EXHIBIT 9**



## 2010 NLJ Billing Survey

Copyright © 2010, ALM Media Properties, LLC, All Rights Reserved

| Fiscal Year | Firm Name | Location | Firmwide Average | Partner High | Partner Low | Partner Average | Associate High | Associate Low | Associate Average |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | Adams and Reese | New Orleans | $265 | $550 | $250 | $344 | $290 | $195 | $229 |
| 2010 | Akerman Senterfitt | Miami | | | | | | | |
| 2010 | Akin Gump Strauss Hauer & Feld | Washington | | | | | | | |
| 2010 | Allen Matkins Leck Gamble Mallory & Natsis | Los Angeles | | | | | | | |
| 2010 | Alston & Bird | Atlanta | $515 | $865 | $450 | $527 | $590 | $270 | $405 |
| 2010 | Andrews Kurth | Houston | | | | | | | |
| 2010 | Archer & Greiner | Haddonfield, NJ | | $560 | $305 | | $340 | $175 | |
| 2010 | Arent Fox | Washington | | $765 | $400 | | $475 | $240 | |
| 2010 | Armstrong Teasdale | St. Louis | | $475 | $300 | | $325 | $200 | |
| 2010 | Arnold & Porter | Washington | | | | | | | |
| 2010 | Baker & Daniels | Indianapolis | | | | | | | |
| 2010 | Baker & Hostetler | Cleveland | | | | | | | |
| 2010 | Baker Botts L.L.P. | Houston | | | | | | | |
| 2010 | Baker, Donelson, Bearman, Caldwell & Berkowitz | Memphis, TN | $312 | $595 | $255 | $357 | $320 | $165 | $231 |
| 2010 | Ballard Spahr | Philadelphia | | | | | | | |
| 2010 | Barnes & Thornburg | Indianapolis | $367 | $613 | $298 | $416 | $355 | $225 | $261 |
| 2010 | Bass, Berry & Sims | Nashville, TN | | | | | | | |
| 2010 | Benesch, Friedlander, Coplan & Aronoff | Cleveland | $315 | $575 | $350 | $335 | $360 | $195 | $245 |
| 2010 | Best Best & Krieger | Riverside,Calif. | | $550 | $310 | | $395 | $225 | |

| Fiscal Year | Firm Name | Location | Firmwide Average | Partner High | Partner Low | Partner Average | Associate High | Associate Low | Associate Average |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | Bingham McCutchen | Boston | | | | | | | |
| 2010 | Blank Rome | Philadelphia | $510 | $855 | $440 | $615 | $550 | $280 | $361 |
| 2010 | Bond, Schoeneck & King | Syracuse, NY | $260 | $475 | $220 | $309 | $280 | $160 | $208 |
| 2010 | Briggs and Morgan | Minneapolis | $373 | $600 | $290 | $437 | $315 | $210 | $240 |
| 2010 | Brinks Hofer Gilson & Lione | Chicago | $435 | $725 | $345 | $541 | $420 | $195 | $308 |
| 2010 | Broad and Cassel | Orlando, FL | $307 | $475 | $260 | $372 | $350 | $175 | $242 |
| 2010 | Brown Rudnick | Boston | | | | | | | |
| 2010 | Brownstein Hyatt Farber Schreck | Denver | $391 | $810 | $295 | $463 | $360 | $200 | $256 |
| 2010 | Bryan Cave | St. Louis | $464 | $790 | $370 | $553 | $550 | $185 | $344 |
| 2010 | Buchalter Nemer | Los Angeles | $415 | $625 | $270 | $490 | $450 | $195 | $328 |
| 2010 | Buchanan Ingersoll & Rooney | Pittsburgh | | $900 | $310 | | $465 | $210 | |
| 2010 | Burr & Forman | Birmingham, AL | $328 | $500 | $210 | $361 | $335 | $200 | $250 |
| 2010 | Butzel Long | Detroit | | $750 | $300 | | $375 | $200 | |
| 2010 | Cadwalader, Wickersham & Taft LLP | New York | | | | | | | |
| 2010 | Cahill Gordon Reindel LLP | New York | | | | | | | |
| 2010 | Carlton Fields | Tampa, FL | $388 | $775 | $325 | $465 | $375 | $195 | $288 |
| 2010 | Chadbourne & Parke | New York | $456 | $995 | $390 | $769 | $625 | $110 | $442 |
| 2010 | Chapman and Cutler | Chicago | | | | | | | |
| 2010 | Clark Hill | Detroit | | | | | | | |
| 2010 | Cooley | Palo Alto, CA | | | | | | | |
| 2010 | Covington & Burling | Washington | | | | | | | |
| 2010 | Cozen O'Connor | Philadelphia | $422 | $880 | $310 | $497 | $585 | $225 | $326 |
| 2010 | Crowell & Moring | Washington | | | | | | | |
| 2010 | Curtis, Mallet-Prevost, Colt & Mosle | New York | $489 | $785 | $675 | $669 | $575 | $290 | $365 |
| 2010 | Davis Wright Tremaine | Seattle | $355 | $795 | $320 | $488 | $435 | $210 | $304 |
| 2010 | Day Pitney | Florham Park, NJ | | | | | | | |

| Fiscal Year | Firm Name | Location | Firmwide Average | Partner High | Partner Low | Partner Average | Associate High | Associate Low | Associate Average |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | Dewey & Leboeuf LLP | New York | | | | | | | |
| 2010 | Dickinson Wright | Detroit | | | | | | | |
| 2010 | Dickstein Shapiro | Washington | $546 | $575 | $355 | | $275 | $195 | $426 |
| 2010 | Dinsmore & Shohl | Cincinnati | | $950 | $525 | $666 | $530 | $265 | $222 |
| 2010 | DLA Piper | Chicago | $302 | $590 | $220 | $360 | $300 | $175 | $285 |
| 2010 | Dorsey & Whitney | Minneapolis | $410 | $795 | $290 | $515 | $440 | $180 | $349 |
| 2010 | Duane Morris | Philadelphia | $483 | $850 | $240 | $550 | $480 | $135 | $325 |
| 2010 | Dykema Gossett | Detroit | $445 | $635 | $360 | $495 | $450 | $225 | |
| 2010 | Eckert Seamans Cherin & Mellott | Pittsburgh | | $625 | $250 | | $320 | $150 | |
| 2010 | Edwards Angell Palmer & Dodge | Boston | $451 | $780 | $345 | $571 | $610 | $200 | $323 |
| 2010 | Epstein Becker & Green | New York | $429 | $850 | $350 | | | | |
| 2010 | Faegre & Benson LLP | Minneapolis | | | | $620 | $450 | $180 | $325 |
| 2010 | Finnegan, Henderson, Farabow, Garrett & Dunner | Washington | | | | | | | |
| 2010 | Fish & Richardson | Boston | | $605 | $340 | | $360 | $220 | |
| 2010 | Fisher & Phillips | Atlanta | | | | | | | |
| 2010 | Fitzpatrick, Cella, Harper & Scinto | New York | | $730 | $460 | | $440 | $275 | |
| 2010 | Foley & Lardner | Milwaukee | $554 | $1,035 | | $654 | | $255 | $426 |
| 2010 | Foley Hoag | Boston | | | | | | | |
| 2010 | Ford & Harrison | Atlanta | $350 | $620 | $375 | $400 | $390 | $250 | |
| 2010 | Fowler White Boggs | Tampa, FL | $407 | $575 | $325 | | $315 | $205 | $250 |
| 2010 | Fox Rothschild | Philadelphia | $279 | $690 | $315 | $473 | $475 | $235 | $298 |
| 2010 | Frost Brown Todd | Cincinnati | | $515 | $200 | $326 | $250 | $150 | $189 |
| 2010 | Fulbright & Jaworski | Houston | | | | | | | |
| 2010 | Gardere Wynne Sewell | Dallas | $445 | $815 | $380 | $331 | $445 | $195 | $311 |
| 2010 | Gibbons | Newark, NJ | $404 | $790 | $390 | $479 | $450 | $250 | $289 |
| 2010 | Gibson, Dunn & Crutcher LLP | Los Angeles | | | | | | | |
| 2010 | Godfrey & Kahn | Milwaukee | | $495 | $325 | | $340 | $180 | |
| 2010 | Goodwin Procter | Boston | | | | | | | |

| Fiscal Year | Firm Name | Location | Firmwide Average | Partner High | Partner Low | Partner Average | Associate High | Associate Low | Associate Average |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | Gordon & Rees | San Francisco, CA | | | | | | | |
| 2010 | GrayRobinson | Orlando, FL | | $750 | $225 | | $315 | $150 | |
| 2010 | Greenberg Traurig | New York | $453 | $876 | $355 | $550 | $610 | $200 | $332 |
| 2010 | Harris Beach | Rochester, NY | | $500 | $275 | | $250 | $140 | |
| 2010 | Haynes and Boone | Dallas | | | | | | | |
| 2010 | Hinshaw & Culbertson | Chicago | | | | | | | |
| 2010 | Hiscock & Barclay | Syracuse, NY | $311 | $650 | $195 | $348 | $440 | $150 | $234 |
| 2010 | Hodgson Russ | Buffalo, NY | $328 | $666 | $230 | $374 | $410 | $175 | $238 |
| 2010 | Hogan Lovells | Washington | | | | | | | |
| 2010 | Holland & Hart LLP | Washington | | | | | | | |
| 2010 | Holland & Knight | Washington | $418 | $850 | $300 | $499 | $480 | $185 | $288 |
| 2010 | Holme Roberts & Owen | Denver | $355 | $635 | $285 | $415 | $530 | $170 | $295 |
| 2010 | Honigman Miller Schwartz and Cohn | Detroit | | | | | | | |
| 2010 | Hughes Hubbard & Reed LLP | New York | | | | | | | |
| 2010 | Hunton & Williams | Richmond, VA | | | | | | | |
| 2010 | Husch Blackwell | St. Louis | $329 | $804 | $230 | $357 | $415 | $171 | $220 |
| 2010 | Ice Miller LLP | Indianapolis | | | | | | | |
| 2010 | Irell & Manella | Los Angeles | | | | | | | |
| 2010 | Jackson Kelly | Charleston, WV | | $496 | $245 | | $275 | $155 | |
| 2010 | Jackson Lewis | White Plains, NY | $364 | $715 | $260 | $428 | $440 | $150 | $282 |
| 2010 | Jones Day | Washington | | $620 | $195 | | $275 | $140 | |
| 2010 | Jones, Walker, Waechter, Poitevent, Carrare & Denegre | New Orleans | | | | | | | |
| 2010 | K&L Gates | Pittsburgh | | | | | | | |
| 2010 | Kelley Drye & Warren | New York | | $900 | $465 | | $565 | $275 | |
| 2010 | Kenyon & Kenyon LLP | New York | | | | | | | |

| Fiscal Year | Firm Name | Location | Firmwide Average | Partner High | Partner Low | Partner Average | Associate High | Associate Low | Associate Average |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | Kilpatrick Stockton | Atlanta | $425 | $730 | $375 | $527 | $465 | $225 | $320 |
| 2010 | Kirkland & Ellis | Chicago | | | | | | | |
| 2010 | Knobbe, Martens, Olson & Bear | Irvine, CA | $432 | $710 | $395 | $511 | $450 | $285 | $332 |
| 2010 | Kramer Levin Naftalis & Frankel | New York | | | | | | | |
| 2010 | Lane Powell | Seattle | $349 | $600 | $310 | $431 | $350 | $230 | $278 |
| 2010 | Lathrop & Gage | Kansas City | | $490 | $255 | | $265 | $160 | |
| 2010 | LeClairRyan, Professional Corporation | Richmond, VA | | | | | | | |
| 2010 | Leonard, Street and Deinard | Minneapolis | | | | | | | |
| 2010 | Lewis and Roca | Phoenix, AZ | | | | | | | |
| 2010 | Lewis Brisbois Bisgaard & Smith | Los Angeles | | | | | | | |
| 2010 | Lewis, Rice & Fingersh | St. Louis | $330 | $460 | $260 | $415 | $315 | $190 | $235 |
| 2010 | Lindquist & Vennum | Minneapolis | $372 | $650 | $290 | $445 | $480 | $210 | $296 |
| 2010 | Littler Mendelson | San Francisco | | | | | | | |
| 2010 | Locke Lord Bissell & Liddell | Dallas | $486 | $1,120 | $400 | $599 | $525 | $215 | $320 |
| 2010 | Loeb & Loeb | New York | | $975 | $475 | | $575 | $275 | |
| 2010 | Lowenstein Sandler | Roseland, NJ | | $825 | $440 | | $575 | $235 | |
| 2010 | Luce, Forward, Hamilton & Scripps | San Diego | | $670 | $350 | | $445 | $245 | |
| 2010 | Manatt, Phelps & Phillips | Los Angeles | $568 | $850 | $525 | $651 | $525 | $200 | $405 |
| 2010 | Marshall, Dennehey, Warner, Coleman & Goggin | Philadelphia | | $410 | $145 | | $320 | $130 | |
| 2010 | Maynard, Cooper & Gale | Birmingham, AL | | $600 | $325 | | $295 | $235 | |
| 2010 | McAndrews, Held & Malloy | Chicago | | $675 | $260 | | $350 | $225 | |

| Fiscal Year | Firm Name | Location | Firmwide Average | Partner High | Partner Low | Partner Average | Associate High | Associate Low | Associate Average |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | McCarter & English | Newark, NJ | $355 | $825 | $360 | $498 | $405 | $215 | $313 |
| 2010 | McElroy, Deutsch, Mulvaney & Carpenter | Morristown, N.J. | $210 | $550 | $295 | $280 | $275 | $160 | $190 |
| 2010 | McGuireWoods | Richmond, Va. | $455 | $830 | $325 | $543 | $600 | $220 | $355 |
| 2010 | McKenna Long & Aldridge | Atlanta | $455 | $775 | $375 | $540 | $490 | $220 | $366 |
| 2010 | Michael Best & Friedrich | Milwaukee | $346 | $650 | $235 | $400 | $320 | $190 | $239 |
| 2010 | Miles & Stockbridge | Baltimore | | $695 | $325 | | $370 | $220 | |
| 2010 | Miller & Martin | Chattanooga, TN | $328 | $610 | $235 | $361 | $275 | $180 | $218 |
| 2010 | Miller, Canfield, Paddock and Stone | Detroit | | | | | | | |
| 2010 | Montgomery, McCracken, Walker & Rhoads | Philadelphia | | $625 | $380 | $461 | $395 | $205 | $284 |
| 2010 | Moore & Van Allen | Charlotte N.C. | $364 | $785 | $265 | $441 | $350 | $180 | $257 |
| 2010 | Morgan, Lewis & Bockius | Philadelphia | | | | | | | |
| 2010 | Morris, Manning & Martin | Atlanta | $424 | $760 | $425 | $492 | $545 | $225 | $353 |
| 2010 | Morrison & Foerster | San Francisco, CA | | | | | | | |
| 2010 | Munger, Tolles & Olson | Los Angeles | | | | | | | |
| 2010 | Neal, Gerber & Eisenberg | Chicago | | | | | | | |
| 2010 | Nelson Mullins Riley & Scarborough | Columbia, SC | $347 | $850 | $245 | $399 | $335 | $185 | $248 |
| 2010 | Nexsen Pruet | Columbia, SC | | $625 | $230 | | $250 | $160 | |
| 2010 | Nixon Peabody | New York | $429 | $905 | $375 | $613 | $580 | $195 | $386 |
| 2010 | O'Melveny & Myers | Los Angeles | | | | | | | |
| 2010 | Ogletree, Deakins, Nash, Smoak & Stewart | Greenville, S.C. | $351 | $575 | $300 | $389 | $390 | $195 | $285 |

| Fiscal Year | Firm Name | Location | Firmwide Average | Partner High | Partner Low | Partner Average | Associate High | Associate Low | Associate Average |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | Orrick, Herrington & Sutcliffe | San Francisco, CA | | | | | | | |
| 2010 | Parker Poe Adams & Bernstein LLP | Charlotte N.C. | | | | | | | |
| 2010 | Patton Boggs | Washington | $482 | $990 | $355 | $645 | $550 | $215 | $399 |
| 2010 | Paul, Hastings, Janofsky & Walker | New York | | | | | | | |
| 2010 | Paul, Weiss, Rifkind Wharton & Garrison LLP | New York | | | | | | | |
| 2010 | Pepper Hamilton | Philadelphia | $326 | $825 | $420 | $547 | $465 | $230 | $329 |
| 2010 | Perkins Coie | Seattle | $447 | $825 | $275 | $534 | $370 | $200 | $354 |
| 2010 | Phelps Dunbar | New Orleans | $226 | $385 | $180 | $272 | $240 | $145 | $183 |
| 2010 | Phillips Lytle | Buffalo, NY | $255 | $535 | $260 | $352 | $450 | $150 | $283 |
| 2010 | Pillsbury Winthrop Shaw Pittman | New York | | | | | | | |
| 2010 | Polsinelli Shughart | Kansas City, MO | | $600 | $250 | | $325 | $185 | |
| 2010 | Quarles & Brady | Milwaukee | $364 | $660 | $290 | $438 | $400 | $210 | $260 |
| 2010 | Reed Smith | Pittsburgh | | | | | | | |
| 2010 | Reinhart Boerner Van Deuren | Milwaukee | | | | | | | |
| 2010 | Roetzel & Andress | Akron, OH | $317 | $525 | $225 | $357 | $325 | $166 | $243 |
| 2010 | Rutan & Tucker | Costa Mesa, CA | | $650 | $355 | | $450 | $225 | |
| 2010 | Saul Ewing | Philadelphia | $412 | $800 | $320 | $491 | $475 | $225 | $310 |
| 2010 | Schiff Hardin LLP | Chicago | | | | | | | |
| 2010 | Schnader Harrison Segal & Lewis | Philadelphia | | | | | | | |
| 2010 | Schulte Roth & Zabel | New York | | $895 | $735 | | $690 | $275 | |
| 2010 | Schwabe, Williamson & Wyatt | Portland, OR | $360 | $440 | $310 | $415 | $450 | $200 | $260 |
| 2010 | Sedgwick, Detert, Moran & Arnold | San Francisco | | | | | | | |
| 2010 | Seyfarth Shaw | Chicago | $377 | $770 | $335 | $505 | $535 | $185 | $325 |

| Fiscal Year | Firm Name | Location | Firmwide Average | Partner High | Partner Low | Partner Average | Associate High | Associate Low | Associate Average |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | Sheppard Mullin | Los Angeles | | $820 | $495 | | $620 | $270 | |
| 2010 | Sherman & Howard | New York | | | | | | | |
| 2010 | Shook, Hardy & Bacon | Kansas City, MO | | | | | | | $246 |
| 2010 | Shumaker, Loop & Kendrick | Toledo, OH | $331 | $540 | $250 | $366 | $315 | $185 | |
| 2010 | Skadden, Arps, Slate, Meagher & Flom | New York | | | | | | | |
| 2010 | Smith, Gambrell & Russell | Atlanta | | $740 | $325 | | $440 | $195 | |
| 2010 | Snell & Wilmer | Phoenix | $338 | $795 | $315 | $486 | $550 | $175 | $282 |
| 2010 | Squire, Sanders & Dempsey | Cleveland | | | | | | | |
| 2010 | Steptoe & Johnson LLP | Washington | | | | | | | |
| 2010 | Stevens & Lee | Reading, PA | | | | | | | |
| 2010 | Stinson Morrison Hecker | Kansas City, MO | | | | | | | |
| 2010 | Stites & Harbison | Louisville, KY | | | | | | | |
| 2010 | Stoel Rives | Portland, OR | $381 | $600 | $315 | $441 | $390 | $190 | $270 |
| 2010 | Strasburger & Price | Dallas | $336 | $617 | $250 | $372 | $306 | $194 | $243 |
| 2010 | Sullivan & Worcester | Boston | $537 | $830 | $475 | $647 | $535 | $290 | $383 |
| 2010 | Sutherland Asbill & Brennan | Atlanta | | | | | | | |
| 2010 | Taft, Stettinius & Hollister | Cincinnati | $315 | $500 | $220 | $358 | $365 | $165 | $227 |
| 2010 | Thompson & Knight | Dallas | | $825 | $410 | | $440 | $265 | |
| 2010 | Thompson Coburn | St. Louis | | $610 | $300 | | $395 | $190 | |
| 2010 | Townsend and Townsend and Crew | San Francisco, CA | $320 | $750 | $470 | $563 | $460 | $260 | $345 |
| 2010 | Troutman Sanders | Atlanta | | | | | | | |
| 2010 | Ulmer & Berne | Cleveland | | $665 | $260 | | $375 | $185 | |
| 2010 | Vedder Price | Chicago | $425 | $720 | $370 | $483 | $365 | $255 | $326 |
| 2010 | Venable | Washington | $484 | $950 | $445 | $590 | $500 | $280 | $353 |

| Fiscal Year | Firm Name | Location | Firmwide Average | Partner High | Partner Low | Partner Average | Associate High | Associate Low | Associate Average |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | Vorys, Sater, Seymour and Pease | Columbus, OH | | | | | | | |
| 2010 | Wachtell, Lipton, Rosen & Katz | New York | | | | | | | |
| 2010 | Weil, Gotshal & Manges LLP | New York | | | | | | | |
| 2010 | White and Williams | Philadelphia | | | | | | | |
| 2010 | Wildman, Harrold, Allen & Dixon LLP | Chicago | | | | | | | |
| 2010 | Wiley Rein | Washington | | | | | | | |
| 2010 | Williams Mullen | Richmond, Va. | $368 | $645 | $315 | $428 | $370 | $230 | $279 |
| 2010 | Wilkie Farr & Gallagher LLP | New York | | | | | | | |
| 2010 | Wilmer Cutler Pickering Hale and Dorr | Washington | | | | | | | |
| 2010 | Winstead | Dallas | $395 | $655 | $340 | $462 | $390 | $215 | $291 |
| 2010 | Winston & Strawn | Chicago | $486 | $1,075 | $475 | $670 | $610 | $250 | $393 |
| 2010 | Womble Carlyle Sandridge & Rice | Winston Salem, NC | $372 | $625 | $300 | $461 | $445 | $210 | $291 |
| 2010 | Wyatt, Tarrant & Combs | Louisville, KY | | $500 | $245 | | $285 | $180 | |

# ALM
an incisive media company

## 2010 NLJ Associate Class Billing Survey

Copyright © 2009, ALM Media Properties, LLC. All Rights Reserved

| Fiscal Year | Firm Name | Associate Class | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1st year | 2nd year | 3rd year | 4th year | 5th year | 6th year | 7th year | 8th year |
| 2010 | Alston & Bird | $270 – $345 | $330 – $395 | $365 – $440 | $395 – $470 | $420 – $515 | $445 – $550 | $470 – $570 | |
| 2010 | Benesch, Friedlander, Coplan | $195 | $200 | $215 | $230 | $240 | $250 | $275 | |
| 2010 | Blank Rome | $250 – $275 | $260 – $290 | $280 – $305 | $325 – $360 | $345 – $400 | $370 – $435 | $390 – $460 | $410 – $480 |
| 2010 | Brinks Hofer Gilson & Lione | $240 | $265 | $285 | $310 | $340 | $365 | $390 | $410 |
| 2010 | Brownstein Hyatt Farber Schreck | $200 | | | | | | | |
| 2010 | Bryan Cave | $185 – $300 | $215 – $350 | $250 – $385 | $275 – $395 | $300 – $420 | $275 – $460 | $330 – $480 | $340 – $510 |
| 2010 | Curtis, Mallet-Prevost, Cott & | $290 | $335 | $375 | $415 | $455 | $495 | $535 | $575 |
| 2010 | Davis Wright Tremaine | $190 – $285 | $205 – $295 | $225 – $325 | $235 – $345 | $245 – $365 | $265 – $380 | $285 – $405 | $285 – $415 |
| 2010 | Dickinson Wright | $190 | $195 | $205 | $220 | $230 | $240 | $250 | |
| 2010 | Dickstein Shapiro | $265 – $290 | $325 – $375 | $375 – $425 | $375 – $425 | $425 – $475 | $425 – $475 | $475 – $530 | $475 – $530 |
| 2010 | Dinsmore & Shohl | $180 | $190 | $205 | $220 | $230 | $240 | $260 | 260 |
| 2010 | Edwards Angell Palmer & Dodge | 255 | 275 | | | | | | |
| 2010 | Fitzpatrick, Cella, Harper & Scinto | $275 | $300 | $325 | $350 | $370 | $385 | $405 | $420 |

| Fiscal Year | Firm Name | Associate Class | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1st year | 2nd year | 3rd year | 4th year | 5th year | 6th year | 7th year | 8th year |
| 2010 | Frost Brown Todd | $150 | | | | | | | |
| 2010 | Gardere Wynne Sewell | 195 | 210 | 260 | 280 | 300 | 315 | 355 | 385 |
| 2010 | Harris Beach | $155 | $170 | $200 | $230 | $230 | $230 | $250 | $250 |
| 2010 | Hiscock & Barclay | $150 - $340 | $150-340 | $165 - $360 | $165 - $360 | $165 - $360 | $175 - $380 | $175 - $380 | $185 - $440 |
| 2010 | Kelley Drye & Warren | $305 | $340 | $370 | $410 | $435 | $455 | $485 | 510 |
| 2010 | Kilpatrick Stockton | 250 | 275 | 310 | 325 | 335 | 360 | 375 | 385 |
| 2010 | Knobbe Martens Olson & Bear | $285 | $310 | $335 | $360 | $385 | | | |
| 2010 | Lindquist & Vennum | $200 | $210 | 225 | 235 | 245 | 260 | 265 | 290 |
| 2010 | Locke Lord Bissell & Liddell | $215 | $230 | $253 | $270 | $300 | $321 | $349 | $386 |
| 2010 | Loeb & Loeb | $350 - $375 | | | | | | | |
| 2010 | Maynard, Cooper & Gale | $235 | $235 | $245 | $255 | $270 | $280 | $295 | |
| 2010 | McElroy, Deutsch, Mulvaney & | $150 | $175 | $185 | $195 | $200 | $205 | $210 | $220 |
| 2010 | McKenna Long & Aldridge | 279 | 312 | 325 | 346 | 363 | 381 | 382 | 415 |
| 2010 | Montgomery, McCracken, Walker | $205 | $215 | $235 | $255 | $275 | $295 | $315 | $335 |
| 2010 | Morris, Manning & Martin | $200 | $265 | $310 | $340 | $365 | $390 | $415 | $425 |

| Fiscal Year | Firm Name | 1st year | 2nd year | 3rd year | 4th year | 5th year | 6th year | 7th year | 8th year |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Associate Class | | | |
| 2010 | Frost Brown Todd | $150 | | | | | | | |
| 2010 | Gardere Wynne Sewell | 195 | 210 | 260 | 280 | 300 | 315 | 355 | 385 |
| 2010 | Harris Beach | $155 | $170 | $200 | $230 | $230 | $230 | $250 | $250 |
| 2010 | Hiscock & Barclay | $150 - $340 | $150-340 | $165 - $360 | $165 - $360 | $165 - $360 | $175 - $380 | $175 - $380 | $185 - $440 |
| 2010 | Kelley Drye & Warren | $305 | $340 | $370 | $410 | $435 | $455 | $485 | 510 |
| 2010 | Kilpatrick Stockton | 250 | 275 | 310 | 325 | 335 | 360 | 375 | 385 |
| 2010 | Knobbe Martens Olson & Bear | $285 | $310 | $335 | $360 | $385 | | | |
| 2010 | Lindquist & Vennum | $200 | $210 | 225 | 235 | 245 | 260 | 265 | 290 |
| 2010 | Locke Lord Bissell & Liddell | $215 | $230 | $253 | $270 | $300 | $321 | $349 | $386 |
| 2010 | Loeb & Loeb | $350 - $375 | | | | | | | |
| 2010 | Maynard, Cooper & Gale | $235 | $235 | $245 | $255 | $270 | $280 | $295 | |
| 2010 | McElroy, Deutsch, Mulvaney & | $150 | $175 | $185 | $195 | $200 | $205 | $210 | $220 |
| 2010 | McKenna Long & Aldridge | 279 | 312 | 325 | 346 | 363 | 381 | 382 | 415 |
| 2010 | Montgomery, McCracken, Walker | $205 | $215 | $235 | $255 | $275 | $295 | $315 | $335 |
| 2010 | Morris, Manning & Martin | $200 | $265 | $310 | $340 | $365 | $390 | $415 | $425 |

| Fiscal Year | Firm Name | Associate Class | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1st year | 2nd year | 3rd year | 4th year | 5th year | 6th year | 7th year | 8th year |
| 2010 | Patton Boggs | $290 | $315 | $340 | $370 | $400 | $425 | $450 | $480 |
| 2010 | Pepper Hamilton | $230 | $275 | $300 | $330 | $355 | $370 | $385 | $395 |
| 2010 | Perkins Coie | 272 | 290 | 306 | 337 | 345 | 372 | 391 | 436 |
| 2010 | Phillips Lytle | $160 | $170 | $190 | $195 | $210 | $225 | $220 | 235 |
| 2010 | Quarles & Brady | $210 - $235 | $220 - $240 | | | | | | |
| 2010 | Saul Ewing | $225 - $235 | $230 - $260 | $255 - $275 | $240 - $315 | $260 - $285 | $285 - $300 | $295 - $425 | $275 - $320 |
| 2010 | Schulte Roth & Zabel | $375 | $445 | $495 | $540 | $560 | $580 | $605 | $625 |
| 2010 | Schwabe, Williamson & Wyatt | $200 | | | | | | | |
| 2010 | Sheppard, Mullin, Richter & Hampton | $270 - $335 | $330 - $430 | $365 - $475 | $395 - $510 | $420 - $540 | $445 - $565 | $470 - $595 | $490 - $620 |
| 2010 | Snell & Wilmer | $185 | $200 | $225 | $260 | $285 | $315 | $350 | $365 |
| 2010 | Strasburger & Price | $200 | $220 | $240 | $260 | $280 | $300 | $320 | $340 |
| 2010 | Sullivan & Worcester | $290 | $305 | $330 | $350 | $370 | $390 | $425 | |
| 2010 | Thompson & Knight | $285 | $300 | $330 | $365 | $385 | $405 | $425 | $440 |
| 2010 | Townsend and Townsend and Crew | 260 | 290 | 325 | 370 | 390 | 420 | 450 | 460 |
| 2010 | Vedder Price | 225 | 270 | 290 | 310 | 325 | 345 | 360 | 380 |

| Fiscal Year | Firm Name | Associate Class | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1st year | 2nd year | 3rd year | 4th year | 5th year | 6th year | 7th year | 8th year |
| 2010 | Williams Mullen | $230 | $250 | $265 | $295 | $295 | $310 | $345 | $345 |
| 2010 | Winstead | $215 | 215 | 227 | 260 | 280 | 300 | 325 | 350 |
| 2010 | Winston & Strawn | $295 - $320 | $305 - $335 | $325 - $365 | $350 - $400 | $380 - $440 | $420 - $480 | $455 - $520 | $490 - $555 |

**EXHIBIT 10**

Law.com - Bankruptcy Rates Top $1,000 Mark in 2008-09          http://www.law.com/jsp/article.jsp?id=1202436371636&src=EMC...

Font Size: ⊞ ⊟

## Bankruptcy Rates Top $1,000 Mark in 2008-09

Amy Kolz
The American Lawyer
December 16, 2009

Print    Share    Email    Reprints & Permissions    Post a Comment

A review of bankruptcy rates in Delaware and the Southern District of New York shows that a handful of U.S.-based partners at Am Law 200 firms have inched above the $1,000 rate barrier, making bankruptcy work as lucrative as it was plentiful in 2008 and 2009. Over a 12-month period ending August 2009, there were more than 13,000 billing rate entries submitted by law firms in the nation's two busiest bankruptcy courts, according to a new database compiled by ALM Media.

Among U.S.-based lawyers at Am Law 200 firms, Shearman & Sterling tax partner Bernie Pistillo topped the rate chart with an hourly fee of $1,085 for his work on the bankruptcy of Stock Building Supply Holdings LLC, a building products supplier, in Delaware. (One solo practitioner in Pleasantville, N.Y., Alan Harris, surpassed Pistillo's rate, charging $1,200 an hour for his work as special real estate litigation counsel on the bankruptcy of Digital Printing Systems in the Southern District of New York.) Eleven other U.S.-based Am Law 200 partners were in the $1,000-plus club, according to the database. Cadwalader, Wickersham & Taft financial restructuring co-chair Deryck Palmer, a former Weil, Gotshal & Manges partner, billed Lyondell Chemical Co. at a rate of $1,050 for work on its 2009 bankruptcy. Greenberg Traurig bankruptcy co-chair Bruce Zirinsky, who left Cadwalader last January, billed $1,050 an hour as debtor's counsel for TH Agriculture and Nutrition LLC, as did White & Case global restructuring head Thomas Lauria for WCI Communities Inc., and Robert Pincus, the head of the corporate practice in Skadden, Arps, Slate, Meagher & Flom's Wilmington office, for Hayes Lemmerz International Inc., an automotive wheel supplier.

Neal Stoll, a Skadden antitrust partner, and Saly Thurston, a Skadden tax partner, billed $1,035 for work on the bankruptcies of VeraSun Energy Corp. and Hayes Lemmerz, respectively, while Latham & Watkins corporate finance chair Kirk Davenport billed at $1,025 an hour for Dayton Superior Corp.'s filing. Paul, Weiss, Rifkind, Wharton & Garrison partners Carl Reisner and Richard Bronstein billed at $1,025 for the Buffets Inc., bankruptcy. (Reisner is co-head of the firm's M&A practice and Bronstein is co-chair of its tax practice.) Simpson Thacher & Bartlett partners Lee Meyerson and litigator Michael Chepiga charged Lehman Brothers $1,000 an hour on the sale of its brokerage to Barclays Bank PLC.

Absent from the $1,000 club are Weil, Gotshal & Manges restructuring gurus Harvey Miller and Marcia Goldstein. Both clocked rates of $950 an hour for their work on the Lehman Brothers and BearingPoint Inc. bankruptcies, respectively. Also, Kirkland & Ellis' James Sprayregen billed $965 an hour for work on the bankruptcies of Lear Corp. and The Reader's Digest Association. And Jones Day partner Corinne Ball charged $960 an hour for her work on Chrysler's filing.

Comparing the median partner rates among Am Law 200 firms in the database demonstrated that there are few bargains when it comes to Chapter 11 work. Among those charging median partner rates of more than $900 an hour were: Cadwalader; Cleary Gottlieb Steen & Hamilton; Davis Polk & Wardwell; Milbank, Tweed, Hadley & McCloy; Paul Weiss; Shearman & Sterling; Simpson Thacher; and Skadden. Firms with median partner billing rates between $800 and $900 were Gibson Dunn, Fried Frank, Latham, Paul Hastings, Weil Gotshal, and White & Case. Firms billing $700 or below were Akin Gump Strauss Hauer & Feld, Kirkland, Sidley Austin, and Sonnenschein Nath & Rosenthal. (Medians can be deceiving, since some firms, such as Kirkland, had a difference of more than $500 between its highest- and lowest-rate partners.)

The bankruptcy case with one of the highest median partner rates was Nortel Networks. The phone equipment maker paid firms such as Cleary and Kirkland a median partner rate of $940. Firms working on the Lehman filing billed a median partner rate of $810 during the same time period, while firms working on the filing of Tribune Co. billed a median of $690, according to the database.

Associate rates occasionally topped $700 an hour on bankruptcies including Lehman and Nortel Networks, as well as that of the lesser-known Sportsman's Warehouse. Discovery attorneys, research specialists and benefits consultants sometimes billed between $500 and $800 on cases such as Nortel, Charter Communications and Graphics Properties Holdings Inc.

| FIRM | MEDIAN PARTNER RATE* | # PARTNERS FILING |
|---|---|---|
| Simpson Thacher | $980 | 30 |
| Cleary Gottlieb | $960 | 47 |
| Shearman & Sterling | $950 | 17 |
| Davis Polk | $948 | 14 |
| Skadden | $945 | 38 |
| Paul Weiss | $925 | 24 |
| Cadwalader | $900 | 29 |
| Milbank | $900 | 55 |
| Weil Gotshal | $843 | 142 |
| Gibson Dunn | $840 | 29 |
| Fried Frank | $83 | $18 |
| Latham & Watkins | $830 | 57 |
| White & Case | $825 | 21 |
| Paul Hastings | $810 | 46 |
| Sidley Austin | $700 | 99 |
| Akin Gump | $690 | 79 |



ADVERTISEMENT

It's nice to know there are 100 global law firms. But you only need one.

Top Stories From Law.com
Legal Technology
    Public Performance in the Digital Age
Corporate Counsel
    'In the Crosshairs': GCs Can Ignore Financial
    Fraud Risks at Their Peril
Small Firm Business
    San Francisco Associate Wins $1 Million in ESPN
    Game

ADVERTISEMENT



ALM REPRINTS

GET STARTED

lawjobs.com
TOP JOBS
MATRIMONIAL LITIGATOR
CONFIDENTIAL SEARCH
Great Neck, NY

Associate General Counsel
Saleslink
Reston, VA

MORE JOBS >>
POST A JOB >>

ADVERTISEMENT

12/16/2009 9:36 AM

Law.com - Bankruptcy Rates Top $1,000 Mark in 2008-09          http://www.law.com/jsp/article.jsp?id=1202436371636&src=EMC...

| | | |
|---|---|---|
| Kirkland | $875 | 149 |
| Sonnenschein | $825 | 47 |

*U.S.-based partners only.

*The American Lawyer* will publish a detailed analysis of the bankruptcy billing rates in its February 2010 issue.

**Click here to order the Excel® version of the 2009 Bankruptcy Billing Rates Report.**

*This article first appeared on The Am Law Daily blog on AmericanLawyer.com.*

Print     Share     Email     Reprints & Permissions     Post a Comment

About ALM  |  About Law.com  |  Customer Support  |  Reprints  |  Privacy Policy  |  Terms & Conditions
Copyright 2009. ALM Media Properties, LLC. All rights reserved.



12/16/2009 9:36 AM

**EXHIBIT 11**

*$1,000 Per Hour Isn't Rare Anymore; Nominal billing levels rise, but discounts ease blow. The National Law Journal January 13, 2014 Monday*

Copyright 2014 ALM Media Properties, LLC
All Rights Reserved
Further duplication without permission is prohibited

# THE NATIONAL LAW JOURNAL

The National Law Journal

January 13, 2014 Monday

**SECTION:** NLJ'S BILLING SURVEY; Pg. 1 Vol. 36 No. 20

**LENGTH:** 1860 words

**HEADLINE:** $1,000 Per Hour **Isn't Rare Anymore**;
Nominal billing levels rise, but discounts ease blow.

**BYLINE:** KAREN SLOAN

**BODY:**

As recently as five years ago, law partners charging $1,000 an hour were outliers. Today, four-figure hourly rates for indemand partners at the most prestigious firms don't raise eyebrows-and a few top earners are closing in on $2,000 an hour.

These rate increases come despite hand-wringing over price pressures from clients amid a tough economy. But everrising standard billing rates also obscure the growing practice of discounts, falling collection rates, and slow march toward alternative fee arrangements.

Nearly 20 percent of the firms included in The National Law Journal's annual survey of large law firm billing rates this year had at least one partner charging more than $1,000 an hour. Gibson, Dunn & Crutcher partner Theodore Olson had the highest rate recorded in our survey, billing $1,800 per hour while representing mobile satellite service provider LightSquared Inc. in Chapter 11 proceedings.

Of course, few law firm partners claim Olson's star power. His rate in that case is nearly the twice the $980 per hour average charged by Gibson Dunn partners and three times the average $604 hourly rate among partners at NLJ 350 firms. Gibson Dunn chairman and managing partner Ken Doran said Olson's rate is "substantially" above that of other partners at the firm, and that the firm's standard rates are in line with its peers.

"While the majority of Ted Olson's work is done under alternative billing arrangements, his hourly rate reflects his stature in the legal community, the high demand for his services and the unique value that he offers to clients given his extraordinary experience as a former solicitor general of the United States who has argued more than 60 cases before the U.S. Supreme Court and has counseled several presidents," Doran said.

In reviewing billing data this year, we took a new approach, asking each firm on the NLJ 350-our survey of the nation's 350 largest firms by attorney headcount-to provide their highest, lowest and average billing rates for associates and partners. We supplemented those data through public records. All together, this year's survey includes information for 159 of the country's largest law firms and reflects billing rates as of October.

The figures show that, even in a down economy, hiring a large law firm remains a pricey prospect. The median among the highest partner billing rates reported at each firm is $775 an hour, while the median low partner rate is $405. For associates, the median high stands at $510 and the low at $235. The average associate rate is $370.

Multiple industry studies show that law firm billing rates continued to climb during 2013 despite efforts by corporate counsel to rein them in. TyMetrix's 2013 Real Rate Report Snapshot found that the average law firm billing rate increased by 4.8 percent compared with 2012. Similarly, the Center for the Study of the Legal Profession at the Georgetown University Law Center and Thomson Reuters Peer Monitor found that law firms increased their rates by an average 3.5 percent during 2013.

Of course, rates charged by firms on paper don't necessarily reflect what clients actually pay. Billing realization rates-which reflect the percentage of work billed at firms' standard rates- have fallen from 89 percent in 2010 to nearly 87 percent in 2013 on average, according to the Georgetown study. When accounting for billed hours actually collected by firms, the realization rate falls to 83.5 percent.

"What this means, of course, is that- on average-law firms are collecting only 83.5 cents for every $1.00 of standard time they record," the Georgetown report reads. "To understand the full impact, one need only consider that at the end of 2007, the collected realization rate was at the 92 percent level."

In other words, law firms set rates with the understanding that they aren't likely to collect the full amount, said Mark Medice, who oversees the Peer Monitor Index. That index gauges the strength of the legal market according to economic indicators including demand for legal services, productivity, rates and expenses. "Firms start out with the idea of, 'I want to achieve a certain rate, but it's likely that my client will ask for discounts whether or not I increase my rate,'" Medice said.

Indeed, firms bill nearly all hourly work at discounts ranging from 5 percent to 20 percent off standard rates, said Peter Zeughauser, a consultant with the Zeughauser Group. Discounts can run as high as 50 percent for matters billed under a hybrid system, wherein a law firm can earn a premium for keeping costs under a set level or for obtaining a certain outcome, he added. "Most firms have gone to a two-tier system, with what is essentially an aspirational rate that they occasionally get and a lower rate that they actually budget for," he said.

Most of the discounting happens at the front end, when firms and clients negotiate rates, Medice said. But additional discounting happens at the billing and collections stages. Handling alternative fee arrangements and discounts has become so complex that more than half of the law firms on the Am Law 100-NLJ affiliate The American Lawyer's ranking of firms by gross revenue-have created new positions for pricing directors, Zeughauser said.

THE ROLE OF GEOGRAPHY

Unsurprisingly, rates vary by location. Firms with their largest office in New York had the highest average partner and associate billing rates, at $882 and $520, respectively. Similarly, TyMetrix has reported that more than 25 percent of partners at large New York firms charge $1,000 per

hour or more for contracts and commercial work.

Washington was the next priciest city on our survey, with partners charging an average $748 and associates $429. Partners charge an average $691 in Chicago and associates $427. In Los Angeles, partners charge an average $665 while the average associate rate is $401.

Pricing also depends heavily on practice area, Zeughauser and Medice said. Bet-the-company patent litigation and white-collar litigation largely remain at premium prices, while practices including labor and employment have come under huge pressure to reduce prices.

"If there was a way for law firms to hold rates, they would do it. They recognize how sensitive clients are to price increases," Zeughauser said. But declining profit margins-due in part to higher technology costs and the expensive lateral hiring market-mean that firms simply lack the option to keep rates flat, he said.

BILLING SURVEY METHODOLOGY

The National Law Journal's survey of billing rates of the largest U.S. law firms provides the high, low and average rates for partners and associates.

The NLJ asked respondents to its annual survey of the nation's largest law firms (the NLJ 350) to provide a range of hourly billing rates for partners and associates as of October 2013.

For firms that did not supply data to us, in many cases we were able to supplement billing-rate data derived from public records.

In total, we have rates for 159 of the nation's 350 largest firms.

Rates data include averages, highs and low rates for partners and associates. Information also includes the average full-time equivalent (FTE) attorneys at the firm and the city of the firm's principal or largest office.

We used these data to calculate averages for the nation as a whole and for selected cities.

Billing Rates at the Country's Priciest Law Firms

Here are the 50 firms that charge the highest average hourly rates for partners.

### Billing Rates at the Country's Priciest Law Firms

| FIRM NAME | LARGEST U.S. OFFICE* | AVERAGE FULL-TIME EQUIVALENT ATTORNEYS* | PARTNER HOURLY RATES | | | ASSOCIATE HOURLY RATES | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | AVERAGE | HIGH | LOW | AVERAGE | HIGH | LOW | |

\* Full-time equivalent attorney numbers and the largest U.S. office are from the NLJ 350 published in April 2013. For complete numbers, please see NLJ.com.

\*\* Firm did not exist in this form for the entire year.

| FIRM NAME | LARGEST U.S. OFFICE | ATTORNEYS | AVERAGE | HIGH | LOW | AVERAGE | HIGH | LOW |
|---|---|---|---|---|---|---|---|---|
| Debevoise & Plimpton | New York | 615 | $1,055 | $1,075 | $955 | $490 | $760 | $120 |
| Paul, Weiss, | New York | 803 | $1,040 | $1,120 | $760 | $600 | $760 | $250 |

| Rifkind, Wharton & Garrison | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Skadden, Arps, Slate, Meagher & Flom | New York | 1,735 | $1,035 | $1,150 | $845 | $620 | $845 | $340 |
| Fried, Frank, Harris, Shriver & Jacobson | New York | 476 | $1,000 | $1,100 | $930 | $595 | $760 | $375 |
| Latham & Watkins | New York | 2,033 | $990 | $1,110 | $895 | $605 | $725 | $465 |
| Gibson, Dunn & Crutcher | New York | 1,086 | $980 | $1,800 | $765 | $590 | $930 | $175 |
| Davis Polk & Wardwell | New York | 787 | $975 | $985 | $850 | $615 | $975 | $130 |
| Willkie Farr & Gallagher | New York | 540 | $950 | $1,090 | $790 | $580 | $790 | $350 |
| Cadwalader, Wickersham & Taft | New York | 435 | $930 | $1,050 | $800 | $605 | $750 | $395 |
| Weil, Gotshal & Manges | New York | 1,201 | $930 | $1,075 | $625 | $600 | $790 | $300 |
| Quinn Emanuel Urquhart & Sullivan | New York | 697 | $915 | $1,075 | $810 | $410 | $675 | $320 |
| Wilmer Cutler Pickering Hale and Dorr | Washington | 961 | $905 | $1,250 | $735 | $290 | $695 | $75 |
| Dechert | New York | 803 | $900 | $1,095 | $670 | $530 | $735 | $395 |
| Andrews Kurth | Houston | 348 | $890 | $1,090 | $745 | $528 | $785 | $265 |
| Hughes Hubbard & Reed | New York | 344 | $890 | $995 | $725 | $555 | $675 | $365 |
| Irell & Manella | Los Angeles | 164 | $890 | $975 | $800 | $535 | $750 | $395 |
| Proskauer Rose | New York | 746 | $880 | $950 | $725 | $465 | $675 | $295 |
| White & Case | New York | 1,900 | $875 | $1,050 | $700 | $525 | $1,050 | $220 |
| Morrison & Foerster | San Francisco | 1,010 | $865 | $1,195 | $595 | $525 | $725 | $230 |
| Pillsbury Winthrop Shaw Pittman | Washington | 609 | $865 | $1,070 | $615 | $520 | $860 | $375 |
| Kaye Scholer | New York | 414 | $860 | $1,080 | $715 | $510 | $680 | $320 |
| Kramer Levin Naftalis & Frankel | New York | 320 | $845 | $1,025 | $740 | $590 | $750 | $400 |
| Hogan Lovells | Washington | 2,280 | $835 | $1,000 | $705 | - | - | - |

| Firm | Location | Size | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Kasowitz, Benson, Torres & Friedman | New York | 365 | $835 | $1,195 | $600 | $340 | $625 | $200 |
| Kirkland & Ellis | Chicago | 1,517 | $825 | $995 | $590 | $540 | $715 | $235 |
| Cooley | Palo Alto | 632 | $820 | $990 | $660 | $525 | $630 | $160 |
| Arnold & Porter | Washington | 748 | $815 | $950 | $670 | $500 | $610 | $345 |
| Paul Hastings | New York | 899 | $815 | $900 | $750 | $540 | $755 | $335 |
| Curtis, Mallet-Prevost, Colt & Mosle | New York | 322 | $800 | $860 | $730 | $480 | $785 | $345 |
| Winston & Strawn | Chicago | 842 | $800 | $995 | $650 | $520 | $590 | $425 |
| Bingham McCutchen | Boston | 900 | $795 | $1,080 | $220 | $450 | $605 | $185 |
| Akin Gump Strauss Hauer & Feld | Washington | 806 | $785 | $1,220 | $615 | $525 | $660 | $365 |
| Covington & Burling | Washington | 738 | $780 | $890 | $605 | $415 | $565 | $320 |
| King & Spalding | Atlanta | 838 | $775 | $995 | $545 | $460 | $735 | $125 |
| Norton Rose Fulbright | N/A** | N/A** | $775 | $900 | $525 | $400 | $515 | $300 |
| DLA Piper | New York | 4,036 | $765 | $1,025 | $450 | $510 | $750 | $250 |
| Bracewell & Giuliani | Houston | 432 | $760 | $1,125 | $575 | $440 | $700 | $275 |
| Baker & McKenzie | Chicago | 4,004 | $755 | $1,130 | $260 | $395 | $925 | $100 |
| Dickstein Shapiro | Washington | 308 | $750 | $1,250 | $590 | $475 | $585 | $310 |
| Jenner & Block | Chicago | 432 | $745 | $925 | $565 | $465 | $550 | $380 |
| Jones Day | New York | 2,363 | $745 | $975 | $445 | $435 | $775 | $205 |
| Manatt, Phelps & Phillips | Los Angeles | 325 | $740 | $795 | $640 | - | - | - |
| Seward & Kissel | New York | 152 | $735 | $850 | $625 | $400 | $600 | $290 |
| O'Melveny & Myers | Los Angeles | 738 | $715 | $950 | $615 | - | - | - |
| McDermott Will & Emery | Chicago | 1,024 | $710 | $835 | $525 | - | - | - |
| Reed Smith | Pittsburgh | 1,468 | $710 | $945 | $545 | $420 | $530 | $295 |
| Dentons | N/A** | N/A** | $700 | $1,050 | $345 | $425 | $685 | $210 |
| Jeffer Mangels Butler & Mitchell | Los Angeles | 126 | $690 | $875 | $560 | - | - | - |
| Sheppard, | Los | 521 | $685 | $875 | $490 | $415 | $535 | $275 |

| Mullin, Richter & Hampton | Angeles | | | | | | |
|---|---|---|---|---|---|---|---|
| Alston & Bird | Atlanta | 805 | $675 | $875 | $495 $425 | $575 | $280 |

THE FOUR-FIGURE CLUB

These 10 firms posted the highest partner billing rates.

**THE FOUR-FIGURE CLUB**

| | |
|---|---|
| Gibson, Dunn & Crutcher | $1,800 |
| Dickstein Shapiro | $1,250 |
| Wilmer Cutler Pickering Hale and Dorr | $1,250 |
| Akin Gump Strauss Hauer & Feld | $1,220 |
| Kasowitz, Benson, Torres & Friedman | $1,195 |
| Morrison & Foerster | $1,195 |
| Skadden, Arps, Slate, Meagher & Flom | $1,150 |
| Baker & McKenzie | $1,130 |
| Bracewell & Giuliani | $1,125 |
| Paul, Weiss, Rifkind, Wharton & Garrison | $1,120 |

Contact Karen Sloan at ksloan@alm.com

**LOAD-DATE:** January 13, 2014



Source: **Legal** > / · · · / > **The National Law Journal** ℹ️
Terms: **"isn't rare anymore"** (Suggest Terms for My Search)
View: **Full**
Date/Time: Friday, August 15, 2014 - 6:12 PM EDT

LexisNexis® About LexisNexis | Privacy Policy | Terms & Conditions | Contact Us
Copyright © 2014 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**EXHIBIT 12**



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Billing Rates Continue Upward Climb, Especially In BigLaw

By **Justin Wise**

Law360 (June 30, 2021, 9:02 AM EDT) -- Average corporate hourly billing rates continued their steady climb throughout the U.S. in 2020, even as the COVID-19 pandemic placed increasing financial pressure on businesses' legal departments, according to a LexisNexis CounselLink legal trends report released Wednesday.

The rate increases spanned a variety of practices, but they were most pronounced in areas such as regulatory and compliance, mergers and acquisitions, and finance, loans and investments, which continued to be dominated by the largest law firms charging the highest fees. The report showed that BigLaw firms command a substantial portion of corporate legal spending and are requiring the highest partner billing rates by far.

Overall, average partner hourly rates jumped year over year by 3.5% in 2020, slightly higher than the 3.3% jump from 2018 to 2019. That progression signals that the legal industry is "alive and doing very well," Kris Satkunas, CounselLink director of strategic consulting and the report's author, said in an interview with Law360 Pulse.

Firms with over 750 lawyers earned roughly half of the money businesses put toward outside counsel in 2020, according to an analysis of more than $40 billion in spending. The biggest firms commanded even more spending share in areas like mergers and acquisitions, at 67%, and finance, loans and investments, at 66%, practices in high demand and attracting the highest average partner rates.

Big firms' grip on the high-value practice areas are linked to the "significantly higher rates" their partners charge compared with the rest of the industry, according to the report.

The median partner at firms with over 750 attorneys charged $844 per hour in 2020, 47% more than the $575 median billing rate for partners at firms with 501 to 750 lawyers. The median billing rate for partners at the biggest firms also increased year over year, by 4.9%, representing the largest percentage jump according to firm size.

## Median Partner Hourly Rates By Law Firm Size

Billing practices can vary dramatically based on law firm size, with the largest firms commanding the highest median partner hourly rates by far.

| Firm Size | Rate |
|---|---|
| 750+ attys | $844 |
| 501-750 | $575 |
| 201-500 | $479 |
| 101-200 | $400 |
| 51-100 | $355 |
| 0-50 | $300 |

Source: 2021 CouncilLink Enterprise Legal Management Trends Report • Created with **Datawrapper**

LAW360 Pulse

The data, Satkunas said, show that legal departments can do more to look beyond the biggest, most expensive firms when they're navigating their budgets.

"The largest firms continue to have such a big share of the legal work, in particular in the highest-value types of work," Satkunas said. The report is meant to encourage corporate legal departments to think about the "second-tier firms."

"They are also very large firms with capabilities that span many practice areas and have offices across the country," she said. "But their rates are lower, so I think there's an opportunity for corporations to look outside of what they think of as go-to firms."

Wednesday's report includes an in-depth breakdown on average partner billing rates across several practices and their subunits.

For example, it includes billing data on seven different groups under the litigation umbrella, showing a wide variation in partner rates based on the specific practice. The median billing rate for class action litigation was $475, while the median rate for product liability was $290.

In corporate practice, the median partner billing rate for antitrust was $850, compared with $350 for bankruptcy.



For many corporate legal departments, the pandemic coincided with a surge in **workloads** as well as pressure to trim spending. A survey from Norton Rose Fulbright **in February** of over 200 corporate counsel found that half expected to bring more work in-house this year as a result of the health crisis and a buildup of cases.

Satkunas noted that hourly rate increases are normally agreed to by law firms and businesses at the start of the year, mitigating the pandemic's effect on them in 2020. It remains unclear, though, whether any budgetary belt-tightening from businesses will affect the normal progression in rate increases.

"I think what is possible is that we may not see as big of an increase in 2021," Satkunas said, cautioning that it's too early to draw any conclusions. She noted that some business representatives she's spoken to said they made arrangements to "lock in" 2020 rates for at least this year.

Another factor affecting the billable hour is the gradual increase in the use of alternative fee arrangements. In 2020, roughly 17% of legal matters tracked by CounselLink had at least some portion of their billing under an arrangement other than an hourly fee. Nearly a quarter of all insurance and labor and employment matters were billed under an alternative fee.

The most common alternative arrangement is fixed fees for a given matter or a particular phase of a legal process, Satkunas said.

"It's notable that legal departments continue to look for new vehicles — including AFAs — to lower costs, make budgets more predictable and better manage their own capacity," Satkunas said in a statement. "Even the largest firms will be under pressure to work with clients to achieve these goals."

The latest data is based on more than 1 million matters and nearly 8 million invoices involving roughly 300 U.S.-based businesses, according to CounselLink.

--Editing by Karin Roberts.

*Law360 is owned by LexisNexis Legal & Professional, a RELX Group company.*

All Content © 2003-2021, Portfolio Media, Inc.

**EXHIBIT 13**

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ----------------------------------x

3  SHANNON TAYLOR,

4             Plaintiff,

5        -against-                        16 CV 1812 (KMK)

6  TRUSTED MEDIA BRANDS, INC.,

7             Defendant.

8  ----------------------------------x

9
                                 United States Courthouse
10                               White Plains, New York

11                               January 31, 2018

12
   B e f o r e:
13
                          HONORABLE KENNETH M. KARAS,
14                               District Court Judge

15  A P P E A R A N C E S:

16  BURSOR & FISHER, PA
             Attorneys for Plaintiff
17           888 Seventh Avenue
             New York, New York 10019
18  BY:  JOSEPH MARCHESE
         PHILIP FRAIETTA
19
   DENTONS US LLP
20           Attorneys for Defendant
             233 South Wacker Drive, Suite 7800
21           Chicago, Illinois 60601
   BY:  NATALIE SPEARS
22       SANDRA HAUSER

23

24

25

                Angela O'Donnell, RPR, 914-390-4025

1              THE CLERK:  Honorable Kenneth M. Karas, presiding.

2              Case number 16CV1812.  *Shannon Taylor versus*

3    *Custom Video Brands, Inc*.

4              Counsel, please state your appearances for the

5    record.

6              MR. MARCHESE:  Good morning, everyone.

7              Joseph Marchese, Bursor & Fisher, for the

8    settlement class.  And I am joined by my colleague today,

9    Phil Fraietta.

10             THE COURT:  Good morning to you both.

11             MS. SPEARS:  Good morning, your Honor.

12             Natalie Spears for defendant, Trusted Media.

13             MS. HAUSER:  Sandra Hauser, also for Trusted

14   Media.

15             THE COURT:  Good morning to you both.  Please be

16   seated.

17             All right.  So we're here on the application for

18   final approval of the class settlement.  I've read the

19   papers.

20             Is there anything that anybody wants to add?

21             MR. MARCHESE:  Your Honor, I've prepared some

22   somewhat lengthy remarks and, as you know, there are no

23   objections to the settlement or to our attorneys' fees

24   requests.  So I'm either prepared to present the remarks

25   from soup to nuts, or just take a cue from your Honor, if

1   you have any questions.

2           THE COURT:  I don't have any questions.  I feel

3   terrible that you've done all this work.  So if you want to

4   say to the client that you were brilliant in delivering

5   these remarks, I'm good with that.

6           MR. MARCHESE:  You know, for now, your Honor, I

7   think I'll just maybe reserve any remarks that I have.  If I

8   hear something that kind of pops up --

9           THE COURT:  Okay.

10          MR. MARCHESE:  -- I may jump up.

11          THE COURT:  Okay.  Thank you.

12          Do you want to give a speech?

13          MS. SPEARS:  No, thank you.  Thank you for the

14  Court's time, and just take the opportunity to do that, but

15  other than that, we support approval of the class

16  settlement.

17          THE COURT:  Okay.  Well, as I said, I've reviewed

18  the papers, and so what I'm going to do is rather than have

19  you all wait for me to draft an opinion, I'm just going to

20  let you know how I come out on this now.

21          The basic terms of the settlement and the request

22  for fees and the incentive award come down to defendant

23  establishing a fund, a non-revisionary settlement fund in

24  the amount of $8,225,000.  That fund is going to pay all the

25  claims to the class members, the incentive award to the

Angela O'Donnell, RPR, 914-390-4025

1   plaintiff, the notice and administration expenses, as well

2   as the attorneys' fees.

3           The class members who submitted the claim form are

4   going to receive a pro rata award estimated to be about $50.

5   In exchange for the settlement, the defendant and each of

6   its related and affiliate entities are going to receive a

7   full release of all claims, "arising out of any facts,

8   transactions, events, matters, occurrences, acts,

9   disclosures, statements, representations, omissions or

10  failure to act regarding the alleged disclosure of the

11  settlement class members, Michigan subscriber information,

12  including, but not limited to all claims that were brought

13  or could have been brought in the action relating to any and

14  all releasing parties."

15          And just parenthetically, the law is well-settled

16  in this circuit, as well as other courts, that class action

17  releases may include claims not presented, and even those

18  which could not have been presented, as long as the released

19  conduct arises out of the identical factual predicate as the

20  settled conduct.  That was noted by the *Second Circuit in*

21  *Wal-Mart Stores Inc. versus Visa USA*, 396 F.3d 96, 107.

22  That principle applies here.

23          Class counsel seeks attorneys' fees of 33.33

24  percent of the settlement fund, which equates to

25  $2,741,392.50, and then the class representative, Taylor,

1    seeks a $5,000 incentive award.

2         Now, before certification, class certification is

3    proper for any purpose, whether it's settlement or

4    otherwise, a court has to make sure that the Rule 23(a) and

5    (b) requirements have been met.  That's what the circuit has

6    instructed in, among other cases, in *Denney versus Deutsche*

7    *Bank AG*, 443 F.3d, 253, 270.

8         Obviously, the settlement only class has to meet

9    all the requirements of Rule 23 with the exception of the

10   requirement dealing with the trial.  So you don't have to

11   worry about the manageability of the trial.  But otherwise,

12   the Rule 23 requirements are not to be watered down just

13   because a settlement might be fair and/or equitable.  That's

14   *Denney* at page 270.

15        Now, under Rule 23(a), plaintiff seeking

16   certification have to meet four requirements; numerosity,

17   commonality, typicality and adequacy of representation.

18        In terms of numerosity, the Second Circuit has

19   said its presumed at a level of at least 40 members, that's

20   from *Consolidated Rail Corp. versus Town of Hyde Park*, 47

21   F.3d, 473, 483.  Here, the representation is that the class

22   consists of roughly 1.1 million or so individuals.  So I

23   think we're comfortably north of 40.

24        In terms of commonality, that requires the

25   questions of fact and law are common to the class.  That's

1    from the *Meredith Corp.*, case.  *That's Meredith Corp. versus*
2    *SESAC, LLC*, 87 F.Supp. 3d, 650, 659.  The courts in the
3    Second Circuit haven't had the pleasure of addressing
4    commonality in the context of claims under their PPPA.  But,
5    as class counsel points out, there are cases in the Eastern
6    District of Michigan that have approved settlement classes
7    for claims brought under this provision, among others is
8    *Kinder versus Meredith Corp.*, 2016 WL 454441, *1.  That's a
9    case from 2016, February of 2016, and there are others that
10   all say the same thing.

11        So the Court finds here that the question common
12   to all class members is whether defendants disclose each of
13   the customers' protected personal reading information to
14   third parties in violation of PPPA, and so commonality is,
15   therefore, satisfied.  For the same reason, typicality is
16   satisfied.  And in terms of adequacy of representation, this
17   requires the Court to inquire as to whether the plaintiffs'
18   interests are antagonistic to the interests of other members
19   of the class, and also that the plaintiffs' attorneys are
20   qualified, experienced and able to conduct the litigation.
21   So said the Second Circuit in *Baffa versus Donaldson, Lufkin*
22   *& Jenrette Security Corp.*, 222 F.3d, 52, 60.

23        There's nothing in the record to indicate that the
24   plaintiff is incapable or somehow ill-suited to represent
25   the other class members, and as for class counsel, it has

1    represented and, indeed, has substantiated that it has

2    extensive experience in litigating class actions of similar

3    size and scope, as well as complexity, including other PPPA

4    cases.  And counsel has been appointed as lead counsel in

5    cases throughout the country.  So I'm comfortable in

6    reaching the conclusion that class counsel's qualified, and

7    that's without hearing your brilliant statement.

8          Now, in addition to the express requirements of

9    Rule 23(a), there is an ascertainability requirement which

10   requires that a class be definite in order to be certified.

11   That's from the *MTBE Products Liability Litigation,* 209

12   F.R.D. 323, 336.  The touchtone of ascertainability is

13   whether the class is sufficiently definite so that it is

14   administratively feasible for the Court to determine whether

15   a particular individual is a member.  That's from *Brecher*

16   *versus Republic of Argentina*, 806 F.3d, 22, 24.

17         Here the class is defined as, "all persons with a

18   Michigan street address who subscribe to a TMBI publication

19   to be delivered to a Michigan street address, between

20   March 10, 2010 and July 30, 2016.  As proposed, this class

21   satisfies the ascertainability requirement as it is limited

22   to Michigan residents who subscribed to the aforementioned

23   publications between the prescribed time period.  As such,

24   these are sufficiently definite requirements that it is

25   administratively feasible for the Court to determine whether

1   or not a particular individual is a member.

2           Now, turning to Rule 23(b)(3), a class has to meet

3   two additional requirements.  Common questions have to

4   predominate over questions affecting only individual members

5   and a class resolution must be superior to other available

6   methods of the fair and efficient adjudication of the

7   controversy.  That's from the Supreme Court Decision in

8   *Amchem Products*, 521 U.S. 591, 615.  In terms of

9   predominance, that asks whether the proposed classes are

10  sufficiently cohesive to warrant adjudication by

11  representation.  That's from the Supreme Court's decision in

12  *Tyson Foods*, 136 Supreme Court Reporter, 1036, 1045.

13          And again, there is case law that applies these

14  principles directly to PPPA claims, and they've been held to

15  satisfy the predominance requirement.  So the aforementioned

16  *Kinder* case, as well as *Coulter-Owens versus Time, Inc.*, 308

17  F.R.D. 524, 536.  And here it's clear to the Court that

18  common questions regarding whether defendant's practices

19  violated Michigan law will indeed predominate over

20  individual questions and so therefore the requirement is

21  satisfied.

22          Superiority requires a showing that the class

23  action is superior to other methods available for the fair

24  and efficient adjudication of the controversy.  I don't

25  think I'm going to break a sweat saying that this would be

1    tough to do if we had to do a million cases.  So I think the

2    superiority requirement is easily satisfied.  So, therefore,

3    the Court finds that the proposed class may be certified for

4    settlement purposes.

5            In terms of the fairness of the settlement, a

6    court can approve a settlement only if the settlement is

7    "fair, adequate and reasonable, and not a product of

8    collusion."  That's from *Wal-Mart Stores* at page 116.

9            In determining fairness, the Court is to look at

10   both the settlement's terms and the negotiating process that

11   led to the settlement.  And indeed, there's a presumption of

12   fairness, adequacy and reasonableness attached to a class

13   settlement reached in arm's-length negotiations between

14   experienced, capable counsel after meaningful discovery.

15   All of that from *Wal-Mart Stores*.  So that does include

16   examining, among other things, the negotiating process that

17   led to the settlement.

18           In terms of this point, the procedural fairness,

19   the Court seeks to ensure that the settlement resulted from

20   an arm's-length, good-faith negotiation between experienced

21   and skilled litigators, said the Second Circuit in *Charron*

22   *versus Wiener*, 731 F.3d, 241, 247.  This is typically found

23   where there has been sufficient discovery, for example, to

24   inform the negotiations where the parties are represented by

25   experienced counsel in litigating these types of claims, and

1  where there is significant evidence demonstrating the

2  settlement was the product of, as I said, prolonged

3  arm's-length negotiation, and it certainly helps that there

4  is the assistance of a respected mediator.

5          Here the settlement was reached after

6  approximately 12 months of litigation.  There was, in fact,

7  a significant exchange of information through the discovery

8  process.  This included, among other things, document

9  production, interrogatories -- I've already commented on the

10  quality of counsel.  So there's no question there, and the

11  settlement was reached after mediation session with Judge

12  Maas, who is awesome, I'll just say that for the record.  So

13  there's more than enough reason to find that this settlement

14  satisfies the procedural fairness requirement.

15          In terms of substantive fairness, we go with the

16  *Grinnell* factors.  I'm not going to read all of them here,

17  you all know them.

18          Starting with complexity, expense and likely

19  duration of litigation.  Obviously, most class actions are

20  inherently complex.  Given the scope of the litigation here,

21  that factor is easily satisfied.

22          Reaction of the settlement class, some courts have

23  said this is perhaps the most significant factor.  One of

24  those is *Raniere versus CitiGroup, Inc.*, 310 F.R.D. 211,

25  218.

1           Obviously, a favorable response demonstrates that

2    the class approves settlement.  Here that's overwhelmingly

3    satisfied as no class member has objected to the settlement.

4    So that weighs in favor of approval.

5           Next is the stage of the proceedings and the

6    amount of discovery completed.  I've already talked about

7    that.  This case has had to go through some pretty

8    substantial document exchanges and interrogatories and a

9    litigation had been going on for some time before there was

10   settlement.  So that included in the document production,

11   things like subscription records, records of transmissions

12   of customer information, there were third parties involved,

13   there were notices of disclosures.  And, yes, it's true

14   there were not depositions, but there were interrogatories.

15   So this factor weighs in favor of approval.

16           The risk of establishing liability and damages.

17   These are the fourth and fifth factors.  In analyzing the

18   risk to plaintiffs in establishing liability, the Court

19   doesn't need to decide the merits of the case.  That's *In Re*

20   *Hi-Crush Partners, LP Securities Litigation*, 2014 WL

21   7323417, *8, the Court is only required to weigh the

22   likelihood of success on the merits against the relief

23   provided by the settlement.  And the courts often approve

24   settlements where the plaintiffs were to face significant

25   legal and factual obstacles to establish liability.

1          Here the defendant has denied and continues to

2     deny liability in this action.  Thus, there is no certainty

3     that the claims would succeed at trial if the case were to

4     go to trial.  And indeed, plaintiffs acknowledge that the

5     case, while it's strong, is not without its risks, which,

6     among other things, could have included a summary judgment

7     motion.  This factor cuts in favor of settlement, because

8     the settlement provides a tangible, certain substantial

9     relief to the class now without subjecting to the class to

10    the risk, complexity, duration and expense of continued

11    litigation.  That's all from *Hi-Crush Partners*, *9.

12         The sixth factor asks about the risks maintaining

13    class action status through the trial.  Indeed, there could

14    have been challenges from the defense about the class

15    certification.  So this factor is, at worst, neutral, and,

16    at best, tips the scales in favor of approval.

17         Seventh factor asks about the ability of defendant

18    to withstand a greater judgment.  Here, there is a question

19    as to whether or not defendant could withstand a much

20    greater judgment because defendant has undergone two

21    bankruptcy proceedings in the preceding ten years.  So this

22    factor cuts in favor of approval.

23         The eighth and ninth factors ask about the range

24    of reasonableness of the settlement in light of the best

25    possible recovery and in light of all the attendant risks of

1   litigation.

2          You think someday somebody is going to cut these

3   nine down to five factors?  You should put that in your

4   speech.

5          MS. SPEARS:  We support that as well.

6          THE COURT:  Right?

7          So under these factors, the courts need only find

8   that the settlement falls within a range of reasonableness.

9   That's from *Meredith Corp*. at 666.  So the adequacy of the

10  amount achieved in settlement is not to be judged in

11  comparison with the possible recovery in best of all

12  possible world, but rather in light of strength and

13  weaknesses of the plaintiffs' case.  Same case, same page.

14         So here, as I mentioned already, the settlement

15  here is an optimal result because there is a certain

16  recovery, this was a result that was achieved after

17  substantial exchange of information with the assistance of

18  Judge Maas.  Given especially defendant's bankruptcy files,

19  the Court is persuaded that the settlement fits safely

20  within the range of what is reasonable, given all the

21  circumstances in this case.

22         So next up is the adequacy of the class notice;

23  23(b) requires the courts must direct to class members the

24  best notice that is practicable under the circumstances,

25  including individual notice to all members who can be

Angela O'Donnell, RPR, 914-390-4025

1   identified through reasonable effort.

2          So under both the federal rule and due process

3   considerations, the adequacy of notice to class members

4   depends on the particular circumstances of each case.

5          Conformity with Rule 23(c) requirements, however,

6   typically fulfills the due process mandate, said the Supreme

7   Court back in 1974, *Eisen versus Carlisle and Jacquelin*, 417

8   U.S. 156, 173.

9          Now, here actual notice was attempted on all class

10  members and actually given to 91.37 percent of the class,

11  which is 1,006,569 class members.  The identities and

12  addresses of the class members were obtained by referencing

13  defendant's records.  And, as I said, actual notice was

14  mailed to these individuals either by postcard or email by

15  the claims administrator.

16         Notice to the remaining class members was returned

17  as undeliverable and alternative email or post email

18  addresses were not available.

19         So given this record, the Court finds that this

20  notice procedure satisfies Rule 23 and due process.  Indeed,

21  the courts have said that for due process to be satisfied,

22  not every class member has to receive actual notice, as long

23  as counsel "acted reasonably in selecting means likely to

24  inform persons affected."  And I'll commit the mortal sin of

25  citing a summary order, that's from the Second Circuit's

Angela O'Donnell, RPR, 914-390-4025

1    order in *Adelphia Communications Corp. Security and*
2    *Derivative Litigation*, 271 Fed. App. 41, 44.

3           So that requirement has been satisfied.

4           In terms of the incentive award, these are common
5    in class actions.  They serve, obviously, to compensate
6    plaintiffs for their time and effort assisting in the
7    prosecution of the litigation, the risk incurred by becoming
8    and continuing as a litigant, and any of the burdens that
9    are sustained by the plaintiff.

10          Here class representative Taylor has requested an
11   incentive award of $5,000.  What is said about Ms. Taylor is
12   she was critical to the ultimate success of the case, having
13   spent approximately 30 hours protecting the interests of the
14   class, including investigating the claims, detailing
15   magazine subscription histories, aiding in the drafting of
16   the complaint and also assisting in the discovery process.

17          In light of these contributions, which are not
18   disputed, the Court finds that the service award is
19   appropriate.

20          Then we come to the issue of attorneys' fees,
21   which I always scrub.  Here, as I said, the request is for
22   one-third of the common fund, which is just a little more
23   than $2.7 million.  It includes, by the way, the
24   unreimbursed litigation expenses of $6,675.53, which is a
25   legitimate thing to seek.

1        Now, in assessing the attorneys' fees, the Second

2   Circuit says that we're supposed to use one of two methods.

3   There's the percentage of the fund method; 33 percent is

4   typical, the *Raniere* case held that at page 216, as well

5   220, 222*, DeLeon versus Wells Fargo Bank*, 2015 WL, 2255394,

6   and so that, obviously, is to take into consideration the

7   attorneys' fees in proportion to the settlement fund as a

8   whole.

9        The other method is the lodestar method, where the

10  Court is to scrutinize the fee petition to ascertain the

11  number of hours reasonably billed to the class and then

12  multiply that figure by the appropriate hourly rate.  That's

13  discussed in *Goldberger*.  But after computing the fee, the

14  Court may, in its discretion, increase the lodestar by

15  applying a multiplier based on other less objective factors

16  such as the risk of litigation and the performance of the

17  attorney.

18       Now, the lodestar method is not supposed to be

19  used for computing attorneys' fees.  In any event, we're

20  supposed to apply the *Goldberger* factor.

21       See*, Goldberger* has it down to six factors.

22       So starting with time and labor, here the time and

23  labor class counsel billed 502.6 hours.  That covered

24  everything from drafting the complaint to doing

25  investigation, discovery, meetings, conferences, review of

1    material and negotiating the settlement.

2              And there was a lot of legal research that had

3    done, too, because of the *Spokeo* decision.  So there is no

4    question that counsel have dedicated a meaningful amount of

5    time and labor to this case.

6              Next is the magnitude, complexity and risk of

7    litigation.  I've already talked about this at length with

8    respect to the Rule 23 issues.  The class is over a million

9    members.  It has its own complexity, both factually and

10   legally, and the risk of litigation was substantial for the

11   aforementioned reasons.  So this factor cuts in favor of the

12   request.

13             Next is the result achieved and the quality of

14   representation.  Obviously, the result achieved is a major

15   factor, and here the result is good for the plaintiffs.

16   It's a substantial fund, and especially given the risk of

17   litigation and given the defendants' financial history, the

18   result achieved here is commendable and, obviously, reflects

19   the high quality of representation.

20             Next is the requested fee in relation to the

21   settlement.  As I said, it's one-third.  That's typically

22   approved by other courts.

23             Public policy considerations.  Here the private

24   Attorney General role is something that does merit

25   compensation and this case is another example of that.

```
 1              So applying the Goldberger factors, the Court
 2     finds that the request for attorneys' fees and expenses is
 3     reasonable.
 4              I would note that using the billing hours and
 5     billing rate, the lodestar calculation is substantially
 6     less.  Indeed, there's a pretty healthy multiplier here
 7     about 11.7 times when looking at the one-third percentage.
 8     But a high multiplier "should not result in penalizing the
 9     plaintiffs' counsel for achieving an early settlement,
10     particularly whereas here the settlement amount was
11     substantial."  That's a quote from Beckman versus Keybank NA
12     293 F.R.D. 467, 482.
13              So for the aforementioned reasons, the motion to
14     certify the class and approve the settlement is granted, as
15     well as the application for the attorneys' fees, expenses
16     and approval of the claims administrator, and also the
17     incentive award for Ms. Taylor.
18              Anything else?
19              MR. MARCHESE:  I don't have anything.
20              Thank you, your Honor.
21              THE COURT:  Anything else?
22              MR. MARCHESE:  There was a proposer order.
23              THE COURT:  Yes, it will be signed and docketed.
24     I promise.
25              MS. SPEARS:  Order.
```

1          THE COURT:  It would have been fun to try the

2   case, but good for you all.

3          MR. MARCHESE:  We have another one before you,

4   your Honor.

5          THE COURT:  There you go.  Hope springs eternal.

6          All right, then I'll bid you a pleasant rest of

7   the day.  Good to see you all.

8          MS. SPEARS:  Thank you, your Honor.

9          MR. MARCHESE:  Thank you.

10          (Proceeding concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 14**

# BURSOR & FISHER
P.A.

www.bursor.com

701 BRICKELL AVENUE          888 SEVENTH AVENUE          1990 NORTH CALIFORNIA BLVD.
MIAMI, FL 33131                NEW YORK, NY 10019            WALNUT CREEK, CA 94596

## FIRM RESUME

With offices in Florida, New York, and California, BURSOR & FISHER lawyers have represented both plaintiffs and defendants in state and federal courts throughout the country.

The lawyers at our firm have an active civil trial practice, having won multi-million dollar verdicts or recoveries in six of six class action jury trials since 2008. Our most recent class action trial victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector found to have violated the Telephone Consumer Protection Act.

In August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which Mr. Bursor served as lead trial counsel, we won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc. (II)*, we obtained a $50 million jury verdict in favor of a certified class of 150,000 purchasers of the Avacor Hair Regrowth System. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009, and the largest in any class action.

The lawyers at our firm have an active class action practice and have won numerous appointments as class counsel to represent millions of class members, including customers of Honda, Verizon Wireless, AT&T Wireless, Sprint, Haier America, and Michaels Stores as well as purchasers of Avacor™, Hydroxycut, and Sensa™ products. Bursor & Fisher lawyers have been court-appointed Class Counsel or Interim Class Counsel in:

1. *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a certified nationwide class of purchasers of LG French-door refrigerators,

2. *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a certified nationwide class of consumers who made in-store purchases at Michaels Stores using a debit or credit card and had their private financial information stolen as a result,

3. *In re Haier Freezer Consumer Litig.* (N.D. Cal. Aug. 17, 2011) to represent a certified class of purchasers of mislabeled freezers from Haier America Trading, LLC,

4. *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a certified nationwide class of military personnel against CitiMortgage for illegal foreclosures,

5. *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012) to represent a certified nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

6. *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012) to represent a proposed nationwide class of purchasers of mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

7. *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012) to represent a certified nationwide class of purchasers of Sensa weight loss products,

8. *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a certified nationwide class of purchasers,

9. *Ebin v. Kangadis Food Inc.* (S.D.N.Y. Feb. 25, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

10. *Forcellati v. Hyland's, Inc.* (C.D. Cal. Apr. 9, 2014) to represent a certified nationwide class of purchasers of children's homeopathic cold and flu remedies,

11. *Ebin v. Kangadis Family Management LLC, et al.* (S.D.N.Y. Sept. 18, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

12. *In re Scotts EZ Seed Litig.* (S.D.N.Y. Jan. 26, 2015) to represent a certified class of purchasers of Scotts Turf Builder EZ Seed,

13. *Dei Rossi v. Whirlpool Corp., et al.* (E.D. Cal. Apr. 28, 2015) to represent a certified class of purchasers of mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

14. *Hendricks v. StarKist Co.* (N.D. Cal. July 23, 2015) to represent a certified nationwide class of purchasers of StarKist tuna products,

15. *In re NVIDIA GTX 970 Graphics Card Litig.* (N.D. Cal. May 8, 2015) to represent a proposed nationwide class of purchasers of NVIDIA GTX 970 graphics cards,

16. *Melgar v. Zicam LLC, et al.* (E.D. Cal. March 30, 2016) to represent a certified ten-jurisdiction class of purchasers of Zicam Pre-Cold products,

17. *In re Trader Joe's Tuna Litigation* (C.D. Cal. December 21, 2016) to represent purchaser of allegedly underfilled Trader Joe's canned tuna.

18. *In re Welspun Litigation* (S.D.N.Y. January 26, 2017) to represent a proposed nationwide class of purchasers of Welspun Egyptian cotton bedding products,

19. *Retta v. Millennium Products, Inc.* (C.D. Cal. January 31, 2017) to represent a certified nationwide class of Millennium kombucha beverages,

20. *Moeller v. American Media, Inc.*, (E.D. Mich. June 8, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

21. *Hart v. BHH, LLC* (S.D.N.Y. July 7, 2017) to represent a nationwide class of purchasers of Bell & Howell ultrasonic pest repellers,

22. *McMillion v. Rash Curtis & Associates* (N.D. Cal. September 6, 2017) to represent a certified nationwide class of individuals who received calls from Rash Curtis & Associates,

23. *Lucero v. Solarcity Corp.* (N.D. Cal. September 15, 2017) to represent a certified nationwide class of individuals who received telemarketing calls from Solarcity Corp.,

24. *Taylor v. Trusted Media Brands, Inc.* (S.D.N.Y. Oct. 17, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

25. *Gasser v. Kiss My Face, LLC* (N.D. Cal. Oct. 23, 2017) to represent a proposed nationwide class of purchasers of cosmetic products,

26. *Gastelum v. Frontier California Inc.* (S.F. Superior Court February 21, 2018) to represent a certified California class of Frontier landline telephone customers who were charged late fees,

27. *Williams v. Facebook, Inc.* (N.D. Cal. June 26, 2018) to represent a proposed nationwide class of Facebook users for alleged privacy violations,

28. *Ruppel v. Consumers Union of United States, Inc.* (S.D.N.Y. July 27, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

29. *Bayol v. Health-Ade* (N.D. Cal. August 23, 2018) to represent a proposed nationwide class of Health-Ade kombucha beverage purchasers,

30. *West v. California Service Bureau* (N.D. Cal. September 12, 2018) to represent a certified nationwide class of individuals who received calls from California Service Bureau,

31. *Gregorio v. Premier Nutrition Corporation* (S.D.N.Y. Sept. 14, 2018) to represent a nationwide class of purchasers of protein shake products,

32. *Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast* (S.D.N.Y. Oct. 24, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

33. *Bakov v. Consolidated World Travel Inc. d/b/a Holiday Cruise Line* (N.D. Ill. Mar. 21, 2019) to represent a certified class of individuals who received calls from Holiday Cruise Line,

34. *Martinelli v. Johnson & Johnson* (E.D. Cal. March 29, 2019) to represent a certified class of purchasers of Benecol spreads labeled with the representation "No Trans Fat,"

35. *Edwards v. Hearst Communications, Inc.* (S.D.N.Y. April 24, 2019) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

36. *Galvan v. Smashburger* (C.D. Cal. June 25, 2019) to represent a proposed class of purchasers of Smashburger's "Triple Double" burger,

37. *Kokoszki v. Playboy Enterprises, Inc.* (E.D. Mich. Feb. 7, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

38. *Russett v. The Northwestern Mutual Life Insurance Co.* (S.D.N.Y. May 28, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

39. *In re: Metformin Marketing and Sales Practices Litigation* (D.N.J. June 3, 2020) to represent a proposed nationwide class of purchasers of generic diabetes medications that were contaminated with a cancer-causing carcinogen,

40. *Hill v. Spirit Airlines, Inc.* (S.D. Fla. July 21, 2020) to represent a proposed nationwide class of passengers whose flights were cancelled by Spirit Airlines

BURSOR&FISHER
P.A.

due to the novel coronavirus, COVID-19, and whose tickets were not refunded,

41. *Kramer v. Alterra Mountain Co.* (D. Colo. July 31, 2020) to represent a proposed nationwide class of purchasers to recoup the unused value of their Ikon ski passes after Alterra suspended operations at its ski resorts due to the novel coronavirus, COVID-19,

42. *Qureshi v. American University* (D.D.C. July 31, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by American University due to the novel coronavirus, COVID-19,

43. *Hufford v. Maxim Inc.* (S.D.N.Y. Aug. 13, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

44. *Desai v. Carnegie Mellon University* (W.D. Pa. Aug. 26, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Carnegie Mellon University due to the novel coronavirus, COVID-19,

45. *Heigl v. Waste Management of New York, LLC* (E.D.N.Y. Aug. 27, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

46. *Stellato v. Hofstra University* (E.D.N.Y. Sept. 18, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Hofstra University due to the novel coronavirus, COVID-19.

47. *Kaupelis v. Harbor Freight Tools USA, Inc.* (C.D. Cal. Sept. 23, 2020), to represent consumers who purchased defective chainsaws.

48. *Soo v. Lorex Corporation* (N.D. Cal. Sept. 23, 2020), to represent consumers whose security cameras were intentionally rendered non-functional by manufacturer.

49. *Miranda v. Golden Entertainment (NV), Inc.* (D. Nev. Dec. 17, 2020), to represent consumers and employees whose personal information was exposed in a data breach.

50. *Benbow v. SmileDirectClub, Inc.* (Cir. Ct. Cook Cnty. Feb. 4, 2021), to represent a certified nationwide class of individuals who received text messages from SmileDirectClub, in alleged violation of the Telephone Consumer Protection Act.

51. *Suren v. DSV Solutions, LLC* (Cir. Ct. DuPage Cnty. Apr. 8, 2021), to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act.

52. *De Lacour v. Colgate-Palmolive Co.* (S.D.N.Y. Apr. 23, 2021), to represent a certified class of consumers who purchased allegedly "natural" Tom's of Maine products.

53. *Wright v. Southern New Hampshire University* (D.N.H. Apr. 26, 2021), to represent a certified nationwide class of students for tuition and fee refunds after their classes were moved online by Southern New Hampshire University due to the novel coronavirus, COVID-19.

BURSOR&FISHER
P.A.

### SCOTT A. BURSOR

Mr. Bursor has an active civil trial practice, having won multi-million verdicts or recoveries in six of six civil jury trials since 2008.  Mr. Bursor's most recent victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector for violations of the Telephone Consumer Protection Act (TCPA).

In *Ayyad v. Sprint Spectrum L.P.* (2013), where Mr. Bursor served as lead trial counsel, the jury returned a verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc.* (2009), the jury returned a $50 million verdict in favor of the plaintiff and class represented by Mr. Bursor.  The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009.

Class actions are rarely tried to verdict.  Other than Mr. Bursor and his partner Mr. Fisher, we know of no lawyer that has tried more than one class action to a jury.  Mr. Bursor's perfect record of six wins in six class action jury trials, with recoveries ranging from $21 million to $299 million, is unmatched by any other lawyer.  Each of these victories was hard-fought against top trial lawyers from the biggest law firms in the United States.

Mr. Bursor graduated from the University of Texas Law School in 1996.  He served as Articles Editor of the Texas Law Review, and was a member of the Board of Advocates and Order of the Coif.  Prior to starting his own practice, Mr. Bursor was a litigation associate at a large New York based law firm where he represented telecommunications, pharmaceutical, and technology companies in commercial litigation.

Mr. Bursor is a member of the state bars of New York, Florida, and California, as well as the bars of the United States Court of Appeals for the Second, Third, Fourth, Sixth, Ninth and Eleventh Circuits,  and the bars of the United States District Courts for the Southern and Eastern Districts of New York, the Northern, Central, Southern and Eastern Districts of California, the Southern and Middle Districts of Florida, and the  Eastern District of Michigan.

### *Representative Cases*

Mr. Bursor was appointed lead or co-lead class counsel to the largest, 2nd largest, and 3rd largest classes ever certified.  Mr. Bursor has represented classes including more than 160 million class members, roughly 1 of every 2 Americans.  Listed below are recent cases that are representative of Mr. Bursor's practice:

Mr. Bursor negotiated and obtained court-approval for two landmark settlements in *Nguyen v. Verizon Wireless* and *Zill v. Sprint Spectrum* (the largest and 2nd largest classes ever certified).  These settlements required Verizon and Sprint to open their wireless networks to third-party devices and applications.  These settlements are believed to be the most significant legal development affecting the telecommunications industry since 1968, when the FCC's Carterfone decision similarly opened up AT&T's wireline telephone network.

Mr. Bursor was the lead trial lawyer in *Ayyad v. Sprint Spectrum, L.P.* representing a class of approximately 2 million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. After a five-week combined bench-and-jury trial, the jury returned a verdict in June 2008 and the Court issued a Statement of Decision in December 2008 awarding the plaintiffs $299 million in cash and debt cancellation.  Mr. Bursor served as lead trial counsel for this class again in 2013 during a month-long jury trial in which Sprint asserted a $1.06 billion counterclaim against the class.  Mr. Bursor secured a verdict awarding Sprint only $18.4 million, the exact amount calculated by the class's damages expert.  This award was less than 2% of the damages Sprint sought, less than 6% of the amount of the illegal termination fees Sprint charged to class members.  In December 2016, after more than 13 years of litigation, the case was settled for $304 million, including $79 million in cash payments plus $225 million in debt cancellation.

Mr. Bursor was the lead trial lawyer in *White v. Cellco Partnership d/b/a Verizon Wireless* representing a class of approximately 1.4 million California consumers who were charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims.  In July 2008, after Mr. Bursor presented plaintiffs' case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements.

Mr. Bursor was the lead trial lawyer in *Thomas v. Global Visions Products Inc.*  Mr. Bursor represented a class of approximately 150,000 California consumers who had purchased the Avacor® hair regrowth system.  In January 2008, after a four-week combined bench-and-jury trial. Mr. Bursor obtained a $37 million verdict for the class, which the Court later increased to $40 million.

Mr. Bursor was appointed class counsel and was elected chair of the Official Creditors' Committee in *In re Nutraquest Inc.*, a Chapter 11 bankruptcy case before Chief Judge Garrett E. Brown, Jr. (D.N.J.) involving 390 ephedra-related personal injury and/or wrongful death claims, two consumer class actions, four enforcement actions by governmental agencies, and multiple adversary proceedings related to the Chapter 11 case.  Working closely with counsel for all parties and with two mediators, Judge Nicholas Politan (Ret.) and Judge Marina Corodemus (Ret.), the committee chaired by Mr. Bursor was able to settle or otherwise resolve every claim and reach a fully consensual Chapter 11 plan of reorganization, which Chief Judge Brown approved in late 2006.  This settlement included a $12.8 million recovery to a nationwide class of consumers who alleged they were defrauded in connection with the purchase of Xenadrine® dietary supplement products.

Mr. Bursor was the lead trial lawyer in *In re: Pacific Bell Late Fee Litigation*.  After filing the first class action challenging Pac Bell's late fees in April 2010, winning a contested motion to certify a statewide California class in January 2012, and defeating Pac Bell's motion for summary judgment in February 2013, Mr. Bursor obtained final approval of the $38 million class settlement.  The settlement, which Mr. Bursor negotiated the night before opening statements were scheduled to commence, included a $20 million cash payment to provide

refunds to California customers who paid late fees on their Pac Bell wireline telephone accounts, and an injunction that reduced other late fee charges by $18.6 million.

## L. TIMOTHY FISHER

L. Timothy Fisher has an active practice in consumer class actions and complex business litigation and has also successfully handled a large number of civil appeals.

Mr. Fisher has been actively involved in numerous cases that resulted in multi-million dollar recoveries for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and consumer fraud. With his partner Scott A. Bursor, Mr. Fisher has tried five class action jury trials, all of which produced successful results. In *Thomas v. Global Vision Products*, Mr. Fisher obtained a jury award of $50,024,611 — the largest class action award in California in 2009 and the second-largest jury award of any kind.

Mr. Fisher was admitted to the State Bar of California in 1997. He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern and Eastern Districts of California. Mr. Fisher taught appellate advocacy at John F. Kennedy University School of Law in 2003 and 2004.  In 2010, he contributed jury instructions, a verdict form and comments to the consumer protection chapter of Justice Elizabeth A. Baron's California Civil Jury Instruction Companion Handbook (West 2010). In January 2014, Chief Judge Claudia Wilken of the United States District Court for the Northern District of California appointed Mr. Fisher to a four-year term as a member of the Court's Standing Committee on Professional Conduct.

Mr. Fisher received his Juris Doctor from Boalt Hall at the University of California at Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first-year moot court competition.

In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science.  Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council."  He is also a member of Phi Beta Kappa.

### *Representative Cases*

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court).  Mr. Fisher litigated claims against Global Vision Products, Inc. and other individuals in connection with the sale and marketing of a purported hair loss remedy known as Avacor.  The case lasted more than seven years and involved two trials.  The first trial resulted in a verdict for plaintiff and the class in the amount of $40,000,000.  The second trial resulted in a jury verdict of $50,024,611, which led to a $30 million settlement for the class.

*In re Cellphone Termination Fee Cases* - Handset Locking Actions (Alameda County Superior Court).  Mr. Fisher actively worked on five coordinated cases challenging the secret locking of

cell phone handsets by major wireless carriers to prevent consumers from activating them on competitive carriers' systems.  Settlements have been approved in all five cases on terms that require the cell phone carriers to disclose their handset locks to consumers and to provide unlocking codes nationwide on reasonable terms and conditions.  The settlements fundamentally changed the landscape for cell phone consumers regarding the locking and unlocking of cell phone handsets.

*In re Cellphone Termination Fee Cases* - Early Termination Fee Cases (Alameda County Superior Court and Federal Communications Commission).  In separate cases that are a part of the same coordinated litigation as the Handset Locking Actions, Mr. Fisher actively worked on claims challenging the validity under California law of early termination fees imposed by national cell phone carriers. In one of those cases, against Verizon Wireless, a nationwide settlement was reached after three weeks of trial in the amount of $21 million.  In a second case, which was tried to verdict, the Court held after trial that the $73 million of flat early termination fees that Sprint had collected from California consumers over an eight-year period were void and unenforceable.

### *Selected Published Decisions*

*Melgar v. Zicam LLC*, 2016 WL 1267870 (E.D. Cal. Mar. 30, 2016) (certifying 10-jurisdiction class of purchasers of cold remedies, denying motion for summary judgment, and denying motions to exclude plaintiff's expert witnesses).

*Salazar v. Honest Tea, Inc*., 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015) (denying motion for summary judgment).

*Dei Rossi v. Whirlpool Corp.*, 2015 WL 1932484 (E.D. Cal. Apr. 27, 2015) (certifying California class of purchasers of refrigerators that were mislabeled as Energy Star qualified).

*Bayol v. Zipcar, Inc.*, 78 F.Supp.3d 1252 (N.D. Cal. 2015) (denying motion to dismiss claims alleging unlawful late fees under California Civil Code § 1671).

*Forcellati v. Hyland's, Inc.*, 2015 WL 9685557 (C.D. Cal. Jan. 12, 2015) (denying motion for summary judgment in case alleging false advertising of homeopathic cold and flu remedies for children).

*Bayol v. Zipcar, Inc*., 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014) (denying motion to transfer venue pursuant to a forum selection clause).

*Forcellati v. Hyland's Inc.*, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) (certifying nationwide class of purchasers of homeopathic cold and flu remedies for children).

*Hendricks v. StarKist Co.*, 30 F.Supp.3d 917 (N.D. Cal. 2014) (denying motion to dismiss in case alleging underfilling of 5-ounce cans of tuna).

*Dei Rossi v. Whirlpool Corp.*, 2013 WL 5781673 (E.D. Cal. October 25, 2013) (denying motion to dismiss in case alleging that certain KitchenAid refrigerators were misrepresented as Energy Star qualified).

*Forcellati v. Hyland's Inc.*, 876 F.Supp.2d 1155 (C.D. Cal. 2012) (denying motion to dismiss complaint alleging false advertising regarding homeopathic cold and flu remedies for children).

*Clerkin v. MyLife.com*, 2011 WL 3809912 (N.D. Cal. August 29, 2011) (denying defendants'

motion to dismiss in case alleging false and misleading advertising by a social networking company).

*In re Cellphone Termination Fee Cases*, 186 Cal.App.4th 1380 (2010) (affirming order approving $21 million class action settlement).

*Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007) (affirming order denying motion to compel arbitration).

### *Selected Class Settlements*

*Melgar v. Zicam* (Eastern District of California) - $16 million class settlement of claims alleging cold medicine was ineffective.

*Gastelum v. Frontier California Inc.* (San Francisco Superior Court) - $10.9 million class action settlement of claims alleging that a residential landline service provider charged unlawful late fees.

*West v. California Service Bureau*, *Inc.* (Northern District of California) - $4.1 million class settlement of claims under the Telephone Consumer Protection Act.

*Gregorio v. Premier Nutrition Corp.* (Southern District of New York) - $9 million class settlement of false advertising claims against protein shake manufacturer.

*Morris v. SolarCity Corp.* (Northern District of California) - $15 million class settlement of claims under the Telephone Consumer Protection Act.

*Retta v. Millennium Products, Inc.* (Central District of California) - $8.25 million settlement to resolve claims of bottled tea purchasers for alleged false advertising.

*Forcellati v. Hyland's* (Central District of California) – nationwide class action settlement providing full refunds to purchasers of homeopathic cold and flu remedies for children.

*Dei Rossi v. Whirlpool* (Eastern District of California) – class action settlement providing $55 cash payments to purchasers of certain KitchenAid refrigerators that allegedly mislabeled as Energy Star qualified.

*In Re NVIDIA GTX 970 Graphics Chip Litigation* (Northern District of California) - $4.5 million class action settlement of claims alleging that a computer graphics card was sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.* (Northern District of California) – $12 million class action settlement of claims alleging that 5-ounce cans of tuna were underfilled.

*In re Zakskorn v. American Honda Motor Co.* Honda (Eastern District of California) – nationwide settlement providing for brake pad replacement and reimbursement of out-of-pocket expenses in case alleging defective brake pads on Honda Civic vehicles manufactured between 2006 and 2011.

*Correa v. Sensa Products, LLC* (Los Angeles Superior Court) - $9 million settlement on behalf of purchasers of the Sensa weight loss product.

BURSOR&FISHER
P.A.

*In re Pacific Bell Late Fee Litigation* (Contra Costa County Superior Court) - $38.6 million settlement on behalf of Pac Bell customers who paid an allegedly unlawful late payment charge.

*In re Haier Freezer Consumer Litigation* (Northern District of California) - $4 million settlement, which provided for cash payments of between $50 and $325.80 to class members who purchased the Haier HNCM070E chest freezer.

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court) - $30 million settlement on behalf of a class of purchasers of a hair loss remedy.

*Guyette v. Viacom, Inc.* (Alameda County Superior Court) - $13 million settlement for a class of cable television subscribers who alleged that the defendant had improperly failed to share certain tax refunds with its subscribers.

## **JOSEPH I. MARCHESE**

Joseph I. Marchese is a Partner with Bursor & Fisher, P.A.  Joe focuses his practice on consumer class actions, employment law disputes, and commercial litigation.  He has represented corporate and individual clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Joe has diverse experience in litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, privacy violations, data breach claims, and violations of the Servicemembers Civil Relief Act.

Joe also has significant experience in multidistrict litigation proceedings.  Recently, he served on the Plaintiffs' Executive Committee in *In Re:  Blue Buffalo Company, Ltd. Marketing And Sales Practices Litigation*, MDL No. 2562, which resulted in a $32 million consumer class settlement.  Currently, he serves on the Plaintiffs' Steering Committee for Economic Reimbursement in *In Re: Valsartan Products Liability Litigation*, MDL. No. 2875.

Joe is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, and the Eastern District of Michigan, as well as the United States Court of Appeals for the Second Circuit.

Joe graduated from Boston University School of Law in 2002 where he was a member of The Public Interest Law Journal.  In 1998, Joe graduated with honors from Bucknell University.

## *Selected Published Decisions:*

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. Sept. 7, 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

*Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. June 17, 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*In re Michaels Stores Pin Pad Litigation*, 830 F. Supp. 2d 518 (N.D. Ill. 2011), denying retailer's motion to dismiss its customers' state law consumer protection and privacy claims in data breach putative class action.

### *Selected Class Settlements:*

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

In *re Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB (S.D.N.Y. 2018) – final approval granted for $47 million class settlement to resolve false advertising claims of purchasers of combination grass seed product.

*In Re:  Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) – final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

*Rodriguez v. Citimortgage, Inc.*, Case No. 11-cv-4718-PGG (S.D.N.Y. 2015) – final approval granted for $38 million class settlement to resolve claims of military servicemembers for alleged foreclosure violations of the Servicemembers Civil Relief Act, where each class member was entitled to $116,785 plus lost equity in the foreclosed property and interest thereon.

*O'Brien v. LG Electronics USA, Inc., et al.*, Case No. 10-cv-3733-DMC (D.N.J. 2011) – final approval granted for $23 million class settlement to resolve claims of Energy Star refrigerator purchasers for alleged false advertising of the appliances' Energy Star qualification.

### JOSHUA D. ARISOHN

Joshua D. Arisohn is a Partner with Bursor & Fisher, P.A. Josh has litigated precedent-setting cases in the areas of consumer class actions and terrorism. He participated in the first ever trial to take place under the Anti-Terrorism Act, a statute that affords U.S. citizens the right to assert federal claims for injuries arising out of acts of international terrorism. Josh's practice continues to focus on terrorism-related matters as well as class actions.

Josh is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York.

Josh previously practiced at Dewey & LeBoeuf LLP and DLA Piper LLP. He graduated from Columbia University School of Law in 2006, where he was a Harlan Fiske Stone Scholar, and received his B.A. from Cornell University in 2002. Josh has been honored as a 2015 and 2016 Super Lawyer Rising Star.

### *Selected Published Decisions:*

*Morris v. SolarCity Corp.*, 2016 WL 1359378 (N.D. Cal. Apr. 4, 2016), denying defendant's motion to dismiss claims that solar company illegally called consumers using an artificial or prerecorded voice and an automatic telephone dialing system.

*Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. 2016), denying defendant's motion to dismiss and finding that the Michigan Video Rental Privacy Act does not violate the First Amendment.

*Edwards v. Oportun, Inc.*, 193 F. Supp. 3d 1096 (N.D. Cal. 2016), denying defendant's motion dismiss and rejecting its argument that providing a class representative with a cashier's check for his individual damages mooted his individual and class claims.

### *Selected Class Settlements:*

*Morris v. SolarCity Corp.*, Case No. 3:15-cv-05107-RS (N.D. Cal.) - final approval granted for $15 million class settlement to resolve claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

### **JOEL D. SMITH**

Joel D. Smith is a Partner with Bursor & Fisher, P.A. Joel's practice focuses on consumer class actions and complex litigation. He has substantial experience in trial and appellate courts across the nation.

Prior to joining Bursor & Fisher, Joel was a litigator at Crowell & Moring, where he represented Fortune 500 companies, privately-held businesses, and public entities in commercial litigation and nationwide class actions. While at Crowell & Moring, Joel litigated some of the firm's most high-profile matters, including several class actions alleging deceptive sales practices with respect to Apple iPhones and iPads, and a class action seeking to hold U.S. energy companies accountable for global warming. In California state court, Joel represented four major U.S. retailers in a case arising from a devastating arson fire and ensuing state of emergency in Roseville, California. That case included crossclaims by the defendant alleging a vast cover-up by the City of Roseville's fire and police departments; the involvement of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives; and settlement on the eve of a trial that was expected to last several months and involve numerous witnesses. Joel also was part

of the trial team in a widely publicized trial over the death of a contestant who died after participating in a Sacramento radio station's water drinking contest.

More recently, Joel has represented University of California students in a class action seeking the return of late fees unlawfully collected from students.  He also served as interim class counsel in *In re Welspun Litigation* (S.D.N.Y. January 26, 2017), a class action against three of the largest retailers in the United States and one of the largest textile manufacturers in the world, arising from events that one reporter described as the "biggest counterfeit story in retail history."

Joel received both his undergraduate and law degrees from the University of California at Berkeley.  While at Berkeley School of Law, he was a member of the California Law Review, received several academic honors, externed for the California Attorney General's office and published an article on climate change policy and litigation.

Joel is admitted to the State Bar of California, as well as the United States Courts of Appeals for the Second, Third and Ninth Circuits; the Northern, Central, Southern and Eastern Districts of California; and is a member of the General Bar of the Northern District of Illinois.

### *Selected Published Decisions:*

*Revitch v. DIRECTV, LLC*, --- F.3d --- (9th Cir. 2020), affirming denial of motion to compel arbitration in putative class action alleging unlawful calls under the Telephone Consumer Protection Act.

*Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116 (C.D. Cal. Sept. 23, 2020), granting class certification of consumer protection claims brought by purchasers of defective chainsaws.

### *Selected Class Settlements:*

*Morris v. SolarCity Corp.*, Case No. 3:15-cv-05107-RS (N.D. Cal.) - final approval granted for $15 million class settlement to resolve claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

## NEAL J. DECKANT

Neal J. Deckant is a Partner with Bursor & Fisher, P.A.  Neal focuses his practice on complex business litigation, consumer class actions, and employment law disputes.  Prior to joining Bursor & Fisher, Neal counseled low-income homeowners facing foreclosure in East Boston.

In 2015, Neal was defense trial counsel for a law firm and several of its partners in a sexual harassment case brought by a former associate of that firm.  The plaintiff's complaint sought $22 million in compensatory and punitive damages.  After a 3-week trial in federal court in New York, the jury returned a verdict of not liable for the federal and state law claims. During the trial, the judge also granted defendants' motion for judgment as a matter of law on the

plaintiff's claims for retaliation and defamation.  The jury found liability solely under New York City's human rights law, awarding only $140,000 in damages.

Neal is admitted to the State Bars of California and New York, and is a member of the bars of the United States District Court for the Northern District of California, the United States District Court for the Eastern District of California, the United States District Court for the Central District of California, the United States District Court for the Southern District of California, the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York, and the bars of the United States Courts of Appeals for the Second and Ninth Circuits.

Neal received his Juris Doctor from Boston University School of Law in 2011, graduating cum laude with two Dean's Awards.  During law school, Neal served as a Senior Articles Editor for the Review of Banking and Financial Law, where he authored two published articles about securitization reforms, both of which were cited by the New York Court of Appeals, the highest court in the state.  Neal was also awarded Best Oral Argument in his moot court section, and he served as a Research Assistant for his Securities Regulation professor. Neal has also been honored as a 2014, 2015, 2016, and 2017 Super Lawyers Rising Star.  In 2007, Neal graduated with Honors from Brown University with a dual major in East Asian Studies and Philosophy.

### *Selected Published Decisions:*

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (N.D. Cal. Mar. 29, 2019), granting class certification of false advertising and other claims brought by purchasers of Benecol spreads labeled with the representation "No Trans Fats."

*Dzielak v. Whirlpool Corp.*, 2017 WL 6513347 (D.N.J. Dec. 20, 2017), granting class certification of consumer protection claims brought by purchasers of Maytag Centennial washing machines marked with the "Energy Star" logo.

*Duran v. Obesity Research Institute*, LLC, 204 Cal. Rptr. 3d 896 (Cal. Ct. App. 2016), reversing and remanding final approval of a class action settlement on appeal, regarding allegedly mislabeled dietary supplements, in connection with a meritorious objection.

*Marchuk v. Faruqi & Faruqi, LLP*, et al., 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

*Selected Class Settlements:*

*In Re NVIDIA GTX 970 Graphics Chip Litigation*, Case No. 15-cv-00760-PJH (N.D. Cal. Dec. 7, 2016) – final approval granted for $4.5 million class action settlement to resolve claims that a computer graphics card was allegedly sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.*, 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016) – final approval granted for $12 million class action settlement to resolve claims that 5-ounce cans of tuna were allegedly underfilled.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – class action claims resolved for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy, following claims that its olive oil was allegedly sold with false and misleading representations.

*Selected Publications:*

Neal Deckant, *X. Reforms of Collateralized Debt Obligations: Enforcement, Accounting and Regulatory Proposals*, 29 Rev. Banking & Fin. L. 79 (2009) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014)).

Neal Deckant, *Criticisms of Collateralized Debt Obligations in the Wake of the Goldman Sachs Scandal*, 30 Rev. Banking & Fin. L. 407 (2010) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014); *Lyon Village Venetia, LLC v. CSE Mortgage LLC*, 2016 WL 476694, at *1 n.1 (Md. Ct. Spec. App. Feb. 4, 2016); Ivan Ascher, Portfolio Society: On the Capitalist Mode of Prediction, at 141, 153, 175 (Zone Books / The MIT Press 2016); Devon J. Steinmeyer, *Does State National Bank of Big Spring v. Geithner Stand a Fighting Chance?*, 89 Chi.-Kent. L. Rev. 471, 473 n.13 (2014)).

## YITZCHAK KOPEL

Yitzchak Kopel is a Partner with Bursor & Fisher, P.A. Yitz focuses his practice on consumer class actions and complex business litigation. He has represented corporate and individual clients before federal and state courts, as well as in arbitration proceedings.

Yitz has substantial experience in successfully litigating and resolving consumer class actions involving claims of consumer fraud, data breaches, and violations of the telephone consumer protection act. Since 2014, Yitz has obtained class certification on behalf of his clients five times, three of which were certified as nationwide class actions. Bursor & Fisher was appointed as class counsel to represent the certified classes in each of the cases.

Yitz is admitted to the State Bars of New York and New Jersey, the bar of the United States Court of Appeals for the Second, Eleventh, and Ninth Circuits, and the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, Eastern District of Missouri, Eastern District of Wisconsin, Northern Distriict of Illinois, and District of New Jersey.

BURSOR&FISHER
P.A.

Yitz received his Juris Doctorate from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards. During law school, Yitz served as an Articles Editor for the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling. In 2009, Yitz graduated *cum laude* from Queens College with a B.A. in Accounting.

### ***Selected Published Decisions:***

*Bassaw v. United Industries Corp.,* --- F. Supp. 3d ---, 2020 WL 5117916 (S.D.N.Y. Aug. 31, 2020), denying motion to dismiss claims in putative class action concerning insect foggers.

*Poppiti v. United Industries Corp.*, 2020 WL 1433642 (E.D. Mo. Mar. 24, 2020), denying motion to dismiss claims in putative class action concerning citronella candles.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 6699188 (N.D. Ill. Dec. 9, 2019), granting summary judgment on behalf of certified class in robocall class action.

*Krumm v. Kittrich Corp.*, 2019 WL 6876059 (E.D. Mo. Dec. 17, 2019), denying motion to dismiss claims in putative class action concerning mosquito repellent.

*Crespo v. S.C. Johnson & Son, Inc.*, 394 F. Supp. 3d 260 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding Raid insect fogger.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 1294659 (N.D. Ill. Mar. 21, 2019), certifying a class of persons who received robocalls in the state of Illinois.

*Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding mosquito repellent.

*Hart v. BHH, LLC*, 323 F. Supp. 3d 560 (S.D.N.Y. 2018), denying defendants' motion for summary judgment in certified class action involving the sale of ultrasonic pest repellers.

*Hart v. BHH, LLC*, 2018 WL 3471813 (S.D.N.Y. July 19, 2018), denying defendants' motion to exclude plaintiffs' expert in certified class action involving the sale of ultrasonic pest repellers.

*Penrose v. Buffalo Trace Distillery, Inc.*, 2018 WL 2334983 (E.D. Mo. Feb. 5, 2018), denying bourbon producers' motion to dismiss fraud and consumer protection claims in putative class action.

*West v. California Service Bureau*, *Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017), certifying a nationwide class of "wrong-number" robocall recipients.

*Hart v. BHH, LLC*, 2017 WL 2912519 (S.D.N.Y. July 7, 2017), certifying nationwide class of purchasers of ultrasonic pest repellers.

*Browning v. Unilever United States, Inc.*, 2017 WL 7660643 (C.D. Cal. Apr. 26, 2017), denying motion to dismiss fraud and warranty claims in putative class action concerning facial scrub product.

*Brenner v. Procter & Gamble Co.*, 2016 WL 8192946 (C.D. Cal. Oct. 20, 2016), denying motion to dismiss warranty and consumer protection claims in putative class action concerning baby wipes.

*Hewlett v. Consolidated World Travel, Inc.*, 2016 WL 4466536 (E.D. Cal. Aug. 23, 2016), denying telemarketer's motion to dismiss TCPA claims in putative class action.

*Bailey v. KIND, LLC*, 2016 WL 3456981 (C.D. Cal. June 16, 2016), denying motion to dismiss fraud and warranty claims in putative class action concerning snack bars.

*Hart v. BHH, LLC*, 2016 WL 2642228 (S.D.N.Y. May 5, 2016) denying motion to dismiss warranty and consumer protection claims in putative class action concerning ultrasonic pest repellers.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting clients' motion for judgment as a matter of law on claims for retaliation and defamation in employment action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217 (E.D.N.Y. 2015), denying diet pill manufacturers' motion to dismiss its purchasers' allegations for breach of express warranty in putative class action.

*Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014), denying online job board's motion to dismiss its subscribers' allegations of consumer protection law violations in putative class action.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*Hart v. BHH, LLC*, Case No. 1:15-cv-04804 (S.D.N.Y. Sept. 22, 2020), resolving class action claims regarding ultrasonic pest repellers.

BURSOR&FISHER
P.A.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014), resolving class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

*West v. California Service Bureau*, Case No. 4:16-cv-03124-YGR (N.D. Cal. Jan. 23, 2019), resolving class action claims against debt-collector for wrong-number robocalls for $4.1 million.

## <u>FREDERICK J. KLORCZYK III</u>

Frederick J. Klorczyk III is a Partner with Bursor & Fisher, P.A.  Fred focuses his practice on complex business litigation and consumer class actions.

Fred has substantial experience in successfully litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, and privacy violations. In 2019, Fred certified both a California and a 10-state express warranty class on behalf of purchasers of a butter substitute.  In 2014, Fred served on the litigation team in *Ebin v. Kangadis Food Inc*.  At class certification, Judge Rakoff adopted Fred's choice of law fraud analysis and research directly into his published decision certifying a nationwide fraud class.

Fred is admitted to the State Bars of California, New York, and New Jersey, and is a member of the bars of the United States District Courts for the Northern, Central, Eastern, and Southern Districts of California, the Southern, Eastern, and Northern Districts of New York, the District of New Jersey, the Northern District of Illinois, the Eastern District of Missouri, the Eastern District of Wisconsin, and the Eastern District of Michigan, as well as the bars of the United States Court of Appeals for the Second and Ninth Circuits.

Fred received his Juris Doctor from Brooklyn Law School in 2013, graduating m*agna cum laude* with two CALI Awards for the highest grade in his classes on conflict of laws and criminal law.  During law school, Fred served as an Associate Managing Editor for the Brooklyn Journal of Corporate, Financial and Commercial Law and as an intern to the Honorable Alison J. Nathan of the United States District Court for the Southern District of New York and the Honorable Janet Bond Arterton of the United States District Court for the District of Connecticut.  In 2010, Fred graduated from the University of Connecticut with a B.S. in Finance.

### *Selected Published Decisions:*

*Revitch v. New Moosejaw, LLC*, 2019 WL 5485330 (N.D. Cal. Oct. 23, 2019), denying defendants' motions to dismiss consumer's allegations of state privacy law violations in putative class action.

*In re Welspun Litigation*, 2019 WL 2174089 (S.D.N.Y. May 20, 2019), denying retailers' and textile manufacturer's motion to dismiss consumers' allegations of false advertising relating to purported "100% Egyptian Cotton" linen products.

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (E.D. Cal. Mar. 29, 2019), granting class certification of California false advertising claims and multi-state express warranty claims brought by purchasers of a butter substitute.

*Porter v. NBTY, Inc.*, 2016 WL 6948379 (N.D. Ill. Nov. 28, 2016), denying supplement manufacturer's motion to dismiss consumers' allegations of false advertising relating to whey protein content.

*Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d. 282 (S.D.N.Y. 2015), denying supplement manufacturer's motion to dismiss consumers' allegations of false advertising relating to a homeopathic cold product.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, Case No. 13-4775 (2d Cir. Apr. 15, 2015), denying olive oil manufacturer's Rule 23(f) appeal following grant of nationwide class certification.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### ***Selected Class Settlements:***

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*In Re: Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) –final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – resolved class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

## <u>YEREMEY O. KRIVOSHEY</u>

Yeremey O. Krivoshey is a Partner with Bursor & Fisher, P.A.  Mr. Krivoshey focuses his practice on class actions involving false advertising, fraud, illegal fees in consumer contracts, invasion of privacy, and unlawful debt collection practices.  He has represented clients in a wide array of civil litigation, including appeals before the Ninth Circuit.

Mr. Krivoshey served as trial counsel with Mr. Bursor in *Perez. v. Rash Curtis & Associates*, where, in May 2019, the jury returned a verdict for a minimum of $267 million in statutory damages under the Telephone Consumer Protection Act.

Mr. Krivoshey is admitted to the State Bar of California.  He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, as well as the District of Colorado.

Mr. Krivoshey graduated from New York University School of Law in 2013, where he was a Samuel A. Herzog Scholar.  Prior to Bursor & Fisher, P.A., Mr. Krivoshey worked as a Law Clerk at Vladeck, Waldman, Elias & Engelhard, P.C, focusing on employment discrimination and wage and hour disputes.  In law school, he has also interned at the American Civil Liberties Union and the United States Department of Justice.  In 2010, Mr. Krivoshey graduated *cum laude* from Vanderbilt University.

### <u>*Representative Cases:*</u>

*Perez v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR (N.D. Cal. May 13, 2019).  Mr. Krivoshey litigated claims against a national health-care debt collection agency on behalf of people that received autodialed calls on their cellular telephones without their prior express consent.  Mr. Krivoshey successfully obtained nationwide class certification, defeated the defendant's motion for summary judgment, won summary judgment as to the issue of prior express consent and the use of automatic telephone dialing systems, and navigated the case towards trial.  With his partner, Scott Bursor, Mr. Krivoshey obtained a jury verdict finding that the defendant violated the Telephone Consumer Protection Act ("TCPA") 534,712 times.  Under the TCPA, class members are entitled to a minimum of $500 per each call made in violation of the TCPA – in this case, a minimum of $267 million for 534,712 unlawful calls.

### <u>*Selected Published Decisions:*</u>

*Bayol v. Zipcar, Inc*., 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014), denying enforcement of forum selection clause based on public policy grounds.

*Bayol v. Zipcar, Inc.*, 78 F. Supp. 3d 1252 (N.D. Cal. Jan. 29, 2015), denying car-rental company's motion to dismiss its subscriber's allegations of unlawful late fees.

*Brown v. Comcast Corp.*, 2016 WL 9109112 (C.D. Cal. Aug. 12, 2016), denying internet service provider's motion to compel arbitration of claims alleged under the Telephone Consumer Protection Act.

*Choi v. Kimberly-Clark Worldwide, Inc.*, 2019 WL 4894120 (C.D. Cal. Aug. 28, 2019), denying tampon manufacturer's motion to dismiss its customer's design defect claims.

*Horanzy v. Vemma Nutrition Co.*, Case No. 15-cv-298-PHX-JJT (D. Ariz. Apr. 16, 2016), denying multi-level marketer's and its chief scientific officer's motion to dismiss their customer's fraud claims.

*McMillion, et al. v. Rash Curtis & Associates*, 2017 WL 3895764 (N.D. Cal. Sept. 6, 2017), granting nationwide class certification of Telephone Consumer Protection Act claims by persons receiving autodialed and prerecorded calls without consent.

*McMillion, et al. v. Rash Curtis & Associates*, 2018 WL 692105 (N.D. Cal. Feb. 2, 2018), granting plaintiffs' motion for partial summary judgment on Telephone Consumer Protection Act violations in certified class action.

*Perez v. Indian Harbor Ins. Co.*, 2020 WL 2322996 (N.D. Cal. May 11, 2020), denying insurance company's motion to dismiss or stay assigned claims of bad faith and fair dealing arising out of $267 million trial judgment.

*Perez v. Rash Curtis & Associates*, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020), upholding constitutionality of $267 million class trial judgment award.

*Salazar v. Honest Tea, Inc.*, 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015), denying manufacturer's motion for summary judgment as to customer's false advertising claims.

### *Selected Class Settlements:*

*Juarez-Segura, et al. v. Western Dental Services, Inc.* (Cal. Sup. Ct.) $35 million settlement to resolve claims of dental customers for alleged unlawful late fees.

*Moore v. Kimberly-Clark Worldwide, Inc.* (Ill. Cir. Ct.) $10.5 million settlement to resolve claims of tampon purchasers for alleged defective products.

*Retta v. Millennium Prods., Inc.*, 2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) granting final approval of $8.25 million settlement to resolve claims of kombucha purchasers for alleged false advertising.

*Cortes v. National Credit Adjusters, L.L.C.* (E.D. Cal.) $6.8 million settlement to resolve claims of persons who received alleged autodialed calls without prior consent in violation of the TCPA.

*Bayol et al. v. Health-Ade LLC, et al.* (N.D. Cal.) – granting final approval of $3,997,500 settlement to resolve claims of kombucha purchasers for alleged false advertising.

## PHILIP L. FRAIETTA

Philip L. Fraietta is a Partner with Bursor & Fisher, P.A. Phil focuses his practice on data privacy, complex business litigation, consumer class actions, and employment law disputes. Phil has been named a "Rising Star" in the New York Metro Area by Super Lawyers® every year since 2019.

Phil has significant experience in litigating consumer class actions, particularly those involving data privacy claims under statutes such as the Michigan Preservation of Personal Privacy Act and the Illinois Biometric Information Privacy Act. Since 2016, Phil has recovered over $100 million for class members in data privacy class action settlements. In addition to data privacy claims, Phil has significant experience in litigating and settling class action claims involving false or misleading advertising.

Phil is admitted to the State Bars of New York and New Jersey, the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, the Western District of New York, the Northern District of New York, the District of New Jersey, the Eastern District of Michigan, the Western District of Michigan, the Central District of Illinois, and the United States Court of Appeals for the Second Circuit. Phil was a Summer Associate with Bursor & Fisher prior to joining the firm.

Phil received his Juris Doctor from Fordham University School of Law in 2014, graduating cum laude. During law school, Phil served as an Articles & Notes Editor for the Fordham Law Review, and published two articles. In 2011, Phil graduated cum laude from Fordham University with a B.A. in Economics.

### *Selected Published Decisions:*

*Kolebuck-Utz v. Whitepages Inc.,* 2021 WL 157219 (W.D. Wash. Apr. 22, 2021), denying defendant's motion to dismiss for alleged violations of Ohio's Right to Publicity Law.

*Bergeron v. Rochester Institute of Technology,* 2020 WL 7486682 (W.D.N.Y. Dec. 18, 2020), denying university's motion to dismiss for failure to refund tuition and fees for the Spring 2020 semester in light of the COVID-19 pandemic.

*Porter v. NBTY, Inc.,* 2019 WL 5694312 (N.D. Ill. Nov. 4, 2019), denying supplement manufacturer's motion for summary judgment on consumers' allegations of false advertising relating to whey protein content.

*Boelter v. Hearst Communications, Inc.,* 269 F. Supp. 3d 172 (S.D.N.Y. 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

BURSOR & FISHER
P.A.

*Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579 (S.D.N.Y. 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

### *Selected Class Settlements:*

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Taylor v. Trusted Media Brands, Inc.*, Case No. 16-cv-01812-KMK (S.D.N.Y. 2018) – final approval granted for $8.225 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. American Media, Inc.*, Case No. 16-cv-11367-JEL (E.D. Mich. 2017) – final approval granted for $7.6 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

## SARAH N. WESTCOT

Sarah N. Westcot is a Partner with Bursor & Fisher, P.A.  Ms. Westcot focuses her practice on complex business litigation, consumer class actions, and employment law disputes. She has represented clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Ms. Westcot served as trial counsel in *Ayyad v. Sprint Spectrum L.P.*, where Bursor & Fisher won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

Ms. Westcot also has significant experience in high-profile, multi-district litigations.  She currently serves on the Plaintiffs' Steering Committee in *In re Zantac (Ranitidine) Products Liability Litigation,* MDL No. 2924 (S.D. Florida).

Ms. Westcot is admitted to the State Bars of California and Florida, and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California and the Southern and Middle Districts of Florida.

Ms. Westcot received her Juris Doctor from the University of Notre Dame Law School in 2009. During law school, Ms. Westcot was a law clerk with the Cook County State's Attorney's Office in Chicago and the Santa Clara County District Attorney's Office in San Jose, CA. She graduated with honors from the University of Florida in 2005.

## ALEC M. LESLIE

Alec Leslie is an Associate with Bursor & Fisher, P.A. He focuses his practice on consumer class actions, employment law disputes, and complex business litigation.

Alec is admitted to the State Bar of New York and is a member of the bar of the United States District Courts for the Southern and Eastern Districts of New York. Alec was a Summer Associate with Bursor & Fisher prior to joining the firm.

Alec received his Juris Doctor from Brooklyn Law School in 2016, graduating *cum laude*. During law school, Alec served as an Articles Editor for Brooklyn Law Review. In addition, Alec served as an intern to the Honorable James C. Francis for the Southern District of New York and the Honorable Vincent Del Giudice, Supreme Court, Kings County. Alec graduated from the University of Colorado with a B.A. in Philosophy in 2012.

## BLAIR E. REED

Blair Reed is an Associate with Bursor & Fisher, P.A. She focuses her practice on complex business litigation and consumer class actions.

Blair served on the trial team for *Perez v. Rash Curtis & Associates*, where Bursor & Fisher won a jury verdict of over $265 million for violations of the Telephone Consumer Protection Act.

Blair is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California.

Blair received her Juris Doctor from the University of San Francisco School of Law in 2017, where she was a Dean's Scholar and served as a staff member for USF Law Review. During law school, Blair worked as a Law Clerk at a Bay Area law firm with a focus on wage and hour class actions. In addition, she worked as a Law Clerk at the Santa Cruz County District Attorney's Office. In 2013, Blair graduated from the University of San Francisco where she played on the Women's Tennis Team and studied Communications.

## ANDREW OBERGFELL

Andrew Obergfell is an Associate with Bursor & Fisher, P.A. Andrew focuses his practice on complex civil litigation and class actions.

BURSOR&FISHER
P.A.

Andrew graduated from Drew University with *summa cum laude* distinction. While at Drew University, Andrew was captain of the varsity baseball team. Andrew was inducted into the Phi Beta Kappa honor society and was President of the college's chapter of the Pi Sigma Alpha political science honor society.

Andrew attended Seton Hall University School of Law, where he obtained his law degree with *magna cum laude* distinction, and was inducted into the prestigious Order of the Coif honor society.  While in law school, Andrew was an editor and published author for the Seton Hall Law Review, participated in the Impact Litigation Clinic, and was a member of the Interscholastic Moot Court Board.  As part of the Interscholastic Moot Court Board, Andrew received the national best-brief award in the 2015 ABA National Appellate Advocacy Competition, as well as the 2015 best student-written brief of the year award as recognized by Scribes, the American Society of Legal Writers.

Prior to joining the firm, Andrew practiced at an AmLaw 100 law firm. He also clerked for The Honorable Douglas M. Fasciale in the New Jersey Superior Court, Appellate Division, in Newark, New Jersey.

## STEPHEN BECK

Stephen is an Associate with Bursor & Fisher, P.A. Stephen focuses his practice on complex civil litigation and class actions.

Stephen is admitted to the State Bar of Florida and is a member of the bars of the United States District Courts for the Southern and Middle Districts of Florida.

Stephen received his Juris Doctor from the University of Miami School of Law in 2018. During law school, Stephen received an Honors distinction in the Litigation Skills Program and was awarded the Honorable Theodore Klein Memorial Scholarship for excellence in written and oral advocacy. Stephen also received the CALI Award in Legislation for earning the highest grade on the final examination. Stephen graduated from the University of North Florida with a B.A. in Philosophy in 2015.

## BRITTANY SCOTT

Brittany Scott is an Associate with Bursor & Fisher, P.A.  Brittany focuses her practice on complex civil litigation and class actions.  Brittany was an intern with Bursor & Fisher prior to joining the firm.

She is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, the Eastern District of Wisconsin, and the Northern District of Illinois.

Brittany received her Juris Doctor from the University of California, Hastings College of the Law in 2019, graduating *cum laude.* During law school, Brittany was a member of the Constitutional Law Quarterly, for which she was the Executive Notes Editor. Brittany published a note in the Constitutional Law Quarterly entitled "Waiving Goodbye to First Amendment

BURSOR&FISHER
P.A.

Protections: First Amendment Waiver by Contract." Brittany also served as a judicial extern to the Honorable Andrew Y.S. Cheng for the San Francisco Superior Court. In 2016, Brittany graduated from the University of California Berkeley with a B.A. in Political Science.

## MAX ROBERTS

Max Roberts is an Associate with Bursor & Fisher, P.A.  Max focuses his practice on complex civil litigation and class actions.  Max was a Summer Associate with Bursor & Fisher prior to joining the firm.

Max is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Northern, Southern, and Eastern Districts of New York.

Max received his Juris Doctor from Fordham University School of Law in 2019, graduating *cum laude*.  During law school, Max was a member of Fordham's Moot Court Board, the Brennan Moore Trial Advocates, and the Fordham Urban Law Journal, for which he published a note entitled *Weaning Drug Manufacturers Off Their Painkiller: Creating an Exception to the Learned Intermediary Doctrine in Light of the Opioid Crisis*.  In addition, Max served as an intern to the Honorable Vincent L. Briccetti of the Southern District of New York and the Fordham Criminal Defense Clinic.  Max graduated from Johns Hopkins University in 2015 with a B.A. in Political Science.

Outside of the law, Max is an avid triathlete.

## CHRISTOPHER R. REILLY

Chris Reilly is an Associate with Bursor & Fisher, P.A. Chris focuses his practice on consumer class actions and complex business litigation.

Chris is admitted to the State Bar of Florida and is a member of the bar of the United States District Courts for the Southern and Middle Districts of Florida.

Chris received his Juris Doctor from Georgetown University Law Center in 2020. During law school, Chris clerked for the Senate Judiciary Committee, where he worked on antitrust and food and drug law matters under Senator Richard Blumenthal.  He has also clerked for the Mecklenburg County District Attorney's Office, the ACLU Prison Project, and the Pennsylvania General Counsel's Office.  Chris served as Senior Editor of Georgetown's Journal of Law and Public Policy.  In 2017, Chris graduated from the University of Florida with a B.A. in Political Science.

## RACHEL MILLER

Rachel Miller is an Associate with Bursor & Fisher, P.A.  Rachel focuses her practice on complex civil litigation and class actions.

Rachel is admitted to the State Bar of Florida and is a member of the bar of the United States District Court for the Southern District of Florida.

Rachel received her Juris Doctor from the University of Chicago Law School in 2015. During law school, Rachel participated in the Criminal & Juvenile Justice Clinic and received the 2014 Public Interest Law Society Award for Public Service.  Rachel graduated *cum laude* from the University of Florida in 2012 with a B.A. in Political Science.

## JULIA K. VENDITTI

Julia K. Venditti is an Associate with Bursor & Fisher, P.A.  Julia focuses her practice on complex civil litigation and class actions.  Julia was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julia is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Southern, and Eastern Districts of California.

Julia received her Juris Doctor in 2020 from the University of California, Hastings College of the Law, where she graduated *cum laude* with two CALI Awards for the highest grade in her Evidence and California Community Property classes.  During law school, Julia was an active member of the UC Hastings Moot Court team and competed at the Evans Constitutional Law Moot Court Competition, where she finished as a national quarterfinalist and received a best brief award.  Julia was also inducted into the UC Hastings Honors Society and was awarded Best Brief and an Honorable Mention for Best Oral Argument in her First-Year Moot Court section.  In addition, Julia served as a Research Assistant for her Constitutional Law professor, as a Teaching Assistant for Legal Writing & Research, and as a Law Clerk at the San Francisco Public Defender's Office.  In 2017, Julia graduated *magna cum laude* from Baruch College/CUNY, Weissman School of Arts and Sciences, with a B.A. in Political Science.

## SEAN L. LITTERAL

Sean L. Litteral is an Associate with Bursor & Fisher, P.A.  Sean focuses his practice on complex business litigation, consumer class actions, and employment law disputes.  He holds degrees from Berea College, the London School of Economics and Political Science, and Berkeley Law.

Sean has represented clients in a variety of matters, including survivors against the Boy Scouts of America for covering up decades of sexual abuse; warehouse workers against Walmart for failing to comply with COVID-19 health and safety guidelines; and drivers against Corinthian International Parking Services for systematically violating California's wage and hour laws.

Sean clerked for the Alaska Supreme Court and served as a fellow for the U.S. House Committee on Education and Labor and the Atlanta City Council.  He previously externed for the Special Litigation Section, Civil Rights Division of the U.S. Department of Justice; the Berkeley Environmental Law Clinic; and the Corporate Sustainability Program at the Pontificia Universidad Católica de Chile.

BURSOR&FISHER
P.A.

He has published in the UC Davis Environmental Law & Policy Journal, the Harvard Latinx Law Review, and the Stanford Law and Policy Review on a broad scope of matters, including corporate sustainability, international trade, and national security.

## **JULIAN DIAMOND**

Julian Diamond is a Law Clerk with Bursor & Fisher, P.A. Julian focuses his practice on privacy law and class actions. Julian was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julian received his Juris Doctor from Columbia Law School in 2020, where he was a Harlan Fiske Stone Scholar. During law school, Julian was Articles Editor for the Columbia Journal of Environmental Law. Prior to law school, Julian worked in education. Julian graduated from California State University, Fullerton with a B.A. in History and a single subject social science teaching credential.

## **MATT GIRARDI**

Matt Girardi is a Law Clerk with Bursor & Fisher, P.A. Matt focuses his practice on complex civil litigation and class actions. Matt was a Summer Associate with Bursor & Fisher prior to joining the firm.

Matt received his Juris Doctor from Columbia Law School in 2020, where he was a Harlan Fiske Stone Scholar. During law school, Matt was the Commentary Editor for the Columbia Journal of Tax Law, and worked for fledgling businesses with Columbia's Entrepreneurship and Community Development Clinic. In addition, Matt worked as an Honors Intern in the Division of Enforcement at the U.S. Securities and Exchange Commission. Prior to law school, Matt graduated from Brown University in 2016 with a B.A. in Economics, and worked as a Paralegal Specialist at the U.S. Department of Justice in the Antitrust Division.

**EXHIBIT 15**

20205srussc

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   --------------------------------x
    ELIZABETH RUSSETT,
3   individually and on behalf of
    all others similarly situated,
4   et al.,

5                  Plaintiffs,

6          v.                              19 CV 7414(KMK)

7                                          DECISION

8   NORTHWESTERN MUTUAL LIFE
    INSURANCE COMPANY,
9
                   Defendant.
10  --------------------------------x

11                                         United States Courthouse
                                           White Plains, New York
12                                         May 28, 2020

13

14

15  Before:  THE HONORABLE KENNETH M. KARAS, District Judge

16

17

18                          APPEARANCES

19
    BURSOR & FISHER, P.A.
20       Attorney for Plaintiffs
    FREDERICK JOHN KLORCZYK
21  PHILIP LAWRENCE FRAIETTA

22
    FAEGRE, DRINKER, BIDDLE & REATH, LLP
23       Attorneys for Defendant
    TIMOTHY J. O'DRISCOLL
24  BRIAN PERRYMAN

25
```

1            THE DEPUTY CLERK:  Russet, et al. v. Northwestern

2     Mutual Life Insurance Company, 19 Civ. 7414.

3            Counsel, please state your appearances.

4            MR. FRAIETTA:  Good morning, your Honor.  This is

5     Phil Fraietta, Bursor & Fisher, for the plaintiff and the

6     proposed Class.

7            THE COURT:  Good morning.

8            MR. KLORCZYK:  Good morning, your Honor.  This is

9     Fred Klorczyk on behalf the plaintiffs and the proposed Class

10    Members.  I'm also from Bursor & Fisher.

11           THE COURT:  Good morning.

12           MR. PERRYMAN:  Good morning.  This is Brian Perryman,

13    law firm of Drinker, Biddle, for the Defendant, Northwestern

14    Mutual life Insurance Company.

15           THE COURT:  Good morning.

16           MR. O'DRISCOLL:  Good morning.  This is Tim

17    O'Driscoll at Faegre, Drinker, also, also for the Defendant,

18    Northwestern Mutual Life Insurance company.

19           THE COURT:  All right.  Good morning.

20           Anybody else?

21           MR. FRAIETTA:  No.  That's all, your Honor.

22           THE COURT:  Okay.  All right.

23           So this is scheduled to be argument on the motion for

24    preliminary approval of the Class settlement and the

25    provisional cert. of the Settlement Class as well as the

1    appointment of Settlement Class representative and counsel and

2    approval of the notice plan.

3           So I've read the papers, but I certainly don't want

4    to deny anybody the opportunity to elaborate, summarize,

5    whatever it is.  So I guess we'll start with plaintiff.  I

6    don't know who's going to speak on behalf of the plaintiff,

7    from the plaintiff's side.

8           MR. FRAIETTA:  Sure, your Honor.  This is

9    Mr. Fraietta.  I'm going to speak for the plaintiff.

10          So, to summarize the lawsuit and the settlement, it's

11   a lawsuit brought pursuant to New York General Business Law

12   Section 399-zzz.  That section prohibits companies from

13   charging additional or differential rates or fees for customers

14   to pay by paper mail.

15          In this case, Northwestern Mutual we allege was

16   charging a $1 fee for its customers to pay by paper mail.  We

17   filed a lawsuit.  Shortly thereafter, the parties began

18   extensive settlement discussions which lasted for many months

19   and involved an in-person mediation with the Honorable Wayne

20   Anderson of JAMS Chicago.  At the conclusion of that mediation,

21   we continued our negotiations and reached the settlement.

22          Under the terms of the settlement, we have

23   established a settlement fund of $595,000, which we believe is

24   significant given that, at the time of the settlement,

25   Northwestern had only collected around $522,000 of these fees,

```
 1    so our recovery there eclipses the actual amount that was

 2    collected.

 3          The settlement is set up to be distributed to Class

 4    Members in two manners.  The first will be for active account

 5    holders.  They'll receive a credit to their bills in a prorated

 6    fashion.  They will automatically receive that.  They don't

 7    have to file a claim or anything like that so long as they do

 8    not opt out of the settlement.  For inactive Class Members,

 9    there will be a pro rata cash award sent via check for those

10    who file claims.  And the reason for that distinction is that

11    Northwestern cannot guarantee the address of inactive members.

12    They may have since deceased or moved.  So we have the claiming

13    process set forth to save on the administrative costs because

14    we don't want to spend the Class' money having an administrator

15    try and search for addresses of people who may no longer be

16    alive.

17          We believe that it's a fair settlement and certainly

18    warrants preliminary approval.

19          THE COURT:  All right.  So just a couple of questions

20    more just I think for clarification.

21          MR. FRAIETTA:  Sure.

22          THE COURT:  Actually, before I do that, anything from

23    the defense side that either counsel wants to add?

24          MR. PERRYMAN:  I'll be speaking on behalf of the

25    Defendant this morning.
```

1          No, I think we would generally agree with what

2     Mr. Fraietta's said.  We would emphasize that Northwestern

3     Mutual does believe it has extremely strong defenses and that

4     this settlement is the product of a really hard-fought

5     negotiation process that culminated in mediation and -- I guess

6     didn't culminate -- started in mediation and continued over a

7     number of months.

8          We would also just note that to the extent there is a

9     claiming process, it applies to a really small fraction of the

10    Class.  The vast majority of folks are going to get direct

11    monetary relief put into their accounts.  So we think this is a

12    meritorious and very worthy settlement.

13          THE COURT:  Okay.  Thank you for that.

14          So just a couple -- I guess just a couple

15    clarification questions.

16          So with respect to the amount of the payments, as I

17    understand it, the amount of the payments are going to be

18    determined basically using the following.

19          So the total amount of service charges assessed

20    during the Class period to Settlement Class Members with closed

21    ISAs who did not commit approved claims and any Class Members

22    who file a request for exclusion from the Settlement Class will

23    be subtracted from the net settlement fund.  Do I have that

24    piece of it right?

25          MR. FRAIETTA:  Yes.

1          THE COURT:  All right.  Then that difference is going

2    to be divided by the total amount of service charges assessed

3    during the Class period to Class Members with closed ISAs who

4    submit approved claims and Class Members with active ISAs, and

5    then that quotient is going to be multiplied by the amount of

6    service charges paid through an individual Class member's ISA

7    during the Class period.  Do I have that piece right?

8          MR. FRAIETTA:  That is right again.  And, yes, I

9    believe that is correct, your Honor.  And the reason for that,

10   if I may --

11         THE COURT:  Please.

12         MR. FRAIETTA:  -- is we did not want to end up in a

13   situation where -- you know, some Class Members, they may have

14   only paid these fees for a month or two while others paid them

15   for two or three years, so we didn't want to end up in a

16   situation where the guy who paid the $1 fee one time gets the

17   same recovery as the guy who paid the $1 fee 30 times.

18         THE COURT:  Okay.  So the difference between the

19   amount of the net settlement amount and the total amount of

20   service charges assessed during the Class period to Class

21   Members with closed ISAs who do not submit approved claims will

22   not be distributed from the net settlement fund and will remain

23   as defendant's property?  Is that right?

24         MR. FRAIETTA:  That's correct, your Honor.

25         THE COURT:  Okay.  So I think the way that you all

1    intend that is that the amount of service charges assessed to

2    the Class Members with closed ISAs who don't submit will stay

3    with the Defendant.  There is I think a way to read that that

4    suggests that the difference between the net settlement amount

5    and the amount of charges assessed to those with closed ISAs

6    who don't send the claim forms will revert to defendant, and I

7    guess I'm wondering why that would not be almost the majority

8    of the net settlement.  But maybe I'm misunderstanding that.

9                 MR. FRAIETTA:  Sure.  Yes.  And, your Honor, this is

10   Mr. Fraietta again.  We believe it's going to be, if any, a

11   very, very small minority, and the reason for that is, as

12   Mr. Perryman said earlier, the vast majority of Class Members

13   in this case are people with active ISAs.  It's over 90

14   percent.  So the actives are already getting their money.

15   That's over 90 percent of the fund.  The remaining 10 percent

16   are the people who will have to claim to get their money.

17   Given that it's only 10 percent, it's a small portion.  And we

18   also believe that the claim rate will be high in this kind of

19   case because we do intend to be able to provide direct notice

20   to the vast majority of that 10 percent given the ability to

21   provide notice via e-mail and also via change-of-address

22   records which the Settlement Administrator will be instructed

23   to search for.  So to the extent that a member with a closed

24   ISA has moved, under the National Change of Address Registry,

25   we expect that there's a good likelihood we will be able to

1    find that person to notice them about the settlement.  But,

2    again, it's only less than 10 percent of the settlement class.

3             THE COURT:  Okay.  All right.  Fair enough.

4             All right.  So the Settlement Agreement also insures

5    that Class Members with active ISAs will automatically receive

6    pro rata shares of the settlement amount and that Class Members

7    with closed may obtain pro rata shares through the submission

8    of the claim forms, right?

9             MR. FRAIETTA:  That's correct.

10            THE COURT:  Okay.  So I guess you have a sense of

11   whether -- or an estimate as to how much the Class Members may

12   receive from the net settlement fund as a percentage of the

13   total charges that they paid.

14            MR. FRAIETTA:  Yes.  And we believe it's probably

15   going to be around two-thirds of what they paid.

16            THE COURT:  Okay.  And the basis for that is?

17            MR. FRAIETTA:  The basis for that, your Honor, is

18   that, as I said, the settlement fund itself eclipses the amount

19   that's actually been collected by Northwestern Mutual.  So once

20   you subtract out the costs of notice, which we've gone ahead

21   and had the proposed notice administrator submit a budget

22   before agreeing to the settlement so we have an understanding

23   of what those costs will be, and the requested incentive awards

24   and attorneys' fees, it's going to leave approximately

25   two-thirds of the actual amount that was collected.

1          THE COURT:  Right, but to the extent the settlement

2     fund conceivably exceeds the total amount of what you all

3     allege to be the lawful fees that are charged, the settlement

4     amount also -- the settlement fund also includes, does it not,

5     attorneys' fees, the service awards and some of the other

6     expenses?

7          MR. FRAIETTA:  Yes, yes, your Honor.  Sorry if I

8     wasn't clear there.  After you subtract those out, we believe

9     about two-thirds of the money is going to be left.  So

10    two-thirds of what was actually collected will be left in the

11    settlement fund to be then distributed to Class Members.

12         THE COURT:  Okay.

13         MR. FRAIETTA:  That's how we come up with the

14    two-thirds calculation.

15         THE COURT:  Okay.

16         As to the proposed service award, I mean, I don't

17    think this is going to upset the apple cart, but is there

18    anything you can add to what's in your memorandum?

19         MR. FRAIETTA:  Yes, sure, your Honor.  And this was

20    something that typically we would elaborate in the fee petition

21    with declarations of the Class representatives, but I can just

22    tell you that, as Class counsel, the Class representatives were

23    imperative to getting this lawsuit settled.  They provided my

24    firm with information regarding their own personal accounts,

25    including billing statements and things of that sort, which

1    allowed us to see how the fee was assessed on the billing

2    statement, which we believe was a key issue in this case.

3            And I'll point the Court to a similar matter that's

4    pending before Cathy Seibel, Judge Seibel, right now.  It's

5    called Santoro v. State Farm.  And in that case, State Farm has

6    argued that the statute permits it to offer discounts as

7    opposed to charging fees.  So how the charge itself is assessed

8    to the individual class member is, in our view, imperative

9    towards whether or not it's a discount or additional fee.  So

10   that the Class representatives doing that was certainly

11   imperative to the case.  They also were involved in every step

12   of the negotiation process, in calls with me and my partner,

13   Mr. Klorczyk, discussing the terms of the settlement, what it

14   would provide for Class Members, and it was very important to

15   the Class representatives to ensure that they got an adequate

16   recovery for their Class, their fellow Class Members.  So I

17   would say that they certainly have done their part to warrant a

18   $5,000 service award, which I note is on par with service

19   awards in this circuit.

20           THE COURT:  Yes, I agree with that.  And I'm not

21   surprised that there is more.  You're right that's something

22   that we do cover in more detail, but I just want to make sure.

23           With respect to the release claims, they are limited

24   by the "identical factual predicate" rule.  Here, the release

25   states that it applies to claims that "arise" -- I'll just put

1    in brackets arise -- "out of or in any way allegedly related

2    to" certain facts, but is not limited to all claims that were

3    brought or could have been brought in the action.

4            Is this limited to the Class period or this somehow

5    could be construed as any future claims?

6            MR. FRAIETTA:  I believe the release would be limited

7    by the Class period, your Honor.  I believe it would be limited

8    by the Class period as those would be the only Class Members

9    bound by the settlement.

10            THE COURT:  Right.

11            MR. FRAIETTA:  And we do believe that the release

12    claims are consistent with the identical factual predicate

13    rule.

14            THE COURT:  Okay.  I agree.  I just want to make sure

15    we're all on the same page.  You would be amazed at what people

16    put, and sometimes inadvertently.

17            MR. FRAIETTA:  And, your Honor, if I may, we

18    understand that, and that's why myself and my partner,

19    Mr. Klorczyk, and Mr. Perryman and Mr. O'Driscoll, with Judge

20    Anderson's help, we negotiated this settlement over a period of

21    months.  And the negotiation was not just a negotiation about

22    the ultimate amount of money, it was a negotiation as well

23    about the specific terms of the settlement, the administration

24    of the settlement and how it would be effectuated.  For all

25    those reasons, as the Court has mentioned, we understand that

1   sometimes these settlements have, for lack of a better word,

2   poor (INAUDIBLE) and we wanted to avoid any of that.

3              THE COURT:  Okay.  Fair enough.

4              I think those are the questions that I had.  If

5   there's nothing else, then I'm just going to go ahead and give

6   you my ruling so we can get this show on the road.

7              Anything else from either side?

8              MR. PERRYMAN:  No, your Honor.

9              MR. FRAIETTA:  Nothing from plaintiffs, your Honor.

10             THE COURT:  Okay.  All right.

11             So, as I mentioned at the outset, this is a class

12  action, and right now we are at the preliminary approval stage.

13  I think the long and the short of it is that the plaintiffs'

14  allegation here is that Northwestern unlawfully charged

15  plaintiffs a $1 fee to pay their monthly premiums by mail,

16  which plaintiffs allege was done in violation of New York GBL

17  Sections 349 and 349-zzz.  And plaintiffs allege that these

18  fees were collected to the tune of over $500,000.

19             So the proposed settlement is that the defense will

20  make available a total of $595,000, which I have referred to as

21  the settlement amount during our colloquy here, to pay approved

22  claims to Class Members and, as I said, settlement

23  administration expenses, service awards to the Class rep,

24  attorneys' fees and other costs and expenses.

25             The Class consists of approximately 24,000 members

1   and will include all persons with a New York mailing address

2   who, from June 21 of 2016 to the date of the preliminary

3   approval order, were charged this additional fee or a

4   differential in the rate or fee based upon a method by which

5   they chose to make certain payments.

6           I'll just note that the Settlement Agreement does

7   have the typical language about those that might be excluded

8   from the settlement class.  Nothing problematic there.

9           So the settlement Class Members are going to receive

10  a pro rata payment from the net settlement fund, which is the

11  amount of the settlement fund after payment of claims

12  administration and, as I said, the costs and fees and incentive

13  awards, et cetera.

14          Now, Class Members with active insurance service

15  accounts, which I referred to as ISAs earlier, are

16  automatically going to receive credit towards their ISAs.

17  Individuals with active ISAs account for over 90 percent of the

18  total fees collected.  Class Members with closed ISAs will have

19  until the claims deadline to submit a claim form for approval

20  by the Settlement Administrator.  These Class Members will

21  receive a check with their pro rata payment.  Class Members who

22  closed their ISAs between the date of the preliminary approval

23  order and the effective date will also receive a check with

24  their pro rata payment.  And I've already gone through the

25  colloquy, so there's no need to repeat here the method being

1    used to calculate the amount of each payment.  And this is all

2    spelled out in Sections 21.1(a) and 21.1(b) of the agreement.

3              Now, Class Members who receive payment by check will

4    have 180 days to cash the check before it becomes null and

5    void.  That's going to be stated on the face of the check.

6    Funds from checks not cashed within 180 days after the issuance

7    will revert to the Legal Aid Society or another nonprofit

8    organization that's recommended by Class Counsel and defendant

9    and approved by the Court.

10             In exchange for the settlement, the releasing parties

11   "shall be deemed to have and, by operation of the final

12   judgment, shall have fully, finally and forever released,

13   relinquished and discharged all released claims against the

14   released parties."  That's from paragraph 3.2.

15             Released claims are those that, as I said, "arise out

16   of any facts, transactions, events, matters, occurrences ... or

17   failures to act arising out of or in any way allegedly related

18   to rates or fees or differentials in rates or fees associated

19   with payments by mail, including but not limited to all claims

20   that were brought or could have been brought in the action

21   relating to any and all releasing parties."  That's paragraph

22   1.29.  These claims include those that are "known or unknown,

23   fixed or contingent, claimed or unclaimed and suspected or

24   unsuspected" and those based on GBL Sections 349, 349-zzz or

25   any other statute or regulation.

1            There's a one-third payment that comes out of the

2     settlement fund for attorneys' fees.  And defendant also has

3     agreed to pay incentive awards of up to $5,000 to the Class

4     Reps.

5            So that's sort of the agreement in a nutshell.

6            Now, in terms of preliminary approval of a settlement

7     agreement, a court may do so where "the proposed settlement

8     appears to be the product of serious, informed, noncollusive

9     negotiations, has no obvious deficiencies, does not improperly

10    grant preferential treatment to class representatives or

11    segments of the class and falls within the range of possible

12    approval."  That's from In re NASDAQ Market-Makers Antitrust

13    Litigation, 176 F.R.D. 99, 102.

14            The Court's task at this stage is to determine

15    "whether there is any reason to notify the Class Members of the

16    proposed settlement and to proceed with a fairness hearing."

17    That's from In re Prudential Securities, Limited Partnership

18    Litigation, 163 F.R.D. 200, 209.

19            Now, there is a presumption of fairness, adequacy and

20    reasonableness to a class settlement that is reached as a

21    result of arm's-length negotiations, especially when it

22    involves experienced and capable counsel and after meaningful

23    discovery.  And that's all spelled out in Wal-Mart Stores,

24    Inc. v. Visa U.S.A., Inc. 396 F.3d 96, 116.

25            Here, the parties engaged in a day-long mediation

session back on December 18th of 2019 before Judge Anderson,

who is a retired judge from the Northern District of

Illinois -- hopefully he's a Cubs fan -- at JAMS in Chicago.

          Although a settlement wasn't reached at this

in-person mediation, the parties did continue to engage in

extensive settlement discussions after that session.

          Throughout, Plaintiffs were represented, ably, I

would note, by the firm of Bursor & Fisher, which has

significant experience in litigating class actions of similar

size and scope and complexity and have served as class counsel

on numerous occasions.  And, indeed, this Court has previously

found that this firm more than adequately satisfies the

criteria for being deemed Class Counsel.  The case is

Ruppel v. Consumer Union of U.S., Inc.  The docket number is 16

Civ. 2444.

          Also, prior to the mediation session, the parties

exchanged an informal discovery.  This included discovery

related to the amount of the allegedly unlawful fees.  There

were a number of detailed mediation statements that laid out

the parties' respective legal arguments.  And counsel for

Plaintiffs represent that this information would have been in

large part the same information that would have been exchanged

in formal discovery and was sufficient to allow the parties to

assess the relative strengths and weaknesses of their

respective claims and/or defenses.

1          So the Court's finding here is that, based on this

2     record, the settlement was the result of arm's-length

3     negotiations between experienced and capable counsel after

4     sufficiently meaningful discovery and, therefore, is

5     presumptively fair, reasonable and adequate, as is the test

6     laid out in Wal-Mart Stores.

7          It also bears noting, as I discussed earlier, that

8     the Settlement Agreement does ensure that Class Members with

9     active ISAs will automatically receive pro rata shares on the

10    settlement amount and the Class Members with closed ISAs may

11    obtain pro rata shares, as well, through the submission of the

12    claim forms.  To the extent that the active ISAs constitute 90

13    percent of the Class, that means that the vast, vast majority

14    of the Class Members will automatically receive compensation

15    from the settlement.

16          The Court, therefore, finds that the settlement has

17    no obvious deficiencies and otherwise does not grant

18    preferential treatment to the Class Representatives or segments

19    of the Class and falls within the range of possible approval.

20          With regard to the release, that is spelled out in

21    paragraphs 3.1 and 3.2.  I've already laid out what the

22    definition of released claims is, and that is spelled out in

23    paragraph 1.29.  The unknown claims piece of it is spelled out

24    in paragraph 1.38.  There is a waiver of a certain provision of

25    the California Civil Code.  Isn't there always?

```
 1            And so the release is broad, but the release, in this

 2     Court's view, especially given that the law in this Circuit has

 3     well established that class-action releases may include claims

 4     not presented and even those which could not have presented as

 5     long as the release conduct arises out of the identical factual

 6     predicate of the settled conduct.  That's, again, laid out in

 7     the Wal-Mart Stores case at page 107.  Indeed, that decision

 8     notes that broad class-action settlements are common because,

 9     otherwise, if you don't have such broad releases, then it

10     leaves defendants open to potentially limitless liability.

11            So, here, the release is limited to claims that arise

12     out of or relate to the rates or fees or differentials in rates

13     or fees associated with payments by mail and specifically

14     includes but is not limited to claims that were brought or

15     could have been brought in the action relating to any and all

16     releasing parties."  And that's from the Settlement Agreement

17     at paragraph 1.29.  And so I think that does satisfy the

18     identical factual predicate test that's laid out within our

19     Circuit and the release is otherwise appropriate.  And the one

20     question I had was satisfactorily answered on that point.

21            In terms of the released parties, that's all defined

22     in paragraph 1.30.  The released parties certainly include the

23     Defendant as well as -- there's a whole list there -- and

24     arguably includes nonparties that is not improper.  "Class

25     action settlements have in the past released claims against
```

nonparties where, as here, the claims against the non-party

being released were based on the same underlying factual

predicate as the claims asserted against the parties to the

action being settled."  That's a quote from Wal-Mart Stores at

page 109.

So I think the preliminary view of the Court is that

the release terms and the released parties are all appropriate

under the circumstances.

Next up is the certification of the Class which is

being sought here.  I've already noted that paragraph 1.35 -- I

even quoted it -- has what the Settlement Class is defined as.

Applying Rule 23(a), that requires that the class is

sufficiently numerous that joinder would be impracticable; that

there are questions of law or fact common to the class; that

the claims or defenses of the representatives are typical of

the claims or defenses of the class; and that the

representative parties are going to fairly and adequately

protect the interests of the class.

Numerosity is presumed at 40.  That's exceeded here

easily as the Class consists of approximately 24,000 members.

In terms of commonality, that means that the

plaintiff is required to demonstrate that class members have

suffered the same injury.  That is satisfied when the claims

depend on a common contention, the resolution of which will

bring class-wide resolution of the claims.  That is met here

1    because the claims all involve the allegations of improperly

2    charged fees for payments made by mail.  So there are clearly

3    issues of fact and law common to all Class Members.

4            Typicality is satisfied when each class member's

5    claim arises from the same course of events and each class

6    member makes similar legal arguments to prove the defendant's

7    liability.  That's from Jackson v. Bloomberg, L.P., 298 F.R.D.

8    152, 164.

9            So, therefore, minor variations in the fact patterns

10   underlying individual claims do not defeat typicality when the

11   allegations involve the same unlawful conduct.

12           Here, I don't think there's any question about

13   typicality.  As I said, the claims all involve what Plaintiffs

14   allege to be the improper charging of fees for payments of

15   premiums made by mail.  So that seems pretty straightforward,

16   in the Court's view, and, therefore, typicality is satisfied.

17           Adequacy of representation entails inquiry as to

18   whether, first, the Plaintiffs' interests are antagonistic to

19   the interest of other class members and, second, that the

20   plaintiffs' attorneys are qualified, experienced and able to

21   conduct the litigation.  That's from Baffa v. Donaldson, Lufkin

22   & Jenrette Securities Corp., 222 F.3d 52, 60.

23           There's certainly nothing in the record to suggest

24   that there's any reason to doubt that the main Plaintiffs are

25   incapable or somehow ill-suited to represent the Class Members.

1   As I said, I've already found that the Bursor firm has

2   extensive experience in litigating precisely these types of

3   actions, and that's why they've been appointed in numerous

4   cases to be lead counsel.  So, therefore, the Court finds that

5   the adequacy requirement easily is satisfied.

6            In terms of Rule 23(b)(3), the Court finds that, at

7   this stage, the common issues predominate and a class action is

8   the superior means of adjudicating the case.

9            Again, the central common question is whether the

10  Defendant's assessment of fees was in violation of the GBL

11  provisions I already mentioned.  So, therefore, there are

12  common questions regarding the legality of Defendant's alleged

13  conduct here.  And there's really no doubt that the class

14  action is a superior means of litigating this case because of

15  so many Class Members and also the fact that they likely have

16  limited financial resources with which to prosecute the

17  individual actions, especially given the recovery they can

18  expect here.  So the 23(b)(3) criteria is satisfied here.

19           The Court's review of the proposed notice plan yields

20  the conclusion that it complies with the requirements of both

21  due process and Rule 23(c).  Under both, "the adequacy of

22  notice to class members depends on the particular circumstances

23  of each case."  That's from In re Global Crossing Securities &

24  ERISA Litigation, 225 F.R.D. 436, 448.

25           Of course, we all know that conformity with Rule

1    23(c)(2) satisfies the due process mandate.

2              23(b)(3) certification requires that the notice,

3    pursuant to Rule 23(c)(2)(B), provide the following:  The

4    nature of the action; the definition of the class certified;

5    the class claims, issues or defenses; that a class member may

6    enter an appearance through an attorney if the member so

7    desires; that the court will exclude from the class any member

8    who requests exclusions; that the time and manner for

9    requesting exclusion and also the binding effect of a class

10   judgment on members under Rule 23(c).

11             Here, the active ISA and closed ISA notices provide

12   sufficient information about the nature of the case, the

13   purpose and amount of the settlement, how the payments are

14   going to be distributed, the deadlines by which Class Members

15   must request exclusion or object to the settlement, contact

16   information for the Settlement Administrator, the date and time

17   of the final approval hearing, and the address of the

18   settlement website for more information.

19             The notices also explain that Class Members can

20   expect to obtain a pro rata share of the Settlement Fund that

21   is based on the total amount of service charges that they paid.

22   And the notice for Class Members with closed ISAs include the

23   claim form and provide instructions on how to submit claim

24   forms by a certain deadline.

25             Also, there's some website notice which provides

1    additional and I would say extensive information about the

2    action and the terms of the settlement, again, including the

3    purpose of the lawsuit and the Class Member rights and options,

4    the process for obtaining claims and information about the

5    settlement hearing.

6         The method to notify potential claimants the Court

7    deems to be sufficient.  No later than seven days after the

8    settlement is preliminarily approved, Defendants are going to

9    produce a list that includes the names and last-known mailing

10   addresses of all persons within the settlement class.  This

11   list will differentiate between Class Members with active and

12   closed ISAs and will include the total amount of service

13   charges paid by each class member.  That's all spelled out in

14   paragraph 4.1(a).

15        The claims administrator will then send notices to

16   all Settlement Class Members by no later than 28 days from

17   entry of the preliminary approval order.  The Class Members

18   with closed ISAs, these will include the claim form with

19   prepaid return postage.

20        If any notices are returned as undeliverable, the

21   Settlement Administrator is to remail the notices to the

22   forwarding address, to the extent provided, within five

23   business days.  If a forwarding address is not provided, the

24   Settlement Administrator will use the USPS National Change of

25   Address Database to attempt to obtain an updated address.

1          Also, there's going to be a dedicated settlement

2     website that's going to include the long-form Settlement Notice

3     as well as certain important court documents and upcoming

4     deadlines.  And again, Class Members with closed ISAs will be

5     able to submit their claim forms online.

6          Also, the Settlement Administrator is going to

7     provide notice of the settlement to the appropriate state and

8     federal officials, as required under CAFA.

9          So, in the Court's view, because the substance of the

10    proposed notices satisfies the requirements of due process and

11    23(c) and because the method of notifying the potential

12    claimants is more than adequate, the Court approves the

13    proposed notice plan.

14         So, for all these reasons, the unopposed motion for

15    preliminary approval of the Class Action Settlement,

16    preliminary certification of the Settlement Class and approval

17    of the Notice Plan is granted.  And the Court also

18    preliminarily designates Plaintiffs as Class Reps and Bursor &

19    Fisher as Class Counsel.

20         Is there anything else?  We obviously have to fill in

21    the blanks, but is there anything else, other than the dates?

22         MR. FRAIETTA:  No, your Honor.  I don't believe

23    there's anything else.  We submitted a proposed order with some

24    blank dates, as the Court mentioned.

25         THE COURT:  Right.  So we just need to fill those in

1    based on the number of days where we are now, right?

2                MR. FRAIETTA:  I believe that's correct, yes.

3                THE COURT:  Okay.  I'm sorry.  Counsel for defense,

4    you were about to say something.

5                MR. PERRYMAN:  Yes, your Honor.  You had mentioned

6    the CAFA notices.  We have filed with the Court a letter

7    attaching as exhibits the notices that we sent to the

8    appropriate state and federal regulators satisfying that

9    obligation.

10               THE COURT:  Right.  Okay.  Thank you for making that

11   clear on the record.

12               So we'll fill in the dates.  On the assumption we

13   don't screw that up, is there anything else we can do for you

14   all?

15               MR. FRAIETTA:  No, your Honor.  Thank you for your

16   time this morning.  We appreciate it.

17               MR. PERRYMAN:  No, your Honor.  We just ask the Court

18   be mindful of the recommended dates in there just so that we

19   can have our CAFA obligations satisfied.  You have to give an

20   appropriate length of notice to the regulators, so nothing too

21   soon.

22               THE COURT:  So we'll just follow what you all are

23   proposing and we should be fine.

24               MR. PERRYMAN:  Yes, your Honor.

25               THE COURT:  Okay.  Well, when you see the order, if

1    the dates are not satisfactory, please let us know.

2              MR. PERRYMAN:  Thank you, your Honor.

3              MR. FRAIETTA:  Thank you.

4              THE COURT:  All right.  So please stay healthy and

5    sane, everybody, and enjoy the rest of the day.

6              MR. FRAIETTA:  Thank you, Judge.

7              MR. PERRYMAN:  Thank you, your Honor.

8                            ----

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 16**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MARIBEL MOSES, on behalf of herself and all others similarly situated,<br><br>                                    Plaintiff,<br><br>         v.<br><br>THE NEW YORK TIMES COMPANY, d/b/a *The New York Times*.<br><br>                                    Defendant. | Civil Action No.: 1:20-cv-04658-RA<br><br>Hon. Judge Ronnie Abrams |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Dated:  March 30, 2021

**BURSOR & FISHER, P.A.**

Frederick J. Klorczyk III
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email: fklorczyk@bursor.com

**BURSOR & FISHER, P.A.**

Neal J. Deckant
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ndeckant@bursor.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................... 2

    A.    California's Automatic Renewal Law ................................................... 2

    B.    Plaintiff's Allegations ........................................................................ 3

    C.    The Litigation History And Settlement Discussions ......................... 3

TERMS OF THE SETTLEMENT ...................................................................................... 5

    A.    Class Definition .................................................................................. 5

    B.    Monetary Relief .................................................................................. 5

    C.    Injunctive Relief ................................................................................. 6

    D.    Release ................................................................................................ 7

    E.    Notice And Administration Expenses ................................................ 7

    F.    Incentive Award ................................................................................. 7

    G.    Attorneys' Fees And Expenses ......................................................... 7

ARGUMENT ...................................................................................................................... 8

I.    PRELIMINARY APPROVAL OF THE SETTLEMENT IS
APPROPRIATE ....................................................................................................... 8

    A.    The *Grinnell* Factors ...................................................................... 10

        1.    Litigation Through Trial Would Be Complex, Costly, And
Long (*Grinnell* Factor 1) ................................................... 10

        2.    The Reaction Of The Class (*Grinnell* Factor 2) ................. 12

        3.    Discovery Has Advanced Far Enough To Allow The Parties
To Responsibly Resolve The Case (*Grinnell* Factor 3) ...... 12

        4.    Plaintiff Would Face Real Risks If The Case Proceeded
(*Grinnell* Factors 4 And 5) ................................................ 13

        5.    Establishing A Class And Maintaining It Through Trial
Would Not Be Simple (*Grinnell* Factor 6) ........................ 13

        6.    Defendant's Ability To Withstand A Greater Judgment
(*Grinnell* Factor 7) ............................................................ 14

        7.    The Settlement Amount Reasonable In Light Of The Possible
Recovery And The Attendant Risks Of Litigation (*Grinnell*
Factors 8 And 9) ................................................................... 14

|   |   |   |   |
|---|---|---|---|
| B. | | The Rule 23(e)(2) Factors ................................................................. 15 | |
| | 1. | The Class Representative And Class Counsel Have Adequately Represented The Class (Rule 23(e)(2)(A) .......................... 15 | |
| | 2. | The Settlement Was Negotiated At Arm's Length ................................. 16 | |
| | 3. | The Settlement Provides Adequate Relief To The Class ........................ 16 | |
| | 4. | The Settlement Treats All Class Members Equally ................................. 18 | |

II.  CONDITIONAL CERTIFICATION OF THE RULE 23 CLASS IS APPROPRIATE ......................................................................................... 18

A. Numerosity ........................................................................................ 20

B. Commonality ..................................................................................... 20

C. Typicality .......................................................................................... 21

D. Adequacy Of The Named Plaintiff ................................................... 22

E. The Proposed Settlement Class Satisfies Requirements Of Rule 23(b)(3) ............................................................................................. 23

    1. Common Questions Predominate ........................................... 23

    2. A Class Action Is A Superior Mechanism ............................. 24

III. PLAINTIFF'S COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL ................................................................................................. 25

IV. THE PROPOSED NOTICE PLAN SHOULD BE APPROVED .................... 26

A. The Content Of The Proposed Class Notice Complies With Rule 23(c)(2) .............................................................................................. 26

B. Distribution Of The Class Notice Will Comply With Rule 23(c)(2) .................. 27

CONCLUSION ..................................................................................................... 27

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................. 19, 24

*Brown v. Title Ticor Ins. Co.*,
  982 F.2d 386 (9th Cir. 1992) ................................................................... 23

*Cassesse v. Washington Mutual, Inc.*,
  255 F.R.D. 89 (E.D.N.Y. 2008) ............................................................... 24

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ..................................................................... 9, 14

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ....................................................................... 20

*County of Suffolk v. Long Island Lighting Co.*,
  710 F. Supp. 1422 (E.D.N.Y. 1989) ........................................................ 19

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ..................................................................... 22

*Dziennik v. Sealift, Inc.*,
  2007 WL 1580080 (E.D.N.Y. May 29, 2007) .......................................... 22

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. 2014) .............................................................. 22, 23

*Frank v. Eastman Kodak Co.*,
  228 F.R.D. 174 (W.D.N.Y. 2005) ............................................................ Passim

*Gilliam v. Addicts Rehab. Ctr. Fund*,
  2008 WL 782596 (S.D.N.Y. Mar. 24, 2008) ........................................... 15

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968) ..................................................................... 24

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................. 25, 26

*Hayes v. Harmony Gold Min. Co.*,
    2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011) ........................................................................ 17

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000) ........................................................ 10, 12, 13

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
    2007 WL 2230177 (S.D.N.Y. July 27, 2007) ........................................................................ 9

*In re GSE Bonds Antitrust Litig.*,
    414 F. Supp. 3d 686 (S.D.N.Y. 2019) ........................................................ 15, 16, 17

*In re Michael Milken & Assocs. Sec. Litig.*,
    150 F.R.D. 57 (S.D.N.Y. 1993) ........................................................ 26, 27

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) ........................................................ 15, 16, 17, 18

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
    2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ........................................................ 10

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) ........................................................ 22

*In re Traffic Executive Ass'n*,
    627 F.2d 631 (2d Cir. 1980) ........................................................ 8

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ........................................................ 24

*In re Warner Chilcott Ltd. Sec. Litig.*,
    2008 WL 5110904 (S.D.N.Y. Nov. 20, 2008) ........................................................ 12

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000) ........................................................ 18

*Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*,
    333 F.R.D. 314 (S.D.N.Y. 2019) ........................................................ 9

*Kamean v. Local 363, Int'l Bhd. of Teamsters*,
    109 F.R.D. 391 (S.D.N.Y. 1986) ........................................................ 20

*Khait v. Whirlpool Corp.*,
    2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) ........................................................ 17

*Marisol A. v. Giuliani,*
  126 F.3d 372 (2d Cir. 1997) ..................................................................... 21

*Martens v. Smith Barney Inc.,*
  181 F.R.D. 243 (S.D.N.Y. 1998) ......................................................... 22, 23

*Maywalt v. Parker & Parsley Petroleum Co.,*
  67 F.3d 1072 (2d Cir. 1998) ....................................................................... 8

*McBean v. City of New York,*
  228 F.R.D. 487 (S.D.N.Y. 2005) ............................................................. 24

*Meredith Corp. v. SESAC, LLC,*
  87 F. Supp. 3d 650 (S.D.N.Y. 2015) ........................................................ 18

*Ortiz v. Fibreboard Corp.,*
  527 U.S. 815 (1999) ................................................................................. 23

*Pichardo v. Carmine's Broadway Feast Inc.,*
  2016 WL 5338551 (S.D.N.Y. Sept. 26, 2016) ..................................... 21, 24

*Port Auth. Police Benev. Ass'n, Inc. v. Port Auth. of N.Y. & N.J.,*
  698 F.2d 150 (2d Cir. 1983) ..................................................................... 20

*Reyes v. Altamarea Grp.,*
  2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011) .......................................... 18

*Robidoux v. Celani,*
  987 F.2d 931 (2d Cir. 1993) ..................................................................... 21

*Rossini v. Ogilvy & Mather, Inc.,*
  798 F.2d 590 (2d Cir. 1986) ..................................................................... 24

*Savino v. Computer Credit, Inc.,*
  173 F.R.D. 346 (E.D.N.Y. 1997) .............................................................. 20

*TBK Partners, Ltd. v. Western Union Corp.,*
  517 F. Supp. 380 (S.D.N.Y. 1981) ........................................................... 10

*Torres v. Gristede's Oper. Corp.,*
  2010 WL 5507892 (S.D.N.Y. Dec. 21, 2010) .......................................... 12

*Toure v. Cent. Parking Sys.,*
  2007 WL 2872455 (S.D.N.Y. Sept. 28, 2007) .......................................... 22

*Trief v. Dun & Bradstreet Corp.*,
    144 F.R.D. 193 (S.D.N.Y. 1992) ............................................................................ 20, 21

*Trinidad v. Breakaway Courier Sys., Inc.*,
    2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) ................................................................... 21

*Wagner v. NutraSweet Co.*,
    95 F.3d 527 (7th Cir. 1996) ........................................................................................... 21

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................................ 20, 23

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) .............................................................................................. 8

*Willix v. Healthfirst, Inc.*,
    2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) .................................................................. 17

*Wright v. Stern*,
    553 F. Supp. 2d 337 (S.D.N.Y. 2008) ............................................................................. 8

**STATUTES**

28 U.S.C. § 1715 .................................................................................................................. 27

Cal. Bus. & Prof. Code § 17200 ............................................................................................ 2

Cal. Bus. & Prof. Code § 17500 ............................................................................................ 3

Cal. Bus. & Prof. Code § 17600 ............................................................................................ 1

Cal. Bus. & Prof. Code § 17602(a) ....................................................................................... 6

Cal. Bus. & Prof. Code § 17602(c) ....................................................................................... 7

Cal. Civ. Code § 1750 ........................................................................................................... 3

**RULES**

Fed. R. Civ. P. 8 .................................................................................................................. 11

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 11

Fed. R. Civ. P. 16 .................................................................................................................. 4

Fed. R. Civ. P. 23 .......................................................................................................... 25, 27

Fed. R. Civ. P. 23(a) ................................................................ 19, 20, 24

Fed. R. Civ. P. 23(b) ............................................................ 2, 19, 23, 24

Fed. R. Civ. P. 23(c) ................................................................... 26, 27

Fed. R. Civ. P. 23(e) ..................................................................... 9, 10

Fed. R. Civ. P. 26(f) ...................................................................... 4, 13

Fed. R. Civ. P. 23(g) ......................................................................... 25

Fed. R. Civ. P. 26 ............................................................................... 5

**OTHER AUTHORITIES**

Newberg on Class Actions (4th ed. 2002) ................................... 8, 9, 18, 19

## INTRODUCTION

In this putative class action, Plaintiff Maribel Moses alleges that Defendant The New York Times Company ("Defendant" or "NYT") has failed to comply with California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*., which imposes detailed information, notice, and consent requirements on businesses that make automatic renewal or continuous service offers to California consumers. Since filing the Complaint, the Parties have engaged in informal discovery, which shows Defendant collected renewal fees from approximately 855,000 subscribers during the Class Period that allegedly were not in compliance with the ARL. At a mediation in November 2020, the Parties reached a class settlement agreement that, if approved, will deliver immediate relief to putative class members and will thereby resolve Plaintiff's and the putative class's claims against Defendant. The Class Action Settlement Agreement and Release (the "Settlement") is submitted herewith as **Exhibit 1** to the contemporaneously filed Declaration of Frederick J. Klorczyk III (the "Klorczyk Decl.").

The Settlement consists of cash and non-cash benefits and has a total value of approximately $5,563,000. Under the terms of the Settlement, NYT will automatically provide over $3,900,000 worth of access codes (the "Automatic Access Codes") for NYT offers to Class Members who do nothing during the claims process, and will also establish a non-reversionary $1,650,000 cash Settlement Fund which will be used to pay all approved claims by class members, notice and administration expenses, a Court-approved incentive award to Plaintiff, and attorneys' fees to proposed Class Counsel to the extent awarded by the Court.

Given the exceptional relief secured on behalf of the Class, the Court should have no hesitation finding that the Settlement falls within the range of possible approval. For the reasons set forth below, the settlement is fair and reasonable, and warrants preliminary approval.

1

Defendant does not oppose this motion. Accordingly, Plaintiff respectfully requests that the Court (1) grant preliminary approval of the proposed Settlement; (2) conditionally certify the settlement class under Fed. R. Civ. P. 23(b)(3) in connection with the settlement process; (3) appoint Bursor & Fisher, P.A., as Class Counsel; (4) appoint Plaintiff Maribel Moses as the Class Representative for the Settlement Class; (5) approve the Notice Plan described in the Settlement and direct its distribution; and (6) schedule a hearing for final approval.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    California's Automatic Renewal Law

On December 1, 2010, the California Legislature enacted the Automatic Renewal Law ("ARL") under California Senate Bill 340 with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third-party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." *See* First Amended Complaint (ECF No. 22) ("FAC") ¶ 21 (citing statement of legislative intent). In 2018, the California Legislature passed California's Senate Bill 313, which amended the ARL to increase consumer protections for orders that contain free trial and promotional pricing, and subscription agreements entered into online. *See id.* ¶ 22. Thus, the ARL's core requirements are that: (1) businesses must clearly and conspicuously disclose automatic renewal terms of any offer, as defined by the statute; (2) they must obtain a consumer's affirmative consent, and (3) they must provide consumers with an acknowledgment containing the terms of the automatically renewing offer and cancellation information. *See id.* ¶ 23. Private citizens in California may enforce ARL violations as predicate claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits "any unlawful[] … business act or practice[.]" *See id.* ¶ 72. Additionally, ARL violations may constitute acts of false advertising in violation of California's False Advertising

Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*. *See id*. ¶¶ 93-97. Finally, ARL violations may also constitute violations under California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*. *See id*. ¶ 102-05.

### B. Plaintiff's Allegations

Defendant is an international media company that, among other things, publishes and distributes to California consumers *The New York Times*, including both print and online editions, and provides automatically renewing subscription plans for various products and services under the NYT brand name (the "NYT Subscriptions"). Plaintiff alleges that Defendant automatically renewed Class Members' NYT subscriptions in violation of the ARL. FAC ¶ 1. Specifically, Plaintiff alleges that when consumers sign up for an NYT Subscription through the NYT Website or App, Defendant actually enrolls consumers in an automatically renewing subscription that results in monthly or annual charges to the consumer's payment method. *Id*. Plaintiff further alleges that Defendant engages in this autorenewal scheme without first providing California consumers the requisite disclosures and authorizations required under the ARL. *Id*. Furthermore, Plaintiff alleges that because every violation of the ARL constitutes an "unlawful" practice under the UCL. *Id*. ¶¶ 72-74. And because Defendant's ARL violations involve misrepresentations and/or omissions of material fact, Plaintiff contends Defendant also violated the FAL and CLRA. *Id*. ¶¶ 94-95, 104-05. On that basis, Plaintiff also brought common law claims against Defendant for conversion, unjust enrichment, negligent misrepresentation, and fraud. *Id*. ¶ 4; *see also id*. ¶¶ 87, 111, 115, 123.

### C. The Litigation History, Defendant's Motion to Dismiss And Settlement Discussions

On June 15, 2019, Plaintiff, through counsel, sent a letter to Defendant alleging that it violated the CLRA by charging her renewal fees in connection with *New York Times*'s

newspaper subscription offerings. *See* Klorczyk Decl. ¶ 4. On June 17, 2020, Plaintiff filed her class action lawsuit in the United States District Court for the Southern District of New York, alleging that Defendant's renewal charge was in violation of the ARL, thus giving rise to predicate claims under California's UCL, FAL, CLRA, and other common law claims. *Id.* ¶ 5; ECF Nos. 1, 22.

On August 17, 2020, Defendant filed a motion to dismiss under Rule 12(b)(6), arguing, that Plaintiff failed to state a claim upon which relief could be granted. ECF Nos. 16, 17. Defendant argued that its pre-checkout disclosures complied with the ARL because they provided all of the information required by the ARL, in a clear and conspicuous manner that was in visual proximity to the request for Plaintiff's consent to the offer, and obtained Plaintiff's affirmative consent to the subscription terms. On August 31, 2020, Plaintiff filed her First Amended Class Action Complaint ("FAC") as of right. ECF No. 22. In addition to claims for relief brought by Plaintiff's Complaint, the FAC asserted additional claims for negligent misrepresentation and fraud. After Plaintiff filed her FAC, the Parties engaged in a planning conference pursuant to Fed. R. Civ. P. 26(f) and a scheduling conference pursuant to Fed. R. Civ. P. 16. ECF No. 23. On September 21, 2020, Defendant filed a motion to dismiss Plaintiff's FAC for failure to state a claim upon which relief could be granted under Rule 12(b)(6). Defendant again argued that its pre-checkout disclosures complied with the ARL because they provided all of the information required by the ARL, in a clear and conspicuous manner, and further argued that Plaintiff's fraud and negligent misrepresentation could not state a claim because, among other reasons, Plaintiff had not identified a false statement or any specific omissions from the pre-purchase disclosures, and any omissions in the post-purchase disclosures

4

could not have influenced Plaintiff's decision to purchase her subscription. ECF Nos. 28, 29. Plaintiff filed her opposition brief on October 29, 2020. ECF No. 32.

From the outset of the case, the Parties engaged in direct communications regarding early resolution as required by Fed. R. Civ. P. 26, which ultimately led to a November 10, 2020 mediation before Jill R. Sperber, Esq., an experienced neutral affiliated with Judicate West. *See* Klorczyk Decl. ¶¶ 10, 12. Prior to the mediation, the Parties exchanged informal discovery, including on issues such as the size and scope of the putative class. *Id.* ¶ 11. The mediation was conducted by Zoom, and it lasted approximately nine hours. *Id.* ¶ 12. The Parties engaged in good faith negotiations, which at all times were at arms' length, and which culminated in an agreement to settle the case. *Id.*

## TERMS OF THE SETTLEMENT

The key terms of the Settlement are briefly summarized as follows:

### A. Class Definition

The "Settlement Class" or "Settlement Class Members" is defined as:

> [A]ll Persons who, from June 17, 2016, to and through the Preliminary Approval Date, enrolled in an automatically renewing NYT Subscription directly through NYT using a California billing and/or delivery address, and who were charged and paid an automatic renewal fee(s) in connection with such subscription.

Settlement ¶¶ 1.43, 1.44.

### B. Monetary Relief

The Settlement consists of cash and non-cash benefits and has a total value of approximately $5,563,000. NYT will establish a non-reversionary Settlement Fund of $1,650,000 which will be used to pay all approved claims by class members, notice and administration expenses, a Court-approved incentive award to Plaintiff, and attorneys' fees to proposed Class Counsel to the extent awarded by the Court. *Id.* ¶ 1.45. NYT will also

automatically provide over $3,900,000 worth of access codes (the "Automatic Access Codes") for NYT offers to Class Members who do nothing during the claims process. *Id.* ¶¶ 1.46, 2.2. Class members with Active NYT Subscriptions will be entitled to receive either a code for one month of free access to any "NYT Digital Product" subscription program to which the Active Class Member does not currently subscribe, or, at their election, a *pro rata* cash payment from the Settlement Fund. *Id.* ¶ 2.2(a). Fully Active Class Members – those class members who are entitled to receive all of NYT's digital offerings – will be entitled to receive access to a one month "NYT Basic Digital Access subscription (NYT's core news subscription), or, at their election, a *pro rata* cash payment from the Settlement Fund. *Id.* ¶ 2.2(c). Class members with Inactive NYT Subscriptions will be entitled to receive either access code(s) for a free Basic Digital Access NYT Subscription for one month, or, at their election, a *pro rata* cash payment from the Settlement Fund. *Id.* ¶ 2.2(b). Settlement Class Members wishing to receive cash must make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by the Claims Deadline. *Id.* ¶ 2.2(e). Settlement Class Members who do not submit a valid Claim Form electing to receive cash will be automatically provided with codes for one month of free access to the appropriate NYT Subscription, based on whether their NYT Subscription was active or inactive as of the Preliminary Approval Date, issued via email by the Settlement Administrator. *Id.* ¶ 2.2(d).

## C. Injunctive Relief

Defendant has agreed to revise the presentation and wording of the automatic renewal terms in its mobile and desktop platforms and in its direct mail offers to be consistent with the requirements of Cal. Bus. & Prof. Code § 17602(a)(1)-(2), and also to provider subscribers with an acknowledgment that includes the automatic renewal terms, cancellation policy, and

information regarding how to cancel in a manner that is capable of being retained by the consumer, consistent with Cal. Bus. & Prof. Code § 17602(c).  *Id.* ¶ 2.3.

### D.    Release

In exchange for the relief described above, Defendant and each of its related and affiliated entities as well as all "Released Parties" as defined at ¶ 1.39 of the Settlement will receive a full release of all claims arising out of or related to or arising from Defendant's automatic renewal and/or continuous service programs in California from June 17, 2016 to the date of entry of judgment.  *See id.* ¶¶ 3.1-3.3 for full release language.

### E.    Notice And Administration Expenses

The Settlement Fund will be used to pay the cost of sending the Notice set forth in the Agreement and any other notice as required by the Court, as well as all other costs of administration of the Settlement.  *See id.* ¶¶ 1.25, 1.27, 1.41, 1.45.

### F.    Incentive Award

In recognition for her efforts on behalf of the Settlement Class, NYT has agreed that Plaintiff Moses may receive, subject to Court approval, an incentive award of $5,000 from the Settlement Fund, as appropriate compensation for her time and effort serving as Class Representative and as a party to the Action.  NYT will not oppose any request limited to this amount.  *Id.* ¶ 8.3.

### G.    Attorneys' Fees And Expenses

NYT has agreed that the Settlement Fund may also be used to pay Class Counsel reasonable attorneys' fees and to reimburse expenses in this Action, in an amount to be approved by the Court.  *Id.* ¶ 8.1.  Plaintiff will petition the Court for an award of attorneys' fees, costs, and expenses not to exceed $1,250,000, and Defendant agrees to not object to or otherwise challenge, directly or indirectly, Class Counsel's petition for attorneys' fees, costs, and expenses

7

if limited to this amount. Class Counsel, in turn, agrees to seek no more than this amount from the Court in attorneys' fees, costs, and expenses. *Id.*

## ARGUMENT

### I.   PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE

The law favors compromise and settlement of class action suits. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (noting the "strong judicial policy in favor of settlements, particularly in the class action context"); *see also Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy."). The approval of a proposed class action settlement is left to the discretion of the trial court. *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1998).

Preliminary approval, which is what Plaintiff seeks here, requires only an "initial evaluation" of the fairness of the proposed settlement on the basis of written submissions and an informal presentation by the settling parties. *Newberg* § 11.25. To grant preliminary approval, the court need only find that there is "'probable cause' to submit the [settlement] to class members and hold a full-scale hearing as to its fairness." *In re Traffic Executive Ass'n*, 627 F.2d 631, 634 (2d Cir. 1980); *Newberg* § 11.25 ("If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness . . . and appears to fall within the range of possible approval," the court should permit notice of the settlement to be sent to class members). "Fairness is determined upon review of both the terms of the settlement agreement and the negotiating process that led to such agreement." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 184 (W.D.N.Y. 2005). "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores*, 396 F.3d at 116 (internal quotations omitted); *Wright v. Stern*, 553 F. Supp. 2d 337, 343 (S.D.N.Y. 2008) (same).

8

If the settlement was achieved through arm's-length negotiations by experienced counsel, "[a]bsent fraud or collusion," "[courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, *4 (S.D.N.Y. July 27, 2007). This first step in the settlement process allows notice to issue to the class and for class members to object or opt-out of the settlement. After the notice period, the Court will be able to evaluate the settlement with the benefit of the class members' input. In evaluating a class action settlement, courts in the Second Circuit consider the nine factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ("*Grinnell*"). Although the Court's present task is to perform an "initial evaluation," *Newberg* § 11.25, it is useful for the Court to consider the criteria on which it will ultimately judge the settlement. The *Grinnell* factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Grinnell*, 495 F.2d at 463.

Courts should also consider the "four enumerated factors in the new [Federal Rule of Civil Procedure] Rule 23(e)(2), in addition to the nine *Grinnell* factors." *Johnson v. Rausch, Sturm, Israel, Enerson & Hornik, LLP*, 333 F.R.D. 314, 420 (S.D.N.Y. 2019). The Rule 23(e) factors are whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal; (ii) the

effectiveness of any proposed method of distributing relief to the class, including the method of

processing class-member claims; (iii) the terms of any proposed award of attorney's fees,

including timing of payment; and (iv) any agreement required to be identified under Rule

23(e)(3); and (D) the proposal treats class members equitably relative to each other.  Fed. R. Civ.

P. 23(e)(2).  "There is significant overlap between the Rule 23(e)(2) and *Grinnell* factors, which

complement, rather than displace each other."  *In re Payment Card Interchange Fee and*

*Merchant Discount Antitrust Litig.*, 2019 WL 6875472, at \*14 (E.D.N.Y. Dec. 16, 2019).

## A.     The *Grinnell* Factors

### 1.     Litigation Through Trial Would Be Complex, Costly, And Long (*Grinnell* Factor 1)

By reaching a favorable settlement prior to dispositive motions or trial, Plaintiff seeks to

avoid significant expense and delay, and instead ensure recovery for the class.  "Most class

actions are inherently complex and settlement avoids the costs, delays and multitude of other

problems associated with them."  *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp.

2d 164, 174 (S.D.N.Y. 2000), *aff'd sub. nom.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir.

2001).  Courts have consistently held that, unless the proposed settlement is clearly inadequate,

its acceptance and approval are preferable to the continuation of lengthy and expensive litigation

with uncertain results.  *TBK Partners, Ltd. v. Western Union Corp.*, 517 F. Supp. 380, 389

(S.D.N.Y. 1981), *aff'd*, 675 F.2d 456 (2d Cir. 1982).

As discussed above, the Parties engaged in informal written discovery prior to mediation.

The next steps in the litigation would have been resolution by the Court of NYT's Motion to

Dismiss, as well as the start of discovery, including depositions of the Parties, substantial

electronically stored information discovery, and contested motions for summary judgment and

class certification, which would be at minimum costly and time-consuming for the Parties and

the Court and creates risk that a litigation class would not be certified and/or that the Settlement Class would recover nothing at all.

More specifically, Plaintiff is aware that Defendant would continue to assert a number of defenses on the merits, including that Plaintiff's allegations are insufficient under Fed. R. Civ. P. 8 and 12(b)(6), including because Defendant provided all of the requisite pre-purchase disclosures under the ARL, presented them in a clear and conspicuous manner as defined under the ARL, and obtained Plaintiff's affirmative consent to the automatically renewing subscription; and any omissions in the post-purchase subscription acknowledgment sent to Plaintiff do not rise to the level of fraud or negligent misrepresentation as alleged. Defendant would also challenge Plaintiff's standing under Article III of the Constitution as well as pursuant to California's consumer protection statutes, including Plaintiff's ability to show that Defendant's conduct caused Plaintiff economic injury. Plaintiff and Class Counsel are also aware that Defendant would oppose class certification vigorously, including because Defendant would continue to take the position that Plaintiff is not entitled to bring at least some of her claims on a class wide basis, given Defendant's position that Plaintiff agreed to a class action waiver in Defendant's Terms of Service. Plaintiff and Class Counsel further understand that Defendant would prepare a competent defense at trial. Looking beyond trial, Plaintiff is also keenly aware of the fact that NYT could appeal the merits of any adverse decision, and in light of the potential damages exposure – which Plaintiff contends is the automatic return of all subscription revenues collected by Defendant during the relevant time period – Defendant would argue for a reduction of damages based on due process concerns.

The Settlement, on the other hand, permits a prompt resolution of this action on terms that are fair, reasonable and adequate to the Class. This result will be accomplished years earlier

than if the case proceeded to judgment through trial and/or appeals, and provides certainty. Consequently, this *Grinnell* factor plainly weighs in favor of preliminary approval of the Settlement.

### 2. The Reaction Of The Class (*Grinnell* Factor 2)

Since Notice of the Settlement has not yet been issued to the Class, it is not possible to gauge the reaction of the Class at this time. *In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 5110904, at *2 (S.D.N.Y. Nov. 20, 2008) ("Since no notice has been sent, consideration of this factor is premature.")*.* Plaintiff is unaware of any opposition to the Settlement.

### 3. Discovery Has Advanced Far Enough To Allow The Parties To Responsibly Resolve The Case (*Grinnell* Factor 3)

"The pertinent question is whether counsel had an adequate appreciation of the merits of the case before negotiating." *Torres v. Gristede's Oper. Corp.*, 2010 WL 5507892, at *5 (S.D.N.Y. Dec. 21, 2010). "[T]he pretrial negotiations and discovery must be sufficiently adversarial that they are not designed to justify a settlement … but an aggressive effort to ferret out facts helpful to the prosecution of the suit." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 176. As discussed above, the Parties have conducted informal written discovery related to issues of class certification and summary judgment, including the scope and size of the class; representative web and mobile pay flow and check out pages, digital acknowledgment emails, and direct mail reply cards during the relevant showing the content and presentation of the ARL disclosures over time; and Defendant's current and historical Terms of Sale and Terms of Service, which recap the ARL terms and other relevant provisions related to subscriptions. Klorczyk Decl. ¶ 11. Class Counsel's experience in similar matters, as well as the efforts made by counsel on both sides confirms that they are sufficiently well apprised of the facts of this action, and the strengths and weaknesses of their respective cases, to make an

intelligent analysis of the proposed settlement. This *Grinnell* factor thus also weighs in favor of preliminary approval.

> ### 4. Plaintiff Would Face Real Risks If The Case Proceeded (*Grinnell* Factors 4 And 5)

Although Plaintiff's case is strong, it is not without risk. Defendant has filed a Motion to Dismiss and has made it clear that it will both move for summary judgment on various issues and vigorously contest the certification of a litigation class. In weighing the risks of certifying a class and establishing liability and damages, the court "must only weigh the likelihood of success by the plaintiff class against the relief offered by the settlement." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d. at 177. In the context of this litigation, not only do Plaintiff and the Class face risks in overcoming Defendant's summary judgment motion and certifying a class, but also further litigation will only delay relief to the Class Members. The Settlement alleviates these risks, and provides a substantial benefit to the Class in a timely fashion. These *Grinnel* factors thus favor preliminary approval.

> ### 5. Establishing A Class And Maintaining It Through Trial Would Not Be Simple (*Grinnell* Factor 6)

The risk of maintaining the class status through trial is also present. The Court has not yet certified the proposed Class and the Parties anticipate that such a determination would be reached only after decision on Defendant's Motion to Dismiss, after discovery is completed, and after exhaustive class certification briefing is filed. Defendant would argue that individual questions preclude class certification, including because of the existence of a class action waiver for some class members, and also that a class action is not a superior method to resolve Plaintiff's claims. Should the Court certify the class, Defendant would likely challenge certification through a Rule 23(f) petition and subsequently move to decertify, forcing additional

rounds of briefing.  Risk, expense, and delay permeate such a process.  Since the Settlement eliminates this risk, expense, and delay, this factor weighs in favor of preliminary approval.

      **6.**      **Defendant's Ability To Withstand A Greater Judgment (*Grinnell* Factor 7)**

While NYT could withstand a greater judgment, a "defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair."  *Frank,* 228 F.R.D. at 186.  Thus, at worst, this factor is neutral.

      **7.**      **The Settlement Amount Reasonable In Light Of The Possible Recovery And The Attendant Risks Of Litigation (*Grinnell* Factors 8 And 9)**

The determination of whether a settlement amount is reasonable "does not involve the use of a mathematical equation yielding a particularized sum."  *Id.*  "Instead, 'there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'"  *Id.*  Because a settlement provides certain and immediate recovery, courts often approve settlements even where the benefits obtained as a result of the settlement are less than those originally sought.  Per the Second Circuit in *Grinnell*, "[t]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth of a single percent of the potential recovery."  495 F.2d at 455 n.2.

Here, Settlement Class Members who neither submit a valid Claim Form nor opt-out of the settlement will be automatically provided with code(s) for one month of free access to the appropriate NYT Subscription.  Settlement Class Members that submit a valid Claim Form to the Settlement Administrator are eligible to receive a *pro rata* cash payment from the Settlement Fund, which Class Counsel estimates will be $5.00 per Class Member based on expected claims rates.  In addition, Defendant has agreed to injunctive relief and to pay the costs of notice and

administration as well as reasonable attorneys' fees and costs for Class Counsel from the all-in fund established by the Settlement. Settlement ¶¶ 2.1-2.3. Weighing the benefits of the Settlement against the risks associated with proceeding in litigation and in collecting on any judgment, the Settlement is more than reasonable. Moreover, when a settlement assures immediate payment of substantial amounts to class members, and does not "sacrific[e] 'speculative payment of a hypothetically larger amount years down the road,'" it is reasonable under this factor. *Gilliam v. Addicts Rehab. Ctr. Fund*, 2008 WL 782596, *5 (S.D.N.Y. Mar. 24, 2008). Thus, these *Grinnell* factors weigh in favor of preliminary approval.

### B.     The Rule 23(e)(2) Factors

#### 1.     The Class Representative And Class Counsel Have Adequately Represented The Class (Rule 23(e)(2)(A)

"Determination of adequacy typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 30 (E.D.N.Y. 2019). Here, "plaintiff's interests are aligned with other class members' interests because [she] suffered the same injuries": paying a fee to Defendant due to its automatic renewal scheme. *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019). "Because of these injuries, plaintiff[] ha[s] an interest in vigorously pursuing the claims of the class." *Id.* Further, numerous other courts in this Circuit have previously found that Plaintiff's attorneys adequately meet the obligations and responsibilities of Class Counsel. *See* Klorczyk Decl. Ex. 2, Firm Resume of Bursor & Fisher, P.A.; *see also id.* Ex. 3, Preliminary Approval Hearing Transcript in *Russett, et al. v. The Northwestern Mutual Life Ins. Co.*, Case No. 19-cv-07414-KMK (S.D.N.Y.) ("NWM Hearing Tr.") at 21:1-4 ("[Bursor & Fisher, P.A.] has extensive experience in litigating

15

precisely these types of actions, and that's why they've been appointed in numerous cases to be lead counsel."). This factor thus favors preliminary approval.

### 2. The Settlement Was Negotiated At Arm's Length

"If a class settlement is reached through arm's-length negotiations between experienced, capable counsel knowledgeable in complex class litigation, the Settlement will enjoy a presumption of fairness." *In re GSE Bonds*, 414 F. Supp. 3d at 693. Here, both counsel for Plaintiff and counsel for Defendant are experienced in class action litigation and engaged in protracted settlement discussions, and reached this settlement with the assistance of an experienced neutral, Jill Sperber of Judicate West. Accordingly, this Rule 23(e)(2) factor has been met.

### 3. The Settlement Provides Adequate Relief To The Class

Whether relief is adequate takes into account "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Rule 23(e)(2)(C)(i-iv). As to "the costs, risks, and delay of trial and appeal," this factor "subsumes several *Grinnell* factors . . . including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial. *In re Payment Card Interchange*, 330 F.R.D. at 36. As noted above, the Settlement has met each of these *Grinnell* factors. *Supra* §§ I.A(1)-(7). As to "any agreement required to be identified by Rule 23(e)(3)" or "any agreement made in connection with the proposal," *In re GSE Bonds*, 414 F. Supp. 3d at 696, no such agreement exists in this case other than the Settlement.

16

As to "the effectiveness of any proposed method of distributing relief to the class," "[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re Payment Card Interchange*, 330 F.R.D. at 40. Here, under the terms of the Settlement, Settlement Class Members will receive Automatic Access Codes for NYT Subscriptions without having to file a claim or anything else. Settlement ¶ 2.2(a). Alternatively, Settlement Class Members can submit a claim form and, if approved, receive a *pro rata* payment from the Settlement Fund in the form of a check. Settlement ¶ 2.2(a). These class members will have one-hundred and eighty (180) days to cash the check. Settlement ¶ 2.2(d). This plan was proposed by experienced and competent counsel with the assistance of an experienced neutral and ensures "the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund." *In re GSE Bonds*, 414 F. Supp. 3d at 695.

As to "the terms of any proposed award of attorney's fees," Plaintiff's counsel will apply for attorneys' fees, costs, and expenses "not to exceed $1,250,000[,]" which constitutes approximately 22.5 percent of the Settlement Value. Settlement ¶ 8.1. This is a reasonable request, as courts in this Circuit routinely approve fee requests for up to one-third of a common fund. *See*, *e.g.*, *Hayes v. Harmony Gold Min. Co.*, 2011 WL 6019219, at *1 (S.D.N.Y. Dec. 2, 2011) (awarding "attorneys' fees in the amount of one third" of a $9 million settlement fund), *aff'd* 509 F. App'x 21, 23-24 (2d Cir. 2013) (affirming fee award, and noting that "the prospect of a percentage fee award from a common fund settlement, as here, aligns the interests of class counsel with those of the class"); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding 33% of $9.25 million settlement fund); *Willix v. Healthfirst, Inc.*, 2011 WL 754862, at *6-7 (E.D.N.Y. Feb. 18, 2011) (awarding one-third of $7.675 million settlement

fund).  Indeed, as courts in this Circuit have noted, fee requests for up to one-third of common funds represent what "reasonable, paying client[s] . . . typically pay . . . of their recoveries under private retainer agreements."  *Reyes v. Altamarea Grp.*, 2011 WL 4599822, at *8 (S.D.N.Y. Aug. 16, 2011).

The Settlement therefore provides adequate relief to the Class under Rule 23(e)(2)(C).

### 4.    The Settlement Treats All Class Members Equally

This Rule 23(e)(2) factor discusses "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *In re Payment Card Interchange*, 330 F.R.D. at 47.  In addition to providing Automatic Access Codes to those who do nothing, the Settlement also distributes cash relief on a *pro rata* basis, which has been found by courts in this Circuit to be equitable.  *Id.*; *see also Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 667 (S.D.N.Y. 2015) (finding that a *pro rata* distribution plan "appears to treat the class members equitably . . . and has the benefit of simplicity").  Thus, this Rule 23(e)(2) factor is weighs in favor of approval.

* * *

Because the Settlement is, on its face, "'fair, adequate, and reasonable, and not a product of collusion,'" *Frank*, 228 F.R.D. at 184 (quoting *Joel A. v. Giuliani,* 218 F.3d 132, 138-39 (2d Cir. 2000)), the Court should grant preliminary approval.

## II.    CONDITIONAL CERTIFICATION OF THE RULE 23 CLASS IS APPROPRIATE

Plaintiff respectfully requests that the Court conditionally certify the Settlement Class for purposes of effectuating the settlement.  *See Newberg* § 11.27 ("When the court has not yet entered a formal order determining that the action may be maintained as a class action, the parties may stipulate that it be maintained as a class action for the purpose of settlement only.");

*County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1422, 1424 (E.D.N.Y. 1989) ("It is appropriate for the parties to a class action suit to negotiate a proposed settlement of the action prior to certification of the class."), *aff'd in part, rev'd in part on other grounds*, 907 F.2d 1295 (2d Cir. 1990).  The Court should determine that the proposed Settlement Class satisfies the requirements of both Rule 23(a) and at least one of the subsections of Rule 23(b), *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Newberg* § 11:27, and provisionally certify the settlement class, appoint Plaintiff's counsel as Class Counsel, and appoint Plaintiff as the Class Representative.  As discussed below, all of the certification requirements for settlement purposes are met and Defendant consents to provisional certification for settlement purposes.

Under Rule 23(a), a class action may be maintained if all of the prongs of Rule 23(a) are met, as well as one of the prongs of Rule 23(b). Rule 23(a) requires that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Rule 23(b)(3) requires the court to find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

19

### A.     Numerosity

Numerosity is satisfied when the class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[N]umerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  Here, the proposed Settlement Class includes over 855,000 persons.  Klorczyk Decl. ¶ 13.  Since there is no question that joinder of all members of the Settlement Class would be impractical, numerosity is satisfied.

### B.     Commonality

Commonality is satisfied when the claims depend on a common contention, the resolution of which will bring a class-wide resolution of the claims.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011).  Although the claims need not be identical, they must share common questions of fact or law.  *Port Auth. Police Benev. Ass'n, Inc. v. Port Auth. of N.Y. & N.J.*, 698 F.2d 150, 153-54 (2d Cir. 1983); *Savino v. Computer Credit, Inc.*, 173 F.R.D. 346, 352 (E.D.N.Y. 1997), *aff'd in part, rev'd in part on other grounds*, 164 F.3d 81 (2d Cir. 1998). There must be a "unifying thread" among the claims to warrant class certification.  *Kamean v. Local 363, Int'l Bhd. of Teamsters*, 109 F.R.D. 391, 394 (S.D.N.Y. 1986).  Courts construe the commonality requirement liberally.  *Frank*, 228 F.R.D. at 181 (citing *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198-99 (S.D.N.Y. 1992)).

Here, there are common questions of law and fact that will generate common answers apt to drive the resolution of the litigation.  Plaintiff alleges that Defendant made identical misrepresentations and omissions regarding the terms of payment for and cancellation of the NYT Subscriptions, and also that it "uniformly fail[ed] to obtain any form of consent … before charging consumers' Payment Methods on a recurring basis."  FAC ¶¶ 33, 98, 118, 126.  Among others, common questions include:  (1) whether NYT failed to disclose the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent

to the offer; (2) whether NYT failed to obtain consumers' affirmative consent to the automatic renewal offer terms; and (3) whether NYT failed to provide an acknowledgement, capable of being retained by the consumer, that contained the automatic renewal offer terms and information on how to cancel. *Id*. "Courts considering similar claims of unlawful payment policies routinely certify classes based on evidence of a common policy." *Pichardo v. Carmine's Broadway Feast Inc.*, 2016 WL 5338551, at *3 (S.D.N.Y. Sept. 26, 2016).

## C.     Typicality

Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotations omitted). "Minor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendant directs "the same unlawful conduct" at the named plaintiff and the class. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). Courts evaluate typicality "with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Trinidad v. Breakaway Courier Sys., Inc.*, 2007 WL 103073, at *6 (S.D.N.Y. Jan. 12, 2007) (quoting *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996)).

Here, Plaintiff alleges that Defendant's practice of charging renewal fees for its NYT Subscriptions to consumers' payment methods without first obtaining their affirmative consent to the transaction – violated the ARL and other California statutes because Defendant failed to fully comply with the ARL for each subscription. FAC ¶¶ 1-5, 30-43. It is Plaintiff's contention that Defendant's automatic renewal process is done in the exact same manner and was directed at, or affected, both Plaintiff and the members of the putative class in the same exact way. Accordingly, by pursuing her own claims in this matter, Plaintiff will necessarily advance the interests of the Settlement Class, and typicality is therefore satisfied. *See, e.g.*, Klorczyk Decl.

21

Ex. 3, NWM Hearing Tr. at 20:12-16 ("Here, I don't think there's any question about typicality. As I said, the claims all involve what Plaintiffs alleged to be the improper charging of fees for payments of premiums made by mail. So that seems pretty straightforward … therefore, typicality is satisfied."); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565-66 (S.D.N.Y. 2014) (Rakoff, J.) (holding that the typicality requirement was satisfied where "the lead plaintiffs' and other class members' claims ar[o]se out of the same course of conduct by the defendant and [were] based on the same legal theories"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405-406 (S.D.N.Y. 2015) (Briccetti, J.) (same).

### D. Adequacy Of The Named Plaintiff

"The adequacy requirement exists to ensure that the class representatives will 'have an interest in vigorously pursuing the claims of the class, and . . . have no interests antagonistic to the interests of other class members.'" *Toure v. Cent. Parking Sys.*, 2007 WL 2872455, at *7 (S.D.N.Y. Sept. 28, 2007) (quoting *Denney v. Deutsche Bank AG,* 443 F.3d 253, 268 (2d Cir. 2006)). "'[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.'" *Dziennik v. Sealift, Inc.*, 2007 WL 1580080, at *65 (E.D.N.Y. May 29, 2007) (quoting *Martens v. Smith Barney Inc.,* 181 F.R.D. 243, 259 (S.D.N.Y. 1998)). In this case, Plaintiff – like each and every Settlement Class Member – is a purchaser of one of Defendant's NYT Subscriptions who was automatically renewed by Defendant. FAC ¶¶ 30-43. Thus, Plaintiff and the Settlement Class Members have the exact same interest in recovering the damages to which they are entitled. As such, Plaintiff does not have any interest antagonistic to those of the proposed Settlement Class and her pursuit of this litigation should be clear evidence of that.

Likewise, proposed Class Counsel – Bursor & Fisher, P.A. – have extensive experience in litigating class actions of similar size, scope, and complexity to the instant action. Klorczyk

Decl. ¶ 17; *see also id.* Ex. 2, Firm Resume of Bursor & Fisher, P.A.  Class Counsel regularly

engages in major complex litigation involving consumer products, has the resources necessary to

conduct litigation of this nature, and has frequently been appointed lead class counsel by courts

throughout the country.  *See, e.g.*, *Ebin*, 297 F.R.D. at 566 ("Bursor & Fisher, P.A., are class

action lawyers who have experience litigating consumer claims. … The firm has been appointed

class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar

verdicts or recoveries in [six] class action jury trials since 2008.").  Further, proposed Class

Counsel has devoted substantial resources to the prosecution of this action by investigating

Plaintiff's claims and that of the Settlement Class, aggressively pursuing those claims through

motion practice, conducting informal discovery, participating in a private mediation and

ultimately, negotiating a favorable class action settlement.  Klorczyk Decl. ¶¶ 10-16, 18.  In sum,

proposed Class Counsel have vigorously prosecuted this action and will continue to do so

throughout its pendency.  *Id.*

### E.     The Proposed Settlement Class Satisfies Requirements Of Rule 23(b)(3)

Rule 23(b)(3) requires that common questions "predominate over any questions affecting

only individual members and that a class action is superior to other available methods for the fair

and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Certification under Rule

23(b)(3) will allow class members to opt out of the settlement and preserve their right to seek

damages independently.  *Cf. Brown v. Title Ticor Ins. Co.*, 982 F.2d 386, 392 (9th Cir. 1992).

This approach protects class members' due process rights.  *See Ortiz v. Fibreboard Corp.*, 527

U.S. 815, 846-48 (1999).  As shown below, Plaintiff has met the Rule 23(b)(3) requirements.

### 1.     Common Questions Predominate

Rule 23(b)(3)'s predominance requirement focuses on whether the defendant's liability is

common enough to be resolved on a class basis, *Dukes*, 564 U.S. at 359, and whether the

proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*,

521 U.S. at 623.  Where plaintiffs are "unified by a common legal theory" and by common facts,

the predominance requirement is satisfied.  *McBean v. City of New York*, 228 F.R.D. 487, 502

(S.D.N.Y. 2005).  That Plaintiff easily meets the Rule 23(a) criteria is a strong indicator that

Rule 23(b)(3) is satisfied.  *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986)

(satisfaction of Rule 23(a) "goes a long way toward satisfying the Rule 23(b)(3) requirement of

commonality").  Here, Plaintiff's allegations all center around Defendant's "automatic renewal

scheme."  FAC ¶ 1.  "Courts considering similar claims of unlawful payment policies routinely

certify classes based on evidence of a common policy." *Pichardo*, 2016 WL 5338551, at *3; *see

also Cassesse v. Washington Mutual, Inc.*, 255 F.R.D. 89, 98 (E.D.N.Y. 2008) (certifying a class

of consumers who "who paid or will be demanded to pay prohibited fees").  Since Plaintiff

alleges Defendant engaged in a common course of conduct, predominance is met.

### 2.       A Class Action Is A Superior Mechanism

Rule 23(b)(3)'s superiority requirement examines whether "the class action device [is]

superior to other methods available for a fair and efficient adjudication of the controversy."

*Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968).  Rule 23(b)(3) sets forth a non-exclusive

list of relevant factors, including whether individual class members wish to bring, or have

already brought, individual actions; and the desirability of concentrating the litigation of the

claims in the particular forum. Fed. R. Civ. P. 23(b)(3).[1]  Here, Plaintiff and the Class Members

---

[1] Another factor, whether the case would be manageable as a class action at trial, is not of
consequence in the context of a proposed settlement.  *See Amchem*, 521 U.S. at 620
("[c]onfronted with a request for settlement-only class certification, a [trial] court need not
inquire whether the case, if tried, would present intractable management problems, for the
proposal is that there be no trial"); *Frank*, 228 F.R.D. at 183 ("The court need not consider the
[manageability] factor, however, when the class is being certified solely for the purpose of
settlement."). Moreover, denying class certification on manageability grounds is "disfavored"

have limited financial resources with which to prosecute individual actions, and Plaintiff is unaware of any individual lawsuits that have been filed by Class Members arising from the same allegations. Employing the class device here will not only achieve economies of scale for Settlement Class Members, but will also conserve the resources of the judicial system and preserve public confidence in the integrity of the system by avoiding the expense of repetitive proceedings and preventing inconsistent adjudications of similar issues and claims. *See Hanlon*, 150 F.3d at 1023. A class action is the most suitable mechanism to fairly, adequately, and efficiently resolve the putative settlement class members' claims.

## III.    PLAINTIFF'S COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL

Under Rule 23, "a court that certifies a class must appoint counsel … [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the Court considers proposed Class Counsel's: (1) work in identifying or investigating the potential claim, (2) experience in handling class actions, other complex litigation, and the types of claims asserted in the action, (3) knowledge of the applicable law, and (4) resources that it will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). As discussed above, proposed Class Counsel has extensive experience in prosecuting consumer class actions in general. *See supra* II.D. And as a result of their zealous efforts in this case, proposed Class Counsel has secured substantial monetary relief to the Settlement Class Members. Thus, the Court should appoint Frederick J. Klorczyk III of Bursor & Fisher, P.A. as Class Counsel.

---

and "should be the exception rather than the rule." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124,140 (2d Cir. 2001) (internal quotation marks omitted).

## IV. THE PROPOSED NOTICE PLAN SHOULD BE APPROVED

### A. The Content Of The Proposed Class Notice Complies With Rule 23(c)(2)

Pursuant to Rule 23(c)(2)(B), the notice must provide:

> the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must concisely and clearly state in plain, easily understood language: the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through counsel if the member so desires; that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and the binding effect of a class judgment on class members under Rule 23(c)(3).

The Notice will provide detailed information about the Settlement, including: (1) a comprehensive summary of its terms; (2) Class Counsel's intent to request attorneys' fees, reimbursement of expenses, and an incentive award for the Named Plaintiff; and (3) detailed information about the Released Claims. Settlement ¶ 4, Exs. B-E. In addition, the Notice will provide information about the Fairness Hearing date, the right of Class Members to seek exclusion from the Class or to object to the proposed Settlement (as well as the deadlines and procedure for doing so), and the procedure to receive additional information. *Id.* In short, the Notice Plan is intended to fully inform Class Members of the lawsuit, the proposed Settlement, and the information they need to make informed decisions about their rights. The very detailed information in this proposed notice goes well beyond the requirements of the Federal Rules. Indeed, courts have approved class notices even when they provided only general information about a settlement. *See, e.g.*, *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (class notice "need only describe the terms of the settlement generally").

## B. Distribution Of The Class Notice Will Comply With Rule 23(c)(2)

The Parties have agreed upon a multi-part notice plan that easily satisfies the requirements of both Rule 23 and due process. First, the Parties will provide the Class List identifying individual subscribers to the Settlement Administrator. Settlement ¶ 4.1(a). The Settlement Administrator will then send direct notice by email to all Settlement Class Members for whom a valid email address is identified in Defendant's records. *Id.* ¶ 4.1(b). The email will contain an electronic link to the online claim form. *Id.* Next, in the event that a valid email address is not available, the Settlement Administrator will send direct notice by First Class U.S. Mail, along with a postcard claim form with prepaid return postage, to all the Settlement Class Members who did not receive an email. *Id.* ¶¶ 4.1(b)-(c). Further, the Settlement Administrator will establish a Settlement Website that shall contain the "long form notice," as well as access to important Court documents, upcoming deadlines, and the ability to file claim forms online. *Id.* ¶¶ 1.24, 1.47, 4.1(e). Finally, the Settlement Administrator will also provide notice of the Settlement to the appropriate state and federal officials as required by the Class Action Fairness Act, 28 U.S.C. § 1715. *Id.* ¶ 4.1(f). In sum, the proposed methods for providing notice to the Class comport with both Rule 23 and due process, and should thus be approved.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully requests that the Court grant her Motion for Preliminary Approval of the Settlement. A Proposed Order granting preliminary approval, certifying the Settlement Class, appointing Class Counsel, and approving the Proposed Notice of Settlement, is submitted herewith.

Respectfully submitted,

Dated: March 30, 2021                    **BURSOR & FISHER, P.A.**

By: _____/s/ Frederick J. Klorczyk III_____
            Frederick J. Klorczyk III

Frederick J. Klorczyk III
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: fklorczyk@bursor.com

**BURSOR & FISHER, P.A.**
Neal J. Deckant
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT 17**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARIBEL MOSES, on behalf of herself and
all others similarly situated,

                    Plaintiff,

     v.

THE NEW YORK TIMES COMPANY, d/b/a
*The New York Times*,

                Defendant.

Civil Action No.: 1:20-cv-04658-RA

Hon. Judge Ronnie Abrams

## ORDER GRANTING PRELIMINARY APPROVAL
## OF CLASS ACTION SETTLEMENT AGREEMENT, CONDITIONALLY CERTIFYING
## SETTLEMENT CLASS, APPOINTING CLASS REPRESENTATIVE,
## APPOINTING CLASS COUNSEL, AND APPROVING NOTICE PLAN

WHEREAS, a proposed class action is pending before the Court entitled *Moses v. The New York Times Company*, No. 1:20-cv-04658-RA; and

WHEREAS, Plaintiff Maribel Moses, and The New York Times Company ("Defendant" or "NYT") (collectively, the "Parties"), have entered into a Settlement Agreement, which, together with the exhibits attached thereto, sets forth the terms and conditions for a proposed class action settlement which would dispose of the Action with prejudice as to NYT and bind plaintiff and all class members to a full release of their claims, upon the terms and conditions set forth therein (the "Settlement Agreement"); and

WHEREAS, and the Court having considered all papers submitted on Plaintiff's Motion for Preliminary Approval and Certification of a Settlement Class, including the Settlement Agreement and exhibits attached thereto including the proposed Notices to the Settlement Class;

IT IS HEREBY ORDERED, DECREED, AND ADJUDGED AS FOLLOWS:

1.     The Parties have agreed to settle and dismiss with prejudice this Action in accordance with the terms and conditions of the Settlement Agreement, inclusive of its exhibits. The definitions in the Settlement Agreement are hereby incorporated herein as though fully set forth in this Order, and all other terms and phrases in this Order shall have the same meaning as ascribed to them in the Settlement Agreement.

2.     This Court finds that it has jurisdiction over the subject matter and all Parties to the Action, including the proposed Settlement Class, pursuant to 28 U.S.C. 1332(d)(2).

3.     The Court finds that, subject to the Final Approval Hearing, the Settlement Agreement, including all exhibits thereto, is preliminarily approved as fair, reasonable, and adequate, and in the best interests of the Settlement Class set forth below.  The Court further finds that the Settlement Agreement substantially fulfills the purposes and objectives of the class action, and provides substantial relief to the Settlement Class without the risks, burdens, costs, or delay associated with continued litigation, trial, and/or appeal.  The Settlement is not a finding or admission of liability by the Defendant or any other person, nor a finding of the validity of any claims asserted in the Action or of any wrongdoing or any violation of law.

4.     The Plaintiff, by and through her counsel, has investigated the pertinent facts and has evaluated the risks associated with continued litigation, trial and/or appeal.  The Court finds that the Settlement Agreement: (a) is the result of arm's-length negotiations between the parties and experienced counsel; (b) is sufficient to warrant notice of the settlement and the Final Approval Hearing to be disseminated to the Settlement Class; (c) meets all applicable requirements of law, including Federal Rule of Civil Procedure 23 and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715.

**Conditional Certification of the Settlement Class**

5. For purposes of settlement only: (a) Bursor & Fisher, P.A. is appointed Class Counsel for the Settlement Class; and (b) Maribel Moses is appointed Class Representative. The Court finds that these attorneys are competent and capable of exercising the responsibilities of Class Counsel and that Plaintiff will adequately protect the interests of the Settlement Class defined below.

6. For purposes of settlement only and for purposes of disseminating Class Notice, and without prejudice to Defendant's right to contest class certification if the Settlement Agreement is not finally approved, the Court conditionally certifies the following Settlement Class as defined in the Settlement Agreement, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3) and 23(e):

> [A]ll Person who, between June 17, 2016, to and through May 12, 2021 enrolled in any of Defendant's digital, print, and/or standalone subscription offerings directly through NYT using a California billing and/or delivery address, and who were charged and paid an automatic renewal fee(s) in connection with such subscription.[1]

7. The Court finds, subject to the Final Approval Hearing referred to in paragraph 23 below, that the Settlement Agreement is fundamentally fair, adequate, and reasonable, and, solely within the context of and for the purposes of settlement only, that the Settlement Class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, specifically, that: the Settlement Class is so numerous that joinder of all members is impracticable; there are

---

[1] Excluded from the Settlement Class are: (1) any Judge or Magistrate presiding over this Action and members of their families; (2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former officers, directors, agents, attorneys, and employees; (3) Persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors or assigns of any excluded Persons.

questions of fact and law common to the Settlement Class; the claims of the Class Representative are typical of the claims of the members of the Settlement Class; the Class Representative and Class Counsel will fairly and adequately protect the interests of the members of the Settlement Class; common questions of law or fact predominate over questions affecting individual members; and a class action is a superior method for fairly and efficiently adjudicating the Action.

8.      If the Settlement Agreement does not receive the Court's final approval, or if final approval is reversed on appeal, or if the Settlement Agreement is terminated or otherwise fails to become effective, the Court's conditional grant of class certification shall be vacated, null, and void in all respects, and the Class Representative and the Settlement Class will once again bear the burden of establishing the propriety of class certification for purposes of litigation.  In such case, neither the conditional certification of the Settlement Class for settlement purposes, nor any other act relating to the negotiation or execution of the Settlement Agreement shall be considered as a factor in connection with any class certification issue(s).

**Notice and Administration**

9.      The Court approves, as to form, content, and distribution, the Notice Plan set forth in the Settlement Agreement, including Claim Form attached to the Settlement Agreement as Exhibit A, the Notice Plan and all forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B, C, D and E, thereto, and finds that such Notice is reasonable and the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure.  The Court also finds that the Notice constitutes valid, due and sufficient notice to all persons entitled thereto, and meets the requirements of Due Process.  The Court further finds that the Notice is reasonably calculated to,

under all circumstances, reasonably apprise members of the Settlement Class of the pendency of this action, the terms of the Settlement Agreement, and the right to object to the settlement and to exclude themselves from the Settlement Class. In addition, the Court finds that no notice other than that specifically identified in the Settlement Agreement is necessary in this Action. The Parties, by agreement, may revise the Notice and Claim Form in ways that are not material, or in ways that are appropriate to update those documents for purposes of accuracy or formatting.

10.    The Court approves the request for the appointment of JND Legal Administration as Settlement Administrator of the Settlement Agreement.

11.    Pursuant to paragraph 4.1 of the Settlement Agreement, the Settlement Administrator is directed to publish the Notice and Claim Form on the Settlement Website and to send direct notice via U.S. Mail in accordance with the Notice Plan called for by the Settlement Agreement. The Settlement Administrator shall also maintain the Settlement Website to provide full information about the Settlement and allow for the filing of claims online. The Settlement Website shall prominently display all Settlement deadlines for Settlement Class Members as well as notify the Settlement Class to object to the Settlement Agreement, request exclusion from the Class and appear at the Settlement Hearing.

**Submission of Claims and Requests for Exclusion from Settlement Class**

12.    Members of the Settlement Class with NYT Subscriptions who wish to receive benefits in the form of *pro rata* cash payments under the Settlement Agreement must complete and submit a timely and valid Claim Form(s) in accordance with the instructions contained therein. All Claim Forms must be postmarked or received by the Settlement Administrator by July 24, 2021.

13.    Members of the Settlement Class who do not submit a valid Claim Form by the

Claims Deadline will receive an Automatic Access Code based on whether their NYT

Subscription was active or inactive as of the Notice Date, issued via email by the Settlement

Administrator, unless they exclude themselves from the Settlement.

14.     Any person falling within the definition of the Settlement Class may, upon valid

and timely request, exclude themselves or "opt out" from the Settlement Class.  Any such person

may do so if, on or before the Objection/Exclusion Deadline of July 24, 2021 they comply with

the exclusion procedures set forth in the Settlement Agreement and Notice.  Any members of the

Settlement Class so excluded shall neither be bound by the terms of the Settlement Agreement

nor entitled to any of its benefits.

15.     Any members of the Settlement Class who elect to exclude themselves or "opt

out" of the Settlement Agreement must file a written request with the Settlement Administrator,

received or postmarked no later than the Objection/Exclusion Deadline.  The request for

exclusion must comply with the exclusion procedures set forth in the Settlement Agreement and

Notice and include the Settlement Class member's name and address, a signature, the name and

number of the case, and a statement that he or she wishes to be excluded from the Settlement

Class for the purposes of this Settlement.  Each request for exclusion must be submitted

individually.  So called "mass" or "class" opt-outs shall not be allowed.

16.     Individuals who opt out of the Settlement Class relinquish all rights to benefits

under the Settlement Agreement and will not release their claims.  However, members of the

Settlement Class who fail to submit a valid and timely request for exclusion shall be bound by all

terms of the Settlement Agreement and the Final Judgment, regardless of whether they have

requested exclusion from the Settlement Agreement or received any benefit or award from the

settlement.

17.     No request for exclusion may be made on behalf of a group of Settlement Class Members who do not share a single NYT subscription.  "Mass" opt outs and/or attempts to opt out a "class" shall not be allowed.

**Appearances and Objections**

18.     At least twenty-one (21) calendar days before the Final Approval Hearing, any person who falls within the definition of the Settlement Class and who does not request exclusion from the Settlement Class may enter an appearance in the Action, at their own expense, individually or through counsel of their own choice.  Any Settlement Class Member who does not enter an appearance will be represented by Class Counsel.

19.     Any members of the Settlement Class who have not timely filed a request for exclusion may object to the fairness, reasonableness, or adequacy of the Settlement Agreement or to a Final Judgment being entered dismissing the Action with prejudice in accordance with the terms of the Settlement Agreement, or to the attorneys' fees and expense reimbursement sought by Class Counsel in the amounts specified in the Notice, or to the award to the Class Representative as set forth in the Notice and Settlement Agreement.  At least fourteen (14) days prior to the Objection/Exclusion Deadline, papers supporting the Fee Award shall be filed with the court and posted to the settlement website.  Members of the Settlement Class may object on their own, or may do so through separate counsel at their own expense.

20.     To object, members of the Settlement Class must sign and file a written objection no later than on or before the Objection/Exclusion Deadline of July 24, 2021.  To be valid, the objection must comply with the objection procedures set forth in the Settlement Agreement and Notice, and include his or her name and address; an explanation of the basis upon which he or she claims to be a Settlement

Class Member; a signature; all grounds for the objection, including all citations to legal authority and evidence supporting the objection; the name and contact information of any and all attorneys representing, advising, or in any way assisting him or her in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection (the "Objecting Attorneys"); and a statement indicating whether he or she intends to appear at the Final Approval Hearing (either personally or through counsel who files an appearance with the Court in accordance with Southern District of New York Local Rules). If a Settlement Class Member or any of the Objecting Attorneys has objected to any class action settlement where the objector or the Objecting Attorneys asked for or received any payment in exchange for dismissal of the objection, or any related appeal, without any modification to the settlement, then the objection must include a statement identifying each such case by full case caption.

21. Members of the Settlement Class who fail to file and serve timely written objections in compliance with the requirements of this paragraph and the Settlement Agreement shall be deemed to have waived any objections and shall be foreclosed from making any objections (whether by appeal or otherwise) to the Settlement Agreement or to any of the subjects listed in paragraph 3, above, *i.e.* (a) whether the proposed settlement of the Action on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and should be given final approval by the Court; (b) whether a judgment and order of dismissal with prejudice should be entered; (c) whether to approve the Fee Award to Class Counsel; and (d) whether to approve the payment of an incentive award to the Class Representative.

22. To be valid, objections must be filed with the Court and sent to the following: Class Counsel Frederick J. Klorczyk III of Bursor & Fisher, P.A., 888 Seventh Avenue, New

York, NY 10019; and Defendant The New York Times Company's Counsel Kristen Rodriguez, Dentons US LLP, 1900 K Street NW, Washington DC 20006. In addition, any objections made by a Class member represented by counsel must be filed through the Court's CM/ECF system.

**Final Approval Hearing**

23.     The Final Approval Hearing shall be held before this Court on September 10, 2021, at 3:00 p.m. in Courtroom 1506 at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York to determine (a) whether the proposed settlement of the Action on the terms and conditions provided for in the Settlement Agreement (including as it may be modified prior to the Final Hearing date) is fair, reasonable, and adequate and should be given final approval by the Court; (b) whether a judgment and order of dismissal with prejudice should be entered; (c) whether to approve the Fee Award to Class Counsel; and (d) whether to approve the payment of an incentive award to the Class Representative. The Court may adjourn the Final Approval Hearing without further notice to members of the Settlement Class. The new date of Hearing, if any, shall be published on the Court's docket and on the Settlement Website.

24.     Class Counsel shall file papers in support of their Fee Award and Class Representative's incentive award (collectively, the "Fee Petition") with the Court on or before July 1, 2021. Defendant may, but is not required to, file a response to Class Counsel's Fee Petition with the Court on or before August 20, 2021. Class Counsel may file a reply in support of their Fee Petition with the Court on or before August 27, 2021.

25.     Papers in support of final approval of the Settlement Agreement and any supplementation to the Fee Petition shall be filed with the Court on or before August 27, 2021.

**Further Matters**

26.     All further proceedings in the Action are ordered stayed until Final Judgment or termination of the Settlement Agreement, whichever occurs earlier, except for those matters necessary to obtain and/or effectuate final approval of the Settlement Agreement.  Additionally, pending this Court's determination as to whether to finally approve the Settlement, the Court hereby prohibits and/or enjoins any other person, entity or counsel (other than successful opt-outs to this Settlement) from representing or from commencing, prosecuting, participating in or assisting in any lawsuit or proceeding against the Released Parties on any matters within the scope of the Released Claims).

27.     Absent prior approval from this Court, Plaintiff and Class Counsel, shall not issue any press release, advertisement, internet posting, or any other public statement (to the media or otherwise), or make any other extrajudicial statements concerning the facts and circumstances of this action or the disclosures exchanged between the parties, with the exception of the notices to be distributed to the Settlement Class Members in accordance with this Settlement.  Any communications between Class Counsel and any individual Settlement Class Members seeking inquiries shall be limited to providing publicly available information contained in the notices provided to the Settlement Class Members, and Class Counsel shall in no way make any disparaging statements about NYT or the Released Parties in responding to any such inquiries.

28.     Members of the Settlement Class shall be bound by all determinations and judgments in the Action, whether favorable or unfavorable.

29.     The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement Agreement.  The Court may approve the Settlement, with such modifications as may be agreed to by the Parties, if appropriate, without further notice to the Class.

30.     All Settlement Class Members who do not timely exclude themselves from the Settlement:  (a) shall be bound by the provisions of the Settlement Agreement and all proceedings, determinations, orders and judgments in the Action relating thereto, including, without limitation, the Judgment or Alternate Judgment, if applicable, and the Releases provided for therein, whether favorable or unfavorable to the Settlement Class or Settlement Class Member; and (b) shall forever be barred and enjoined from directly or indirectly filing, commencing, instituting, prosecuting, maintaining, participating in, or intervening (as class members or otherwise) in any action, suit, cause of action, arbitration, claim, demand, or other proceeding in any jurisdiction, whether in the United States or elsewhere, on their own behalf or in a representative capacity, that is based upon or arises out of any or all of the Released Claims against NYT and the other Released Parties, as more fully described in the Settlement Agreement, whether or not a Claim Form is required or submitted.

31.     Neither this Order, the Settlement Agreement including the exhibits thereto, the negotiations leading to the execution of the Settlement Agreement, nor any proceedings taken pursuant to or in connection with the Settlement Agreement and/or approval of the Settlement (a) shall be referred to or offered against any of the Releasees as evidence of, or constructed as, or deemed to be evidence of any presumption, concession or admission by any of the Releasees with respect to the truth of any allegation, the validity of any claim or the deficiency of any defense that has been or could have been asserted in the Action or in any other litigation,

including the appropriateness of a litigation class, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Releasees, in any civil, criminal or administrative action or proceeding, or (b) shall be construed against any of the Releasees or Releasing Parties as an admission, concession or presumption that the consideration to be given represents the amount which could be or would have been recovered after trial; provided, however, that notwithstanding the foregoing, if the Settlement Agreement is approved by the Court, the Parties and Releasees and their respective counsel may file or refer to the Settlement Agreement or the Judgment in any action that may be brought to enforce its terms.

32.     In accordance with the Settlement Agreement, if the Settlement Agreement is not approved by the Court, each party will have the option of having the Action revert to its status as if the Settlement Agreement had not been negotiated, made, or filed with the Court.  In such event, the parties will retain all rights as if the Settlement Agreement was never agreed upon.

33.     If the Settlement Agreement is terminated pursuant to the provisions of the Settlement Agreement or for any reason whatsoever the approval of it does not become Final then (i) the Settlement Agreement shall be null and void, including any provision related to the award of attorneys' fees, and shall have no further force and effect with respect to any party in this Action, and shall not be used in this Action or in any other proceeding for any purpose; (ii) all negotiations, proceedings, documents prepared, and statements made in connection therewith shall be without prejudice to any person or party hereto, shall not be deemed or construed to be an admission by any party of any act, matter, or proposition, and shall not be used in any manner or for any purpose in any subsequent proceeding in this Action or in any other action in any court or other proceeding, provided, however, that the termination of the Settlement Agreement shall not shield from subsequent discovery any factual information provided in connection with the

negotiation of this Settlement Agreement that would otherwise be discoverable; (iii) other than as expressly preserved by the Settlement Agreement in the event of its termination, the Settlement Agreement shall have no further force and effect with respect to any party and shall not be used in the Action or any other proceeding for any purpose; and (iv) any party may elect to move the Court pursuant to the provisions of this paragraph, and none of the non-moving parties (or their counsel) shall oppose any such motion.

34.     Pending final determination of whether the proposed Settlement Agreement should be approved, neither Plaintiff nor any Settlement Class Member, directly or indirectly, in a representative or any other capacity, shall commence or prosecute against Defendant and the other Released Parties any action or proceeding in any court or tribunal asserting any of the Released Claims.

35.     The Parties and their counsel shall meet and confer and work together in good faith to effectuate the terms of the Settlement Agreement and this Order.  The Court may, upon proper notice and motion, resolve any disputes between the parties concerning the Settlement Agreement and this Order.


IT IS SO ORDERED, this 12 day of May, 2021.

_____
            Honorable Ronnie Abrams,
            United States District Judge